UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

**SUPPRESSED**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) No. |
| MARTIN T. SIGILLITO, aka "Marty," | ) |
| aka "Bishop Sigillito," | ) |
| JAMES SCOTT BROWN, aka "Scott," and | ) |
| DEREK J. SMITH, | ) |
| Defendants. | ) |
| | ) |

**4 11CR00168UNA**

## INDICTMENT

### COUNT 1: WIRE FRAUD

The Grand Jury charges that:

## A. INTRODUCTION AND BACKGROUND

At times relevant to this Indictment:

1. **MARTIN T. SIGILLITO ("SIGILLITO"), aka "Marty," aka "Bishop Sigillito,"**

was a St. Louis, Missouri attorney who resided in the Eastern District of Missouri, in Webster

Groves, Missouri. He was also an ordained priest, and eventually a "Bishop," in the church of

the American Anglican Convocation.

a. Prior to 2000, **SIGILLITO** was not financially successful. In 1986, he

declared Chapter 7 financial bankruptcy following a divorce. In connection with the bankruptcy

petition, Cause Number 86-01499DPM, he claimed his occupation was "Teacher" at Webster

University in St. Louis, Missouri, and that his debts totaled $72,749.97 but his assets totaled only

$2,220.00. In bankruptcy court he represented that he did not own any real estate, did not have any funds in a bank account and did not own a vehicle. His creditors, several of whom had sued him, included book shops, restaurants, a tobacco shop and a lunch club. His debts were discharged in bankruptcy court.

b. Between 1986 and 1999, his Social Security and Medicare earnings averaged approximately $27,709 per year. Between approximately 1999 and the end of 2001, **SIGILLITO** leased office space from, and was identified as "Of Counsel" with, the law firm of Helfrey, Simon and Jones, P.C., in Clayton, Missouri.

c. Beginning in approximately late 2001 to early 2002, **SIGILLITO** opened his own office at 7710 Carondelet Ave., Suite 208, Clayton, Missouri and remained there until approximately 2010. **SIGILLITO** did business as "Martin T. Sigillito and Associates, Ltd.," ("MTSA"), a Sub-Chapter "S" Corporation. **SIGILLITO** did not have any actual associates or law partners and employed a clerical assistant. MTSA was described by **SIGILLITO** as providing "international business consulting services."

d. **SIGILLITO** was a member of several St. Louis, Missouri exclusive, private clubs, including The Racquet Club and the Boone Valley Golf Club.

e. **SIGILLITO** held himself out as an expert in international law and finance and an "experienced international businessman and attorney." He also claimed that he was a lecturer at Oxford University in England, based on his participation in an annual summer program of Continuing Legal Education at Oxford through the University of Missouri - Kansas City. **SIGILLITO** had very few, if any, actual law clients. Instead, **SIGILLITO'S** primary occupation between 2000 and 2010 was a "merchant banking" business referred to herein as the "British Lending Program," ("BLP") from which business **SIGILLITO** took substantial "fees."

2

As an attorney, **SIGILLITO** maintained an attorney trust bank account.

f. Between 2000 and 2010, the fees **SIGILLITO** took from the BLP supported an affluent lifestyle. He was an avid collector of rare and antique books, maps, prints, coins, jewelry, artifacts, liquor and rugs. He routinely traveled first class, including internationally, took his family on expensive vacations, purchased a country home in Marthasville, Missouri, employed a chauffeur, paid large charges at various domestic and international private clubs, sent his children to private schools, purchased and leased Volvo automobiles, and invested in a condominium project at the Lake of the Ozarks in Missouri.

2. **JAMES SCOTT BROWN, aka "Scott Brown," aka "Scott," ("BROWN")**, was an Arkansas-born attorney residing in Leawood, Kansas. **BROWN** practiced law in England for several years prior to 2000 and also once served as the Honorary Consul for the State of Kansas and Western Missouri to the United Kingdom of Great Britain and Northern Ireland. **BROWN** also participated in the UMKC CLE program at Oxford University in England. Between 2000 and 2010, **BROWN** did not actively practice law. Instead, **BROWN'S** primary occupation between 2000 and 2010 was the BLP from which **BROWN** took substantial "fees," but considerably less than those taken by **SIGILLITO**.

a. In connection with the BLP, **BROWN** did business as "British American Group" ("BAG") and "J. Scott Brown and Associates." **BROWN** maintained several bank accounts at the Bank of Blue Valley, in Overland Park, Kansas, in the name of "British American Group."

3. **DEREK J. SMITH ("SMITH")** was a structural engineer, businessman and real estate speculator/developer who resided outside of London, England. **SMITH** did business as

3

"Princess Hotels Management" and "Distinctive Properties," among others. Prior to the late 1990's, **SMITH** worked for several English boroughs, or governmental bodies, as a structural engineer and planner. He operated a private firm, "Derek Smith and Associates Consulting Engineers," between 1982 and 1989. As part of his private practice, **SMITH** was successful in real estate speculation, land option trading and real estate development. **SMITH** sold his private practice in the late 1980's. During the 1990's, **SMITH** continued to speculate in real estate and acquired distressed hotel properties, but he was not successful during this period due to a recession in the English real estate market. By the end of the 1990's, **SMITH** was in need of capital to maintain his ownership of several small hotels which were not trading profitably and to support his retention of several options to purchase land. **SMITH'S** land option business model was to acquire land which had been zoned agricultural or commercial and to increase the value of the land through a process of borough approval to convert the land zoning to planned residential/commercial projects. **SMITH** would then either exercise the option, acquire the land and resell it to a developer or sell the option itself to another land speculator.

