## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4: 11 CR 168 LRR |
| | ) | |
| MARTIN T. SIGILLITO, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT SIGILLITO'S MEMORANDUM OF LAW IN SUPPORT OF
### MOTION TO SUPPRESS MAY 24, 2010 SEARCH OF DEFENDANT'S LAW OFFICE

NOW COMES Defendant Martin T. Sigillito, by and through his attorney, Douglas P. Roller, and for his Memorandum of Law in Support of Motion to Suppress May 24, 2010 search of Defendant's Law Office, presents the following.

### INTRODUCTION

At this point, the Court is familiar with the background facts relating to the British Lending Program (BLP) and the allegations by the government against Defendant in connection with that program.  For that reason, a recitation of general facts would serve no useful purpose. Rather, the pertinent facts relating to each issue raised herein will be discussed in connection with the presentation of legal authority supporting Defendant's position.

Five distinct, but interrelated, grounds compel the suppression of the May 24, 2010 search of Defendant Sigillito's law office and all evidence derived therefrom and all leads emanating from the information acquired during the May 24, 2010 search.  The grounds requiring suppression are as follows: 1) the search was a product of an illegal search by a private party with the encouragement and acquiescence, if not at the direction of, the government; 2) the

search warrant is invalid on its face[1]; 3) the application for search warrant and the accompanying affidavit fail to state probable cause to believe a violation of either the mail fraud or wire fraud statute had been committed; 4) the affiant of the affidavit in support of the search warrant knowingly and intentionally or in reckless disregard of the truth, omitted material information and knowingly and intentionally or in reckless disregard of the truth, made material false statements in his affidavit in violation of *Franks v. Delaware*, 438 U.S. 154 (1978), and; 5) the execution of the search turned the search into a constitutionally defective general search.  Each of these grounds is discussed separately below.

## ARGUMENT

### A.     PROBABLE CAUSE FOR THE SEARCH WAS OBTAINED THROUGH AN ILLEGAL SEARCH BY A PRIVATE PERSON WITH THE ENCOURAGEMENT OF THE GOVERNMENT

In his affidavit in support of the search warrant, Special Agent Cosentino acknowledged that Elizabeth Stajduhar provided Cosentino with "numerous documents, including promissory notes and other related documents to the investment scheme.  She obtained these documents from the office."  Elizabeth Stajduhar was an employee of the defendant who did not have authority from the defendant to obtain documents from the office and provide them to the FBI.  As a consequence, agent Cosentino relied upon information obtained through an illegal private search by Elizabeth Stajduhar.

Although the surreptitious search of premises by a private party does not violate the Fourth Amendment, if, in conducting the search, the searcher is acting as an instrument or agent of the Government, there is a Fourth Amendment transgression. *United States v. Miller,* 688 F.2d 652, 656 (9th Cir.1982). However, "[a] private person cannot act unilaterally as an agent or

---

[1] Much of the argument and authority relating to this issue was raised in the original Motion for Return of Seized Property filed by Defendant in 2010.  However, the substantive issues raised therein were never specifically ruled on by the Court.  Therefore, this particular issue is being raised again in the Motion to Suppress.

instrument of the state; there must be some degree of governmental knowledge and acquiescence." *United States v. Sherwin,* 539 F.2d 1, 6 (9th Cir.1976) (en banc), *cert. denied,* 437 U.S. 909, 98 S.Ct. 3101, 57 L.Ed.2d 1140 (1978). *See United States v. Luciow,* 518 F.2d 298, 300 (8th Cir.1975); *Meister v. CIR,* 504 F.2d 505, 510 (3d Cir.1974), *cert. denied,* 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975); *United States v. Valen,* 479 F.2d 467, 469-470 (3d Cir.1973), *cert. denied,* 419 U.S. 901, 95 S.Ct. 185, 42 L.Ed.2d 147 (1974).

As with many areas of the law, a "gray area" exists between the extremes of overt governmental participation in a search and the complete absence of such participation. *United States v. Walther,* 652 F.2d 788, 791 (9th Cir.1981). The general principles for determining whether a private individual is acting as a government instrument or agent for Fourth Amendment purposes have been synthesized into a two-part test: (1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends. *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994); *United States v. Miller, supra*, 688 F.2d at 657.

The Eighth Circuit follows a similar test in determining whether a private search is at the behest of the government. In *United States v. Muhlenbruch*, 634 F.3d 987, 998-99 (8th Cir. 2011), *reh'g denied* (Mar. 25, 2011), the court articulated the government interest test as follows:

> To determine whether a private citizen is acting as a "government agent," we consider (1) whether the government had knowledge of and acquiesced in the search; (2) whether the citizen intended to assist law enforcement agents or to further his own purposes; and (3) whether the citizen acted at the government's request.

*United States v. Wiest*, 596 F.3d 906, 910 (8th Cir. 2010) *cert. denied,* 131 S. Ct. 339, 178 L. Ed. 2d 220 (U.S. 2010). *See also*, *United States v. Inman,* 558 F.3d 742, 745 (8th Cir.2009) (quoting *United States v. Smith,* 383 F.3d 700, 705 (8th Cir.2004)).

In the present case, Elizabeth Stajduhar's lawyer, Ethan Corlija, met with the FBI on May, 18, 2011, the day before Stajduhar was to meet with the government.  Following that meeting, at which he provided the government with certain documents relating to Elizabeth Stajduhar's involvement in the BLP, Corlija, called Stajduhar.  According to a statement that Corlija made to Missouri's Chief Disciplinary Counsel, Corlija told Stajduhar that he had arranged the meeting with federal agents and Ms. Stajduhar for the next day.  Corlija further told Stajduhar that she should bring along any and all documentation "which you rely to support her assertions that Mr. Sigillito was engaged in fraud."  Stajduhar told Corlija that she possessed a multitude of documents and she would bring the supporting documentation with her to the meeting with federal authorities.

Prior to his meeting with the FBI, Corlija, in a text message to Stajduhar requested only that she provide him with a list of the lenders in the program.  Not until he met with federal agents did Corlija request that Stajduhar bring additional documentation regarding her allegations against the defendant to the meeting (presumably with the same agents as well as an Assistant United States Attorney).  In fact, in a text message exchange between Stajduhar and Corlija, Stajduhar asked Corlija "what do you want me to bring" referencing the meeting with government officials the next day.  Corlija responded "everything you have."  In a later text message with a person identified as "Ice", Stajduhar stated that Ethan (Corlija) told her to get her flash drives and not to go back to the office.  Later that day, Corlija sent a text message to Stajduhar telling her that they needed to be at the US Attorney's office the next morning at 9 AM.  He further told Stajduhar to "have everything ready."

The above-described facts clearly established that Stajduhar collected records and documents in order to assist government agents.  Although direct proof will have to await the

4

hearing on defendant's motion to suppress, the clear inference is that the government told Stajduhar's agent, Corlija, to have her collect all documents to support her allegations. Otherwise, Corlija would have told her to obtain all the documents that she could to support her allegations right away before meeting with the FBI.

Subsequent to these exchanges, Stajduhar sent a text to a family member known as "Ice" that she was told by Ethan to get her flash drives and not go back. Since Corlija in his meeting with government agents was acting as Stajduhar's attorney (agent), anything told Corlija by the government would be equivalent to telling Stajduhar the same thing. Clearly, her producing whatever documents she could find pertaining to her allegations was at the behest and with the knowledge and acquiescence of the federal investigative agencies.

Defendant anticipates that additional evidence pertaining to this issue will be elicited at the suppression hearing. If it is established that Stajduhar conducted her private search for the purpose of assisting law enforcement and with the acquiescence and knowledge of law enforcement, with the government's direct or indirect urging, the search warrant was obtained by an illegal search contrary to the Fourth Amendment and all evidence gathered during the course of the search, and any leads derived therefrom, must be suppressed.

