UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:11CR168 LRR |
| | ) | |
| MARTIN T. SIGILLITO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S OMNIBUS RESPONSE TO DEFENDANT SIGILLITO'S MOTION TO SUPPRESS MAY 24, 2010 SEARCH OF DEFENDANT'S OFFICE (DOC. 96), MOTION TO SUPPRESS MAY 24, 2010 SEIZURE WARRANT (DOC. 98), AND MOTION TO SUPPRESS JULY 1 AND 2 SEARCHES AND SEIZURES (DOC. 100)**

COMES NOW the United States of America, by and through its attorneys, Beth Phillips, United States Attorney for the Western District of Missouri, and Jess E. Michaelsen, Steven E. Holtshouser, and Richard E. Finneran, Special Attorneys to the United States Attorney General and submits the following omnibus response to defendant Sigillito's motions to suppress:

**Table of Contents:**

I. Introduction                                                                                      3

II. Overview of Facts                                                                            4

III. Analysis                                                                                         13

      A.    Elizabeth Stajduhar Did Not "Search" Sigillito's Private Documents and Was Not a Government Agent When She Obtained the Documents          13

           1.    There Was No Search by Elizabeth Stajduhar          13

           2.    Stajduhar Was Not A Government Agent When She Obtained the Documents and Thus Any Search by Her Was Purely Private          17

           3.    Ms. Stajduhar's Text Messages Establish That No Search Was Conducted and That She Was Not a Government Agent          20

B. May 24, 2010 Search Warrant for Sigillito's Office Satisfied Fourth Amendment 24

 1. Attachment A Was Incorporated into Search Warrant When Issued 24

 2. Attachment A Was Sufficiently Particular 28

  a. The Sufficiency of an Attachment Is a Matter of "Practical Accuracy" Based Upon the Circumstances of the Case 29

  b. The Failure to Reference a Specific Statute in Attachment A Is Irrelevant 36

  c. Attachment A Permissibly Authorized the Search and Seizure of Sigillito's Computers 37

 3. The Application for the May 24, 2010 Search Warrant Was Supported by Probable Cause 40

 4. Sigillito Cannot Meet His Burden Under *Franks v. Delaware* Because the Affidavit Did Not Contain Any Material False Statements 46

C. May 24, 2010 Search Warrant for Sigillito's Office Was Validly Executed 53

 1. Document Seizures Were in Substantial Compliance with the Scope of Attachment A 53

 2. There Was No Seizure of Assets for Forfeiture on May 24, 2010 58

D. The July 1, 2010 Search of Sigillito's Primary and Secondary Home and Seizure of Assets for Forfeiture Was Done Pursuant to Validly Issued and Executed Search and Seizure Warrants 60

 1. The Search Warrants Authorized Seizure of the Property 60

 2. The Seizure Warrant Was Appropriately Limited 60

 3. Contrary to Sigillito's Premature Challenges, the July 1, 2010 Seizure Warrant Was Valid 62

 4. Sigillito's Contention That Property Not Subject to Forfeiture Was Seized Is, Again, Premature 63

2

5.  Sigillito's Challenge to the Seizure of Bank Funds Is Likewise Premature and Without Merit                                    63

6.  The Affidavit Established Probable Cause                             65

    a.  The Affidavit Is Not Insufficient for Failing to Identify Investors by Name                                              65

    b.  Sigillito Again Fails to Make a Threshold Showing of the Falsity of Any Statements in the Affidavit                       65

    c.  Even If the Contested Statements Were Intentionally False, the Affidavit Still Established Probable Cause Without Them     66

E. Good Faith                                                           66

F.  Inevitable Discovery                                                68

G. Independent Source                                                   70

IV.  Conclusion                                                         71

# I.  <u>INTRODUCTION</u>

Sigillito's Motions to Suppress challenge two law enforcement actions:[1] the search of his office pursuant to a federal search warrant on May 24, 2010, and the seizure (and related search) of particular items from his primary home and a second home pursuant to a federal seizure warrant and search warrants on July 1, 2010.[2]  The actions were part of an investigation of the fraudulent loan solicitation scheme operated by Sigillito for over 10 years, known as the "British Lending Program" (BLP).  The investigation resulted in the pending indictment.

---

[1] Sigillito's motions do not seek to suppress statements made by him on May 24, 2010, or July 1, 2010, to law enforcement officials.  His motions also do not seek to suppress the results of a search, pursuant to a federal warrant, of his stored e-mail communications held by Yahoo! on or about June 1, 2011.  Accordingly, this omnibus response will not address those actions.

[2] The seizures initiated on July 1, 2010 continued to July 2, 2010 and covered property held by third parties.

The Government will provide the Court with an overview of the facts and legal analysis of those facts.  The facts will be proven at a hearing on Sigillito's pretrial motions.  Sigillito's motions to suppress should be denied.

**II.    OVERVIEW OF FACTS**

In May 2010, attorney Ethan Corlija began representing Elizabeth Stajduhar in connection with concerns about an investment loan business operated by Sigillito, her employer. The office where Sigillito and Ms. Stajduhar worked, which was located at 7710 Carondelet Ave., Suite 208, Clayton, Missouri, consisted of a reception area, a hallway, a storage room, an office and a conference room.  The door simply stated "Martin T. Sigillito."  Ms. Stajduhar had complete access to the entire space and everything in it, with the exception of locked glass bookcases that held valuable books.  She had a key, opened and closed the office and was in charge of the office more often than not.  There was no e-mail network, and she used her personal e-mail account for work-related e-mails.  She created the passwords for her computer and Sigillito's computer.  She had access to Sigillito's personal e-mail accounts.  She often carried documents to her home, either physically or in electronic form on a personal thumb drive that she always kept in her purse, or e-mailed documents to herself for the purpose of working at home.  She often worked from home for Sigillito as she had children and was a part-time student. At home, she worked for Sigillito on her personal computer and used one of several personal printers. Sigillito knew that Stajduhar frequently worked from home.  For approximately ten years she had been Sigillito's sole employee.[3]

Ms. Stajduhar and Mr. Corlija met during the evening of May 17, 2010.  Ms. Stajduhar

_____

[3]Another secretary preceded Ms. Stajduhar when he first moved to his own office.  In addition, for a brief time while Ms. Stajduhar was on maternity leave, the daughter of an investor victim worked part-time.

worked in the office that day even though Sigillito was out of the country in Israel soliciting a new lender.  After meeting, Mr. Corlija accompanied Ms. Stajduhar back to the office.  Mr. Corlija viewed the dilapidated and disorganized condition of the office and also viewed loan documents for Ms. Stajduhar's in-laws.  Her in-laws were among those who had given money to Sigillito as part of the BLP.  Nothing was removed from the office during the visit.  Ms. Stajduhar already possessed a large quantity of pertinent documents, either physically or electronically, at her home.

That evening Mr. Corlija, after leaving the office with Ms. Stajduhar, contacted then-Deputy U.S. Marshal Luke Adler.[4]  Mr. Corlija advised that he had a client who had information concerning criminal activity.  The Deputy U.S. Marshal immediately referred the information to FBI Forfeiture Contractor, and former Special Agent, James Appelbaum, who in turn contacted FBI Special Agent Kevin Cosentino on May 18, 2010.  SA Cosentino, Appelbaum and Deputy Adler met Mr. Corlija on May 18, 2010 at a coffee shop.  Mr. Corlija advised the agents, *inter alia*, that his client was the employee of a non-practicing attorney and that his client believed the attorney was engaged in a fraudulent loan solicitation/investment scheme involving millions of dollars.  He also told the agents that the client, Elizabeth Stajduhar, already possessed numerous documents which related to the scheme.  He also stated that the attorney, Martin T. Sigillito, was then out of the country soliciting a large investor and would not return until May 23, 2010.  He indicated that his client had full access to and control of the office where she worked for the attorney and sometimes worked from home.  It was agreed that Ms. Stajduhar  would meet with them and representatives of the U.S. Attorney's Office on May 19, 2010.  Mr. Corlija was

---

[4] Deputy Adler was a friend of Mr. Corlija.  At the time Deputy Adler was assigned to the FBI.  Deputy Adler is now retired.

instructed to advise Stajduhar to bring any documents she already possessed.[5]  The agents also instructed Mr. Corlija to tell Ms. Stajduhar not to return to the office or remove anything from the office, at least until after they met.[6]  The agents were not aware that Mr. Corlija had briefly visited the office with Ms. Stajduhar on May 17, 2010.

On May 19, 2010, Stajduhar and Corlija met with several representatives of the U.S. Attorney's Office and SA Cosentino and Appelbaum.  It was admitted that Ms. Stajduhar had misappropriated approximately $200,000 from Sigillito during her employment.  No promises were made to Ms. Stajduhar in connection with that offense or information she provided other than standard oral proffer and use immunity assurances.  Ms. Stajduhar proceeded to describe a complicated fraudulent loan solicitation and investment scheme carried out by Sigillito over the course of 10 years.  Ms. Stajduhar estimated that Sigillito had taken in over $44 million dollars and used most of the money for personal purposes and in a manner consistent with a "Ponzi" scheme.  She advised that Sigillito was then in Israel trying to obtain $5 million from a new lender/investor and was due to return to the U.S. on May 23, 2010.

At the meeting, Ms. Stajduhar also provided the agents a packet of documents which numbered approximately 500 pages and included spreadsheets of loan activity prepared by her, a sample "John Doe" promissory note and numerous e-mail communications with lenders and others involved in the scheme.  Most of these were printed by her at her home from her personal e-mail account or from electronic documents that she had previously e-mailed to herself or kept

---

[5] No distinction was made between documents that she possessed physically and documents that she possessed at home in electronic form that needed to be printed out.

[6] In fact, Ms Stajduhar did not return to the office until Monday, May 24, 2010, and agents were there interviewing Sigillito when she arrived.

6

by her on hard or flash drives.  The documents did not contain any completed, actual loan agreements.  Some of the documents had been created by her during her employment and possessed by her for many weeks prior to May 19, 2010.

Even prior to May 17, 2010, Ms. Stajduhar had already possessed either hard or electronic copies of the documents she provided on May 19, 2010.  She had printed most of those documents from her personal home computer on her personal home printer with her own paper and ink from hard and flash drives which she often used to do work at home and from her personal e-mail account which she used to communicate with Sigillito and others.  She had access to all of these at her home.  Most of the printing of e-mails had been done during the afternoon and evening of May 18, 2010.  In addition to providing these documents to the agents on May 19, 2010, she permitted her cell phone to be examined forensically to download her e-mail and text communications.[7]  She was also equipped with a recorder to record any conversations that she might have with Sigillito.[8]

The Government viewed Ms. Stajduhar's information as credible and reliable and was concerned that Sigillito was in the midst of fraudulently obtaining $5 million in new funds.  Independent investigation revealed a previous allegation by Millenium Trust Company (MTC), which administered IRA's for Sigillito lenders as investments.  MTC had prepared and filed a

---

[7] Although the Government possessed the downloaded information, it was many months before the content of the information could be viewed by members of the investigating team. The information had to be processed by forensic software and then further processed to produce a chronological list of sent and received messages with accurate dates and times.  Conversions had to be made from Greenwich Mean Time.  In addition, there was initial concern about potential attorney-client privileged materials that delayed review by the investigating team.  In any event, the investigating team did not have knowledge of the contents of any of the text messages or e-mails from Ms. Stajduhar's cell phone until well after the events in question.

[8] She had the recorder with her on May 24, 2010, when she talked privately in a hallway of the office with Sigillito, but was unable to turn the recorder on without being detected.

Suspicious Activity Report in July, 2008, alleging that Martin T. Sigillito, 7710 Carondelet Ave.,

Suite 208, Clayton, Missouri, was operating a loan investment opportunity as a Ponzi scheme.

In addition, it was verified that a federal lawsuit had been filed in the Eastern District of

Missouri by Phillip Rosemann against Derek Smith in England related to the loan scheme.  It

was also determined that Sigillito only had several thousand dollars in a bank account, which

was consistent with Ms. Stajduhar's statement that not much was left of the $44 million he had

taken in.  Finally, it was determined that Sigillito's name had come up in 1997 in connection

with a money laundering investigation that involved an attempt to deposit approximately $3

million in illegal cash into a Swiss bank account.

A search warrant for Sigillito's office, 7710 Carondelet Ave., Suite 208, Clayton,

Missouri, was prepared by SA Cosentino, reviewed by the U.S. Attorney's Office and presented

to U.S. Magistrate Judge Frederick R. Buckles on May 21, 2010.  Judge Buckles signed and

issued a "Search and Seizure Warrant," at 9:40 a.m.  Attachment A to the warrant was a list of

the items to be seized for the period June 1, 2000, through the date of the warrant.  *Exhibit 1A,*

*1B and 1C* to this response is a copy of the "Application For A Search Warrant." including

Attachments A (List of Items to be Seized) and B (Investor List); the "Search and Seizure

Warrant" signed by Judge Buckles; and the return made on the warrant, respectively.  Later in

the day on May 21, 2010, Mr. Corlija obtained from Ms. Stajduhar and delivered to the FBI a

copy of a Personal Articles Declaration (PAD), which identified specific property insured by

Sigillito and which Ms. Stajduhar advised had been purchased by Sigillito during the period

covered by the scheme.

On May 24, 2010, FBI agents proceeded to Sigillito's office.  Previously, they had

received instructions from First AUSA Michael W. Reap concerning use of taint procedures to avoid viewing or seizing attorney-client privileged items, if any, based on Sigillito's status as an attorney.  SA Wade Beach[9] served as the taint agent to assist with the execution of the search warrant and later taint-reviewed seized items before releasing them to the investigation agents. Each agent participating in the search was required to read the affidavit and to possess a copy of Attachment A, the list of items to be seized.

The agents proceeded to the office on the morning of May 24, 2010.  They were admitted to the office by Sigillito himself.  The office was in complete disarray with boxes and papers spread everywhere, including the hallway.  The agents then had a conversation with Sigillito concerning the investment scheme.  Sigillito answered questions for about 45 minutes.  Sigillito admitted much of the information provided by Ms. Stajduhar, including the fact that he did not have any civil or criminal legal clients, the fact that new lenders' money had been used to pay prior lenders and that less than $1 million had been sent to England. He admitted he had been in Israel trying to raise $5 million from a new lender and that if successful some of it would be used to pay other investors.  Sigillito then advised that he did not want to answer further questions without consulting an attorney.  The agents stopped questioning Sigillito and advised him that they had a search warrant to search the office.  They further advised Sigillito that they did not want to look through any materials to which the attorney-client privilege might apply.  The agents requested Sigillito's assistance in identifying attorney-client or irrelevant materials. Rather than assist, Sigillito requested to leave the premises and directed the agents to obtain guidance from his assistant, Ms. Stajduhar.  Sigillito was permitted to leave.

---

[9] SA Beach is an attorney.