4. Mark, Gilbert, Morse ("MGM") was a British law firm operating in the Newcastle-upon-Tyne area of northern England. During the late 1990's/early 2000's, MGM was in need of capital to finance expansion of its law practice, particularly in the area of coal mining personal injury claims, and was an early borrower under the BLP.

5. Symmtrexx was a closely held hanger manufacturing firm operated by M.B. During the late 1990's/early 2000's, Symmtrexx was in need of capital to finance continuation and expansion of its manufacturing operations and was an early borrower under the BLP.

6. During the late 1990's and early 2000's, other minor BLP borrowers included but were

4

not limited to "JMJG," a firm related to MGM, and an individual borrower, C.Y.

7. K.C. , doing business as "KC International, Ltd.," was an English financial consultant who specialized in placing private investment funds.

8. M.H. was an Arkansas Certified Public Accountant who was retained by **SIGILLITO** and **BROWN** to handle payment of interest and principal through a BAG bank account utilizing interest calculations supplied by a British accountant, J.S., **SIGILLITO, BROWN** and **SIGILLITO'S** office assistant.

## B. SCHEME AND ARTIFICE TO DEFRAUD: THE BRITISH LENDING PROGRAM

9. Beginning in or about 1999 and continuing until the date of this Indictment, in the Eastern District of Missouri and elsewhere,

### MARTIN T. SIGILLITO, aka "Marty," aka "Bishop Sigillito,"

defendant herein, together with other persons known and unknown to this Grand Jury, including but not limited to **BROWN** and **SMITH**, knowingly devised a scheme and artifice to defraud and to obtain money and property, by means of materially false and fraudulent pretenses, representations and promises, from BLP lenders located in the United States and the United Kingdom, which scheme and artifice is more fully described below.

10. The BLP was originated by K.C. in the late 1990's. In the original form of the BLP, funds were loaned by U.S. investors/lenders for short terms at high interest rates. Early loan funds were sent to the United Kingdom and lenders received written loan agreements through a British law firm. Borrowers paid interest to lenders directly or through intermediaries and loan principal was repaid at the termination of a loan unless a loan was "rolled over," or renewed, for an additional year. Initially, loans were made to JMJG, MGM, Symtrexx and C.Y. **SMITH**

5

became a borrower in approximately 2000. K.C. received finder's fees for finding lenders and placing loan funds with borrowers and said fees were paid by borrowers.

11. **BROWN** became acquainted with K.C. and initially was a lender in the BLP. **BROWN** then began soliciting other lenders and took finder's fees for himself.

12. In approximately 2000, **BROWN** introduced **SIGILLITO** to the BLP. **SIGILLITO** first became a lender to the BLP on or about November 3, 2000. Thereafter, **BROWN** and **SIGILLITO** together developed a packet of marketing materials and began marketing the BLP to other U.S. would-be lenders. Later, **BROWN** and **SIGILLITO** also utilized third-party recruiters to locate new investors and bring their funds into the BLP. These third-party recruiters included, but were not limited to, R.M., D.F., D.A., C.M., H.M., S.C., G.J., P.V., R.B., and K.W. Third-party recruiters received fees from **BROWN** and **SIGILLITO** for their efforts.

13. At some point in the early 2000's, **SMITH** became the sole and exclusive borrower in the BLP and became the focal point of marketing efforts by **SIGILLITO** and **BROWN**. When MGM repaid its loans to **SIGILLITO** and **BROWN**, without prior notice to most lenders, the loans were rolled into new loans to **SMITH** and lenders were issued new loan agreements

14. Many lenders lent funds which had been saved for retirement and were held in Individual Retirement Accounts ("IRA"). IRA funds were usually held by IRA custodians or trust companies, including Allegiant Bank and Trust Co. in St. Louis, Missouri; Millenium Trust Company in Illinois; and Enterprise Bank and Trust Company in St. Louis, Missouri. Many IRA lenders let their "interest" accrue and also rolled their loans over annually for years, each time receiving a signed loan agreement for a new, larger amount. Thus, many IRA lenders were led to believe that their IRA accounts were growing and that they could be relied upon in retirement.

6

Even though the loans were short-term, for periods of one year, **SIGILLITO** referred to IRA lenders as "long-term" lenders who would not need to be repaid or paid interest for several years. In addition, even many non-IRA lenders let their "interest" accrue and rolled their investments over annually. Still other non-IRA lenders chose to receive periodic interest payments regardless of whether they rolled loans over.