## B.   THE SIGILLITO LAW OFFICE SEARCH WARRANT IS CONSTITUTIONALLY DEFICIENT

On May 24, 2010, the law office of Martin T. Sigillito was searched by the FBI pursuant to a "Search and Seizure" warrant. This warrant was invalid for the following reasons.

### 1.   Facially Invalid Warrant

The Fourth Amendment clearly provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Fourth amendment requires particularity *in the warrant*,

not just the supporting documents. *Massachusetts v. Sheppard*, 468 U.S. 981, 988, n. 5 (1984). A search conducted pursuant to a warrant that fails to conform to the particularity requirements of the Fourth amendment is unconstitutional. *Stanford v. Texas*, 379 U.S. 476 (1965).

A search warrant may satisfy the particularity requirement by referencing other documents, but the warrant must use *appropriate words of incorporation* and the *document must accompany the warrant*. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004). The Supreme Court described the importance of any incorporated document accompanying the warrant as follows:

> "The presence of a search warrant serves a high function," *McDonald v. United States,* 335 U.S. 451, 455, 69 S.Ct. 191, 93 L.Ed. 153 (1948), and that high function is not necessarily vindicated when some other document, somewhere, says something about the objects of the search, but the contents of that document are neither known to the person whose home is being searched nor available for her inspection.

The Court also observed that unless the particular items to be seized are either set forth in the warrant or incorporated by reference in another document and that document is present at the search, "there can be no written assurance that the Magistrate actually found probable cause to search for, and to seize, every item mentioned in the affidavit." 540 U.S. at 560.

The Eighth Circuit recently confronted a situation similar to that presented in *Groh*. In *United States v. Hamilton*, 591 F.3d 1017 (8th Cir. 2010), the search warrant contained the phrase "See Affidavit" as a means of describing the items to be seized, but the affidavit did not accompany the warrant and the warrant itself did not list the items to be seized. The court noted that in *Groh*, the affidavit was not attached and there was no incorporating language. Thus, the Court of Appeals addressed the situation of an incorporated document not accompanying the warrant. 591 F.3d at 1024. In so doing, the court observed that cases in the Eighth Circuit had held that an incorporated document must accompany the warrant in order to comply with the Fourth Amendment's particularity requirements, although one court implied that incorporation

6

was enough.  591 F.3d at 1025. *Compare United States v. Curry,* 911 F.2d 72, 77 (8th Cir.1990) ("a description in a supporting affidavit can supply the requisite particularity if 'a) the affidavit accompanies the warrant, and b) the warrant uses suitable words of reference which incorporate the affidavit therein.' "(quoting *United States v. Strand,* 761 F.2d 449, 453 (8th Cir.1985), in turn quoting *United States v. Johnson,* 541 F.2d 1311, 1315 (8th Cir.1976)) *with United States v. Nieman,* 520 F.3d 834, 839 (8th Cir.2008) ("An affidavit may provide the necessary particularity for a warrant if it is incorporated into the warrant, attached to the warrant, or present at the search.").

The *Hamilton* court noted that, in *Curry*, it had reiterated the "circuit's well- established rule that the affidavit must both accompany the warrant and be incorporated into it."  591 F.3d at 1025.  Ultimately, the court in *Hamilton* did not specifically rule on the issue, instead choosing to rely on *United States v. Leon*, 468 U.S. 897, 922-923 (1984) and finding that the officer's reliance on the warrant in that case was not objectively unreasonable.  591 F.3d at 1030.[2]

In the present case, the warrant, in describing the property to be seized, contained the words "See Attachment A.  However, the warrant left in the law office after Mr. Sigillito had left was not accompanied by Attachment A.[3]  Thus, the warrant, without the accompanying attachment, did not comply with the requirements of the Fourth Amendment and the search pursuant to that warrant was unconstitutional.  The items taken from the law office must, therefore, be suppressed for use in any trial and the seized property returned to Movant.

---

[2] The facts in this case establish a consistent lack of good faith by the government and Agent Cosentino (who presented each of the warrants herein), in obtaining and execution of the warrants.  *See infra.*
[3] Counsel for Sigillito ultimately received a copy of Attachment A from the government.

2.      **The Search Warrant Lacked Particularity**

Even if Attachment A had accompanied the warrant, the search was still unlawful because Attachment A is so lacking in particularity regarding property to be seized that it authorizes a general search, requiring suppression.

### a. Degree of Particularity Dependent on Circumstances

The Eighth Circuit, in *United States v. Apker*, 705 F.2d 293, 299 (8th Cir. 1983), summarized the underlying principles regarding particularity as pronounced by the Supreme Court as follows:

> The Supreme Court has repeatedly stated the underlying considerations behind the particularity requirement. The requirement "makes general searches ... impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976), *quoting Stanford v. Texas,* 379 U.S. at 485, 85 S.Ct. at 511. *See also United States v. Clark,* 531 F.2d 928, 931 (8th Cir.1976). The problem posed by a general warrant "is not of intrusion *per se,* but of a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564 (1971). In applying the particularity requirement, we recognize that "the degree of specificity required is flexible and may vary depending on the circumstances and the type of items involved." *United States v. Muckenthaler,* 584 F.2d 240, 245 (8th Cir.1978). The Supreme Court has said: "A seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." *Roaden v. Kentucky,* 413 U.S. 496, 501, 93 S.Ct. 2796, 2799, 37 L.Ed.2d 757 (1973).

Before discussing the specific failings of the search warrant, it should be noted that a special circumstance exists in this case which requires greater particularity in describing property to be seized.  That circumstance is that the search was of a lawyer's office.  Within the law office were files and documents relating to law clients totally separate from the lenders in the U.K. project.   Obviously, the issue of attorney-client privileged documents arises under these circumstances.

The Department of Justice, cognizant of the constitutional sensitivity of searching an attorney's office has promulgated Guidelines for government attorneys contemplating a search of an attorney's office. Although these guidelines purportedly do not create any substantive or procedural rights or limit the prerogatives of prosecutors, they nevertheless emphasize the sensitivity of law office searches of attorneys under investigation. For example, the Guidelines provide that prosecutors are to take the *least intrusive means* available to obtain records from a law office, including issuance of a subpoena. Furthermore, the Assistant U.S. Attorney is required to consult with the Criminal Division at the Department of Justice. Ex. 22 at 1-2. The information required by the Department is quite extensive. *See* Ex. 23. Prosecutors are instructed that the "search warrant should be drawn as specifically as possible … to minimize the need to search and review privileged material to which no exception applies." Ex. 23 at 2. [4] Regardless of whether the AUSA in this case received approval from the Department of Justice, the Guidelines were clearly not followed.

### b. Failure to Identify Alleged Crime

The first deficiency in particularity is the total failure to describe the purported criminal activity to which the search related or even what generically was the object of the search (i.e., evidence of a crime, contraband, fruits of a crime, or property used in committing the crime[5]). The face of the search warrant does not describe the nature of any property to be seized or any violation of law. Rather, the warrant merely contains the reference "SEE ATTACHMENT A."

When Attachment A is reviewed, all it says prior to the listing of items to be seized is the following: "For the period January 1, 2000 through the present the property to be seized is as follows:" The only mention of any type of possible criminal activity is a reference in paragraph

---

[4] Movant doubts that the AUSA had time to obtain approval from the Department of Justice before executing the search and seizure warrant for Mr. Sigillito's law office.
[5] Rule 41(c)(1)-(3), Federal Rules of Criminal Procedure.

9

5 to "the Ponzi scheme" and a reference in paragraph 11 to "investment scheme."  This total absence of any specificity as to the alleged criminal conduct renders the warrant overbroad and facially invalid.