9

The search was conducted and Ms. Stajduhar assisted the agents in locating materials related to the investment scheme. The search was directed by SA Cosentino. At the search site, SA Cosentino had a copy of the signed search warrant with Attachment A attached, a copy of the affidavit including Attachments A and B and the PAD. Sigillito did not ask to view a copy of the warrant prior to his departure even though SA Cosentino was holding it. Many boxes of items were seized, consisting of books believed to be purchased with proceeds and documents related to the investigation and covered by Attachment A. A copy of the warrant that included Attachment A and a receipt for the items seized were left at the scene at the conclusion of the search. Categories of documents included promissory notes, financial documents, such as tax returns, tax return preparation papers and receipts of expenditures used to prepare tax returns; copies of e-mail communications, correspondence, spreadsheets, marketing materials and notes relating to the investment loan activity under investigations. Agents also seized four computers and several computer discs.[10]

Ms. Stajduhar did identify some boxes of documents as pertaining to previous law clients and Sigillito's church activities. Those documents were neither viewed nor seized. However, Sigillito's office organization was practically non-existent. Despite efforts to seize only pertinent documents described by the warrant, without reviewing every document on site it was impossible to avoid seizing some irrelevant documents. In addition, the taint procedures being

---

[10] The computers and computer media were subsequently searched by a computer forensic expert for materials related to the investment scheme. Only two of the computers and several of the discs had pertinent information and that information was filtered through a taint review process before being transferred to the investigating team. Some of the computers could not be mirrored on site because they were "Macs" rather than "PCs".

used made it impractical to review every document on site.[11]  As a result of the commingling of relevant documents with irrelevant documents by Sigillito, some documents not pertaining to the scheme under investigation were seized.  None of these resulted in the discovery of pertinent or other evidence and will not be used against Sigillito at trial.  Finally, a number of valuable artifacts and collectible books were seized as evidence of Sigillito's expenditure of illegal proceeds and were later made the subject of an administrative forfeiture proceeding.[12]

The Government's investigation continued after the May 24, 2010 search.  On June 30, 2010, SA Cosentino applied for seizure warrants for a specific list of items which he had probable cause to believe were subject to forfeiture.  Many of these items were believed to be kept by Sigillito at his primary home on Gore Ave. in Webster Groves, Missouri and his secondary home on Links Rd. in Marthasville, Missouri.  To gain entry to these locations, SA Cosentino applied for search warrants.  The same affidavit supported the seizure and search warrants.  Some of the items were also believed to be in his attorney's bank account, his attorney's office, his country club wine room and other bank accounts.  Seizure, but not search, warrants were obtained for these items.

On July 1, 2010, the search warrants were executed at Gore Ave. and Links Rd. simultaneously.  Sigillito and his family were present at Gore and no one was present at Links.

---

[11] The actual taint review took many months.  The Government sought the assistance of Sigillito's then-counsel in expediting the taint review.  This resulted in Sigillito and his attorneys reviewing documents for a half day on June 24, 2010, identifying some documents as privileged, and then never returning to complete the task.  The segregated documents have remained tainted, but the taint team had to complete the taint review of the hundreds of thousands of additional pages of material without input from Sigillito or his counsel.

[12] After timely notice was given to Sigillito, he filed a claim contesting administrative forfeiture and thereafter a civil forfeiture complaint was filed against the property in question.  The property was eventually made the subject of a criminal forfeiture allegation in the indictment.  Thus, at present, there has been a Grand Jury determination of probable cause to believe the property in question is proceeds of the offenses charged and is subject to forfeiture.

Despite being given ample opportunity to remove his family from the Gore residence before searching agents came to the house, Sigillito instead chose to depart himself and left his wife and children to confer with agents about the items they were seeking.  Before leaving, Sigillito had a brief conversation with the agents concerning the whereabouts of certain items.  Every possible precaution was taken so that the seizure of assets had a minimum impact on Sigillito's family.  In many instances, the agents advised Sigillito's wife which assets they were looking for and permitted her to retrieve them from different locations in the home.  Even though authorized to be seized, if Sigillito's wife indicated that the asset pre-dated the scheme or was acquired by means other than proceeds of the scheme, then the agents did not seize the item in question.  Numerous items covered by the seizure warrant were located at and seized from the residences at Gore and Links.  Attached as Exhibits 2A-C, 3A-C and 4A-C are the seizure warrant documents, the Gore search warrant documents and the Links search warrant documents.

The seizure warrant authorized the seizure of a specified amount of money in the trust account of Sigillito's counsel at his counsel's bank, a quantity of liquor held at the Racquet Club in the possession of the club manager and funds in several of Sigillito's bank accounts.  After being given notice of the seizure warrant on July 1, 2010, Sigillito's counsel provided agents with a check payable to the FBI for the amount in question in lieu of seizing funds from his bank.  As stated by Sigillito, certain gold coins covered by the seizure warrant were in the possession of his counsel and these coins were also provided to the FBI by his counsel upon learning of the seizure warrant.  The liquor was seized from the Racquet Club and the bank funds were seized from the bank.  Because the check provided by the law firm should have been made payable to the USMS, on July 2, 2010, Sigillito's counsel substituted a new check payable to the

12

USMS for the check to the FBI.  In addition, a watch covered by the seizure warrant had been worn by Sigillito on July 1, 2010 when he left the Gore residence.  Through communication with Sigillito's counsel, the watch was obtained and provided by his counsel to the FBI on July 2, 2010.

The items seized on July 1 and 2, 2010, were made the subject of the administrative forfeiture process, a claim was made by Sigillito, his wife and his counsel, and a civil forfeiture action was eventually filed against the property.  The property is now the subject of the forfeiture allegation in the indictment in this case.

## III.   ANALYSIS

### A.   Elizabeth Stajduhar Did Not "Search" Sigillito's Private Documents and Was Not a Government Agent When She Obtained the Documents

#### 1.   There Was No Search by Elizabeth Stajduhar

To constitute a "search" within the meaning of the Fourth Amendment, there must be an invasion of a person's privacy.  *Oliver v. United States,* 466 U.S. 170. 177–78 (1984).  To determine whether a person's expectation of privacy is legitimate, the defendant must have a subjective expectation of privacy in a place and society recognizes that expectation as reasonable.  *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).  A subjective expectation of privacy is demonstrated by taking actions to keep material secret. *Rawlings v. Kentucky*, 448 U.S. 98, 105–06 (1980).

A workplace setting, such as an office, entails a diminished expectation of privacy, and sharing of material together with workplace practices and procedures can further diminish that expectation .  *United States v. Simmons*, 206 F.3d 392, 398-99 (4th Cir. 2000); *see, e.g., United States v. Ziegler*, 474 F.3d 1184, 1189–90 (9th Cir. 2007) (locked office and password protected

computer created expectation of privacy). That is because society is not willing to recognize an expectation as reasonable where material is willingly exposed to third-parties. *Katz*, 389 U.S. at 361. The Supreme Court has recognized that an individual who entrusts another with allegedly private material takes the risk that the other might breach that trust and expose the material to others or permit others to view it. *United States v. Matlock*, 415 U.S. 164, 171 n.7 (1974) (risk that persons given joint access and control might permit search); *Frazier v. Cupp*, 394 U.S. 731, 740 (1969) (assumption of risk that person to whom bag was lent would allow someone else to look inside).

Whether an expectation of privacy existed in a shared office setting between co-workers turns on the circumstances of the workplace and the relationship between the one conducting the "search" and the one whose property was allegedly "searched." *See O'Connor v. Ortega*, 480 U.S. 709, 718 (1987) (plurality opinion) (noting that because of great variety of work environments, reasonable expectation of privacy must be addressed on a case-by-case basis). Indeed, some offices "may be so open to fellow employees . . . that *no expectation of privacy* is reasonable." *Id.* (emphasis added). When an employee is given unrestricted access to documents of her employer, the employer lacks a legitimate expectation of privacy with respect to those documents. *See United States v. John Bernard Indus., Inc.,* 589 F.2d 1353, 1361–62 (8th Cir. 1979) (holding that defendant lacked legitimate expectation of privacy in records kept in office accessible to other employees and retrieved by cooperating government witness and co-employee of defendant), *cited with approval in United States v. Williams*, 2009 WL 943790 (E.D. Mo. Jan 30, 2009), *recommendation adopted by* 2009 WL 928733 (E.D. Mo. March 31, 2009); *United States v. Miller*, 800 F.2d 129, 134 (7th Cir. 1986) (holding that absent express

14

limitation by employer, custodian has unrestricted right to hand over business documents to authorities); *United States v. Ziperstein*, 601 F.2d 281, 289 (7th Cir. 1979) (holding that employer had no legitimate expectation of privacy in records to which employee was given complete access: "[W]hat employees observe in their daily functions is undoubtedly beyond the employer's reasonable expectation of privacy . . . . (quoting *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 315 (1978)) (emendations omitted)).  *But see United States v. Welliver*, 976 F.2d 1148 (8th Cir. 1992) (declining to apply *Ziperstein* and *Marshall* and finding no expectation of privacy on alternative ground that records were subject to FCIC inspection). The Supreme Court "consistently has held that a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties." *Smith v. Maryland*, 442 U.S. 735, 743–44 (1979).

The evidence at the hearing will show that there was no Fourth Amendment "search" <u>by Ms. Stajduhar</u>, because she did not invade any area where Sigillito had a subjective or objectively reasonable expectation of privacy <u>as against her</u>.  The documents that she provided to the FBI on May 19, 2010, were documents to which she had complete access, both at the office and at her home.  A few of the physical documents were taken by her and possessed by her prior to her contact with the FBI,[13] but the bulk of the documents were printed by her at her home using her home computer, her home printer and her personal e-mail account.  She could bring the documents home, either physically or electronically, because Sigillito trusted Ms. Stajduhar with complete access and control over his office and business.  She opened and closed the office with her key.  Files were not password protected.  As such, Ms. Stajduhar was no different than a spouse who discovered evidence of a crime in a home shared with another spouse who then

---

[13] They were also possessed by her prior to her contact with her attorney and prior to his contact with government agents.

delivered it to authorities or a whistleblower in a business who discovered that an employer was committing a crime and brought to police documents to which the employee had access.

Contrast the situation where an employee secretly obtained a password from an employer to access the employer's private documents or the landlord who entered a tenant's dwelling to gather evidence of criminal activity of the tenant. In the latter situations, the private individual actually invaded a private area where the employee or landlord did not have access as part of their relationship with the employee or tenant. To obtain the documents in question, Ms. Stajduhar did not exceed the scope of the access and control freely granted to her by Sigillito. Sigillito had exposed all of his business documents to her. No area that Sigillito kept private from Ms. Stajduhar needed to be violated to obtain the documents. In fact, most of them were available to her as attachments in her personal e-mail account. Sigillito surely lacked an expectation of privacy that society is willing to recognize as reasonable in either the documents she handled at work or at home in her personal e-mail account. As with consensually recorded conversations, Sigillito took a risk in trusting Ms. Stajduhar with so much access and control that she would report his illegal activities to authorities.[14]

Whether an expectation of privacy exists goes to Sigillito's standing to seek a suppression remedy . To claim that Ms. Stajduhar "searched" his private papers in a manner that implicated the Fourth Amendment, he bears the burden to establish that he had an expectation of privacy as against Ms. Stajduhar. *United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006) (citing *United States v. Pitts*, 322 F.3d 449, 456 (7th Cir. 2003)). To meet this burden, defendant

---

[14] In fact, it is questionable whether agents even underlined(needed) a search warrant to search the office. Sigillito shrouded Ms. Stajduhar with both apparent and actual authority to control the office during the many times he was not present and to maintain a virtual office in her home. Ms. Stajduhar could have given the FBI consent to search the office. *United States v. Matlock*, 415 U.S. 164, 171 (1974).

almost always must offer an affidavit or testimony. *Mendoza*, 438 F.3d at 795 (citation omitted).

Thus, if Sigillito wishes to persist in this argument, he must first prove that Ms. Stajduhar, in printing and delivering the documents in question to the FBI, violated an area that he kept private *from her*. *Minnesota v. Carter*, 525 U.S. 83, 91 (1998); *Rawlings*, 448 U.S. at 104–05. Sigillito cannot meet this burden. With respect to correspondence, documents and e-mails, any expectation of privacy terminated upon Sigillito's delivery to Ms. Stajduhar. *United States v Gordon*, 168 F.3d 1222, 1228 (10th Cir. 1999); *United States v. King*, 55 F.3d 1193, 1195–96 (6th Cir. 1995).

### 2. Stajduhar Was Not A Government Agent When She Obtained the Documents and Thus Any Search by Her Was Purely Private

Sigillito argues that the search warrant was the fruit of an "illegal private search" by Ms. Stajduhar. The phrase "illegal private search" is an oxymoron, because the Fourth Amendment applies only to searches and seizures that are the product of <u>government action</u>. *Walter v. United States*, 447 U.S. 649, 656 (1980). If any search by Ms. Stajduhar was private, then by definition it did not violate the Fourth Amendment. So long as the Government does not exceed the bounds of a previous private search in conducting its investigation, the Fourth Amendment is not implicated. *See, e.g.*, *United States v. Runyan*, 275 F.3d 449, 464 (5th Cir. 2001) (defendant's wife viewed computer discs and brought them to police, but police exceeded scope of private search by viewing discs not previously viewed by wife). In *United States v. Knoll*, 116 F.3d 994 (2d Cir. 1997), a private party had obtained and searched defendant's documents and upon learning of the action the police <u>requested</u> that the individual deliver the documents to them. The Court held that the defendant no longer had an expectation of privacy in the documents and therefore the Fourth Amendment was not violated. *Id.* at 997–98. Similarly, in *United States v.*

17

*Starr*, 533 F.3d 985 (8th Cir. 2008), the Fourth Amendment was not violated by police reexamining materials initially searched by a private citizen, because the officer's search did not exceed the scope of the private search. *Id.* at 995; *see also United States v. Feffer*, 831 F.2d 734, 739 (7th Cir. 1987) (one co-worker obtained information that another co-worker, Feffer, was diverting unreported sales to herself and brought incriminating documents to the IRS).

In some circumstances, the conduct of a private party may be subject to Fourth Amendment review if the party was acting as a government agent at the time of the party's search. To determine whether a private party is a government agent, three factors must be considered: "1) whether the government had knowledge of and acquiesced in the search; 2) whether the citizen intended to assist law enforcement agents or to further his own purposes; and 3) whether the citizen acted at the government's request." *United States v. Muhlenbruch*, 634 F.3d 987, 998–99 (8th Cir. 2011).

Sigillito quotes the correct test, but modifies it, misapplies it and misrepresents the facts. He treats the "knowledge and acquiescence" factor as met, because when the agents received the documents in question from Ms. Stajduhar on May 19, 2010, they believed she had obtained them from the "office."[15] However, the "knowledge and acquiescence" factor is to be examined at the time of the search, not at a later time. Otherwise, the factor would be meaningless: every private search would violate the Fourth Amendment. The purpose of the exclusionary rule is to

---

[15] This term is used loosely, because there were essentially two offices to which Ms. Stajduhar had access: the office on Carondelet Ave. that was searched and the office in Ms. Stajduhar's home. The documents that she printed existed in e-mails on her personal e-mail account, in flash drives that she routinely carried between the office and home and on the hard-drive of her personal home computer. Therefore, when SA Cosentino stated in paragraph 20 of his affidavit that Ms. Stajduhar obtained the documents from the "office" he was referring to all of the offices over which she had control and to which she had access. In addition, on May 19, 2010, SA Cosentino had no reason to be concerned with the particulars of how Ms. Stajduhar obtained the documents in question once they were delivered to him.

regulate government action; there is no government action if the government was not even aware of the search when it took place.  Accepting the benefits of a private search afterwards with knowledge of the circumstances does not constitute "knowledge <u>and</u> acquiescence."  Here, there is no evidence that the government knew of Ms. Stajduhar's action at the time she obtained and collected the documents into her possession.