15. U.S. lenders were recruited, based primarily on representations by **SIGILLITO, BROWN** and third-party recruiters trained by **SIGILLITO** and **BROWN**, to loan funds to **SMITH** and his businesses. For marketing purposes, lenders were often given oral information about **SMITH** and the quality of the investment. Some lenders were also shown written marketing materials outlining claims concerning the features of the BLP, the borrower's financial condition, the anticipated uses of the loan funds and a listing of the borrower's assets and liabilities.

16. The loans were typically for short periods, such as one year, at promised high rates of return. Lenders were given the option of receiving interest periodically or of allowing interest to accrue. Annual interest rates of return ranged from a low of 10% to as high as 48%. The average annual interest rate on BLP loans was approximately 19.5%. The loans were not secured with a mortgage or charge against the claimed assets of **SMITH**, but **SIGILLITO** represented to some potential lenders that loans were "secured" by collateral. At maturity, lenders had the option of rolling the loan over for another year, with or without accrued interest, or of receiving repayment of their principal.

17. Loan funds were usually sent by wire communication to either **BROWN'S** BAG bank accounts or **SIGILLITO'S** attorney trust account. If not by wire transfer, loan funds were

7

paid by lenders in the form of checks transmitted by mail, interstate courier or in person to **SIGILLITO** and **BROWN** who in turn deposited said checks to said accounts. Thereafter, **SIGILLITO** and/or **BROWN** caused **SMITH** to sign loan agreements, usually with an attached statement of **SMITH'S** assets and liabilities (hereinafter "A/L Statement"). In most cases, the loan agreements were sent to **SMITH** to be signed and Smith sent them by mail or interstate/international courier service to **SIGILLITO** and **BROWN**. In some cases, **SIGILLITO** or **BROWN** transmitted loan agreements to lenders personally, by mail or by interstate courier.

18. In later years, BLP loan agreements were often sent by **SIGILLITO** and **BROWN**, directly or indirectly, to **SMITH** in batches to be signed and he paid little attention to the amounts that he was "borrowing" or the terms of the loan agreements. Still later, **SMITH** was receiving and signing only the signature pages of loan agreements. During 2010, prior to May 24, 2010, **SMITH** received approximately one hundred loan agreement signature pages to sign in advance and return to **SIGILLITO** and **BROWN**. **SMITH** signed about half of these signature pages, returned them to **SIGILLITO** and retained the other half.

19. Many BLP lenders placed a great deal of trust in **SIGILLITO** and **BROWN** based on their claimed expertise, their status as attorneys, affinity through family connections and private organizations, and particularly **SIGILLITO'S** mastery of multiple languages, his status as a Board Member of The Racquet Club and his status as a "Bishop." In this regard, **SIGILLITO** took advantage of several lenders who were particularly vulnerable due to age, friendship, lack of financial expertise, family circumstances and faith.

20. **SIGILLITO** used high pressure tactics to persuade some lenders to loan funds to

8

**SMITH**. As part of his sales tactics, **SIGILLITO** often avoided giving direct and specific answers to questions about documentation and his claimed due diligence in the BLP. Once loans were "closed," **SIGILLITO** avoided direct contact with lenders with questions or problems and used intermediaries, including but not limited to his office assistant, E.S., and an accountant hired to make BLP interest payments, M.H., to respond to lenders' concerns. **SIGILLITO** also used his membership in several exclusive clubs to gain access to members with funds available to invest. He similarly used his status as a member of the Board of Governors of The Racquet Club to convince some staff and employees to invest their savings and retirement funds in the BLP.

21. Efforts by BLP lenders to conduct their own due diligence were met by **SIGILLITO'S** efforts to change or divert their focus. During 2008, **SIGILLITO** managed to convince a banker and fellow Racquet Club Board member, P.V., to invest in the BLP and market it to others. As part of P.V.'s due diligence, P.V. twice traveled in 2009 to England with **SIGILLITO** to meet **SMITH** and to view and inspect several of **SMITH'S** properties. Thereafter, P.V. prepared a report of his trip for use with P.V.'s potential BLP recruiting efforts, but **SIGILLITO** also used the report to lull prior lenders who had raised concerns.

22. Similarly, in 2009 **SIGILLITO** convinced another Racquet Club member, R.B., to market the BLP to others and to personally inspect the properties in question. The result of R.B.'s trip was another report which **SIGILLITO** used, even though **SMITH** was already in default to several BLP lenders, to further market the BLP and lull concerned lenders. R.B. was among the most persistent in seeking documentation and proof of **SMITH'S** financial condition, particularly his ability to make money while paying such high rates of interest. In an exchange of

9

e-mails between **SIGILLITO** and R.B. on December 31, 2009, R.B.'s efforts to obtain actual

financial statements for **SMITH** from **SIGILLITO** were met by **SIGILLITO'S** refusal and the

false explanations that "such is never done in UK merchant banking" and that **SIGILLITO** was

the one who had access to and regularly reviewed **SMITH'S** income statements.