In *Rickert v. Sweeny*, 813 F.2d 907, 908 (8th Cir. 1987), the search warrant at issue had a general description of the items to be seized similar to that presented here, but made reference to specific criminal statutes.[6] In declaring the search unlawful, the court observed:

> In the present case, the warrant on its face authorizes a general search limited only by references to the general conspiracy statute, 18 U.S.C. § 371, and general tax evasion statutes, 26 U.S.C. §§ 7201 and 7206(2). Section 371, however, has been held to be too broad in scope to provide any real limitation on the warrant. *Voss v. Bergsgaard,* 774 F.2d 402, 405 (10th Cir.1985). Tax Code Section 7201 has also been held insufficient to limit a search of business records. *United States v. Cardwell,* 680 F.2d 75, 77 (9th Cir.1982). 26 U.S.C. § 7206(2) is merely the general aiding and abetting statute for tax evasion….These statutes do not limit the search in any substantive manner. On its face, the warrant authorizes general rummaging through the offices and company records.

813 F.2d at 909.

In the present case, the warrant is even more deficient.  Of the thirteen (13) paragraphs describing items to be seized, only paragraph 5 and paragraph 11 mention any type of alleged criminal activity.  The remaining 11 paragraphs have no restrictions either as to the basis for seizure of the items or what criminal activity they relate to.

In *United States v. Leary*, 846 F.2d 592, 600-601 (10th Cir. 1988), the Court made the

---

[6] The description of items to be seized was as follows:[R]ecords, documents, papers, correspondence, and similar evidence relating to the period January 1, 1980 through April 30, 1986, including but not limited to: ledgers, journals, books of account, bills, receipts, bank records, bank deposit books, checkbooks, telephone books, investor files, contract-for-deeds, real estate documents, notes, financial statements, records and documents relating to assets and liabilities, checks, money orders, accounts receivable records, and accounts payable records, computer hardware, floppy discs, tapes or other memory retention media, software-user manuals and access discs, internal instructions for computer use, and similar books and records, belonging to Gary W. Rickert, Hoyt N. McPherson, Garrick, Inc., Resort Development, Inc., Resort Management, Inc., and Professional Financial Services, Inc., which are instrumental means and evidence of the commission of offenses in violation of Title 18, United States Code, Section 371, and Title 26, United States Code, Sections 7206(2) and 7201.

following finding regarding a search warrant drawn much more narrowly than the one in the

present case:

> The warrant under scrutiny here included only two limitations. First, the documents to be seized had to fall within a long list of business records typical of the documents kept by an export company. Second, those documents had to relate to "the purchase, sale and illegal exportation of materials in violation of the" federal export laws. In this context-the search of the offices of an export company-these limitations provide no limitation at all. The warrant authorizes, and the customs agents conducted, a general search of the Kleinberg offices.

The court in *United States v. Bridges*, 344 F.3d 1010, 1018 (9th Cir. 2003) set forth a list

of the types of warrants that had been found to be constitutionally insufficient:

> Although we have "criticized repeatedly the failure to describe in a warrant the specific criminal activity suspected [by the Government]," <u>Kow</u>, 58 F.3d at 427, the warrant at issue in this case does not state what criminal activity is being investigated by the IRS. In *Kow,* we found that a warrant's reference to "fraudulent" transactions and possible disparities between actual and reported income is not sufficient to withstand constitutional muster. *Id.* Similarly in <u>Center Art Galleries-Haw., Inc. v. United States,</u> 875 F.2d 747 (9th Cir.1989) *abrogated on other grounds,* <u>J.B. Manning Corp. v. United States,</u> 86 F.3d 926, 927 (9th Cir.1996), we held that a "warrant['s] provision for the almost unrestricted seizure of items which are 'evidence of violations of federal criminal law' without describing the specific crimes suspected is constitutionally inadequate." <u>Id.</u> at 750. Such warrants are suspect because "[n]othing on the face of the warrant tells the searching officers for what crime the search is being undertaken." <u>United States v. George,</u> 975 F.2d 72, 76 (2d Cir.1992).

The court in *Bridges* also articulated the constitutional predicate for the decisions it cited:

> Search warrants, including this one, are fundamentally offensive to the underlying principles of the Fourth Amendment when they are so bountiful and expansive in their language that they constitute a virtual, all-encompassing dragnet of personal papers and property to be seized at the discretion of the State. <u>*See Stanford,*</u> 379 U.S. at 481, 85 S.Ct. 506 (the Fourth Amendment "reflect[s] the determination of those who wrote the Bill of Rights that the people of this new Nation should forever 'be secure in their persons, houses, papers, and effects' from intrusion and seizure by officers acting under the unbridled authority of a general warrant." (internal quotation marks omitted)); *see also* <u>Boyd,</u> 116 U.S. at 630-31, 6 S.Ct. 524.

The search warrant in this case is even more offensive in its failure to specify the alleged

criminal activity than any of the warrants described in the above-cited cases.  Because of this failure, the search warrant and all evidence derived there from must be suppressed and the property returned to Movant.

### c. Seizure of Every Piece of Computer Equipment

Paragraphs one (1) through four (4) of Attachment A authorizes the seizure of every piece of computer hardware, software and virtually anything computer oriented.  Paragraphs 1-4 of Attachment A specifically authorized seizure of the following:

> All computer hardware, including data-processing devices (such as central processing unit and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, external hard disks,  floppy disk drives and diskettes, tape drives and tapes, optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communication devices (such as modems, cables and connections, recording equipment, speed dialers, programmable telephone dialing or signaling devices, and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical locks and keys).

> Computer software, including programs to run operating systems, applications, utilities, compilers, interpreters, video, web browsers, and communications programs. To include, Microsoft Outlook.

> All computer-related documentation, including written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

> All computer passwords and data security devices, including encryption devices, chips, and circuit boards.

In certain circumstances, seizure of computer hardware may be appropriate.  For example, a computer that stores child pornography is itself contraband. *See United States v. Hay*, 231 F.3d 630, 637 (9th Cir. 2000). A computer may also be used as an instrumentality of crime, as when it is used to commit a hacking offense or send threats. *See, e.g.*, *United States v. Adjani*, 452 F.3d 1140, 1145-46 (9th Cir. 2006) (computer used to send extortive threat is

instrumentality); *Davis v. Gracey*, 111 F.3d 1472, 1480 (10th Cir. 1997) (computer used to operate bulletin board distributing obscene materials is instrumentality); *United States v. Lamb*, 945 F. Supp. 441, 462 (N.D.N.Y. 1996) (computer used to send or receive child pornography is instrumentality).  Although it could be argued that any computer that is used to store evidence of a crime is an instrumentality, the reasoning in *Davis* suggests that in order for a computer to qualify as an instrumentality, more substantial use of the computer in the commission of the crime is necessary. *See Davis*, 111 F.3d at 1480 ("the computer equipment was more than merely a 'container' for the files; it was an instrumentality of the crime").  It is clear, even from the paltry information contained in the search warrant, that the computers in the Sigillito law office were not instrumentalities of a crime, nor is there any allegation, or even suggestion, in the warrant to draw such a conclusion.

Thus, the seized computer equipment is "evidence" only to the extent that some of the data it stores is evidence. *See United States v. Giberson*, 527 F.3d 882, 887 (9th Cir. 2008) ("Computers, like briefcases and cassette tapes, can be repositories for documents and records."). In this type of situation, the authority to search relates, in whole or in part, to information stored on the computer, rather than the computer itself.  The warrant must identify the information with particularity, focusing on the content of the relevant files rather than on the storage devices which may happen to contain them. *See, e.g.*, *United States v. Otero*, 563 F.3d 1127, 1132 (10th Cir. 2009) (stating that the ability of a computer to store "a huge array" of information "makes the particularity requirement that much more important"); *United States v. Vilar*, 2007 WL 1075041, at *36 (S.D.N.Y. Apr. 4, 2007) ("underlying information must be identified with particularity and its seizure independently supported by probable cause"); *United States v. Carey*, 172 F.3d 1268, 1275 (10th Cir. 1999) (stating that a warrant to seize evidence stored on a

13

computer should specify "which type of files are sought").