Regarding the second factor, the evidence will show that Ms. Stajduhar obtained and possessed the documents in question for personal reasons well before it was in her interest to assist law enforcement.  Ms. Stajduhar began collecting the documents many months prior to May 2010, out of concern for her family's investment in the BLP and out of concern for her own possible exposure if the BLP collapsed and was exposed.  She was not a lawyer and was easily influence by Sigillito, her employer.  But she had read about Bernie Madoff and wondered whether the BLP was also a Ponzi scheme.  She initially accepted Sigillito's stated justifications for the BLP, but soon began to have concerns. As investors were not paid and false explanations were given to investors, she educated herself on where the funds were going and took other steps to satisfy her growing concerns.  She even posed questions to Sigillito in the name of an investor who had not actually posed the questions.  Things began to get worse when she assisted with the drafting of a letter under Mr. Smith's name which she did not believe to be true. Then, an attorney for an investor began to press for answers and filed suit, and an attorney working with Sigillito advised Ms. Stajduhar to get her own attorney.  She also felt vulnerable to Sigillito because she had taken money from him and she believed that Sigillito knew it.  Based upon these and other facts presented at the pretrial motions hearing, it will be clear that Ms. Stajduhar's initial and primary purpose for the alleged search was to protect herself and not necessarily to

19

assist law enforcement.

As to the third factor, there is no evidence that Ms. Stajduhar collected the documents in question at the request of the government.  She had already done so prior to even contacting her attorney, and further action was taken at his recommendation based upon the attorney's experience with federal authorities.  Her attorney knew that his client may have committed a crime herself.  He also had enough sense to know Ms. Stajduhar needed corroboration for her allegations.  Thus, to enhance her credibility, he wisely counseled her to bring forth documentary proof.

Ms. Stajduhar was not a government agent.  Thus, any search by her was private and therefore no warrant was required.

### 3.      Ms. Stajduhar's Text Messages Establish That No Search Was Conducted and That She Was Not a Government Agent

Sigillito relies on text messages between Ms. Stajduhar and her attorney, Ethan Corlija, as evidence that Ms. Stajduhar conducted a search and was acting as a Government agent. Attached as Exhibits 5 and 6 are the pertinent text message log and a summary of the messages,[16] respectively.  Aside from the fact that SA Cosentino did not review the content of these messages prior to receiving the documents in question from Ms. Stajduhar or even prior to the search, the messages do not support Sigillito's claim that Ms. Stajduhar was acting as a government agent or conducted a search.  A fair reading of the messages, in order and in context, warrants rejection of Sigillito's arguments.

First, Ms. Stajduhar was advised by her attorney to bring everything that she had to him

---

[16] The verbatim language of the texts is in Exhibit 5, but the times and dates are based on Greenwich Mean Time (GMT).  Exhibit 6 summarizes the texts, but lists the accurate time and date when converted from GMT to Central Time and Daylight Saving Time (DST).

and to the meeting with the U.S. Attorney.  *Exhibits 5 and 6, Message 1024*.  He did not instruct

her to go to an office or another location to obtain anything she did not <u>already possess</u>.  The

message confirms that there was no need for her to search Sigillito's office, because she already

possessed the documents in question, either physically or electronically in flash drives, personal

e-mail and her home computer hard-drive.

    Second, the visit to Sigillito's office on the evening of May 17, 2010 was not only brief,

but nothing was removed from the office during the visit.  The meeting between Ms. Stajduhar

and her attorney occurred sometime between 7:23 p.m. (time of last message before meeting)

and 8:54 p.m. (time of first message after leaving Sigillito's office). Most of the intervening hour

and a half was spent in her attorney's office.  At 8:54 p.m., Mr. Corlija texted Ms. Stajduhar to e-

mail him the BLP investor list.  *Exhibits 5 and 6, Messages 1031 and 1034*.  This shows both

that nothing was taken from Sigillito's office and that Ms. Stajduhar already possessed any

pertinent documents at her home.  If items were taken from Sigillito's office, such as the investor

list, Mr. Corlija would have received a copy of the investor list then and there would have been

no need for him to request Ms. Stajduhar to e-mail it to him.  Moreover, the request for the

investor list occurred <u>prior</u> to Mr. Corlija's first contact with a member of law enforcement.

That contact was not until shortly before 9:52 p.m., <u>after</u> the request for the investor list.

*Exhibits 5 and 6, Message 1035* (Mr. Corlija "just" spoke with an acquaintance at the USMS).

    Third, the message concerning Mr. Corlija instructing her to get her "flash drives" and

not return to Sigillito's office was to Ms. Stajduhar's husband.[9]  *Exhibits 5 and 6, Message 1059*.

This occurred in a series of messages on the morning of May 18, 2010, between 8:36 a.m. and

---

[9] Ms. Stadjuhar's husband's cell phone nickname was "Ice."

8:48 a.m.  The reference in Message 1059 was to "my flash drives," because they were <u>hers</u> and she regularly used them to transport work documents between the office and home.  Even if she obtained the flash drives from the office during the visit on the evening of May 17, 2010, it was not a search because she had access to the them and they belonged to her.  In addition, the office visit was prior to contact with any law enforcement official.  Message 1059 was also prior to Mr. Corlija's meeting with FBI agents on May 18, 2010.

Fourth, the texts establish that Ms. Stajduhar did <u>not</u> return to the office any time between the visit on May 17, 2010 and her meeting with the U.S. Attorney's Office on May 19, 2010.  A series of texts on May 18, 2010, demonstrate that she was planning to go to the office, and even was going to meet with Phillip Rosemann there, but cancelled due to babysitter issues and spent the rest of the day at her home printing documents on her home printer.  *Exhibits 5 and 6, Messages 1049–1075.*  Later that evening, she met with Mr. Corlija at a Cracker Barrel parking lot in Collinsville, Illinois.  *Exhibits 5 and 6, Messages 1078–1084.*  In other words, there was no opportunity to conduct a private search of the office subsequent to any contact with law enforcement and therefore any search was purely private and not contrary to the Fourth Amendment.

Fifth, the documents in question were printed by Ms. Stajduhar at her home on her home printer and were not taken from the office at the insistence of law enforcement.  Mr. Corlija met with FBI agents on May 18, 2010 between 8:48 a.m. and before 2:02 p.m.  *Exhibits 5 and 6, Messages 1059 and 1069.*  Mr. Corlija advised her to "have everything ready" for the meeting with the FBI and they agreed to meet that night.  In a series of messages immediately following, Ms. Stajduhar and her husband discussed which printer at home she could use and he advised her

22

to use the "Brother."[10] *Exhibits 5 and 6, Messages 1072–1073.* By 5:27 p.m., Ms. Stajduhar advised Mr. Corlija that it had taken her all afternoon to print 200 "<u>messages</u> just from 2010" and she was still printing. Mr. Corlija advised her that she did not need everything for "tomorrow" but would need to print it all eventually for review by Mr. Corlija. *Exhibits 5 and 6, Messages 1075–76 (emphasis added).* The clear inference again is that the documents in question were either e-mail "messages" or contained in e-mails and that there was no search of the office because she was printing from home using her computer and her personal e-mail account. With respect to any non-e-mail documents on May 19, 2010, Ms. Stajduhar already possessed them prior to any contact with law enforcement.

Finally, mixed in with the above texts are texts between Sigillito and Ms. Stajduhar. For example, *Message 1038* shows that Sigillito made no effort to keep his communications secret, he texted to her phone information about his fundrasing efforts in the Middle East. An earlier series of messages on May 17, 2010, not only supports a finding that Sigillito had no expectation of privacy in information and documents shared with Ms. Stajduhar, but also corroborates Sigillito's fraudulent intent. In *Message 958*, Sigillito advised Ms. Stajduhar to tell Kathy Winter, an investor and a representative of other investors, that he was "on  way to complete refunding in middle east." This was a direction to Ms. Stajduhar to lie to Ms. Winter, because the amount he was working on was $5 million at a time when it would have taken over $50 million to completely "refund" the BLP. The series of messages from Sigillito to Ms. Stajduhar's phone that began in *Message 994*, at 7:52 a.m. on May 17, 2010, the day Ms. Stajduhar decided to contact Mr. Corlija, also contained a direction to lie or mislead others as to

---

[10] This was a reference Ms. Stajduhar's husband's printer at home.

the truth about the BLP.  He advised her to give Michael Becker that day an accounting for Phillip Rosemann's investment "but no need to compute all interest owed except for Phil.  Stick with the a & l statement for now."  *Exhibits 5 and 6, Messages 995–96.*  This is significant, because at the time the "a & l statement," a reference to Derek Smith's assets and liabilities, either failed to account for Mr. Smith's BLP principal and interest liabilities at all or grossly understated them.  Sigillito was instructing Ms. Stajduhar to mislead attorney Michael Becker so that Mr. Becker could mislead Mr. Rosemann and his attorney about the true BLP situation.[11]

In sum, Sigillito attempts to create the appearance that Ms. Stajduhar obtained the documents in question from his office during the evening of May 17, 2010, at the direction and insistence of her attorney acting on suggestions from the Government.  A chronological, contextual and fair reading of the text messages, together with other evidence that may be presented at the hearing,[12] demonstrates that not only was there no search by Ms. Stajduhar but any conduct by her was not as an agent of the Government.

**B.     May 24, 2010 Search Warrant for Sigillito's Office Satisfied Fourth Amendment**

**1.     Attachment A Was Incorporated into Search Warrant When Issued**

Sigillito argues that the results of the warrant should be suppressed because the attachment to the warrant was not actually included in the copy of the warrant left at Sigillito's

---

[11] These texts also support the Government's motion to determine that the crime-fraud exception to the attorney-client privilege applies to Michael Becker's representation of Sigillito.

[12] If Sigillito fails to establish standing to challenge the conduct of Ms. Stajduhar, such evidence would not be needed and will not be presented.

office upon completion of the search.[13]  Sigillito claims that the copy he retrieved from the office after the agents left was just the warrant pages (front and back) and did not include Attachment A.

SA Cosentino was an experienced agent and was familiar with the legal requirement to leave a copy of the warrant, including attachments, at the scene of the search.  He will testify that he received multiple complete copies of the warrant from the U.S. Attorney's Office after Judge Buckles signed the warrant on May 21, 2010.  In preparing the search team, he did separate Attachment A from the warrant and made multiple copies of Attachment A for each agent to review in advance and to have with them to guide them during the search.  Multiple copies of the affidavit were made and each agent was required to read the affidavit before proceeding to the search site, but no agent other than SA Cosentino possessed a copy of the affidavit at Sigillito's office.

The warrant, Attachment A and the affidavit were in SA Cosentino's possession at the scene of the search together with the PAD that had been received after the warrant was signed on May 21, 2010, from Ms. Stajduhar's attorney.  SA Cosentino will also testify that his recollection is that Attachment A <u>was</u> stapled to the warrant left at the conclusion of the search.  Regardless, it was his intent to leave a <u>complete</u> copy of an original signed warrant at the scene and he had no intention of leaving a partial warrant that did not include Attachment A.  If Attachment A was not attached to the warrant left behind, it was accidental and could only have

---

[13] After Sigillito terminated the interview with the agents he was advised that the agents had a search warrant and SA Cosentino had it in his hand at the time.  Sigillito did not ask to review the warrant.  Sigillito asked to depart the office and was permitted to do so.

resulted from the process to equip all search team members with Attachment A.[14]  At the

conclusion of the search, and being aware of the requirements of Rule 41, SA Cosentino left a

copy of the <u>complete</u> warrant and a receipt for the items seized at Sigillito's office.

Rule 41(f)(1)(C) of the Federal Rules of Criminal Procedure provides:

The officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property.

Fed. R. Crim. P. 41(f)(1)(C).  Sigillito argues in his Memorandum in Support of his Motion,

Doc. 97 at 5–7, that the search warrant was facially invalid because the copy left behind at the

scene did not have Attachment A stapled to it.  However, he relies on cases that concern failure

to incorporate necessary documents into the application and warrant presented to or issued by the

magistrate.  *See, e.g.*, *Groh v. Ramirez*, 540 U.S. 551 (2004); *United States v. Hamilton*, 591

F.3d 1017 (8th Cir. 2010).  These cases arise in the context of attempting to cure otherwise

constitutionally deficient warrants and supporting documents where either the documents

<u>presented</u> to the magistrate were not attached or there were insufficient words of incorporation.

Sigillito's cases and argument miss the mark, because both the warrant and the affidavit

presented to and signed by the magistrate here included Attachment A as evidenced by the

certified copies of the documents on file with the issuing court.[15]  None of the cases cited by

---

[14] SA Cosentino did not want each search team member to have a copy of the signed warrant pages to prevent accidental exposure of the sealed warrant.  In addition, Sigillito may have intentionally or accidentally removed Attachment A and did not provide it to his counsel.  When this matter was raised in Sigillito's pre-indictment motion for return of property (No 4:10MC00461 UNA, Doc. 1), Exhibit 7 was a copy of the warrant he claimed was left behind.  On the copy, staple holes from where Attachment A was stapled to the warrant were clearly visible.  For Sigillito to establish that Attachment A was not attached to the warrant he found at the office would appear to require his testimony.

[15] Sigillito also confuses the issue by assuming that the Government will argue that the contents of the affidavit can be incorporated into the warrant to bolster the particularity of Attachment A.  The Government does not assert such an argument, because obviously in the warrant there were no words of incorporation referring to the

defendant concern a failure to leave a complete copy of the <u>issued</u> warrant at the scene of the search at the conclusion of the search.

Rather than an issue concerning facial validity of a warrant when issued, Rule 41(f)(1)(C) sets forth rules for execution of a valid warrant.  The rules are not constitutional and a violation does not support suppression. This Court noted as much when it considered the meaning of Rule 41(f) in *United States v. McAtee*, 2005 WL 1491214 (N.D. Iowa 2005), *aff'd*, 481 F.3d 1099 (8th Cir. 2007).  The claim there was that the warrant should have been given at the outset, but there was no issue regarding the propriety of the warrant left at the conclusion of the warrant.  This Court noted with approval the principle that "unless the Rule has been disregarded deliberately, or unless the defendant can show prejudice, a violation of Rule 41 does not require suppression of the evidence." *Id*. at 7 (citing *Groh* and *United States v. Hepperle*, 810 F.3d 836, 839 (8th Cir. 1987)).

Other courts have considered complete failures to comply with Rule 41(f) and found that suppression was not warranted where the movant could not establish prejudice and the violation was not intentional.  *United States v. Neal*, 2006 WL 1525893 at 4 (5th Cir. 2006); *United States v. Martinez-Garcia*, 397 F.3d 1205, 1213 (9th Cir. 2005).  In two cases where there was a factual dispute as to which documents were left at the scene, as here, each court found it unnecessary to resolve the dispute in order to rule on the motion to suppress.  *United States v. Tomkins*, 2009 WL 590237 at 7 (N.D.Ill. 2009) (claim that the agents left the face page of the warrant but not the attachments); *United States v. Kling*, 2006 WL 1980179 at 7 (N.D. Iowa 2006) (same).  In both cases, the courts denied the motions to suppress because the defendants had failed to

---

affidavit and the affidavit was not attached to the warrant.  However, the contents of the affidavit and its <u>presence</u> at the search site do bear on both particularity and the good faith of the agents as discussed *infra*.

establish prejudice or intentional misconduct.