23. Between 2000 and 2010, U.S., and a few U.K., investors lent the following

approximate amounts through the BLP during the following years:

| YEAR | AMOUNT OF NEW LENDER RECEIPTS |
|------|-------------------------------|
| 2000 | $1.6 million |
| 2001 | $4.2 million |
| 2002 | $2.4 million |
| 2003 | $3 million |
| 2004 | $3 million |
| 2005 | $4.5 million |
| 2006 | $4 million |
| 2007 | $12.4 million |
| 2008 | $10.8 million |
| 2009 | $5.2 million |
| 2010 | $1.4 million |
| **Total** | **$52.5 million** |

24. As part of the scheme and artifice to defraud, false, fraudulent and deceptive material

representations were made to potential lenders and actual lenders including, but not limited to,

the following:

10

a. **FEES**

Some lenders were told that **SIGILLITO** and **BROWN** and others earned fees for facilitating the loans, but **SIGILLITO** emphasized that fees, if any, were paid by the borrower and not out of lender funds. If lenders were advised of fees and if lenders inquired as to the amount of fees, **SIGILLITO** represented that fees were not greater than 8-10%. Other lenders were simply not advised that **SIGILLITO** and **BROWN** received any fees on BLP loans, even when lenders questioned how **SMITH** could afford to pay such high interest rates and even though the amount and frequency of fees were material to **SMITH's** ability to meet his loan obligations. In truth, as defendant **SIGILLITO** well knew, the actual amount of the fees was usually 32% or higher, fees were taken out of loan proceeds by **SIGILLITO** and **BROWN** and fees were charged at loan initiation, rollover and redemption, if any.

b. **SMITH'S ABILITY TO PAY**

**SIGILLITO** represented that **SMITH** was willing to borrow at, and could afford to pay, high rates of interest, and that British banking practices made it cumbersome for **SMITH** to borrow funds in a timely fashion to take advantage of time-sensitive opportunities. In truth and fact, as defendant **SIGILLITO** well knew, no real estate developer, no matter how successful and especially not **SMITH**, could afford to make enough money from BLP loans with the small amount of funds left over after payment of interest and fees to make a profit and to meet BLP interest and redemption obligations. Also, in truth and fact, as defendant **SIGILLITO** well knew, **SMITH** could not borrow from a traditional lending institution because he lacked sufficient equity in his properties for them to serve as collateral, because his hotels were not profitable and because options could not serve as loan collateral.

11

c. **RISK**

**SIGILLITO** represented that there was little or no risk of not being repaid in full, because the present market value of **SMITH'S** assets exceeded his liabilities by a ratio of at least 2-to-1 and often as high as 6-to-1. Unique aspects of the British legal system for collection of debts were also emphasized and it was claimed that in the event of a default a lender could take his/her loan agreement to a British judge and quickly obtain an interest in **SMITH'S** assets "down to one's last cufflink." In truth and fact, as defendant **SIGILLITO** well knew, **SMITH'S** A/L Statements were false and misleading in that: 1) they listed assets which were not in **SMITH'S** name or the name of his companies; 2) they listed a marital asset that was held in the joint names of **SMITH** and his wife; 3) they listed future, potential values conditioned upon several events, such as re-zoning and development plan approval, rather than actual current market values; 4) they listed assets as owned by **SMITH** on which **SMITH** held only an option contract; and 5) they understated liabilities by not disclosing any or all of the outstanding BLP loans to U.S. lenders.

d. **DUE DILIGENCE**

**SIGILLITO** represented that he and **BROWN**, directly and indirectly, performed an oversight function with respect to the safety of the BLP funds. He represented that due diligence and quality reviews of **SMITH'S** assets and real estate businesses were conducted and **SMITH'S** assets were verified to always exceed his liabilities by a ratio of at least 2-to-1 and that the BLP loan funds were properly utilized by **SMITH**. These representations included, but were not limited to, claims that **SMITH'S** income, tax and financial statements were reviewed on a regular basis and that all valuations on the A/L Statements were supported by professional

12

valuations. In truth and fact, as defendant **SIGILLITO** well knew, no such due diligence was conducted, **SMITH'S** financial statements and tax returns were not reviewed and most of the valuations on the A/L Statements were projected values not supported by professional appraisals of current market value.

### e. SMITH'S RECORD

**SIGILLITO** represented that **SMITH** and the BLP had a track record of success and a unique ability to identify undervalued properties and properties whose value could be greatly increased through the re-zoning process. **SMITH'S** goal for all properties was to sell or "flip" them for a profit. They further represented that **SMITH** was a highly successful real estate owner and developer who generated cash flow and profits from regular "flipping" of properties and options. In truth and fact, as defendant **SIGILLITO** well knew, during the BLP, **SMITH'S** trading properties were unprofitable and required funding to avoid foreclosure, **SMITH'S** re-zoning efforts did not produce successful property flips and **SMITH** could never repay the large sums which had been borrowed in his name from BLP lenders.