In cases where the computer is merely a storage device for evidence, failure to identify the relevant files constitutes a Fourth Amendment violation. For example, in *United States v. Riccardi*, 405 F.3d 852, 862 (10th Cir. 2005), which involved an investigation into harassing phone calls, the court held that a warrant authorizing seizure of all storage media and "not limited to any particular files" violated the Fourth Amendment. *See also, United States v. Hunter*, 13 F. Supp. 2d 574, 584 (D. Vt. 1998) (concluding that warrant to seize "[a]ll computers" was not sufficiently particular where description "did not indicate the specific crimes for which the equipment was sought, nor were the supporting affidavits or the limits contained in the searching instructions incorporated by reference.").

The warrant in this case, like *Hunter*, did not even specify that the computers contained "evidence", let alone the type of information contained in the computers being seized.  In *United States v. Henderson*, 416 F.3d 686, 695 (8th Cir. 2005) a warrant authorizing seizure of all "records which appear on any and all computers which are located in the house, to include the hard drive and any disks which are located in the house" was found to be overly broad in violation of the Fourth Amendment.

Clearly the description of computer equipment to be seized in paragraphs one (1) through four (4) of Schedule A is constitutionally deficient.  The computers seized and all files therein must be returned to Movant and suppressed as evidence in any future proceedings.

### d. Lack of Particularity in Description of Documents to be Seized

 The search warrant's description of business records to be seized in Attachment A is even broader than the language used for the computer equipment:  "Records of all personal and business expenditures" (¶ 8); "Cash checks, or other monetary instruments" (¶ 9) and; virtually

14

all business, banking, credit card and financial records (¶ 6)[7] for the previous **10 years**. The scope of the records sought in these paragraphs is even broader and more expansive than the description of records found to constitute a general warrant in *Rickert v. Sweeney*, 813 F.2d 907, 908-909 (8th Cir. 1987).

In *In re Grand Jury Proceedings*, 716 F.2d 493, 497 (8th Cir. 1983), the court described the search warrant at issue therein as follows:

> The warrant authorized the FBI to seize all records pertaining to his bail bonding business for the period January 1, 1976, to the present. The scope of the search was otherwise unlimited: the warrant did not indicate that the documents sought pertained to any specific transactions, did not identify the offenses on which evidence was sought, and did not confine the search to any particular files or categories of documents. In the absence of any clearly demonstrated necessity, the seven-year period covered by the search warrant is excessive and unreasonable. Indeed, it is difficult to imagine a search warrant stated in more general terms.

The court also rejected the government's argument

> that the warrant contained a lengthy list of the types of records that could be seized (e.g., copies of bail bonds or powers of attorney, applications for bonding, payment records, individual files of each defendant, subject, or client, etc.). It [the government] asserts that this list provides sufficient specificity to limit the scope of the search..... [W]e believe that this laundry list of various type of records is insufficient to save the search warrant.… [T]he list itself was overly broad, consisting of little more than a broad statement of the types of records ordinarily kept by any bail bondsman. There were no designations or references to particular transactions or to specific individuals or specific files, or to a reasonably specific time within the approximately seven-year period.

716 F.2d at 498.

In this case, the warrant did not specify particular individuals or entities or groups of individuals or entities to whom the specified records would relate. Additionally the period in

---

[7] Paragraph 6 authorized the seizure of the following: Business records, bank statements, bank deposit tickets, cancelled checks, check register, deposit tickets, items of deposit, money drafts, letters of credit, wire transfer records, checking accounts, savings accounts, passbooks and other similar financial statements, loan applications, loan records, payments and purchase records, credit card statements, money orders and cashier's checks receipts, traveler's checks, negotiable bearer instruments, records of transfer and/or concealment of assets and the obtaining, secreting transfer, concealment and/or expenditure of money. Any and all reconciliations, and other records of receipts, dispositions, and disbursement of funds received by Martin T. Sigillito.

question was *10 years.*  For example, the warrant sought "records of ***all personal and business*** expenditures" [emphasis added] (¶ 8) from 2000 to 2010.  Not only was the period of time covered by the warrant outrageously broad, but the warrant authorized the FBI to seize all records of personal and business expenditures, regardless of whether the records even related to the lending program.  The records sought would necessarily include attorney-client information, church related expenditures and a potential host of other innocent categories of records.  The same constitutional violation applies to "checks, cash, or other monetary instruments" over the 10 year period.  What about church records of funds collected at church and used to pay church expenses?  What about records of clients' payments for legal services totally unrelated to the lending program?

Furthermore, in *In re Grand Jury Proceedings*, the fact that Paragraph 6 contains a laundry list of records is not indicative of a closely narrowed, particularized description of documents to be seized, but rather an overly broad "shotgun" approach of listing all possible records the business in question might possess over an entire decade.  Once again, because the period encompassed goes back to the year 2000, bank statements, check registers, money orders, credit card statements and other financial records would necessarily encompass matters relating to attorney-client matters and church affairs.

Even the category of documents which refers to alleged criminal activity is constitutionally deficient.  Paragraph 5 of Schedule A sets forth the following description of documents for the preceding ten years:

> Books, records, ledgers, journals, receipts, billing statements, and other papers records, or documents, opened and/or sealed packages, and/or other mailings located in the office of Martin T. Sigillito which may record or relate in any way to transactions involving the Ponzi scheme.

This category of documents, as with the other categories, encompasses a ten year period and includes a listing of every kind of record that might exist in an ongoing business/law office. The government attempts to salvage this generalized search by including the language "which may record or relate in any way to transactions involving the Ponzi scheme." Perhaps a "Ponzi" scheme is defined in the affidavit, but that does not save a warrant to which the affidavit is not attached.[8]

A Ponzi scheme is normally considered a type of fraud. However, there is no description of the alleged Ponzi scheme as to parties involved, the instrumentalities used to carry it out, or even the general nature of the alleged scheme. "The Ponzi scheme" with no further particularity is constitutionally defective. Warrants with similar vague descriptions of alleged criminal activity, as well as those only referring to criminal statutes, have been held to be insufficient. *See e.g. United States v. LeBron*, 729 F.2d 533, 537 (8th Cir. 1984) ("property believed to be stolen"); *Center Art Galleries-Haw., Inc. v. United States,* 875 F.2d 747, 750 (9th Cir.1989) *abrogated on other grounds, J.B. Manning Corp. v. United States,* 86 F.3d 926, 927 (9th Cir.1996) ("evidence of violations of federal criminal law"[9]); *United States v. Kow*, 58 F.3d 423, 427 (9th Cir. 2003) ("fraudulent" transactions); *Rickert v. Sweeney*, 813 F.2d 907, 908 (8th Cir. 1987) (long recitation of types of documents allegedly constituting evidence of violation of 18 U.S.C. 371 and 26 U.S.C. 7206).

Similarly, paragraphs 11 and 12 are constitutionally defective. Paragraph 11 authorizes seizure of:

> Correspondence, memoranda, client lists, agendas, and other documents and papers which may relate to investors and potential investors and other documents

---

[8] The affidavit was not attached to the warrant and thus does not play a role in determining the facial validity of the warrant. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).

[9] The court in *Center Art Galleries-Haw., Inc.* also noted that the warrant, as in the present case, did not describe the alleged crime, thus giving no guidance to the searching officers as to what to look for. 875 F.2d at 750.

related to the investment scheme.

Included in items authorized to be seized are "other documents and papers which may relate to" investors and "other documents related to" the investment scheme.  The term other documents and papers gives no guidance to the searching agent.  The only reasonable alternative for the seizing agent is to seize every piece of paper which "may", *not does*, relate to investors and potential investors.  However, how does the searching agent know from the warrant who is an investor or potential investor?  At the minimum, the agent would undoubtedly seize everything with a name on it – who knows – this person may be a "potential investor."  This situation is made worse by reference in paragraph 11 to "client lists".  Given the ten year span of the search and inclusion of "client lists" as records to be seized, the likelihood of seizure of attorney-client privileged documents is increased dramatically.  These expansive terms themselves turn paragraph 11 into a general warrant.