Sigillito bears the burden of establishing prejudice or that the violation was intentional. *Neal*, 2006 WL 1525893 at 4; *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. 1981). Sigillito cannot meet either burden here. Sigillito not only did not ask to view a copy of the complete warrant, he did not want to be present while the search was conducted and he left before the search started. Later, when Sigillito's attorney claimed that he had not received Attachment A, it was sent to his attorney by the U.S. Attorney's Office. *See Kling*, 2006 WL 1980179 at 7. He does not even begin to argue prejudice in his motion. Moreover, he cannot show that the failure to include Attachment A on the warrant copy left at the scene, if there was such a failure, was the result of intentional disregard of the requirements of the rule. It does not even make sense why the agents would have done so or what advantage they might have gained thereby. Because the face of the warrant prominently states "See Attachment A," the failure to attach it to the copy left at the scene served no purpose whatsoever. The receipt attached to the warrant clearly stated what was seized so, at a minimum, Sigillito was informed what was taken. Any alleged violation of Rule 41(f)(1)(C) does not warrant suppression.

### 2. Attachment A Was Sufficiently Particular

Sigillito argues that the May 24, 2010 warrant was overbroad and failed to meet the particularity requirement of the Fourth Amendment. Sigillito generally attacks the description as insufficient and specifically attacks both the failure of Attachment A to reference a specific criminal offense and the specification of the computers to be searched. Based upon a fair reading of Attachment A, and under the totality of the circumstances known to the affiant at the time the warrant was issued, it sufficiently described the items to be seized. Attachment A

satisfied the Fourth Amendment.

> **a.**     **The Sufficiency of an Attachment Is a Matter of "Practical Accuracy" Based Upon the Circumstances of the Case**

The Warrant Clause of the Fourth Amendment to the U.S. Constitution provides that a valid search warrant must particularly describe the "things to be seized." To satisfy the Fourth Amendment, language must describe the items to be seized with sufficient particularity "to enable the searcher to reasonably ascertain and identify the things authorized to be seized." *United States v. Saunders*, 957 F.2d 1488, 1491 (8th Cir. 1992); *see also Andresen v. Maryland*, 427 U.S. 463, 480 (1976); *United States v. Neiman*, 520 F.3d 834, 839 (8th Cir. 2008). The purpose of the particularity requirement is to prevent "a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). The standard is one of "practical accuracy," and the specificity required depends on the circumstances of each case. *United States v. Peters*, 92 F.3d 768, 769–70 (8th Cir. 1996); *United States v. Strand*, 761 F.3d 449, 453 (8th Cir. 1985). A search warrant "need not be elaborately detailed." *Russell v. Harms*, 397 F.3d 458, 464 (7th Cir. 2005). "If detailed particularity is impossible, generic language is permissible if it particularizes the types of items to be seized." *United States v. Hall*, 142 F.3d 988, 996 (7th Cir. 1998). In an investigation involving a scheme to defraud, a search warrant is sufficiently particular if the description of items to be seized "is as specific as the circumstances and nature of the activity under investigation permit." *United States v. Kail*, 804 F.2d 441, 445 (8th Cir. 1986) (quoting *United States v. Wuagneaux*, 683 F.2d 1343, 1349 (11th Cir. 1982); *see also United States v. Sherman*, 2010 WL 1461559 at 11 (8th Cir. April 14, 2010) ("depend[s] on the circumstances of the case and on the type of items involved"). The particularity requirement does not impose a "'hypertechnical' standard, but one of 'practical

accuracy.'" *Id.* (citation omitted).  Finally, the necessary particularity can be found on the basis of the contents of an affidavit if the affidavit is present at the scene of the search to assist in narrowing the discretion of the seizing agents.  *Nieman*, 520 F.3d at 839 (citing *Rickert v. Sweeney*, 813 F.3d 907, 909 (8th Cir, 1987)); *United States v. Gamboa*, 439 F.3d 796, 807 (8th Cir. 2006) (same).

In some circumstances particularly broad descriptions of the items to be seized can be justified by the circumstances, especially when the crime under investigation is fraud perpetrated as part of an ongoing business.  In cases where there is "probable cause to believe that fraud permeated the entire business operation," broad descriptions of items to be seized can be sufficiently particular.  *United States v. Kail*, 804 F.2d 441, 445 (8th Cir. 1986); *see also United States v. Hurwitz*, 459 F.3d 463 (4th Cir. 2006) (probable cause that illegal drug business operating under guise of medical practice supported seizure of all patient files); *United States v. Oloyede*, 982 F.2d 133 (4th Cir. 1993) (nearly all business records authorized to be seized where attorney perpetrating immigration fraud out of his office and non-immigration matters represented *de minimis* portion of business); *United States v Bentley*, 825 F.2d 1104 (7th Cir. 1987) (if there is a criminal fraud part of a business, all the records of that portion of the business may be most accurate description); *United States v. Offices Known as 50 State Distributing Co.*, 708 F.2d 1371 (9th Cir. 1983) (entire business permeated by fraud); *United States v. Waugneux*, 683 F.2d 1343 (11th Cir. 1982) (complexity of investigating fraud and white collar crime, requiring assembly of "paper puzzle" of seemingly innocent documents may be considered); *United States v. Sawyer*, 799 F.2d 1494 (11th Cir. 1986) (probable cause to believe business was "boiler room" operation permeated with fraud); *United States v. Brien*, 617 F.2d 299 (1st Cir.

1980) (all records of business authorized where probable cause to believe fraudulent sale of London commodity options was sole activity of business).

This is sometimes referred to as the "all-records" exception to the Fourth Amendment's particularity requirement, and it was recently applied by the Southern District of New York to reject claims similar to movant's. *United States v. D'Amico*, 2010 WL 3290996 (S.D.N.Y., Aug. 10, 2010). The exception[16] applies "[w]hen there is probable cause to believe that an entire business is 'pervaded' or 'permeated' with fraud." *Id.* at 34 (citations omitted). Under such circumstances, "seizure of all records of the business is appropriate, and broad language used in a search warrant will not offend the particularity requirement." *Id.* "'[I]t is not necessary that the affidavit supporting the search warrant set forth specific factual evidence that every part of the enterprise in question is engaged in fraud.'" *Id.* The affidavit need only describe sufficient fraudulent activity to infer that the activity is "'just the tip of the iceberg.'" *Id.* at 35 (citations omitted).

Here, Attachment A was sufficiently particular to guide the discretion of the agents in determining what to seize even without reliance on the "permeated by fraud" doctrine. The language was admittedly broad, but there were limits in its terms. The affidavit established probable cause to believe that Sigillito held himself out to be a one-man law office occupying his own leased space. However, the affidavit clearly established that his law practice was *de minimis* or non-existent and that for over 10 years his sole business had been the BLP. There

---

[16] Rather than an "exception," the principle recognizes that a warrant is lawful "'if its scope does not exceed the probable cause upon which it is based.'" *D'Amico*, 2010 WL 3290996 at 35 (citation omitted).

was probable cause to believe that Sigillito operated the BLP fraudulently and as a Ponzi[17]

scheme.  There was also probable cause to believe that Sigillito's handling of loan funds was at

the heart of the fraud.  Paragraphs 1 through 4 referred to computer equipment, media and

software.  In 2010, all businesses, including criminal businesses, depended on computers to

survive and exist and such items obviously are used to store records and documents.  Paragraphs

1 through 4 should be read in conjunction with paragraph 5, which refers to physical books and

papers and limits the items to be seized to items that "relate in any way to transactions involving

the Ponzi scheme."  Paragraphs 1 through 4 only describe electronic containers for electronic

versions of the items described in paragraph 5.

Agents having read the affidavit and being familiar with its contents would have known

what they were limited to seizing.  The affidavit was read by all agents prior to searching and

was present at the scene.  In addition, the lead investigating agent was present at the search site.

Because it was honestly believed that Sigillito did no <u>other</u> business which could relate to a

Ponzi scheme <u>other than the BLP</u>, the phrase was sufficiently limiting to satisfy the particularity

requirement.  Simply, there was no possibility of confusing legitimate non-BLP loan documents

from illegitimate BLP loan documents, because Sigillito engaged in no other kind of loan

activity.  Common sense need not be "checked at the door" when inquiring into particularity.

These are the kind of "circumstances" that *Peters* and *Strand* held should be taken into account

in evaluating the particularity of a search warrant.

Paragraphs 6 through10 were aimed at Sigillito's receipt and distribution of funds, his tax

---

[17] The term "Ponzi" is essentially a term of art describing a particular type of fraud scheme.  Merriam-Webster defines a "Ponzi scheme" as "an investment swindle in which some early investors are paid off with money put up by later ones in order to encourage more and bigger risks."

records, and his expenditures <u>without limitation</u>. Paragraph 6 covered monetary records, 7

covered assets, 8 covered expenditures, 9 covered actual money and 10 covered tax information.

The fact that some of these overlap or are redundant did not render the descriptions inadequate.

In a complex fraud and Ponzi scheme investigation like the one described in the affidavit, <u>all</u>

financial transactions and information were relevant to investigate the "paper puzzle." The

affidavit established probable cause that there was little or no law practice income and the only

substantial business was the BLP. Therefore, it was probable that all financial transaction

information at the office related to the matter under investigation. Attachment A was not a

general warrant to rummage through his finances, but a specific description of all things which

arguably would shed light on Sigillito's perpetration of the offense under investigation. To be

particular as justified by the circumstances set out in the affidavit, Attachment A need not

specify those circumstances or limit the search to financial documents relating to the BLP. It is

enough that Paragraphs 6 through 10 stated with particularity the specific <u>types</u> of documents to

be seized.

Paragraph 11 covered certain types of documents "which may relate to investors and

potential investors and other documents related to the investment scheme." Paragraph 12 began

with the limiting term "investor." Paragraph 13 covered items "purchased with investor funds."

Again, these limitations might have been ambiguous and created a general search if Sigillito

solicited both legitimate and illegitimate investments, but that was not the circumstance the

agents believed to be true here. The only "investor" business done by Sigillito per the affidavit

was the BLP, and there was probable cause to believe it was a fraudulent business. Thus, under

the particular circumstances of this investigation, the descriptors and limiting terms were

sufficiently particular. *Nieman*, 520 F.3d at 839 (warrant language had specific limitations such as "evidence of the illegal possession of drugs" and evidence which "shows an association of individuals").

Some examples illustrate the sufficiency of the particularity here. Attachment A would not have authorized the seizure of law books, attorney-client files, firearms, photo albums, livestock, furniture, or food items, unless a connection to investor funds could be made per paragraph 13. Moreover, none of the paragraphs would have authorized seizing a document or thing not described there. *Cf. Rickert v. Sweeney*, 813 F.2d 907, 908 (8th Cir. 1987) (list described all business records which might be evidence of a specified crime). Attachment A served to sufficiently limit the discretion of the searching agents.

The nature of Sigillito's business also rendered Attachment A sufficiently particular. The location purported to be a one-man law office with one secretary and the office physically consisting of a couple of rooms. According to Ms. Stajduhar, there was not one part of the office used for the law practice and another used for the BLP. *See, e.g., Nat'l City Trading Corp. v. United States*, 635 F.2d 1020 (2d Cir. 1980) (law office and business operation commingled into one set of offices).

In addition, reference to what was *not* seized or searched is another indicator that Attachment A was sufficiently particular. The agents did not expect to find many legal client records. Nor did the agents have reason to believe an attorney and investment marketer would run a church out of his law office, because the church operated out of rented space at a former mortuary. Yet at the scene many boxes of church-related items and even some boxes of legal client records were identified by Ms. Stajduhar. The agents did <u>not search</u> these, because they

34

were not within the scope of Attachment A.  Other personal papers were present but were <u>not</u> <u>seized</u>.  As discussed *infra*, the seizure of items <u>outside</u> the scope of the warrant was less than 5% of tens of thousands of documents.  The adequacy of Attachment A to <u>limit</u> the discretion of the agents is established by the fact that <u>it did so</u>.

It is ironic that Sigillito argues elsewhere that the warrant was improperly executed because agents seized items not covered by Attachment A.  The irony is that if Attachment A was clear enough for defendant to claim that it was sufficiently particular to determine that unauthorized items were seized, then *a fortiori* it was sufficiently particular to limit the scope of authorized seizures.

The time period covered by Attachment A was only as great as the period during which Sigillito operated the BLP.  The applicable statute of limitations for a mail or wire fraud offenses alleged to be under investigation is normally five years, but the government can charge, and did charge here, ongoing criminal mail or wire fraud schemes that are continuing offenses back to the time the schemes were hatched.  *United States v. Blumeyer*, 114 F.3d 758, 766 (8th Cir. 1997); *United States v. Garfinkel*, 29 F.3d 1253, 1259 (8th Cir. 1994).  The affidavit clearly supported the basis for extending the search to items for the last ten years.  The affidavit was also supported by an attachment which contained a BLP "client list," which list was incorporated into the affidavit, and the extensive number of investors supported the temporal breadth of Attachment A.

The presence of the affidavit at the scene of the search and its possession by the lead agent also cures any deficiency in particularity.  Any doubts about which Ponzi scheme or which investment activity or which financial transactions Attachment A referred to were certainly

35

cleared up by the contents of the affidavit.  The lack of any such doubts further bolsters the particularity of the Attachment A under the circumstances.

Alternatively, Attachment A should be found acceptable because the affidavit established probable cause to believe that the Sigillito's entire business was underline permeated by fraud. In the affidavit, Ms. Stajduhar made the case for the fact that Sigillito's so-called law practice was non-existent or a front for his real and only business, the BLP.  "The only business of Martin T Sigillito . . . is as follows: Mr. Sigillito solicits investors who loan money to him, which they believe will be invested with promised annual rate of return in excess of 20%."  *Exhibit 1A, Affidavit Paragraph 4 (emphasis added)*.  "Therefore, she believes most, if not all, records in his office relate to the investment scheme."  *Id*.  Ms. Stajduhar provided much richer detail of the activity, but there could be no doubt that the claim was that the only substantial business operated by Sigillito at the location was a fraudulent investment scheme which functioned like a Ponzi scheme. *Exhibit 1A, Affidavit Paragraphs 3 and 4*.  There was no suggestion that the BLP had a legitimate side to it and therefore anything related to the BLP and the intake or disbursement of funds was properly subject to seizure.

### b.     The Failure to Reference a Specific Statute in Attachment A Is Irrelevant

Sigillito argues that the failure of Attachment A to reference criminal statutes or the specific name of the offenses under investigation was a fatal flaw.  Sigillito is mistaken.  "It is not necessary for an affidavit to include the name of the specific crime alleged."  *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007); *see also D'Amico*, 2010 WL 3290996 at 37 (failure to indicate the names of the specific crimes under investigation did not violate particularity requirement).