### f. RECEIPT OF LOAN FUNDS BY SMITH

**SIGILLITO**, directly and indirectly, represented that lenders' loan funds were sent to **SMITH** in England for use in his real estate activities and that payments of interest and principal came from England out of **SMITH'S** business revenues and profits. In truth and fact, as defendant **SIGILLITO** well knew, beginning in the early 2000's, the vast majority of BLP loan funds were never sent to or received by **SMITH** for use in productive business activities. Instead, the vast majority of funds remained in the U.S. under the control of **SIGILLITO** and **BROWN** and were used to pay fees to **SIGILLITO, BROWN** and others, were used to pay

interest and principal to prior BLP lenders, and were not utilized by **SMITH** for any profit-generating business purpose. Between 2000 and 2010, **SMITH** received the benefit of a total of approximately 3.7 million British Pounds Sterling, or approximately $6.1 million, at the same time that approximately $52.5 million in loan funds were received in the BLP. In contrast, during the same period, **SIGILLITO** took "fees" totaling approximately $7.8 million, **BROWN** took "fees" totaling approximately $1.4 million and approximately $27 million was used to pay interest and principal to lenders. All BLP funds were dissipated and as of June, 2010, the BLP had no funds. Thus, the BLP operated as a "Ponzi" scheme and served as a fee-generating machine for the primary benefit of **SIGILLITO**.

### g. NUMBER OF BORROWERS

**SIGILLITO** represented that the BLP worked with several qualified borrowers, that BLP borrowers were carefully screened and selected by **SIGILLITO** and **BROWN** and that the BLP maintained a position of exclusivity with respect to loans to BLP borrowers. In truth and fact, as defendant **SIGILLITO** well knew, after October, 2003, **SMITH** was the only BLP borrower, **SMITH** was not subjected to a careful screening process and the BLP did not have any exclusivity arrangement with **SMITH**.

### h. DEFAULTS

**SIGILLITO** represented that no BLP borrower had ever defaulted on a loan. In truth and fact, as defendant **SIGILLITO** well knew, several borrowers had defaulted, including **SMITH**. In addition, there were several occasions during the BLP that the BLP was unable to timely pay interest or principal redemption to BLP lenders, and by early 2009, the BLP was making late or no payments to most BLP lenders, but **SIGILLITO** continued to market the BLP.

14

### i. BLENDED INTEREST RATE

**SIGILLITO** represented that the average or "blended" interest rate on all of the U.S. loans owed by **SMITH** was approximately 11-12%. In truth and fact, as **SIGILLITO** well knew, the blended interest rate was considerably higher, approximately 19.5%, and that between the high interest rates and the large fees taken by **SIGILLITO** and **BROWN** and others, the cost of borrowing under the BLP was prohibitive.

### j. INVESTMENT MINIMUMS AND LIMITED TIME OFFERS

**SIGILLITO** represented that there was an investment minimum amount and that loan funds needed to be committed rapidly to take advantage of particular real estate opportunities by **SMITH**. In truth and fact, as **SIGILLITO** well knew, there was no "investment minimum" and the claim was merely a sales ploy. In addition, there were no "short fuse" requirements by **SMITH**. In any event, **SIGILLITO** intended to use and did use most BLP funds to pay fees and cover the repayment of interest and principal to prior BLP lenders, also known as "Ponzi overhead," rather than fund a specific **SMITH** project.

### k. SIGILLITO'S STAKE IN THE BLP

**SIGILLITO** represented that all of his personal assets and all of his family's assets were invested in the BLP. In truth and fact, as **SIGILLITO** well knew, all of his personal assets and all of his family's assets were not invested in the BLP.

25. During the BLP, concerns were raised by lenders about the nature and safety of their loans. In face-to-face meetings, e-mails and mailed correspondence **SIGILLITO** provided lenders, directly and indirectly, with false explanations for delays or failures in payments. These communications were intended to further the scheme by lulling lenders into a false sense of

15

security and to keep them from taking action against **SMITH** by filing a "statutory demand," which may have forced **SMITH** into involuntary bankruptcy and revealed the fraud perpetrated by **SIGILLITO** and others in the BLP.

## C. THE WIRE TRANSMISSION

26. On or about November 16, 2006, within the Eastern District of Missouri, and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and to obtain money and property and in attempting to do so, defendant **MARTIN T. SIGILLITO**, acting with others, did knowingly cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, to wit: a wire transfer of $99,450.00 from K.W.'s Millenium Trust Company account at Cole Taylor Bank in Illinois to **SIGILLITO'S** attorney trust account at St. Louis Bank in Missouri, which transfer was routed through the Federal Reserve Bank in New Jersey by means of the Fedwire system.

In violation of Title 18, United States Code, Sections 1343 and 2(b).

### COUNTS 2 THROUGH 9; WIRE FRAUD

The Grand Jury further charges that:

1. The factual allegations contained in paragraphs 1 through 25 of Count 1 are realleged and incorporated herein by reference.