The phrase "documents related to the investment scheme" does not stand in any better stead.  Although this phrase uses "related to" rather than "may relate," the problem is the same as "may" – the agent must make an independent decision whether a particular item is related to the "investment scheme."  Use of the term "investment" scheme creates an additional problem.  Is the "investment" scheme the same as the "Ponzi" scheme, or is it different?  Are potential "investors" included? This problem is made even worse since documents regarding separate investments, as opposed to the lending program were contained within the law offices and are believed to have been seized.

Furthermore, in the matter under investigation, the transactions were not "investments," as that term is generally perceived.  Rather, individuals *loaned* Distinctive Properties (UK) Ltd money for 1 year pursuant to a loan agreement.  At the end of the 1 year, the note evidenced by

the loan agreement could be redeemed for principal and interest, or "rolled over" for another year.  Interest in the average range of 15% - 20% was earned per annum on each one year loan.  Each loan agreement clearly states the purpose of the loan: "The monies are lent by way of assistance in relation to cash flow for the business purposes of the Borrower."  (Distinctive Properties (UK) Ltd) (owned by Derek Smith).[10]  Clearly, these transactions are loans, not investments, further broadening the scope of the search and causing additional risk that items not covered by the warrant would be seized.

Paragraph 12 calls for the seizure of "Investor files, contracts, letters and correspondence."  Other than not explaining the difference between letters and correspondence, paragraph 12 suffers from the same problem addressed above regarding who are the "investors."  The searching agent has to make an independent decision on that issue since the warrant does not name the "investors" or "potential investors."  Such discretion turns the warrant into a prohibited "general warrant."  This principle was discussed in *Andresen v. Maryland*, 427 U.S. 463, 480 (1976):

> General warrants, of course, are prohibited by the Fourth Amendment. "[T]he problem [posed by the general warrant] is not that of intrusion *per se,* but of a general, exploratory rummaging in a person's belongings.... [The Fourth Amendment addresses the problem] by requiring a 'particular description' of the things to be seized." *Coolidge v. New Hampshire,* 403 U.S. 443, 467 [91 S.Ct. 2022, 2038, 29 L.Ed.2d 564] (1971). This requirement " 'makes general searches ... impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.' " *Stanford v. Texas,* 379 U.S. 476, 485 [85 S.Ct. 506, 512, 13 L.Ed.2d 431] (1965), quoting *Marron v. United States,* [275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231 (1927) ].

The warrant in this case, rather than limiting the search and describing particularly what was to be seized so that "nothing is left to the discretion of the officer executing the warrant,"

---

[10] A copy of a typical loan agreement is attached hereto as Exhibit 3.

gave the FBI a license to rummage through every piece of paper in Mr. Sigillito's office in an unlawful general exploratory search.  A review of the summary sheets the FBI euphemistically calls an inventory reveals that items seized were only generally identified, such as "box of loan agreements."  A total of 69 boxes were taken from the office – 46 of these boxes were labeled as "box-books."   Also, apparently no serious attempt was made to segregate attorney-client privileged materials.

For all of the above reasons everything seized during the course of the May 24, 2010 search of Mr. Sigillito's law office must be returned to Mr. Sigillito and suppressed from use in any subsequent proceeding.

## C.   THE SEARCH WARRANT AFFIDAVIT FAILS TO ESTABLISH PROBABLE CAUSE FOR THE SEARCH

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

The United States Supreme Court in *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011), recently described the requirements of the Fourth Amendment:

> The text of the Amendment thus expressly imposes two requirements. First, all searches and seizures must be reasonable. Second, a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity. *See Payton v. New York,* 445 U.S. 573, 584, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

An affidavit establishes probable cause if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the place to be searched. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). A probable cause determination is based on the totality of the circumstances. *United*

*States v. Morales,* 923 F.2d 621, 623–24 (8th Cir.1991).  In attempting to ensure that search warrant affidavits comply with the Fourth Amendment's prohibition against unreasonable searches and seizures resulting from warrants issued without probable cause, the issuing magistrate "is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit ..., there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983).  However, the court must "insist that the magistrate perform his 'neutral and detached' function and not serve merely as a rubber stamp for the police." *Aguilar v. Texas,* 378 U.S. 108, 111, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), *overruled on other grounds, Gates,* 462 U.S. at 238,

In order for a judicial officer to carry out this neutral and detached function, law enforcement officials must present evidence from which the magistrate judge can conclude from the totality of the circumstances, 'including the "veracity" and "basis" of knowledge of persons supplying hearsay information, that there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *United States v. Williams,* 224 F.3d 530, 532 (6th Cir.2000) (quoting *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

"When information supplied by an informant forms the basis for probable cause in a warrant, the 'core question in assessing probable cause ... is whether the information is reliable.'" *United States v. Nieman,* 520 F.3d 834, 839–40 (8th Cir.2008) (quoting *United States v. Williams,* 10 F.3d 590, 593 (8th Cir.1993)).  The court in United States v. Cowling, 648 F.3d 690, 695 (8th Cir. 2011) observed that

> In assessing such reliability, this Court considers several factors, such as (1) whether officers conducted a face-to-face interview with the informant, (2) the level of detail included in the information provided to law enforcement by the

informant, and (3) whether law enforcement independently corroborated any of the information provided by the informant.

The affidavit of Special Agent Cosentino in support of the Application for a search warrant suffers from two violations of the Constitutional principles set forth above. The first is a failure to establish the probability that any criminal activity occurred. The second failure of the Affidavit is that it is predicated solely upon information obtained from Elizabeth Stajduhar, whose reliability is not corroborated and is contradicted by the information contained in the Affidavit itself.

Turning to the first point, the Affidavit in support of the Application states that the search warrant is to search for evidence of violations of the mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1341) statutes. The mail fraud statute provides in pertinent part, as follows:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, … for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service… shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C.A. § 1341 (West). (The wire fraud statute contains the same provisions except references wire transfers.).

The Affidavit, however, does not set forth any specific scheme or artifice to defraud, any specific false or fraudulent pretenses, representations, or promises and does not describe any mailings or wire transfers made in furtherance of and for the purpose of executing the alleged scheme or artifice. Rather, Ms. Stajduhar merely states in paragraphs 4-6 that Mr. Sigillito solicits investors to lend money to him in the form of promissory notes with returns in excess of 20% for the lender. The purpose of the loans related to purchase of land options in England.

Ms. Stajduhar contends that Mr. Sigillito collected approximately $44 million from investors over the previous 10 years.  There is no criminality whatsoever set forth in those paragraphs.

In paragraph 7, Ms. Stajduhar states that much of the investor's principal investment is not used for purchase of land options but to pay other investors, who had earlier loaned money. Agent Cosentino then places his own interpretation on what Ms. Stajduhar said by stating in paragraph 7 that, "[In] other words, Ms. Stajduhar *believes* that there are no real investments and money from later investors is used to pay earlier investors the promised rate of return." [emphasis added].   Cosentino goes on to say, "[T]hus, investors believe they're receiving legitimate profits on their investment."  Agent Cosentino then concludes that this demonstrates a Ponzi scheme.  The difficulty here is that there is no averment that Ms. Stajduhar actually made that statement.  In fact, a logical inference can be drawn that Ms. Stajduhar did ***not*** say what Special Agent Cosentino paraphrased.   Furthermore, all that is set forth, even according to Cosentino, is Ms. Stajduhar's *belief*.

In paragraph 8, Ms. Stajduhar, in regards to the fees Mr. Sigillito received from each loan, states that the investors "are not *necessarily aware* of the amount of money taken by Mr. Sigillito as fees.  She doesn't say that the lenders are not aware of the fees nor that Mr. Sigillito ever made any misrepresentations to the lenders regarding the fees.  Indeed, nowhere in the affidavit is there any allegation that Mr. Sigillito made false statements or misrepresentations to any lender.  The money referenced by Ms. Stajduhar in paragraph 8 were from fees received by Mr. Sigillito as described by Ms. Stajduhar.  Thus, whether Mr. Sigillito spent large amounts of money or not does not establish that any criminality occurred in connection with his collection of fees.