Moreover, naming specific crimes under investigation does not supply the particularity required by the Fourth Amendment. This was made clear in *Rickert*, in which several specific statutes were listed as the limitation on the nature of the records sought. The warrant was nevertheless defective, because there was probable cause relating to only one project of the company and the warrant authorized searching through all records for evidence of the specified crimes. *Rickert*, 813 F.2d at 909. Thus it authorized a general search of non-subject projects. This violated the Fourth Amendment, because specificity must relate to the description of the items to be seized, not the description of the offense under investigation. Here, the warrant did not need to specify the title and statute section to add particularity, because it specifically described the items to be seized and in some cases tied the items to a Ponzi scheme and investment activity.

### c. Attachment A Permissibly Authorized the Search and Seizure of Sigillito's Computers

Sigillito also contends that the warrant was overbroad because it authorized the seizure of computer equipment in the office without specifically stating what files were to be searched for. A warrant authorizing the seizure of computer equipment, however, impliedly authorizes the search of files on the computer. *See* Fed. R. Crim. P. 41(e)(2)(B) ("A warrant . . . may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media of information consistent with the warrant."); *see also United States v. Gregoire*, 638 F.3d 962, 967–68 (8th Cir. 2011). Similarly, a warrant that authorizes a search of "any and all records or documents" authorizes a search of computer equipment for electronic records and documents, even if "electronic" evidence is not specifically mentioned. *United States v. Hudspeth*, 459 F.3d

922 , 927 (8th Cir. 2006), *vacated on other grounds, opinion reinstated by* 518 F.3d 954 (8th Cir. 2008) (en banc). Because the computer equipment was properly seized both as an instrumentality of the crime and a container for evidence of the crime, this Court should uphold that aspect of the search warrant.

The seizure of Sigillito's computers was justified based on the facts contained within the affidavit showing that the computers located in the office would contain records related to the BLP. "The Fourth Amendment affords 'neither a heightened nor a reduced level of protection for information stored on computers." *D'Amico*, 2010 WL 3290996 at 35 (citation omitted). As in *Sherman*, the warrant needed to cover all of the computer equipment present "to effectively allow law enforcement to 'recognize and seize the materials described.'" *Sherman*, 2010 WL 1461559 at 11 (citation omitted). The failure to specify the precise form in which the materials would be found is not fatal. *Id*. at 11–12.

The warrant in this case specifically authorized the seizure of computer equipment in the office, as well as a search of "[a]ll computer related documentation." The affidavit provided probable cause for this search and seizure, insofar as it indicates that Ms. Stajduhar identified the existence of a desktop computer, a laptop, and a hard drive in Sigillito's office, all of which were "used for the business purposes of the above described Ponzi scheme."[18] As Sigillito concedes, when a computer is used as an instrumentality in the commission of a crime, as opposed to being a mere "container" for files, it is subject to search and seizure for that reason alone. Mem. in

---

[18] Aff. in Supp. of May 24, 2010 Search Warrant at ¶ 14. The following several pages of the affidavit explain the common characteristics of computer equipment and note that such equipment is commonly used "to store information or data in the form of electronic or magnetic coding" (¶ 15(E)) and may contain "hidden, erased, compressed, encrypted, or password-protected data" (¶ 15(B)), some of which may be recoverable even if the user believes he has "deleted" the data (¶ 17).

Supp. of Mot. to Suppress (Doc. 97) at 12–13; *see also Davis v. Gracey*, 111 F.3d 1472, 1480 (10th Cir. 1997) (upholding seizure of computer as instrumentality of crime; fact that computer is also "container" does not render invalid otherwise proper seizure). Because, as discussed above, the affidavit established that Sigillito's business was permeated by fraud, the warrant properly authorized the seizure of all such computer equipment used in the conduct of that business. *See also United States v. Sherman*, 372 Fed. Appx. 668, 675–76 (8th Cir. 2010) (unpublished) (rejecting defendant's contention that search of computer must be limited to particular program on computer: defendant "had access to all components of the computer system . . . and . . . the computer data could be manipulated, stored in different formats, or stored outside" of the program).

Yet even if the affidavit had not established probable cause to seize the computers as instrumentalities of the offense, the warrant would nonetheless have authorized the executing officer to search their contents for "business records . . . or documents . . . which may record or relate in any way to transactions involving the Ponzi scheme."[19]  The Eighth Circuit has held that a warrant authorizing a search for records relating to an offense impliedly authorizes the search of electronic records kept on computers on the premises. *Hudspeth*, 459 F.3d at 927; *see also Gregoire*, 638 F.3d at 967–68 ("A search warrant which specifically authorized the seizure of a computer and a search for financial records clearly contemplates at least a limited search of the computer's contents without the need of a second warrant." (internal quotations omitted)).  Thus, if the Court finds that the warrant properly authorized the search and seizure of records and documents relating to the scheme, it should uphold the search and seizure of any electronic

---

[19] *See* Attachment A to May 24, 2010 Search Warrant at ¶ 5.

evidence as being comprehended within that authority.

### 3.    The Application for the May 24, 2010 Search Warrant Was Supported by Probable Cause

Sigillito argues that the affidavit failed to establish probable cause to believe that evidence of a federal crime would be found at Sigillito's office.  A cursory review of the affidavit demonstrates that this argument is without merit.

In reviewing an affidavit in support of a search warrant, the task is to "ensure that the magistrate judge had a substantial basis for concluding that probable cause existed.  *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983).  A magistrate's "'determination of probable cause should be paid great deference by reviewing courts.'" *Id.* at 236 (quoting *Spinelli v. United States*, 309 U.S. 410, 419 (1969)).  So long as the magistrate had a "'substantial basis for . . . conclud[ing]' that search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *United States v. Kling*, 2006 WL 1980179 at 5 (N.D. Iowa 2006) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).  The "resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants."  *United States v. Ventresca*, 380 U.S. 102, 109 (1965); *see Gates*, 462 U.S. at 237 n.10.  Evaluating probable cause requires a "practical, common sense" evaluation of the "totality of the circumstances."  *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986); *see also United States v. McAttee*, 2005 WL 1491214 at 7 (N.D. Iowa 2005), *aff'd* 481 F.3d 1099 (8th Cir. 2007).

The affidavit here rests largely on SA Cosentino's recitation of information provided by the identified informant, Ms. Stajduhar.  "When an affidavit is based in substantial part on information from an informant, the informant's reliability, veracity and basis for knowledge are relevant considerations - but not independent, essential elements - in finding probable cause."

*Gates*, 462 U.S. at 238; *see also, McAtee*, 2005 WL 1491214 at 7.  In *United States v. Revich*, 793 F.2d 957 (8th Cir. 1986), the Court identified five typical factors in determining probable cause: 1) the sources for the facts recited in the affidavit came from identified, named individuals, not anonymous or confidential informants; 2) there was no question that a crime was being committed - the question was by whom; 3) the sources for the facts had personal knowledge; 4) the sources were identified in the affidavit and the bases for their knowledge were clear; and 5) the statements of the source was made against penal interest.  *Id.* at 959; *see McAtee*, 2005 WL 1491214 at 7; *see also United States v. Mashek*, 606 F.3d 922 (8th Cir. 2010) (partial corroboration); *United States v. Ball*, 499 F.3d 890 (8th Cir. 2007) (named informant, firsthand knowledge, heavily involved in activity, statements against penal interest, corroboration).

Here, Ms. Stajduhar was a named informant who provided detailed information based on firsthand, personal knowledge and based on her heavy involvement in the activities described as Sigillito's only assistant.  Firsthand, detailed accounts of wrongdoing add great weight to the probable cause determination.  *McAtee*, 481 F.3d at 1103.  Ms. Stajduhar was essentially Sigillito's only employee for 10 years.[20]  The affidavit also stated that she was "aware of all of this activity because she [was] intimately involved in the creation of correspondence and dealing with clients and payment of client money per the investment agreement."[24]  Sigillito had few legal clients and his "only business" for 10 years involved receiving loan funds from investors

---

[20] ¶3 of May 21, 2010 affidavit, Exhibit 1A.

[24] ¶13.

promised 20% or better returns.[25]  She believed that all records in the office related to the loan business, but the affiant nonetheless indicated that, out of an abundance of caution, taint procedures would be used.

The fraudulent aspects of the loan activity were set forth in paragraphs 5 through 8. Sigillito complains that the affidavit falsely stated that Sigillito collected $44 million but only $900,000 was sent to England to buy land and no funds have come back.  This was not stated as a fact but as something Ms. Stajduhar believed to be true "[t]o Ms. Stajduhar's knowledge."  In other words, the magistrate was not misled as to the basis for the claim.  Paragraph 7, read in its totality, established that investors believed that the funds were going to be used to invest in English real estate, not "pay earlier investors the promised rate of return," and thus were misled to "believe they [were] receiving legitimate profits on their investment."  SA Cosentino added that the scheme described to him by Ms. Stajduhar is a "Ponzi" scheme.  Although not a separately defined offense, a Ponzi scheme is a term of art, recently made infamous by Bernie Madoff,  that describes a particular type of fraud that is usually charged as mail, wire or bank fraud.[26]  Paragraph 8 described funds that Sigillito kept for himself as fees, the amount of which lenders did not know.  The remainder of the paragraph as well as paragraph 9 described Sigillito's disposition of the loan funds not used to pay Ponzi overhead and Ms. Stajduhar described some of the items bought by Sigillito with investor money.  Ms. Stajduhar also stated that she believed that very little funds were left and that investors were becoming suspicious and

---

[25] ¶4.  This fact was also confirmed by Sigillito himself when interviewed by the agents prior to the execution of the search warrant on May 24, 2010.

[26] *See* note 17 *supra*.

complaining about missed payments and redemptions.[27]  A list of investors prepared by Ms. Stajduhar was attached as Attachment B.  Ms. Stajduhar claimed that she had personally received such investor complaints.[28]  And, of course, Ms. Stajduhar had provided to SA Cosentino approximately 500 pages of documents which established the credibility of her information, and she had been willing to allow SA Cosentino to have her text messages copied.[29]  Thus, the account by Ms. Stajduhar, who was clearly identified, set out in rich detail instances of wrongdoing and the basis for her knowledge.  She also provided rich detail about the items to be found in the search, "client files," promissory notes, storage areas, desks and computers.[26]

Probable cause and Ms. Stajduhar's credibility are also supported by the fact that her statements were also against her penal interest.  She implicated herself in both the misappropriation of a substantial amount of funds from Sigillito, and she participated, albeit unwittingly, in the fraudulent investment scheme she described.[27]  By implicating herself, her statements had particular reliability: "People do not lightly admit a crime and place critical evidence in the hands of the police in the form their own admissions ."  *Revich*, 793 F.2d at 959.

---

[27] ¶9.  *See also* ¶10.

[28] ¶10.

[29] ¶20.  Although SA Cosentino stated that he had received promissory notes, plural, the documents from Ms. Stajduhar actually only included one sample promissory note using "John Doe" names.  He also stated that he believed the documents came "from the office."  This was technically correct in the sense that the documents had at one time or another been at the office, but it was not a statement of where Ms. Stajduhar had immediately obtained the documents, i.e., printed from home.  Moreover, SA Cosentino did not review the documents in detail or review the copied text messages until some time later after they had passed through a taint review.  But the fact that she had provided them and permitted copying of the texts bolstered her reliability.  Paragraph 11, concerning Sigillito's efforts to raise $5 million in funds in Israel was directly corroborated in the text messages for May 17, 2010.  *See* Exhibits 5 and 6.

[26] ¶¶12 and 14.  The computers were specifically described as to type and location and she stated that all were "used for the business purpose of the . . . Ponzi scheme."

[27] ¶13.

43

She was not simply blame-shifting.  *See also McAtee*, 2005 WL 1491214 at 7.

Corroboration is always a key ingredient in determining credibility and reliability. *Mashek*, 606 F.3d at 929 (statements partially corroborated); *United States v. Ball*, 499 F.3d 890, 896 (8th Cir. 2007) (statements corroborated).  Here, corroboration took several forms.  First, Ms. Stajduhar advised that one investor, Phillip Rosemann, had recently sued Sigillito's "representative" in England.  Mr. Rosemann's name appeared on Attachment B as an investor and the lawsuit was identified in federal court.  The fact that SA Cosentino characterized Smith as Sigillito's "representative" did not detract from probable cause.  Smith may have been the named borrower, but the facts in the affidavit (and in the overall investigation as well) suggested that was more form than substance.  The agents had obtained some bank information to verify that Sigillito actually had only a few thousand dollars in an account, which corroborated Ms. Stajduhar's statement concerning the status of the $44 million.[28]  The fact that Ms. Stajduhar provided a batch of documents (mainly e-mails) and an investor list likewise had a corroborative effect.[28]

Another corroborative fact was that a prior Suspicious Activity report filed in July 2008, by Millenium Trust Company corroborated Ms. Stajduhar's statements in that it also specifically alleged that Sigillito, named fully at the same address given by Ms. Stajduhar, was operating a Ponzi scheme in connection with 59 IRA accounts.[29]  In other words, the affidavit showed that not one but two independent, credible sources alleged that Sigillito was operating a Ponzi

---

[28] ¶9.

[28] ¶¶12 and 20.

[29] ¶21.

scheme. In addition, an examination of the investor list in Attachment B revealed that approximately 86 of the investors were IRA accounts. It also provided at least some corroborative effect that in 1997, Sigillito was in the company of another attorney in Switzerland carrying $3 million in cash for the purpose of depositing it into a Swiss account and the other attorney later plead guilty to a money laundering felony. The affidavit stated that from that investigation it was established that Sigillito was there "to assist [the attorney] due to Mr. Sigillito's familiarity with international banking practices."[29] This incident would not, standing alone convict Sigillito of anything, but in the totality of the circumstances it tended to corroborate the allegation that Sigillito was not a scrupulous attorney. It was corroborative that Sigillito had international bank expertise and just happened to be implicated in an international investment fraud scheme.

Sigillito complains that the affidavit failed to establish probable cause to believe that an essential element of the crime of mail and wire fraud, namely mailings and wires, existed. Paragraph 24 specifically stated that promissory notes and other documents were mailed and funds were transferred by wire in furtherance of the scheme. In addition, the affidavit established the use of bank accounts, foreign travel, payment of credit card bills with proceeds, "creation of correspondence,"[30] travel to Israel and IRA investments. Each of these, by common sense, implicates the use of the mail or wires. Such large sums of money are not usually transferred as currency or check, but by wire transfer, especially from the U.S. to the U.K. The term "correspondence" usually means either mailed letters or e-mails (which involve wires).

---

[29] ¶22

[30] ¶13.

Large credit card payments are usually made by mail or by the Internet (again, using wires).
Finally, Ms. Stajduhar stated that she received cell phone messages from investors complaining
about not getting paid and at some point in the process, cell phone calls depend on wire
communications.

Thus, the affidavit was more than sufficient to establish probable cause to believe
Sigillito was involved in a federal crime and that evidence of the crime would be found at his
office.