2. Within the Eastern District of Missouri, and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and to obtain money and property and in attempting to do so,

**MARTIN T. SIGILLITO, aka "Marty," aka "Bishop Sigillito,"**

defendant herein, acting with others, did knowingly cause to be transmitted by means of wire

16

communication in interstate commerce the following writings, signs and signals, to wit: the

following wire transfers on the following dates:

| COUNT | DATE | DESCRIPTION OF USE OF WIRE |
|-------|------|----------------------------|
| 2 | 1-5-07 | A wire transfer of $15,596,593.00 from S.P.'s account at Jefferson Bank of St. Louis to **SIGILLITO'S** attorney trust account at St. Louis Bank, which transfer was routed through the Federal Reserve Bank in New Jersey by means of the Fedwire system. |
| 3 | 9-20-07 | A wire transfer of $134,205.00 from S.C.'s Millenium Trust Company account at Cole Taylor Bank in Illinois to **SIGILLITO'S** attorney trust account at St. Louis Bank, which transfer was routed through the Federal Reserve Bank in New Jersey by means of the Fedwire system. |
| 4 | 3-13-08 | A wire transfer of $43,066.00 from T.B.'s Millenium Trust Company account at Cole Taylor Bank in Illinois to **SIGILLITO'S** attorney trust account at St. Louis Bank, which transfer was routed through the Federal Reserve Bank in New Jersey by means of the Fedwire system. |
| 5 | 4-11-08 | A wire transfer of $500,000.00 from P.A.'s and T.A.'s account at U.S. Bank of Missouri to **SIGILLITO'S** attorney trust account at St. Louis Bank, which transfer was routed through the Federal Reserve Bank in New Jersey by means of the Fedwire system. |
| 6 | 5-15-08 | A wire transfer of $1,000,000.00 from M.B.'s account at Bank of Nova Scotia in New York to **SIGILLITO'S** attorney trust account at St. Louis Bank, which transfer was routed through the Federal Reserve Bank in New Jersey by means of the Fedwire system. |
| 7 | 8-27-08 | A wire transfer of $500,000.00 from T.O.'s Dain Rauscher, Inc. account at U.S. Bank in Minneapolis, Minnesota to **SIGILLITO'S** attorney trust account at St. Louis Bank, which transfer was routed through the Federal Reserve Bank in New Jersey by means of the Fedwire system. |

| 8 | 4-9-09 | A wire transfer of $500,000.00 from C.M./B.O.'s RBC Capital Markets Corporation account at U.S. Bank in Minneapolis, Minnesota to **SIGILLITO'S** attorney trust account at St. Louis Bank, which transfer was routed through the Federal Reserve Bank in New Jersey by means of the Fedwire system. |
| 9 | 1-26-10 | A wire transfer of $300,000.00 from B.M.'s Nova Scotia Capital, Ltd. account at J.P. Morgan Chase to **SIGILLITO'S** attorney trust account at St. Louis Bank, which transfer was routed through the Federal Reserve Bank in New Jersey by means of the Fedwire system. |

In violation of Title 18, United States Code, Sections 1343 and 2(b).

## COUNT 10: MAIL FRAUD

The Grand Jury further charges that:

1. The factual allegations contained in paragraphs 1 through 25 of Count 1 are realleged and incorporated herein by reference.

2. On or about November 30, 2008, within the Eastern District of Missouri, and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and to obtain money and property and in attempting to do so,

**MARTIN T. SIGILLITO, aka "Marty," aka "Bishop Sigillito,"**

defendant herein, acting with others, did knowingly cause to be sent, from Saint Louis County, Missouri, by means of the United States Postal Service, from Enterprise Bank and Trust, 150 North Meramec Avenue, Clayton, Missouri 63105, to R.A., a BLP lender, an envelope containing a monthly statement of investments which included loans to Distinctive Properties in the United Kingdom.

In violation of Title 18, United States Code, Section 1341 and 2.

18

## COUNTS 11 THROUGH 15: MAIL FRAUD

The Grand Jury further charges that:

1. The factual allegations contained in paragraphs 1 through 25 of Count 1 are realleged and incorporated herein by reference.

2. Within the Eastern District of Missouri, and elsewhere, for the purpose of executing the above-described scheme and artifice to defraud and to obtain money and property and in attempting to do so,

**MARTIN T. SIGILLITO, aka "Marty," aka "Bishop Sigillito,"**

defendant herein, acting with others, did knowingly cause to be sent by mail from the following locations to the following locations the following documents on the following dates:

| COUNT | DATE | DESCRIPTION OF MAILING |
|-------|------|------------------------|
| 11 | 7-31-08 | Enterprise Bank and Trust, 150 North Meramec, Clayton, Missouri, 63105 to S.K., a BLP lender, an envelope containing a monthly statement of investments which included loans to Distinctive Properties in the United Kingdom. |
| 12 | 7-31-08 | Enterprise Bank and Trust, 150 North Meramec Avenue, Clayton, Missouri 63105, to M.A., a BLP lender, an envelope containing a monthly statement of investments which included loans to Distinctive Properties in the United Kingdom. |
| 13 | 8-30-10 | Enterprise Bank and Trust, 150 North Meramec Avenue, Clayton, Missouri 63105, to S.M., a BLP lender, an envelope containing a monthly statement of investments which included loans to Distinctive Properties in the United Kingdom. |
| 14 | 3-17-10 | MTSA, 7710 Carondelet Ave., Suite 208, Clayton, Missouri, to E.W., a BLP lender, an envelope containing a Loan Agreement for a loan from E.W. to Distinctive Properties (UK) Limited and SMITH. |

19

15        1-1-10         MTSA, 7710 Carondelet Ave., Suite 208, Clayton, Missouri, to B.G. on behalf of V.T., a BLP lender, an envelope containing a Loan Agreement for a loan from V.T. to Distinctive Properties (UK) Limited and SMITH.