Finally, Ms. Stajduhar states merely that lenders have complained about not receiving their rate of return and/or demanding that their principal be returned based upon the promissory notes. Once again, no criminality is disclosed by virtue of these facts. Indeed, Ms. Stajduhar goes on to state that Mr. Sigillito is attempting to raise money to meet the complaints of the lenders as described by Ms. Stajduhar.

Although the Affidavit is 13 pages long, less than 3 1/2 pages set forth specific information received from Ms. Stajduhar. The rest of the affidavit contains introductory comments by agent Cosentino regarding his experience and description supporting the seizure of computer information. Nowhere in those 13 pages is there any statement regarding specific use of the mails, false representations made by Mr. Sigillito or that there even existed a scheme or artifice to defraud.[11] Thus, on the basis of Ms. Stajduhar's actual statements, the Affidavit fails to establish any criminality whatsoever. In order to establish probable cause, a search warrant must "present ample evidence to establish probable cause that a *federal crime* has been committed." *United States v. Brouillette*, 478 F.2d 1171, 1173 (5th Cir.1973). Agent Cosentino's affidavit fails to do so and the search pursuant to the warrant must be suppressed.

The second Constitutional flaw in the Affidavit is the lack reliability of Ms. Stajduhar. The reliability of an informant providing information is critical to establishing probable cause. *United States v. Coffee*, 434 F.3d 887, 893 (6th Cir. 2006). However, even when the individual providing the information is identified, his or her reliability must still be established in the affidavit. An example of the type of information establishing reliability necessary to supply probable cause was discussed in *United States v. Clay*, 618 F.3d 946, 956-57 (8th Cir. 2010) *cert.*

---

[11] The only mention of mailing or interstate transfers of money is in paragraph 24 of the Affidavit, wherein Agent Cosentino expresses that he "*believes*" promissory notes and other documents are mailed from Mr. Sigillito as well as interstate transfers of money made in furtherance of the Ponzi scheme." The agent's belief without any underlying facts or specifics, of course, does not establish probable cause.

*denied.* 131 S. Ct. 1540, 179 L. Ed. 2d 309 (U.S. 2011). In *Clay*, the search warrant of Clay's offices relied on an FBI agent's affidavit regarding statements made by tax preparer, Kenny Wright. In upholding the warrant, the court found that the affidavit demonstrated Wright's veracity and upheld the warrant. One of the factors upon which the court relied was described by the court as follows:

> The court found Wright sufficiently reliable because he had met with FBI agents on three occasions, and he gave the agents Clay's social security number, two pay stubs, and lists of information Nealy had given him to prepare the false returns. The court reasoned that the FBI agents had a sufficient opportunity to assess Wright's credibility during the three meetings, and that the warrant demonstrated Wright's knowledge.

*Id.*

Corroboration was also an important aspect of the determination of the reliability of Wright's statements:

> The district court also found that the FBI agent corroborated Wright's statements. The agent requested Clay and Nealy's tax return records for the previous three years and learned through the Secretary of State's website that Clay's corporate licenses had been revoked for failing to pay taxes. The agent then took an undercover agent to Nealy's office and recorded conversations. Based on this information, the agent prepared an affidavit in support of the search warrant, and the magistrate judge issued the warrant.

*Id.*

The Affidavit of Special Agent Cosentino fell far short of the standard for establishing the veracity and reliability of a named individual as established in *Clay*. As in *Clay*, Ms. Stajduhar purported to have first-hand knowledge of Mr. Sigillito's activities. However, unlike *Clay*, Cosentino had only interviewed Ms. Stajduhar on one occasion prior to preparing the affidavit. The Affidavit states in paragraph 20 that Ms. Stajduhar allowed the FBI to download her cell phone text messages and provided the FBI with numerous documents, including promissory notes and other related documents which she obtained from Mr. Sigillito's office.

25

However, as opposed to the agents' actions in *Clay*, agent Cosentino did not use any of the documents supplied by Ms. Stajduhar to corroborate her statements. Thus, no basis existed for the magistrate to conclude whether the documents supplied by Stajduhar supported her statements.[12]

This failure to establish the reliability of Ms. Stajduhar is particularly important in that Ms. Stajduhar admitted to the FBI that she had stolen in excess of $200,000 from Mr. Sigillito. Furthermore, the text messages made available to the FBI established that Ms. Stajduhar came forward for the express purpose of attempting to minimize her criminal liability. Thus, not only was Ms. Stajduhar's reliability and veracity not established, but her conduct and motive in coming to the FBI seriously called into question her veracity.

Nor did Agent Cosentino corroborate Ms. Stajduhar's information in any manner, even though Agent Cosentino had access to documents supposedly supporting Ms. Stajduhar's statements. Indeed, the only relevant information contained in the Affidavit in addition to Ms. Stajduhar's statements is Agent Cosentino's characterization of a hearsay allegation contained in an SAR. No basis for the alleged allegation is set forth by Agent Cosentino, nor is a copy of the alleged SAR attached to or set forth in the Affidavit. Finally, this alleged SAR does not corroborate either the details of Ms. Stajduhar's statements or her reliability.

Thus, the Cosentino affidavit fails to establish probable cause that a federal crime was committed and also fails to establish the reliability of Elizabeth Stajduhar. Singly and collectively, these failings demonstrate that probable cause to search Mr. Sigillito's office was lacking and the subsequent search and all objects and leads derived therefrom pursuant to the search warrant, must be suppressed.

---

[12] As will be seen in the next Section of this Memorandum, a number of Ms. Stajduhar's statements were not true.

## D.    FALSE STATEMENTS AND OMMISSION OF MATERIAL FACTS

In *Franks v. Delaw*are, 438 U.S. 154 (1978), the United States Supreme Court was confronted with the issue of whether a defendant in a criminal proceeding ever has the right, under the Fourth Amendment subsequent to the *ex parte* issuance of a search warrant, to challenge the truthfulness of factual statements made in an affidavit supporting the warrant?  438 U.S. at 155.   In deciding this issue, the Court set forth the following analysis of the Fourth Amendment:

> The bulwark of Fourth Amendment protection, of course, is the Warrant Clause, requiring that, absent certain exceptions, police obtain a warrant from a neutral and disinterested magistrate before embarking upon a search. In deciding today that, in certain circumstances, a challenge to a warrant's veracity must be permitted, we derive our ground from language of the Warrant Clause itself, which surely takes the affiant's good faith as its premise: "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . ." Judge Frankel, in *United States v. Halsey*, 257 F.Supp. 1002, 1005 (S.D.N.Y.1966), aff'd, Docket No. 31369 (CA2, June 12, 1967) (unreported), put the matter simply: "[W]hen the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a *truthful* showing" (emphasis in original). This does not mean "truthful" in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily. But surely it is to be "truthful" in the sense that the information put forth is believed or appropriately accepted by the affiant as true.

438 U.S. at 164-65.

To void a search warrant under *Franks,* a defendant must show by a preponderance of evidence that (1) the affiant included in the warrant affidavit "a false statement knowingly and intentionally, or with reckless disregard for the truth," and (2) "the affidavit's remaining content is insufficient to establish probable cause." *Franks supra,* 438 U.S. at 155–56; *see also United States v. Buchanan,* 574 F.3d 554, 561 (8th Cir.2009). If a defendant shows a *Franks* violation,

27

then the "the fruits of the search [must be] excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks,* 438 U.S. at 156.