### 4.   Sigillito Cannot Meet His Burden Under *Franks v. Delaware* Because the Affidavit Did Not Contain Any Material False Statements

Sigillito argues that he is entitled to a hearing pursuant to *Franks v. Delaware*, 438 U.S.
154 (1978), because there were material false statements in the affidavit made by the affiant
intentionally or with reckless disregard for the truth.  To be entitled to a hearing that exceeds the
four corners of the affidavit, Sigillito must first make a "substantial preliminary showing that a
false statement was knowingly and intentionally, or with reckless disregard for the truth,
included by an affiant in a search warrant affidavit" and that "the allegedly false statement is
necessary to a finding of probable cause."  *United States v. Butler*, 2010 WL 431720 at 2-4 (8th
Cir. 2010).  *Franks* applies also to omissions that, if included, would have cast doubt on probable
cause.  *Id*.  In a request for a Franks hearing, the defendant bears the burden of proving
intentional or reckless inclusion of false statements.  *United States v. Garcia*, 785 F.2d 214, 222
(8th Cir. 1986).  In complex economic crimes, as is the case here, *Franks* relief will be rare
because the issue "turn[s] on what was in the government's affidavits, not on what defendant
assert[s] with the benefit of hindsight the government should have known."  *United States v.
Ozar*, 50 F.3d 1440, 1445–46 (8th Cir. 1995).  Sigillito cannot meet his burden here, because he

46

cannot show that SA Cosentino intentionally or recklessly made false or misleading statements or omissions.  At best, he argues that Ms. Stajduhar's statements were incorrect or imprecise in several respects or that, based solely on hindsight, the government should have known certain information.

Most of the arguments made by Sigillito can be quickly dispatched, because they are not attacks on the veracity of SA Cosentino, but on the accuracy or precision of SA Cosentino's understanding of what Ms. Stajduhar told him on the first day that he began investigating the BLP.  Sigillito attacks the statement in paragraph 4 of the affidavit that "Mr. Sigillito solicits investors who loan money <u>to</u> him, which they believe will be invested . . . ."  Again, in paragraph 7, the affidavit states that new loan funds were used to "pay other investors who had earlier loaned money <u>to</u> Mr. Sigillito for investment purposes."  Sigillito reads the sentences as stating that Sigillito was <u>himself</u> borrowing the money, but a fair reading of the words, together with the rest of the affidavit, make it clear that this was not what SA Cosentino meant.  In both sections it was made clear that the funds were to be invested elsewhere on their behalf and Sigillito was not the final stop for the funds.  The reading that Sigillito gives to the language is strained and biased.  SA Cosentino would testify that Ms. Stajduhar did not state that on May 19, 2010, that Sigillito was the borrower of the funds.  What she said and what he understood was that most of the loan funds came to him initially and were collected by him, but he did not use them for the purpose he represented to lenders.  Further, he did not understand Ms. Stajduhar to mean that Sigillito was the borrower of the funds.  He did understand, based on Ms. Stajduhar's information, that Sigillito received most of the funds.  In other words, while lenders may have thought they were lending money to Smith as the borrower, they were in fact lending—or sadly,

and more precisely, *giving*—their money to Sigillito.

This is even clearer when the challenged clauses are read with paragraph 8, wherein Ms. Stajduhar stated that Sigillito took "fees" from the loans.  It makes sense that Sigillito would take fees for arranging what were purported to be loans to another, but not to himself.  Also, paragraph 6 refers to money Sigillito had "collected" not "borrowed" and that a problem was Sigillito's failure to send money to England for investment.  Nowhere in the affidavit was there a suggestion that Sigillito was the buyer of options in England or an English real estate developer. In hindsight, the circumstances could have been communicated more clearly, but no statements concerning the loans were false, intentionally or otherwise.  Sigillito argues that SA Cosentino could have seen from completed promissory notes that Smith was a primary borrower, but SA Cosentino had only a sample "John Doe" note that was not made out to Derek Smith.

The main problem with Sigillito's argument and others, though, is that Sigillito is attacking the veracity or accuracy of Ms. Stajduhar's description of the activity, not the affiant's communication of the information from Ms. Stajduhar to the magistrate.  A *Franks* hearing showing must be directed at the affiant, not the informant.  If, unbeknownst to the affiant, a source were intentionally fabricating allegations, *Franks* is not implicated.  Reliability and corroboration are the checks on a source's credibility, whereas *Franks* is a check on affiant misconduct.

Sigillito's next complaint is about the statement in paragraph 3 that he had "few, if any," legal clients.  Rather than claim that the assertion was false, he claims that it was reckless because not corroborated.  This argument is nonsense in a *Franks* context and Sigillito fails to cite any authority for the proposition that failure to corroborate a statement is reckless.  SA

48

Cosentino referenced awareness of attorney-client issues out of an abundance of caution because Sigillito was an attorney and operated his Ponzi scheme under the cover of a law practice. This statement does not contradict Ms. Stajduhar's statement. Reliance on the alleged seizure of 3000 pages of attorney-client records is precisely the type of hindsight prohibited in a *Franks* analysis. And, again, the argument is an attack on the accuracy of a statement by Ms. Stajduhar, not a statement by the affiant.

Sigillito's third complaint concerns the retention of "fees" described in paragraph 8 of the affidavit. The affidavit states that Ms. Stajduhar stated that lenders were not aware of the "amount" of the fees. Again, aside from the fact that this is a hindsight attack on the veracity of Ms. Stajduhar, not SA Cosentino, Sigillito cannot show that the allegation was false. At best, he relies on language in a completed promissory note that purports to promise that all fees would be paid by the borrower.[31] Even if, in hindsight that is true, it does not refute the statement by Ms. Stajduhar that the lenders were not aware of the <u>amount</u> of the fees. It is the amount that is one of the primary aspects of the fraud here, because the fee was so large that it increased the risk to lenders far beyond what was advertised by Sigillito. In addition, Sigillito took pains to conceal the amount of fees from lenders and lied to some lenders when asked about the amount of his fee. A *Franks* hearing is not an opportunity to try the case before a jury is selected. Even if SA Cosentino was aware of the loan agreement clause in question, which he was not, Sigillito fails to make a substantial preliminary showing that lenders were in fact aware of the <u>amount</u> of fees

---

[31] This argument itself shows the lack of logic in the loans-to-Sigillito argument: the borrower is someone other than the person receiving the fees. Describing a loan as an investment from the lender's point of view is merely a common sense usage of the term. The "American Heritage College Dictionary" (Third Edition), defines "invest" as "commit[ing] (money or capital) in order to gain a financial return." From the standpoint of a lender, all loans which promise interest and return of principal are investments. In practice, Sigillito himself also referred to lenders as "investors"and the loans as a safe "investment."

or that SA Cosentino knew that to be the case.

Sigillito's next complaint concerns his claim that a clause, paragraph 3, used in some, but not all, promissory notes, referred to the purpose of the "advance" as including "cash flow" for a business purpose of the borrower and that refinancing debt or making payments on pre-existing debt was such a purpose. Sigillito again attacks a statement by Ms. Stajduhar, not SA Cosentino. He also again draws support from the claim that SA Cosentino had completed promissory notes, whereas he only had sample "John Doe" notes.[32]

However, without delving too far into the complexities of the trial evidence, the problem with Sigillito's theory that Section 3 of some promissory notes permitted him to use, on Smith's behalf, new loan money to pay old interest and principal is that said use was contrary to what lenders were told the funds were going to be used for, and most lenders did not see their promissory note, if ever, until some time after transferring funds to Sigillito. Whatever Ms. Stajduhar knew[33] was irrelevant to whether SA Cosentino had any reason to believe what he reported was false or misleading. Even in hindsight, given the fact of the indictment following an extensive investigation that is still continuing, SA Cosentino had and has no reason to believe that Sigillito was ever authorized by lenders to use their funds in the manner he used them. On the contrary, as will be the evidence at trial, lender after lender was led to believe their funds were needed to invest in English real estate, and, had they known their funds would be used to

---

[32] SA Cosentino did not actually review all of the documents received from Ms. Stajduhar prior to applying for the warrant.

[33] Ms. Stajduhar is a high school graduate who did not fully understand the legalities and formalities of much of Sigillito's business. She certainly was not qualified to read and interpret contracts involving international finance. She relied to a great extent on explanations given by Sigillito until several of those explanations became suspicious.

"refinance" or pay Ponzi overhead, they would not have loaned the funds.  Sigillito went to lengths to conceal the actual use of funds from lenders.  No clause in a contract could ever excuse such intentional fraudulent representations and concealment.

Sigillito next argues that the claim in paragraph 6 that only $900,000 out of $44,000,000 had been sent to England was false.  Again, a complaint that Ms. Stajduhar made an inaccurate statement does not raise a *Franks* issue unless the affiant knew it was inaccurate.  The statement was preceded by the qualifier "[t]o Ms. Stajduhar's knowledge."  Sigillito offers no support for his bald statement she "well knew" that millions had been sent to England and less than no support for what put SA Cosentino on notice that the statement was inaccurate.  In fact, were this case to go to trial, the evidence would show that based upon the disorganized records of Sigillito Ms. Stajduhar had tried to account for where funds went with the assistance of others and $900,000 is the figure they came up with.  It is doubtful that Sigillito even knew precisely how much had been transferred to England for use by a borrower.  Even now, the precise amount sent to England is unclear, but is far, far less than the amount of the loans and only a fraction of the fees retained by Sigillito.  Sigillito's theory that the funds were Smith's funds while sitting in Sigillito's accounts in the U.S. does not refute the statement that the funds were not sent to England.

Sigillito complains that the "haste" with which the Government sought a search warrant supports a Franks hearing, but he offers no legal support for any such challenge.  The timing of the search warrant was driven by the information that Sigillito was in the process of defrauding a new victim out of $5 million.[34]

---

[34] *See* ¶11 of the affidavit.

51

Sigillito complains of the omission from paragraph 22 that Sigillito was not charged with Thomas Utterback. There was nothing misleading about the omission, because there was nothing in the description which indicated that Sigillito was charged. He also complains of the omission of a statement that he did not know about the $3 million, but fails to support his claim with any evidence. The Government does not concede Sigillito's claim that he did not know about the cash. If he was there to assist with the international banking system and traveled all the way to Switzerland, presumably at someone else's expense, it is likely that he knew what he was there to assist.

Finally, Sigillito makes a vague argument about omitting from the affidavit the consequence of interrupting a Ponzi scheme, i.e., the collapse of the scheme. Sigillito points to a text message by Ms. Stajduhar, but SA Cosentino was not able to review the text messages until long after the search was executed. Therefore, he did not have any information to omit. In any event, the alleged omission was not true, the affidavit established probable cause to believe the Ponzi scheme was already collapsing. Phillip Rosemann had sued Derek Smith and was close to suing Sigillito, payments could not be made to lenders, and Sigillito needed an additional $5 million from an Israeli lender to simply meet past due payments. The benefit of hindsight offers even more dire facts about the status of the BLP. For example, Michael Becker, an attorney that Sigillito hired[35] to interface with Phillip Rosemann's attorney, had decided to withdraw from representation on May 17, 2010 and had advised Ms. Stajduhar to get her own attorney before she was in more trouble.

Thus, Sigillito fails to make the required showing to probe in a *Franks* hearing the

---

[35] This also refutes the claim that Sigillito had engaged in some practice of law. If Sigillito was actively practicing law, why did he need to hire an attorney to deal with another attorney concerning a BLP claim?

52

veracity of the affidavit beyond its four corners.  Although the Government does not believe that it will be necessary to reach this issue, even were this Court to find that any statement in the affidavit, by SA Cosentino, was intentionally or recklessly false, the motion to suppress should still be denied.  Details concerning how much Sigillito practiced law as of 2010, who the borrowers were, the legalese in the promissory notes, or the precise amount of money that ever made it to England for investment, were not material to the primary allegations.  None of those details changed the primary factual information which created probable cause to believe that Sigillito was in some way responsible for a massive fraudulent investment and Ponzi scheme and that evidence of the scheme would be found in his office.  If the alleged inaccuracies were removed, the affidavit still established probable cause.  None of the challenged statements or omissions were material to a finding of probable cause.

### C. May 24, 2010 Search Warrant for Sigillito's Office Was Validly Executed

#### 1. Document Seizures Were in Substantial Compliance with the Scope of Attachment A

Sigillito argues that the execution of the warrant violated the Fourth Amendment.  He claims that so much material not covered by the warrant was seized that it is evidence of flagrant disregard of Attachment A that converted the search into a general search or fishing expedition of Sigillito's property.  The general rule, of course, is that the Government may only seize items described in the warrant and items which exceed the warrant may be suppressed absent an exception to the warrant requirement.  *United States v. Schroeder*, 129 F.3d 439, 442 (8th Cir. 1997); *United States v. Robbins*, 21 F.3d 297, 300 (8th Cir. 1997).  With respect to voluminous documents, broad seizure is permitted when on-site sorting of documents is impractical.  *United States v. Hargas*, 128 F.3d 1358, 1363 (10th Cir. 1997) (two entire file cabinets properly seized

where at least some authorized records found in every drawer); *United States v. Schandl*, 947 F.2d 462, 465-66 (11th Cir. 1991) (seizure of non-authorized items permissible in investigation of complex tax evasion scheme where agents could not immediately evaluate materials without more review).  If unauthorized items are seized, suppression is limited to the those items.  Some circuits, including the Eighth, have endorsed the principle that a flagrant disregard may result in blanket suppression of all evidence seized.   However, no Eighth Circuit decision has actually found such blanket suppression warranted.  Such a finding was made in *United States v. Foster*, 100 F.3d 846, 851 (10th Cir. 1996), because the agents had "'grossly exceeded'" their warrant authority, *id*. at 850 (citation omitted), when the warrant authorized seizure of four guns and marijuana but the agents took everything in the house according to a policy designed to uncover evidence of other crimes.  In *United States v. Tamura*, 694 F.2d 591, 597 (9th Cir. 1982), the agents had widely exceeded the bounds of the warrant, but the Court found that "considerations of practicality rather than a desire to engage in indiscriminate 'fishing'" motivated the seizures and the warrant did not serve as a pretext to look for other items not described in it. Blanket suppression has been rejected where the actions of the agents were objectively reasonable under practical and logistical circumstances of the search.  *See, e.g.*, *United States v. Srivastava*, 540 F.3d 277, 293-94 (4th Cir. 2008).  *United States v. Beusch*, 596 F.3d 871, 877 (9th Cir. 1979), held that material not covered by the warrant could be seized if it was contained within the same container as documents covered by the warrant.

Sigillito does not cite any authority which supports his argument that all of the fruits of the May 24, 2010 search should be suppressed.  In *Marvin v. United States*, 732 F.2d 669, 673–74 (8th Cir. 1984), the Court did not find that seizures exceeded the limitations of the

warrant and held that even if they did, suppression of the whole search was not warranted.

Relying on *Tamura*, the Court found that there were no flagrant violations which converted the

warrant into a general search where "the agents attempted to stay within the boundaries of the

warrant and the extensive seizure of documents was prompted largely by *practical*

*considerations and time constraints*." *Id*. at 675 (emphasis added) (citations omitted).  Similarly,

in *United States v. Premises Known as 1007 Morningside Ave., Sioux City, Iowa*, 625 F. Supp.

1343, 1349–51 (N.D. Iowa 1985), the Court did not find that a search which admittedly exceeded

the bounds of the warrant demonstrated flagrant disregard resulting in a general search, even

though 37% of the material seized exceeded the warrant and was First Amendment protected

material.  Despite the excess, the Court found a good faith attempt to stay within the boundaries

of the warrant, where a large quantity of protected material was left at the scene and the

"*logistics* of the operation made it impossible to sort all the material on site." *Id.* at 1350

(emphasis added).