In violation of Title 18, United States Code, Section 1341 and 2(b).

### COUNT 16: CONSPIRACY TO COMMIT WIRE AND MAIL FRAUD

The Grand Jury further charges that:

1. The factual allegations of Counts 1 through 15 are realleged and incorporated herein by reference.

2. Between in or about 1999 and continuing until the date of this indictment, in the Eastern District of Missouri and elsewhere:

**MARTIN T. SIGILLITO, aka "Marty,"**
**aka "Bishop Sigillito,"**
**JAMES SCOTT BROWN, aka "Scott," and**
**DEREK J. SMITH,**

defendants herein, did knowingly combine, conspire, confederate and agree with each other, and with other persons, known and unknown to this Grand Jury, to commit certain offenses against the United States, that is:

a. to devise a scheme and artifice to defraud and to obtain money and property by means of material false or fraudulent pretenses, representations and promises, and for the purpose of executing the scheme and artifice to defraud, transmit and cause to transmit by means of wire communication in interstate commerce, writings, signs, and signals in violation of Title 18, United States Code, Section 1343;

b. to devise a scheme and artifice to defraud and to obtain money and property by means of material false and fraudulent pretenses, representations, and promises, and

20

for the purpose of executing the scheme and artifice to defraud, and attempting to do so, use and cause the use of the United States mails, in violation of Title 18, United States Code, Section 1341.

3. In furtherance of the conspiracy, and to accomplish the objects of the conspiracy, the defendants and their co-conspirators, committed, among others, the following acts within the Eastern District of Missouri and elsewhere:

a. On or about January 8, 2007, **BROWN** sent **SIGILLITO** an e-mail concerning **BROWN'S** response to an inquiry from R.S. of the United Kingdom law firm of Howard, Kennedy regarding the source of funds to pay a settlement of a claim by BLP lender W.D.

b. On or about June 4, 2007, **SIGILLITO** sent **SMITH** by fax a letter falsely assuring **SMITH** that the BLP was not fraudulent and that BLP problems had been solved.

c. On or about June 4, 2007, **SIGILLITO** faxed to **BROWN** a copy of **SIGILLITO'S** June 4, 2007 letter to **SMITH**.

d. On or about May 27, 2009, **SIGILLITO** sent an e-mail to M.B. concerning repayment of M.B.'s loans and forwarding an e-mail from **BROWN** on behalf of BAG dated May 22, 2009.

e. On or about June 1, 2009, **SIGILLITO** sent an e-mail to M.B. forwarding an e-mail from **BROWN** to **SIGILLITO**.

f. On or about October 9, 2009, **SIGILLITO** caused **SMITH** to send a letter by mail to P.F. claiming that **SMITH** and his companies were "third-party beneficiaries."

g. On or about November 6, 2009, **SIGILLITO** caused E.S. to e-mail a letter to **SMITH** for **SMITH** to sign and fax back to E.S. so that E.S. could fax it to D.M. at Enterprise

21

Bank and Trust falsely explaining delays in payments to lender P.R.

        h. On or about December 31, 2009, **SIGILLITO** sent an e-mail to R.B. explaining why **SIGILLITO** could not provide R.B. with **SMITH'S** financial information.

        i. On or about January 16, 2010, **SIGILLITO** and **BROWN** engaged in a string e-mail.

        j. On or about May 9, 2010, **SIGILLITO, BROWN** and **SMITH** engaged in a string e-mail.

        k. On or about May 13, 2010, **SIGILLITO** and **SMITH** met at the Chesterfield Mayfair hotel in London, England to discuss **SMITH'S** response to an inquiry from an attorney for P.R.

        l. On or about May 14, 2010, **SIGILLITO** and **SMITH** engaged in an e-mail conversation concerning **SMITH'S** response to an inquiry from an attorney for P.R.

        m. On or about May 14, 2010, **SIGILLITO** and **BROWN** engaged in an e-mail conversation.

        n. On or about May 16, 2010, **SIGILLITO** sent an e-mail to **SMITH**.

        o. On or about June 3, 2010, **SIGILLITO**, directly and indirectly, caused **SMITH** to send an e-mail to several BLP lenders lulling them into believing that BLP loans were secure and not the result of fraud.

        p. On or about June 25, 2010, **SIGILLITO** used the e-mail server of hnjlaw.com to cause S.R. and D.H. to send an e-mail from **SIGILLITO** to several BLP lenders falsely advising them, in part, that **SIGILLITO**, as a BLP lender himself, had "many of the same questions that [they had]" concerning BLP loans.

In violation of Title 18, United States Code, Section 371.

## COUNT 17: MONEY LAUNDERING TRANSACTION

The Grand Jury further charges that:

1. The factual allegations contained in paragraphs 1 through 25 of Count 1 are realleged and incorporated herein by reference.