As the eighth Circuit explained in *United States v. Finley*, 612 F.3d 998, 1002 (8th Cir. 2010) *cert. denied,* 131 S. Ct. 547, 178 L. Ed. 2d 401 (U.S. 2010):

> The applicable test is "not simply whether the affiant acknowledged that what he reported was true, but whether, viewing all of the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *United States v. Clapp,* 46 F.3d 795, 801 n. 6 (8th Cir.1995). To prevail, a defendant must show more than negligence or an innocent mistake. *Franks,* 438 U.S. at 171, 98 S.Ct. 2674; *United States v. Butler,* 594 F.3d 955, 961 (8th Cir.2010).

A search warrant may also be invalidated under *Franks* if (1) the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading and (2) the affidavit, if supplemented by the omitted information would not have been sufficient to support a finding of probable cause. *United States v. Alexander*, 574 F.3d 484, 488 (8th Cir. 2009) *cert. denied,* 130 S. Ct. 3273, 176 L. Ed. 2d 1188 (U.S. 2010), *quoting United States v. Hart,* 544 F.3d 911, 914 (8th Cir.2008).

A combination of critical misstatements of fact and omission of material facts in the Cosentino affidavit compels a finding that when the misstatements are excised from the affidavit and the material omissions added to the affidavit, the resulting affidavit is not sufficient to support a finding of probable cause to search Mr. Sigillito's office.

The first misstatement is contained in paragraph 4, wherein the affidavit states that Mr. Sigillito solicited investors who loaned money to *him*. Such a statement is clearly not a clerical mistake because in paragraph 7, the affidavit refers to "investors, who had earlier loaned money to Mr. Sigillito for investment purposes." In fact, Mr. Sigillito was never a borrower on any of the loans in the British Lending Program. This is a critical misstatement because, among other

28

things, Ms. Stajduhar is reported to have stated, in paragraph 8 of the affidavit, that "Mr. Sigillito uses money he receives to support a lavish lifestyle…"

The inclusion of these misstatements in the affidavit were either intentional, or at the very least, in reckless disregard of the truth.  In paragraph 20 of the affidavit, Agent Cosentino states that Ms. Stajduhar provided him with "numerous documents, including promissory notes and other related documents to the investment scheme."  A simple perusal of the promissory notes provided by Ms. Stajduhar would have revealed that Mr. Sigillito was not a borrower on any of the loans.

A second misstatement in the affidavit is the statement by Ms. Stajduhar that Mr. Sigillito had very few, if any clients for whom he does actual work.  This assertion, in paragraph 3, is emphasized in paragraph 4, when the affidavit states that the only business of Martin T Sigillito, to the best of Ms. Stajduhar's knowledge is that he solicits investors.  There is absolutely no corroboration of Ms. Stajduhar's statements and the making of such a statement without corroboration is, at best, reckless.  Indeed, agent Cosentino states in paragraph 4 that he is "aware of potential attorney/client privilege issues in files, documents, and the computers."  Cosenntino goes on to say that of such information is discovered it will be segregated and not viewed by the seizing agents.  In fact, as will be demonstrated in the next section of this memorandum, over 3000 attorney – client privileged records were seized by the FBI during the course of the search of Mr. Sigillito's office.

The third critical misstatement is contained in paragraph 8 where Ms. Stajduhar states that Mr. Sigillito keeps for himself a substantial amount of money from each investment, which Mr. Sigillito designated as fees.  According to the affidavit, the lenders are "not necessarily aware of the amount of money taken by Mr. Sigillito."  This statement, is, at best, misleading.

As Agent Consentino well knew, or clearly should have known, each promissory note, including the ones provided to him by Ms. Stajduhar, contained the following provision:

**6.       Costs, charges, expenses and other liabilities**

The Borrower undertakes with the Lender to pay to the Lender on demand and on a full and unlimited indemnity basis all costs, charges, expenses and liabilities paid and incurred by the Borrower (whether directly or indirectly) in relation to this agreement and the obligations owed under and associated with this agreement (***including all commission, legal and other professional fees and disbursements***, and VAT on them).... [emphasis added].

Thus, each lender was put on notice that commission, legal and other professional fees were contemplated, and that the borrower (not the lender) was responsible for the payment of any such commission, legal and other professional fees.  Furthermore, the agreement makes clear that the fees taken by Mr. Sigillito were not only contemplated under the agreement, but that these fees were to be paid by Mr. Smith and not the lender.  Mr. Smith was still responsible to pay the lender on the due date of the promissory note the principal and accrued interest in full with no deduction resulting from the payment of fees.  Furthermore, Ms. Stajduhar well knew that Mr. Smith authorized, in writing, all fees taken by Mr. Sigillito in connection with the British Lending Program.

Therefore, the monies used for the so called lavish life style of Mr. Sigillito were not lender funds, but rather were transfer of funds to Mr. Sigillito by Mr. Smith for Mr. Sigillito finding lenders regarding the British Lending Program.   As such, the money spent by Mr. Sigillito emanated from legitimate fees paid to him by Mr. Smith not lender funds as stated in the affidavit in paragraph 8.  Similarly, the statement in paragraph 9 that Mr. Sigillito would "draw down on these [lender] monies for his own purposes," is erroneous and very misleading because Mr. Sigillito did not draw down on the IOLTA account for his own "purposes" but rather for the payment of the fees to Mr. Sigillito from, and authorized by, Mr. Smith.

30

The above-described misstatements completely misconstrue the nature of the payments to Mr. Sigillito and conjures up the appearance of criminality when, in fact, Mr. Sigillito was receiving agreed upon fees from Mr. Smith for the procurement of lenders for the British Lending Program.  The payment of "finders" fees is a widespread and legal practice undertaken by a variety of legitimate businesses.

Similarly, the affidavit's statement that investors believed they were receiving legitimate profits on their investment when in fact subsequent lenders' funds were being used to repay the prior lenders also is a misstatement that is contrary to the documents in the possession of Agent Cosentino provided by Ms. Stajduhar.  Each promissory note contained the following or similar provision:

### 3.     Purpose of Advance

The monies are lent by way of assistance in relation to *cash flow* for the business purposes of the Borrower. [emphasis added]

Thus, each lender loaned the money to Mr. Smith for the purpose of assisting Mr. Smith with the cash flow of the ventures involved in the British Lending Program.  In essence, each lender had no vested interest in how Mr. Smith was to spend the money he received in connection with the company business.  Similarly, earlier lenders were put on notice that in the event of cash flow problems, Mr. Smith could repay the principal and interest owing the earlier investor from funds lent by subsequent lenders.  Thus, there was no concealment from the lender as to what Mr. Smith could do with the money.  Once again, this information was readily available to Agent Cosentino from the very documents supplied to him by Ms. Stajduhar.

As Ms. Stajduhar well knew, the cash flow difficulties plaguing the British Lending Program in 2008 and 2009 and into 2010 were predicated upon delays in the Bracknell project being approved by local British authorities.  This situation was further complicated by virtue of

31

delay in obtaining a settlement from a lawsuit in Turkey and Phil Rosemann's insistence upon cashing out all of his loans at the same time although some had not yet matured. None of this information was included in the affidavit. Although defendant cannot establish that agent Consentino was aware of these facts, the lack of corroboration of Ms. Stajduhar and her prior dishonestly required further investigation rather than obtaining a search warrant less than 48 hours after his one and only interview of Ms. Stajduhar.

A further false statement and omission of material fact is contained in paragraph 6 of the affidavit. Therein, the affidavit states that, to Ms. Stajduhar's knowledge, only approximately $900,000 and been sent to England "ostensibly" for purposes of investing the money in the land options. As Ms. Stajduhar well knew, millions of dollars had been sent to England for the purchase of land options or paid on behalf of Mr. Smith regarding the British Lending Program. Furthermore, omitted from the affidavit was the fact that the repayment of loans and accrued interest was on behalf of Mr. Smith. If all the funds, minus fees and expenses incurred for procuring the loans, money sent to England would have had to have been returned to the United States to pay off prior lenders' promissory notes. Thus, to say that only $900,000 had "been sent to England" was false to begin with and was also misleading by omitting the fact that expenses of Mr. Smith were paid on his behalf and that the repayment of prior loans was also on Mr. Smith's behalf because such payment was an obligation of Mr. Smith under the promissory note.