Sigillito argues that 7,781 pages of documents were not covered by the warrant, which he

claims was 10% of items seized.  To arrive at 10%, Sigillito compares his number with the

number of bates-stamped pages of material that the Government produced at Rule 16 discovery

which may be offered into evidence.  What he fails to advise the Court is that this number does

not include the thousands of pages produced in unbates-marked CD form which came from 17

CD's and 2 computers seized and taint-reviewed.  His calculation also omits thousands of pages

of documents covered by the search warrant which have not been produced and will not be

offered as evidence, but which the Government has made available for inspection.  It also does

not include the thousands of pages of documents segregated by Sigillito's counsel during the one

day of taint review in which he participated or the thousands of pages of documents which the Government deemed relevant but tainted by potential attorney-client privilege issues and produced to Sigillito in CD format.  Quite frankly, the Government cannot give an accurate number of the total pages of material covered by the search warrant which were seized, but even if Sigillito is correct that 7,781 pages were not covered by the warrant, the proportion would be less than 5%.

Alternatively, Sigillito's analysis of the 7,781 pages is flawed.  The fact that 3096[36] alleged attorney-client privileged[37] documents were seized does not demonstrate that the documents were not relevant under Attachment A.  He claims that 263 documents "related only to the practice of law."  However, blank legal forms were used for promissory notes, Lexis-Nexis was used to provide victims with lulling articles about the UK economy, and Martindale-Hubbell and Sigillito's business cards have many uses beyond the practice of law.  For one, Sigillito targeted individuals with money or access to others with money and Sigillito often exaggerated his legal expertise to lull investors into not performing customary due diligence in connection with BLP loans.  Sigillito claims that 1086 were "strictly personal."  Unfortunately, Sigillito involved his family to the extent that they were the beneficiaries of the proceeds

---

[36] An example of Sigillito's exaggeration of the facts is that he claims that 3096 is "almost half" of 7781. Doc. 97 at 35.  Not only is that not almost half, it is approximately 25% less than half.

[37] Given the lack of specificity of Sigillito's analysis, it cannot be discerned whether the documents were allegedly privileged because they concerned communications to/from Sigillito's attorney or communications to/from Sigillito's few clients.  As to the former, Sigillito has waived the privilege as to some attorneys and the Government argues that one attorney is covered by the crime-fraud exception.  As to the latter, the Government does not concede that these were not covered by the warrant.  Some investors also thought Sigillito was their attorney and Sigillito separately billed them at a substantial mark-up for the cost of setting up offshore corporations which were never used by clients in connection with their BLP loans.  It appears that it was but one more scam by Sigillito to collect fees from unsuspecting victims.  If any of the documents allegedly concern legitimate law practice for a legitimate client, the Government has not viewed said documents.

(vehicles, travel, tuition) and his spouse was listed as an officer on one of the bank accounts which received investor proceeds. Sigillito claims that 735 pages were church-related, but several church members[38] were investors and Sigillito used the cloak of his religious affiliation and position to lull investors into trusting him without question. Lastly, Sigillito complains about the seizure of 2601 items, some of which sound like trash, but given the belief at the time the warrant was executed that the entire one-man shop was permeated by fraud, Sigillito fails to show how the items were not conceivably related to the items described in Attachment A. Certainly, in a financial fraud with specific allegations of misappropriating investor funds, call summaries and IRS forms and documents were covered by Attachment A.

In addition, the exit photographs of the search demonstrate that a large volume of material was left behind. In fact, Sigillito's counsel, in the course of discussing reciprocal discovery obligations, has informed the Government that after the search Sigillito was assisted by friends in boxing up the remaining documents and that they filled approximately 20 bankers boxes.

Given the condition of Sigillito's office and the complete lack of order therein, the fact that a larger number of non-relevant documents was not seized is both surprising and strong evidence of the FBI's more than reasonable efforts to limit the seizure to only relevant items covered by Attachment A. As the evidence will establish at the hearing, there was no real filing system, the office was full of trash and relevant documents were often sandwiched between irrelevant. It was impracticable and unreasonable to expect that the agents would go through

---

[38] At page 36 of his Memorandum, Doc. 97, Sigillito raises the rights of third parties such as his clients, church members and family. Sigillito can only assert his own privacy interests, not the interests of third parties. *United States v. Salvucci*, 448 U.S. 83, 85 (1980); *see also United States v. Mendoza*, 438 F.3d 792, 795 (8th Cir. 2006).

every single piece of paper on-site given the volume of material covered by the warrant and the period of time that the fraud occurred. Sigillito can't have it both ways— he can't insist that the attorney-client privilege be respected by use of a taint team and taint procedures and at the same time insist on surgical precision in the relevancy of the items seized. To the extent there was a filing system, the agents took advantage of it and seized only relevant documents. The agent cannot be faulted because Sigillito's adherence to an organization system was non-existent. The disorder cannot be blamed on Ms. Stajduhar, because the condition of Sigillito's home was even worse than the office when the agents went there on July 1, 2010.

Rather than a flagrant disregard of the documentary limitations of Attachment A, the search team was as careful as practicable under the circumstances to avoid seizing material not covered by the warrant. The evidence of the execution fails to establish a motive to engage in "fishing." Much material was left behind, and substantial material was not examined on site out of respect for the attorney-client privilege. The use of a taint review process, the conditions of the office as the agents found it and the temporal scope and complexity of the scheme under investigation made it impractical to be more precise in the scope of the seizures. Nevertheless, the precision was far greater than that in any of the cases cited by Sigillito. Thus, the search was executed in a reasonable manner and complied with the Fourth Amendment.

## 2.    There Was No Seizure of Assets for Forfeiture on May 24, 2010

Sigillito's Motion to Suppress the May 24, 2010 "Seizure Warrant" misconceives entirely of the nature of the warrant at issue. The Government did not obtain a separate seizure warrant on May 21, 2010. Rather, it obtained a single "search and seizure" warrant that, like any search warrant, authorized the seizing agents to seize the evidence and fruits of crime detected during

the search. *See* Fed. R. Crim. P. 41(b) (authorizing magistrate to issue warrant "to search for *and seize* . . . property located within the district" (emphasis added)); *see also* Fed R. Crim. P. 41(c) ("A warrant may be issued for . . . evidence of a crime . . . [or] fruits of crime, or other items illegally possessed . . . ."). Thus, to the extent any property was seized, it was not <u>at that time</u> seized for forfeiture, but as evidence and/or fruits of the alleged crime. The affidavit established probable cause to believe that Sigillito had spent proceeds of the offense on various assets and collectible items for which he had no legitimate source of income and his possession of those items was evidence and fruits of the crime. As such, the Government did not need to establish "probable cause that the property sought was subject to forfeiture."[39] Nor did the Government have to support any special findings relating to the insufficiency of a restraining order to preserve the availability of the property for forfeiture.[40] Accordingly, these challenges to the May 24, 2010 "Seizure Warrant" are completely without merit.

The remaining arguments in the motion and its supporting memorandum merely rehash arguments put forward in Sigillito's Motion to Suppress the May 24, 2010 Search Warrant. These arguments are thoroughly addressed above and are not restated here.

---

[39] Mem. in Supp. (Doc. #90) at 1–2.

[40] *See* 21 U.S.C. § 853(f) ("The Government may request the issuance of a warrant authorizing the seizure of property *subject to forfeiture* under this section in the same manner as provided for a search warrant. If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be *subject to forfeiture* and that an order under subsection (e) of this section may not be sufficient to assure the availability of the property *for forfeiture*, the court shall issue a warrant authorizing the seizure of such property." (emphasis added).

**D.   The July 1, 2010 Search of Sigillito's Primary and Secondary Home and Seizure of Assets for Forfeiture Was Done Pursuant to Validly Issued and Executed Search and Seizure Warrants**

### 1.   The Search Warrants Authorized Seizure of the Property

Sigillito claims that the search warrants are invalid because they authorized a search for "indirect" proceeds of the fraud, "a category [not] specifically articulated in Rule 41." While "proceeds" are not an enumerated category in Rule 41, "fruits of crime" is. Thus, the search warrants authorized the executing officer to search the premises for the proceeds of Sigillito's crime, and when he found them, to seize them as "fruits of the crime," and—as the seizure warrants provided—for forfeiture.

### 2.   The Seizure Warrant Was Appropriately Limited

Sigillito first argues that "any other items purchased with investor/lender funds" is overbroad as used in Attachment A, Section I.  *Exhibit 2A*.  It was not overbroad for the reasons discussed in Section III.B.2.b, *supra*.  Moreover, Sigillito reads the clause out of context—read as a whole, Section I was limited by the phrase: "which items are detailed below" from the Personal Articles Declaration ("PAD"). This phrase served to limit the scope of the seizure and the "any other items" phrase was intended to prevent the introductory terms from being underinclusive.  It was the items on the PAD that the agents were authorized to seize.  Sigillito has not identified any items which he claims were seized which were not on the PAD.

Sigillito next argues that the warrant is overbroad because it does not specify a time period for the purchase of the enumerated items. Yet as explained above, a warrant that identifies specific property is not required to specify the crime to which that property relates, so long as the application supports probable cause to believe those items are evidence of the crime.

60

Sigillito makes a similar error when he claims that items purchased more than five years before the date of the search should not have been seized because they would have been acquired outside the statute of limitations for fraud. This is mistaken for at least two reasons. First, as discussed above, mail and wire fraud are both continuing offenses. *See also United States v. Garvin*, 565 F.2d 519, 523 (8th Cir. 1977) (holding that evidence extending beyond statute of limitations is admissible to show "continuing scheme"); *United States v. Phillips*, 688 F.2d 52, 54–55 (8th Cir. 1982) (holding that action of cashing money order after transmission of wire was part of "continuing scheme to defraud"). The statute of limitations for those offenses runs from the last mailing or wire that is identified, but the "offense" includes all conduct that is part of the scheme, even if it happens more than five years before charges are brought. *See United States v. Ashdown*, 509 F.2d 793, 798 (5th Cir. 1975), *cited in Garvin*, 565 F.2d at 523 ("[I]f the prosecution is timely with respect to the mailings alleged, it is no defense that the scheme was formed earlier, and proof running back of the statute is admissible to show the scheme and intent if it is connected up with the scheme existing when use of the mails occurred." (internal quotations and emendations omitted)). Second, the statute of limitations on *civil* forfeiture runs not from the date of the offense, but from the *discovery* of the offense.[41] As the seizure warrants were multi-purpose warrants that authorized the seizure of the property for either criminal or civil forfeiture, the search properly comprehended any property that was part of the newly discovered scheme.

---

[41] 19 U.S.C. § 1621 ("No suit or action to recover . . . forfeiture of property . . . shall be instituted unless such suit or action is commenced within five years after the time when the alleged offense *was discovered*, or in the case of forfeiture, within 2 years after the time when the involvement of the property in the alleged offense was discovered, whichever was later . . . ." (emphasis added)); *see also* 18 U.S.C. § 981(d) (applying Title 19 provisions governing forfeitures to forfeitures brought under Title 18).

### 3.     Contrary to Sigillito's Premature Challenges, the July 1, 2010 Seizure Warrant Was Valid

Before addressing the particular arguments Sigillito raises in opposition to the July 1, 2010 seizure warrant, it is important to note that Sigillito's challenges to this warrant is premature. While the search warrants discussed above permitted the property to be seized as evidence, the seizure warrant at issue authorized the seizure of the identified property for forfeiture. To the extent that Sigillito seeks to suppress the use of items obtained during the July 1, 2010 search as evidence, he must demonstrate the insufficiency of the search warrant. To the extent, however, that Sigillito seeks the return of the property seized for forfeiture,[42] that challenge must wait until the ancillary proceeding[43] unless Sigillito is able to show both that the government lacked probable cause to believe the property was subject to forfeiture and return of the property is necessary to protect Sigillito's Sixth Amendment right to counsel.[44] Sigillito has not even attempted to make this second showing, and to do so would be premature in any event.

---

[42] While Sigillito's Motion to Suppress the July 1 and 2 Searches and Seizures (Doc. 100) does not pray for the return of the property, the Memorandum in Support (Doc. 101) repeatedly requests the return of the property. *See* Mem. in Supp. (Doc. 101) at 3, 4, 7.

[43] *See Madewell v. Downs*, 68 F.3d 1030, 1043–44 (8th Cir. 1995) (recognizing that motion for return of property should not be granted where forfeiture proceeding provides forum for adjudication of property interest and collecting authorities); *see also In re Harper*, 835 F.2d 1273, 1274 (8th Cir. 1988), *overruled on other grounds* (holding that a motion for return of property is equitable remedy that cannot be exercised where forfeiture action provides adequate remedy at law).

[44] This requirement is known as the "*Jones-Farmer* rule," after *United States v. Jones*, 160 F.3d 641 (10th Cir. 1998), and *United States v. Farmer*, 274 F.3d 800 (4th Cir. 2001), the two leading cases to develop the doctrine. *See Jones*, 160 F.3d at 647–48; *Farmer*, 274 F.3d at 803. While the Eighth Circuit has not expressly adopted this approach, district courts within the Eighth Circuit have. *See United States v. Mueller*, 2008 WL 289258, *1 (D. Minn. July 18, 2008); *United States v. Lewis*, 2006 WL 1579855, *9 (D. Minn. Jun. 1, 2006). The Eighth Circuit has, however, recognized that "neither the fifth nor sixth amendment rights of a defendant are offended by forfeiture of property that would otherwise be used to pay an attorney" and that "pretrial restraint of such assets is permissible after a showing of probable cause." *See United States v. Unit No. 7 and Unit No. 8 of Shop in Grove Condominium*, 890 F.2d 82, 84 (8th Cir. 1989) (citing *United States v. Monsanto*, 491 U.S. 600, 612 (1989) and *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 622 (1989)).

This Court therefore should not order any forfeitable property returned to Sigillito.[45]

### 4.      Sigillito's Contention That Property Not Subject to Forfeiture Was Seized Is, Again, Premature

In contending that "property not subject to forfeiture was seized" in connection with the July 1 and 2, 2010 searches, Sigillito again suffers from a confusion between the seizure of property <u>as evidence</u> and <u>for forfeiture</u>. Even if the property seized was not subject to forfeiture, it still could have been seized <u>as evidence</u> under the search warrant provided it fell within the description of the property provided.  In other words, even if the forfeiture seizure warrant were invalid, that would not require the suppression of the evidence obtained pursuant to the valid search warrant.

But Sigillito is also mistaken to contend that the seizure warrant was invalid. Sigillito again asserts that "any mail fraud violation occurring more than five years prior to July 1, 2010 is not subject to prosecution" and "[f]ailure to convict precludes criminal forfeiture." As stated above, mail fraud is a scheme offense, and thus any proceeds acquired during the scheme is subject to forfeiture.  Moreover, the statute of limitations for civil forfeiture runs from the *discovery* of the offense and not its commission. As such, the forfeitability of the seized property is entirely unaffected by the date of the offense itself.