2. On or about March 3, 2008, in the Eastern District of Missouri, and elsewhere,

**MARTIN T. SIGILLITO, aka "Marty,"
aka "Bishop Sigillito,"**

defendant herein, did knowingly engage and attempt to engage in a monetary transaction, affecting interstate commerce, in criminally derived property of a value of greater than $10,000, that is: the withdrawal of $347,089.67 from **SIGILLITO'S** St. Louis Bank personal money market account number XXXXX6385 to fund cashier's check 103512 payable to Commonwealth Title to purchase a country home in Marthasville, Missouri, such property having been derived from specified unlawful activity, that is, wire fraud, in violation of Title 18, United States Code, Section 1343; and mail fraud, in violation of Title 18, United States Code, Section 1341.

In violation of Title 18, United States Code, Sections 1957 and 2(b).

## COUNTS 18 to 22: MONEY LAUNDERING TRANSACTIONS

The Grand Jury further charges that:

On or about the following dates, in the Eastern District of Missouri, and elsewhere,

**MARTIN T. SIGILLITO, aka "Marty,"
aka "Bishop Sigillito,"**

defendant herein, did knowingly engage and attempt to engage in the following monetary transactions, affecting interstate commerce, in the following criminally derived property of a

23

value greater than $10,000, such property having been derived from a specified unlawful activity,

that is, wire fraud, in violation of Title 18, United States Code, Section 1343; and mail fraud, in

violation of Title 18, United States Code, Section 1341.

| COUNT | DATE | DESCRIPTION OF TRANSACTION |
|-------|------|----------------------------|
| 18 | June 15, 2009 | Check number 1039 in the amount of $31,000 payable to Boone Valley Golf Club, Inc., drawn on **SIGILLITO'S** St. Louis Bank personal money market account number XXXXX6385 to be applied towards **SIGILLITO'S** initiation fee and membership stock at said club. |
| 19 | January 15, 2009 | St. Louis Bank cashier's check number 12505 in the amount of $250,000 payable to Cranmar Associates, LLC, funded by **SIGILLITO** with a St. Louis Bank certificate of deposit, as part of a total investment of $500,000 in a residential real estate project at Lake of the Ozarks, Missouri. |
| 20 | April 14, 2008 | Southwest Bank check number 1027 in the amount of $22,545.68 payable to Diners Club on **SIGILLITO'S** personal money market account number XXXX3930. |
| 21 | January 15, 2009 | Southwest Bank check number 1210 in the amount of $16,960 payable to W.C. Motor Company drawn on **SIGILLITO'S** personal checking account number XXXX3919 for the purchase of a 2006 Volvo S40 vehicle. |
| 22 | May 23, 2008 | Southwest Bank check 1031 in the amount of $33,820 payable to New York Life Insurance Company drawn on **SIGILLITO'S** personal checking account number XXXX3930 for the annual premium on **SIGILLITO'S** whole life insurance policy. |

All in violation of Title 18, United States Code, Section 1957 and 2(b).

## FORFEITURE ALLEGATION

The Grand Jury further finds by probable cause that:

1.     Pursuant to Title 18, United States Code, Sections 981(a) and Title 28, United States Code, Section 2461(c), upon conviction of an offense, in violation of Title 18, United States Code, Section 1341 or 1343 or conspiracy to commit such offenses in violation of Title 18, United States Code, Section 371, as set forth in Counts 1 through 16, the defendant(s) shall forfeit to the United States of America any property, real or personal, constituting or derived from any proceeds traceable to said offense.

a.     Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, constituting or derived from any proceeds traceable to said offense, in the amount of at least $52.5 million.

2.     Pursuant to Title 18, United States Code, Section 982(a)(1), upon conviction of an offense in violation of Title 18, United States Code, Section 1957 as set forth in Counts 17 through 22, the defendant(s) shall forfeit to the United States of America any property, real or personal, involved in such offense, or any property traceable to such property.

a.     Subject to forfeiture is a sum of money equal to the total value of any property, real or personal, involved in said offense, or any property traceable to such property.

3.     Specific property subject to forfeiture includes, but is not limited to, the property described in "Appendix A to Forfeiture Allegation", which appendix is incorporated herein by this reference.

4.     If any of the property described above, as a result of any act or omission

25

of the defendant(s):

    a.     cannot be located upon the exercise of due diligence;

    b.     has been transferred or sold to, or deposited with, a third party;

    c.     has been placed beyond the jurisdiction of the court;

    d.     has been substantially diminished in value; or

    e.     has been commingled with other property which cannot be divided

            without difficulty,

the United States of America will be entitled to the forfeiture of substitute property pursuant to

Title 21, United States Code, Section 853(p).

A TRUE BILL

                                          _____

                                          FOREPERSON

ERIC H. HOLDER, JR.
United States Attorney General
BETH PHILLIPS
United States Attorney
WESTERN DISTRICT OF MISSOURI

_____
JESS E. MICHAELSEN, #52253
Special Attorney to the United States Attorney General

_____
STEVEN E. HOLTSHOUSER, #24277
Special Attorney to the United States Attorney General

_____
RICHARD FINNERAN, #60768
Special Attorney to the United States Attorney General