Indeed, the very haste with which the government proceeded with a search warrant in this case demonstrates a reckless disregard for the truth. From Ms. Stajduhar's statements and the documents provided to the government by her, the agent knew that the British Lending Program had existed for at least 10 years. The lender list provided by Ms. Stajduhar listed well over 100 loans. According to Ms. Stajduhar, over $44 million had been loaned to Smith and Smith-related

entities over that 10 year period.  Presumably, the contact by Ms. Stajduhar's attorney the day before Ms. Stajduhar was interviewed, was the first time the government was aware of the allegations of wrongdoing in the British Lending Program.  Given the fact that the agent knew that Ms. Stajduhar had stolen over $200,000 from Mr. Sigillito and that her motive for coming to the government was to escape prosecution, it was indeed in reckless disregard of the truth for the government to proceed with a search warrant on the information available and the questionable motives and veracity of Ms. Stajduhar.

Paragraphs 22 and 23 of the affidavit refer to the arrest of Mr. Thomas Utterback 13 years previously in connection with having possession of $3 million in cash on his person.  Mr. Sigillito happened to be present when Mr. Utterback was arrested.  Although the affidavit states that Mr. Utterback pled guilty, the affidavit fails to note that Mr. Sigillito was never charged or accused of any wrongdoing whatsoever.  Indeed, the government well knew that no evidence existed establishing that Mr. Sigillito even knew about the $3 million.

Finally, perhaps the most serious and egregious omission of material fact related to the consequence, according to Ms. Stajduhar, of executing a search warrant at the time she provided the FBI with her information.  Among the text messages downloaded by the FBI from Ms. Stajduhar's cell phone was the following text message sent by Ms. Stajduhar the day before she met with the FBI:

> Sorry to bother you again.  I am so stressed and confused.  I am told by some that it can be fixed and no one lose their money.  But if I give this guy the info today it could be ruined for everyone else.  People could lose their whole networths.  But I am not a lawyer and I need to know if the plan will work.  I could blow this whole up right now but so many people lose a lot.  So I have been holding out for this "fix."

A different text message makes clear that Ms. Stajduhar is collecting documents and information to give to the government.

33

I have another person who is gathering the information to bring forward.  I have been working with him and his lawyer.  Said I should be fine.  But to hire someone to represent me and have them talk to him.

In the event that at a hearing, the allegation of intentional misstatement or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false materials set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.  *Franks*, *supra*, 438 U.S. at 155-156.  The same rationale is applied to omissions of material facts in that if omitted facts are added to the affidavit would probable cause still exist.  *United States v. Reivich,* 793 F.2d 957, 960 (8th Cir.1986); *United States v. Jacobs,* 986 F.2d 1231, 1234 (8th Cir. 1993).

## E.    GENERAL SEARCH

As discussed previously, the search warrant for Defendant's office was fatally defective in that it was overbroad and did not describe the documents to be seized with sufficient particularity.  However, even if this Court were to conclude that the search warrant itself was not constitutionally defective, the manner of execution of the search warrant rendered the search unconstitutional.

Even where a search warrant meets both probable cause and particularity requirements, the search itself must be conducted in a reasonable manner, appropriately limited to the scope and intensity called for by the warrant. *United States v. Heldt,* 668 F.2d 1238, 1256 (D.C.Cir.1981).  In other words, the general touchstone of reasonableness which governs Fourth Amendment analysis ... governs the method of execution of the warrant." *United States v. Ramirez,* 523 U.S. 65, 71, (1998). *United States v. Gregoire*, 638 F.3d 962, 967 (8th Cir. 2011)

If the scope of the search exceeds that permitted by the terms of a validly issued warrant or the character of the relevant exception from the warrant requirement, the subsequent seizure is unconstitutional without more. *Horton v. California*, 496 U.S. 128, 139-40 (1990). Indeed, a flagrant disregard for the limitations of a search warrant might make an otherwise valid search an impermissible general search requiring the return of all evidence seized. *Marvin v. United States*, 732 F.2d 669, 674 (8th Cir.1984).

When items are seized which are not included within the terms of the warrant, the usual remedy is to suppress only those items which were outside the scope of the warrant. *United States v. Medlin,* 798 F.2d 407, 411 (10th Cir.1986), *app. after remand,* 842 F.2d 1194 (1988). However, "'flagrant disregard for the limitations of a search warrant might make an otherwise valid search an impermissible general search and thus require suppression or return of all evidence seized during the search.'" *Medlin,* 798 F.2d at 411 (citing *Marvin v. United States,* 732 F.2d 669, 647–75 (8th Cir.1984)). In *Medlin,* the Court of Appeals for the Tenth Circuit provided the rationale for this "blanket exclusion" of all evidence seized during a search, including those items particularly described in the warrant:

> The basis of those decisions which hold that blanket exclusion is appropriate when a search warrant is executed with "flagrant disregard" for its terms is found in our traditional repugnance to "general searches" which were conducted in the colonies pursuant to writs of assistance. To protect against such invasive and arbitrary searches, the Fourth Amendment mandates that search warrants "particularly describ[e] the place to be searched and the persons or things to be seized."

In the present case, the agents seized almost 8000 pages (7781) of documents that had nothing to do with the BLP. This constitutes 10% of all documents seized. Included in the 7781 documents, almost half (3096) were clearly attorney–client privileged documents. 263 documents that related only to the practice of law (blank forms for use by attorney, Lexis-Nexis

material, Martindale-Hubbell, copies of business cards as well as similar material related solely to the practice of law). 1086 documents were strictly personal (letters and e-mails from family, children's bank statements, e-mail from daughter concerning mother's birthday, letter of recommendation for a friend of the family, a fax transmission from the Chamber's of Judge Autry containing personal data of Mr. Sigillito's wife, notes of travel plans of friends and communications with his wife). Also taken during the search were 735 pages of church-related material. Examples of this type of seizure include church bank statements, documents regarding a church lease, church corporate documents, church bulletins, invoices for church purchases and even a 119 page list of documents and materials owned by the Bishop whom Mr. Sigillito succeeded. Finally, 2601 documents, categorized as miscellaneous, were taken during the search. Included in this category were empty envelopes, catalogs of various types, unsolicited advertisements, call summary compilations, unused tax voucher forms and various IRS tax forms and booklets.

The incredible amount of noncriminal documents and categories of documents that were not even listed on the warrant clearly establishes an illegal search. Just as the warrant itself was facially defective, lacking a schedule A and supported by an affidavit totally lacking probable cause and containing misstatements and omissions of fact, so too, the search was recklessly conducted with no concern for either Mr. Sigillito's rights or those of his clients, church members or family. Although the warrant with schedule A was incredibly broad and, as defendant contends, defective, the agents went well beyond even the broad categories listed in the warrant.

Such a flagrant violation of the parameters of a very broad search warrant requires that all evidence seized must be suppressed and returned to Defendant. *Marvin v. United States*, 732

F.2d 669, 674 (8th Cir. 1984); *United States v. Premises Known as 1007 Morningside Ave., Sioux City, Iowa*, 625 F.Supp. 1343, 1350 (N.D. Iowa 1985).

**CONCLUSION**

WHEREFORE, for the foregoing reasons, Defendant respectfully requests that his motion to suppress the May 24th 2010 Search warrant be granted.

Respectfully, submitted,

/s/ Douglas P. Roller
Douglas P. Roller #50262MO
Roller Law Office LLC
2507 January Avenue
St. Louis, Missouri 63110
(314) 645-7228
(314) 645-7235 (fax)
dprcrimlaw@aol.com

***Attorney for Defendant Martin Sigillito***

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 4th day of October 2011, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system to all counsel of record:


/s/ Douglas P. Roller

38