### 5.      Sigillito's Challenge to the Seizure of Bank Funds Is Likewise Premature and Without Merit

Sigillito does not appear even to argue that the <u>evidence</u> of the funds in account #******7284 must be suppressed. Instead, he argues, they must be returned. Again, in order to

---

[45] Indeed, even if a search or seizure is found to be illegal, that does not make the property unforfeitable; it merely makes the evidence relating to that seize inadmissible. *United States v. Daccarett*, 6 F.3d 37, 46 (2d Cir. 1993).

obtain the return of the property prior to the ancillary proceeding, Sigillito would have to show, among other things, that return of the property is necessary to protect his right to counsel. He has not endeavored to make that showing. Indeed, as the evidence of these funds was obtained without use of a search warrant, there is no argument whatsoever that the evidence of the funds should be suppressed.

But Sigillito also misses the mark by arguing that funds from this account have come from other sources. First, Sigillito does not even contend that any of the contrary information he provides was known or available to the Government at the time the warrant was obtained or executed. Second, Sigillito forgets that funds in an account are subject to civil forfeiture even if those funds are not proceeds, so long as the government can trace proceeds into the account up to the amount seized. Where the property subject to civil forfeiture is funds on deposit, "it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for forfeiture; and it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property." 18 U.S.C. § 984(a)(1).[46] Although the affidavit establishes that at least $25,000.00 of proceeds were deposited into the account, Sigillito challenges the restraint of $13,150 deposited into the account because those funds are "clearly from sources not traceable to any violation."[47] But under Section 984, the government

---

[46] Section 984(a) relaxes the traceability requirement only if the action to forfeit the property is commenced within a year of the offense. See id. § 984(b). In this case, the seizure warrant was executed on July 1, 2010, and a civil forfeiture action was brought against the property on December 7, 2010. See United States v. 478 Lots of Misc. Antique Books & Pamphlets, Case No. 4:10-cv-02298-LRR (Dec. 7, 2010). The Indictment alleges that Sigillito committed acts of mail and wire fraud within a year both of the filing of the civil complaint and the execution of the warrant. See Indictment (Doc. #1) at Counts 9, 13, 14, 15. The declaration in support of the civil complaint likewise states that the scheme to defraud carried through into 2010. See 478 Lots, Case No. 4:10-cv-02298-LRR, Doc. #1-2, at ¶ 10.

[47] Mem. in Supp. (Doc #101) at 7.

64

may forfeit the funds even if they are "not traceable directly to the offense."[48] Thus, even if Sigillito had the ability to challenge the forfeiture at this early stage, that challenge would fail.

## 6. The Affidavit Established Probable Cause

### a. The Affidavit Is Not Insufficient for Failing to Identify Investors by Name

Sigillito complains that a number of paragraphs in the affidavit contain information provided by lenders without identifying the name of the individual providing the information. As Sigillito acknowledges, an informant need not be identified by name in a search warrant affidavit. Rather, the question is whether the affidavit establishes the reliability of the information. The fact that the information attributed to any lender was corroborated by several sources, as opposed to just one, as well as by Elizabeth Stajduhar, who was named in the affidavit, adequately established the reliability of the information provided.

### b. Sigillito Again Fails to Make a Threshold Showing of the Falsity of Any Statements in the Affidavit

Sigillito points to several paragraphs of the affidavit that Sigillito claims were false statements. Yet the statements identified by Sigillito were not in fact false. For example, as discussed above, it was true that "Mr. Stajduhar stated that [Sigillito] has very few, if any, clients for whom he does actual legal work."[49] It is also true (in language that is perhaps more artful than that in the May 24, 2010 affidavit) that "Mr. Sigillito solicited individuals who *furnished* money to him, which they believed would be invested and/or loaned . . . for use by a real estate

---

[48]     18 U.S.C. § 984(b).

[49]     Aff. in Supp. of July 1, 2010 Search Warrant at ¶ 3.

developer and investor in the United Kingdom named Derek Smith."[50]  The other paragraphs cited by Sigillito contain nothing but true statements.  As such, Sigillito has not met his burden to show that any of the statements were false, let alone that any false statements were knowingly included in the warrant affidavit.  Regardless of the extent of his law practice or the circumstances of his handling of BLP money, there was still probable cause to believe that the items sought were subject to forfeiture as proceeds of a federal crime.

**c.**    **Even If the Contested Statements Were Intentionally False, the Affidavit Still Established Probable Cause Without Them**

As discussed above, even if the Court determines that any of the statements in questions was false, the affidavit still established probable cause without the statement.

**E.**    **Good Faith**

In the event this Court finds that any of the warrants were invalid in their issuance or execution, suppression is not warranted because the agents reasonably and in good faith relied on the warrant.  *United States v. Leon*, 468 U.S. 897 (1984).  Some courts have even held that the probable cause issue should not even be reached in cases where "'the good faith exception of *Leon* will resolve the matter.'" *United States v. Neal*, 2006 WL 1525893 at 3 (5th Cir. 2006) (citing *United States v. Craig*, 861 F.2d 818, 820 (5th Cir. 1988)).  "When judges can look at the same affidavit and come to differing conclusions, a police officer's reliance on that affidavit must, therefore, be reasonable."  *In re Search of 4801 Fyler Avenue*, 879 F.2d at 388 (citing, *United States v. Martin*, 833 F.2d 752, 756 (8th Cir. 1987); *see also Leon*, 468 U.S. at 923–24.  Under *Leon*, the reliance on the warrant must be objectively reasonable.  *Id.* at 914–15.  If an

---

[50]    Aff. in Supp. of July 1, 2010 Search Warrant at ¶ 4 (emphasis added).

affidavit obviously did not provide a sufficient basis to issue the warrant, *Leon* would not apply. *Id*.  For the good faith exception to the "extreme sanction of exclusion" not to apply, *id*. at 916, the agents' belief in the existence of probable cause must be "entirely unreasonable."  *Id*. at 923. When assessing the objective good faith of the agents, courts look to the totality of the circumstances.  *United States v. Weeks*, 160 F.3d 1210, 1212 (8th Cir. 1998); *United States v. Martin*, 833 F.2d 752, 756 (8th Cir. 1987).  The *Leon* exception applies to claims that a list of items to be seized was insufficiently particular, and good faith exists where, as here, the magistrate signed the warrant and the officer who prepared the affidavit also directed the search. *United States v. Curry*, 911 F.2d 72 (8th Cir. 1990); *see also United States v. Thomas*, 263 F.3d 805 (8th Cir. 2001) (search warrant with wrong address but searched right address); *United States v. Kattaria*, 553 F.3d 1171 (8th Cir. 2009) (four exceptions to *Leon*).

Here, under the totality of the circumstances SA Cosentino's belief in the existence of probable cause was far from "entirely unreasonable" and the warrants were hardly "so facially deficient" that he could not presume its validity.  SA Cosentino has been an agent nearly 20 years, but he has prepared relatively few search warrants.  The warrants here were reviewed and approved by senior members of the U.S. Attorney's Office with whom he had worked successfully on many occasions and two magistrates (one seasoned and experienced and the other relatively new) signed the warrants without question.  The discussions *supra* demonstrate that even if reasonable minds could differ as to the conclusions, the questions are close enough that reliance on the signed warrants was far from entirely unreasonable.  The actions of the agents also speak to their good faith.  Steps were taken to respect the attorney-client privilege even though the agents did not expect to encounter much privileged material, and once the items

were seized, they were taint-reviewed out of an abundance of caution.  The latter step seriously delayed the investigation.  At the scene of the office search, Sigillito was interviewed and the interview was terminated when he requested it to stop.  When he asked to leave he was permitted to leave.  The agents requested his assistance to avoid privileged materials or irrelevant materials, but he was more concerned with departing than protecting privileged items.

Similarly, on July 1, 2010, extremely unusual courtesies were shown to Sigillito's family in connection with executing the warrant and despite the efforts Sigillito was more interested in departing again than minimizing the impact on his family.  During the execution, the agents permitted the occupants unusual freedom to minimize the impact.  Further, Sigillito's counsel was shown the courtesy of seizing the funds directly from them rather than their bank to avoid undue embarrassment. These were not the actions of agents acting in bad faith and this Court should find that under *Leon* suppression is not warranted.

### F.      Inevitable Discovery

Another exception to the exclusionary rule is inevitable discovery of the evidence sought to be suppressed.  To establish inevitable discovery, the Government must show: 1) an ongoing line of investigation distinct from the unlawful technique; and 2) a reasonable probability that the evidence would have been discovered through the permissible line of investigation.  *Nix v. Williams*, 467 U.S. 431 (1984); *see also United States v. Hammons*, 152 F.3d 1025, 1029 (8th Cir. 1998).  To meet the exception, under *Nix* the Government must establish inevitability only by a preponderance of the evidence

Here, there are many sources of inevitable discovery, but the Government will only highlight the main ones.  First, there had already been an ongoing line of investigation based on

the Millenium Trust Company claim in July 2008, that Sigillito was engaged in a Ponzi scheme with respect to IRA investments.  Second, Sebastion Rucci, on behalf of Phillip Rosemann, had already filed a federal lawsuit against Derek Smith in England.  Mr. Rucci had hired an English attorney to investigate Mr. Smith and interview him.  From that effort, Mr. Rucci learned of the fraudulent nature of the BLP and Mr. Sigillito's role in it.  That resulted in the pending civil RICO suit eventually naming Sigillito as a defendant.  All of this information would have made its way to the Government, and the Government would have acted on it.  Third, Ms. Stajduhar was a source of information and had supplied documents to the Government.  She had provided most of the investor names already.  Given time to contact investors, additional probable cause would have been developed, but at a minimum all promissory notes would have been obtained from investors, James Scott Brown[51], Hal Milsap[52], Paul Vogel[53], Derek Smith[54] and others.  Fourth, all pertinent e-mail and text messages would have been obtained independently from Ms. Stajduhar, James Scott Brown, Derek Smith, and others.  These individuals, together with many

---

[51]The Government traveled to Kansas City, Missouri and interviewed James Scott Brown on May 28, 2010.  Among other statements, Mr. Brown admitted that the BLP was a Ponzi scheme.  He provided additional information clarifying the roles of Sigillito and Derek Smith and eventually became a cooperating witness.  Through his counsel, he produced a large volume of documents.

[52]Hal Milsap was an Arkansas salesman who sold the BLP in return for commissions from Sigillito and James Scott Brown.  He recruited several investors and provided copies of many of the same promissory notes seized from Sigillito's office.

[53]Paul Vogel was an investor who also assisted Sigillito market the BLP in its later stages.  He provided many documents and records which were his copies of documents seized from Sigillito's office.  These were significant because they reflected fraudulent representations and Sigillito used Mr. Vogel's reputation to bolster the credibility of the representations.  At times, Sigillito also used the name of Mr. Vogel's wife, a prominent Missouri attorney, as the purported preparer of some promissory notes.

[54]Derek Smith responded to an e-mail inquiry from SA Cosentino on June 1, 2010, and acknowledged that he signed blank signature pages of loans for Sigillito and did not always know the extent of Sigillito's activities in his name.  A short time later, Derek Smith, with his attorney, gave additional information to the Government in a telephone interview and eventually became a cooperating witness.  Much of the information learned from Mr. Smith was incriminating of Sigillito and duplicated information learned from items seized during the search of Sigillito's office.

investors, when contacted, provided copies of voluminous e-mails.[55]  Fifth, if the Government

had not proceeded to search Sigillito's office, it would have and could have obtained by Grand

Jury subpoena every one of the documents seized.  The Government had already served Grand

Jury subpoenas on the banks and Sigillito's business was a corporation whose records could be

obtained by subpoena regardless of Sigillito's Fifth Amendment rights.  Sixth, certainly by June,

2011, the Government had ample probable cause to believe Sigillito had committed a crime in

connection with the BLP and he had been indicted.  That is when the Government obtained a

search warrant for Sigillito's e-mails stored by Yahoo!.  Thus, all of the e-mails located in

Sigillito's office sent or received by Sigillito would have inevitably been discovered in the

Yahoo! search.  Also, because Ms. Stajduhar had complete access and control over the items in

the office, she could have given the Government all of the items to which she had free access if

the Government requested her to do so.

### G.      Independent Source

The independent source doctrine has its roots in the exclusionary rule itself.  In *Wong*

*Sun*, the Supreme Court stated that exclusion was not warranted where "the Government learned

of the evidence 'from an independent source.'"  *Wong Sun v. United States*, 373 U.S. 471, 487

(1963) (quoting *Silverthorne Lumber Co. V. United States*, 251 U.S. 385, 392 (1920)).  *See also*,

*Murray v. United States*, 487 U.S. 533, 537 (1988); *United States v. Junkman,* 160 F.3d 1191,

1193-94 (8th Cir. 1998).  As discussed above, prior to the search of Sigillito's office, the

Government had documents from Ms. Stajduhar and the names of investors and other

---

[55]Paul Vogel, James Scott Brown, Derek Smith, Phillip Rosemann, and Sebastian Rucci, among others, provided a great many e-mail communications.  Some of these were their copies of e-mails recovered during the search of Sigillito's office.

participants.  Independent of the search, as discussed above, the Government eventually obtained much of the documentary evidence seized on May 24, 2010.  The Government did not learn of the witnesses to contact to get that evidence by virtue of the search results - the Government learned the names of investors and others involved from, *inter alia*,  Ms. Stajduhar, the investor list, the documents she delivered to the Government, the search of Sigillito's e-mail account, bank records.  Therefore, the independent source exception to the exclusionary rule applies here.

## IV.    CONCLUSION

Reasonableness is the touchstone of the Fourth Amendment, and the agents reasonably executed a warrant for a reasonably particular list of items to be seized on May 24, 2010.  Similarly, the July 1 and 2, 2010 searches and seizures were based on valid warrants that were validly executed.  For these reasons, the government respectfully requests that the Court deny Sigillito's Motions to Suppress in their entirety.

Respectfully submitted,
ERIC H. HOLDER, JR.
United States Attorney General
BETH PHILLIPS
United States Attorney
WESTERN DISTRICT OF MISSOURI

  *s/ Jess E. Michaelsen*
JESS E. MICHAELSEN, #52253
Special Attorney to the United States Attorney General
Charles Evans Whittaker Courthouse
400 East Ninth Street, Fifth Floor
Kansas City, Missouri  64106

  *s/ Steven E. Holtshouser*
STEVEN E. HOLTSHOUSER, #24277
Special Attorney to the United States Attorney General
111  South 10th Street, Room 20.333
St. Louis, Missouri  63102

  *s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768
Special Attorney to the United States Attorney General
111  South 10th Street, Room 20.333
St. Louis, Missouri  63102

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 21, 2011, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

**Douglas P. Roller**
dprcrimlaw@aol.com

_s/ Jess E. Michaelsen_
JESS E. MICHAELSEN, #52253
Special Attorney to the United States Attorney General
Charles Evans Whittaker Courthouse
400 East Ninth Street, Fifth Floor
Kansas City, Missouri  64106

_s/ Steven E. Holtshouser_
STEVEN E. HOLTSHOUSER, #24277
Special Attorney to the United States Attorney General
111  South 10th Street, Room 20.333
St. Louis, Missouri  63102

_s/ Richard E. Finneran_
RICHARD E. FINNERAN, #60768
Special Attorney to the United States Attorney General
111  South 10th Street, Room 20.333
St. Louis, Missouri  63102