# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

MARTIN T. SIGILLITO,

        Defendant.

No. 11-CR-168-LRR

**ORDER**

————————————

## *TABLE OF CONTENTS*

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   RELEVANT PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . 2

III.  RELEVANT FACTS AND ALLEGATIONS . . . . . . . . . . . . . . . . . . . 3
     A.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     B.    *Stajduhar Reports her Concerns* . . . . . . . . . . . . . . . . . . . . 5
     C.    *Search and Seizure Warrant Issued on May 21, 2010* . . . . . . . . . . 7
     D.    *Search Warrants and Seizure Warrant Issued on June 30, 2010* . . . 11

IV.  ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
     A.    *Motion to Suppress May 24, 2010 Search of Defendant's Law Office
         and Motion to Suppress May 24, 2010 Seizures* . . . . . . . . . . . . . 14
         1.   *Illegal search* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
             a.    *Legitimate expectation of privacy* . . . . . . . . . . . . . 16
             b.    *Government action* . . . . . . . . . . . . . . . . . . . . . . 25
         2.   *Defective Search and Seizure Warrant* . . . . . . . . . . . . . . 28
             a.    *Attachment A* . . . . . . . . . . . . . . . . . . . . . . . . . 28
             b.    *Law office* . . . . . . . . . . . . . . . . . . . . . . . . . . 30
             c.    *Failure to identify alleged crime or
                  objects of the search* . . . . . . . . . . . . . . . . . . . . . 30
             d.    *Computer equipment* . . . . . . . . . . . . . . . . . . . . . 31
             e.    *Particularity of documents* . . . . . . . . . . . . . . . . . 33
             f.    *Special findings* . . . . . . . . . . . . . . . . . . . . . . . 34
         3.   *Probable cause* . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
             a.    *Applicable law* . . . . . . . . . . . . . . . . . . . . . . . . 36
             b.    *Stajduhar's reliability* . . . . . . . . . . . . . . . . . . . . 36

        *c.*     *Allegations of criminal activity* . . . . . . . . . . . . . . . . **37**
    *4.*     *Material false statement or omission* . . . . . . . . . . . . . . . . **39**
    *5.*     *General search* . . . . . . . . . . . . . . . . . . . . . . . . . . . . **42**
    *6.*     *Government's arguments* . . . . . . . . . . . . . . . . . . . . . . . **43**
    *7.*     *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **45**
 *B.*    *Motion to Suppress July 1 and 2 Searches and Seizures* . . . . . . . . **45**
    *1.*     *Search warrants* . . . . . . . . . . . . . . . . . . . . . . . . . . . **46**
        *a.*     *Specific criminal activity* . . . . . . . . . . . . . . . . . **46**
        *b.*     *Discretion* . . . . . . . . . . . . . . . . . . . . . . . . . . **48**
        *c.*     *Time limitation* . . . . . . . . . . . . . . . . . . . . . . . **48**
        *d.*     *Prior illegal search* . . . . . . . . . . . . . . . . . . . . . **49**
    *2.*     *Seizure warrant* . . . . . . . . . . . . . . . . . . . . . . . . . . . **49**
    *3.*     *Affidavit* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **50**
    *4.*     *Government's arguments* . . . . . . . . . . . . . . . . . . . . . . . **51**
    *5.*     *Conclusion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **52**
*V.*  *CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **52**

## I. INTRODUCTION

The matters before the court are Defendant Martin T. Sigillito's "Motion to Suppress May 24, 2010 Search of Defendant's Law Office" (docket no. 96), "Motion to Suppress May 24, 2010 Seizure Warrant" (docket no. 98) and "Motion to Suppress July 1 and July 2 Searches and Seizures" (docket no. 100) (collectively, the "Motions").

## II. RELEVANT PROCEDURAL HISTORY

On April 28, 2011, the government filed a twenty-two count Indictment (docket no. 2) against Defendants Martin T. Sigillito, James Scott Brown and Derek J. Smith. Count 1 charges Sigillito with committing wire fraud in violation of 18 U.S.C. §§ 1343 and 2(b). Counts 2 through 9 charge Sigillito with committing wire fraud in violation of 18 U.S.C. §§ 1343 and 2(b). Count 10 charges Sigillito with committing mail fraud in violation of 18 U.S.C. §§ 1341 and 2. Counts 11 through 15 charge Sigillito with committing mail fraud in violation of 18 U.S.C. §§ 1341 and 2(b). Count 16 charges Sigillito, Brown and Smith with conspiracy to commit wire and mail fraud in violation of 18 U.S.C. § 371. Count 17 charges Sigillito with engaging in and attempting to engage in a money

laundering transaction in violation of 18 U.S.C. §§ 1957 and 2(b).  Counts 18 through 22 charge Sigillito with engaging in and attempting to engage in money laundering transactions in violation of 18 U.S.C. §§ 1957 and 2(b).  The Indictment also contains a forfeiture allegation.  On September 16, 2011, Defendants Brown and Smith pled guilty to Count 16.

On October 4, 2011, Sigillito filed the Motions, seeking to suppress certain evidence.  On October 21, 2011, the government filed an "Omnibus Response" ("Resistance") (docket no. 113) to the Motions.  Sigillito did not file a reply, and the time for doing so has expired.  *See* E.D.Mo. L.R. 4.01(C) ("Within seven (7) days after being served with a memorandum in opposition, the moving party may file a reply memorandum.").  On October 25, 2011, the court held an evidentiary hearing ("Hearing") on the Motions.  *See* Hearing Minutes (docket no. 117).  Assistant United States Attorneys Jess Michaelsen, Richard Finneran and Steven Holtshouser appeared for the government.  Attorney Douglas Roller represented Sigillito, who was personally present.  The Motions are fully submitted and ready for decision.

### III.  RELEVANT FACTS AND ALLEGATIONS

#### A.  Background

From approximately 2000 until 2010, Sigillito operated a loan program referred to as the British Lending Program ("BLP").  Specifically, Sigillito solicited loans from individual lenders, or investors, on behalf of Distinctive Properties, Ltd. ("Distinctive Properties").  Sigillito advised lenders that they were making loans to Distinctive Properties for the purchase of purported land deals in England.  The government alleges that Sigillito accepted over $50 million in loans, a very small percentage of which was actually invested in England.  The government maintains that Sigillito kept a significant amount of the loan money as fees and used new loan money to pay off previous lenders, making the BLP a Ponzi scheme.

Throughout most of the ten-year period that Sigillito operated the BLP, his sole employee was his secretary, Elizabeth Stajduhar.  Sigillito's office was located at 7710 Carondelet Ave, Suite 208, in Clayton Missouri.  The office suite consisted of a reception area, a hallway, a storage room, an office and a conference room.  The signage on the door to the office suite read "Martin T. Sigillito."  Stajduhar had complete, unlimited access to the entire office suite and its contents, with the exception of locked glass bookcases that held books, some of which were valuable.  Sigillito believes that Stajduhar knew where the keys to the bookcase were kept but she did not need to access the locked bookcases.  Stajduhar had an office key and frequently opened and closed the office during the workweek.

Stajduhar selected the computer equipment for the office and claims that she set up passwords for her computer and Sigillito's computer; however, Sigillito testified that he did not believe his computer was password protected.  Stajduhar also frequently worked from home on her personal computer and used various personal printers.  Sigillito knew Stajduhar frequently worked from home because she had children and often had problems with babysitters.

Stajduhar and Sigillito did not have business email accounts, but instead maintained their own personal email accounts.  Thus, Stajduhar used her personal email account for work purposes.  Stajduhar also had access to Sigillito's email account, but she used it infrequently.  Stajduhar kept many of her work-related documents on a thumb-drive that she generally carried in her purse.  She also emailed many documents from her office computer to her personal email account for the purpose of working at home.  Stajduhar may have taken some paper documents home with her on occasion, but Sigillito testified that he thought Stajduhar only took paper documents from the office when she planned to deposit them in the mail.  Between about 2008 and 2010, Stajduhar misappropriated approximately $200,000 from Sigillito.  Stajduhar maintains that she used the funds largely

4

to pay for medical bills.

## B. *Stajduhar Reports her Concerns*

At some point, Stajduhar began having concerns about the legality and soundness of the BLP.  Stajduhar was especially concerned about the BLP because her mother and father-in-law had loaned money to the program.  In May of 2010, she contacted Ethan Corlija, an attorney with whom she was acquainted.  She informed him that she had some concerns about her employer and the BLP.  On May 17, 2010, Sigillito was in Israel soliciting a new lender and Stajduhar worked at the office.  That evening, Stajduhar met Corlija to discuss her concerns about the BLP.  After the meeting, Corlija accompanied Stajduhar to Sigillito's office.  Stajduhar showed Corlija her in-laws' loan agreements and some of the emails in her personal email account to support her concerns.  Neither Stajduhar nor Corlija took anything from the office that evening.

After leaving the office, Corlija contacted his friend, then-Deputy United States Marshal Luke Adler, who was assigned at that time to a Federal Bureau of Investigation ("FBI") task force.  Corlija told Adler that he had a client who had information concerning criminal activity.  Adler then contacted FBI Forfeiture Contractor James Appelbaum, who in turn contacted Special Agent Kevin Cosentino.  The following morning, on May 18, 2010, Corlija met Adler, FBI Contractor Appelbaum and Special Agent Cosentino at a coffee shop.  Corlija explained that his client, Stajduhar, worked for a non-practicing attorney, Sigillito, and that Stajduhar believed that Sigillito was engaged in a fraudulent loan solicitation scheme involving millions of dollars.  Corlija also notified the agents that Stajduhar already possessed numerous documents related to the scheme and that Sigillito was out of the country soliciting a large investor and would not return until May 23, 2010.  Corlija indicated that Stajduhar had full access to and complete control of Sigillito's office and that she sometimes worked from home.  Corlija agreed to bring Stajduhar to a meeting with the agents and representatives of the United States Attorney's Office the next day.

The agents instructed Corlija to advise Stajduhar not to return to the office until after they met and to bring any documents she already possessed, with no distinction made between documents in electronic or paper form. The agents did not know that Corlija had gone to Sigillito's office on the evening of May 17, 2010.

On May 18, 2010, Stajduhar spent several hours at home working on her personal computer printing emails and documents from her thumb drive. On May 19, 2010, Stajduhar and Corlija met with Special Agent Cosentino, FBI Contractor Appelbaum and several representatives of the United States Attorney's Office. During the meeting, Stajduhar admitted that during her employment she misappropriated approximately $200,000 from funds controlled by Sigillito. The government maintains that no promises were made to Stajduhar other than "standard oral proffer and use immunity assurances." Resistance at 6. Stajduhar described Sigillito's fraudulent loan solicitation and investment scheme that he carried out over a period of ten years. Stajduhar estimated that Sigillito had collected over $44 million from investors and opined that he spent most of the money for personal purposes and in a manner consistent with a Ponzi scheme.

Stajduhar explained that Sigillito was in Israel attempting to secure $5 million from a new lender and was due to return to the United States on May 23, 2010. Stajduhar also provided the government representatives with a packet of documents that numbered approximately five-hundred pages. The packet included spreadsheets that Stajduhar prepared as part of her job responsibilities to document loan activity, a sample promissory note and numerous email communications with lenders and other persons involved in the BLP. All of the documents were already in Stajduhar's possession, either in paper or electronic form, prior to Corlija's first contact with law enforcement on May 18, 2010. Stajduhar also permitted law enforcement officials to download her email and personal

cellular phone text communications.[1]

After the meeting, government officials conducted independent research and learned that Millennium Trust Company ("MTC"), which had previously administered IRA accounts invested in the BLP, had prepared and filed a Suspicious Activity Report in July of 2008, alleging that Sigillito was "operating a loan investment opportunity as a Ponzi scheme." Resistance at 8. The report included Sigillito's office address. Investigators also verified that Phillip Rosemann, a BLP lender, had filed a federal lawsuit related to the BLP against Derek Smith, the owner of Distinctive Properties. Investigators determined that Sigillito's bank account had a modest balance, which they believed was consistent with Stajduhar's claim that very little of the $44 million that Sigillito received from investors remained. Investigators also learned that in 1997, Sigillito was arrested in connection with a money laundering investigation when he attempted to assist a client who wanted to deposit approximately $3 million in cash into a Swiss bank account. Although Sigillito was not charged in connection with that incident (which was unrelated to the BLP), the government maintains that Sigillito's involvement in this incident demonstrated that he was not a "scrupulous attorney." Resistance at 45.

### C. Search and Seizure Warrant Issued on May 21, 2010

On May 20, 2010, Special Agent Cosentino prepared an application and affidavit to obtain a search warrant for Sigillito's office. On the first page of the warrant application, it states that "[t]he basis for the search under [Federal Rule of Criminal Procedure] 41(c) is . . . [to obtain] evidence of a crime [and] contraband, fruits of [a] crime, or other items illegally possessed." Gov. Ex. 1A at 1. First Assistant United States Attorney Michael W. Reap and Assistant United States Attorney Rosemary Meyers

---

[1] Officials were not able to view the information on Stajduhar's cellular phone for several months because it had to be processed by forensic software and converted into a chronological list with accurate dates and times.

reviewed the warrant application, affidavit and search warrant before Special Agent Cosentino presented them to United States Magistrate Judge Frederick R. Buckles on the morning of May 21, 2010. At 9:40 a.m., Judge Buckles signed a "Search and Seizure Warrant" for Sigillito's office. Gov. Ex. 1B at 1. The first page of the warrant states, "The person or property to be searched, described above, is believed to conceal . . . SEE ATTACHMENT A." *Id.* On Attachment A thirteen paragraphs set forth the items to be seized during the execution of the Search and Seizure Warrant. The last paragraph of Attachment A authorizes the seizure of "[a]ntique collectible books, maps, jewelry, coinage, and oriental rugs, and any other item purchased with investor funds." *Id.* at 3.

Also on May 21, 2010, Stajduhar went into work in an effort to make everything appear normal to Sigillito. While at the office, she obtained a copy of a document from Sigillito's insurance policy, which was labeled "Personal Articles Declaration" ("PAD"), and three emails sent to Sigillito regarding investors in Israel. Although neither Corlija nor the government asked Stajduhar for these items, she provided them to Corlija. Stajduhar informed Corlija that the PAD identified specific property Sigillito purchased with investor funds and then insured. Stajduhar also provided Corlija with a map she drew of the office indicating where specific items were kept. Corlija gave the PAD, the emails and the map to the FBI.

To prepare for the execution of the search warrant, First Assistant United States Attorney Reap and Special Agent Wade Beach, who is also an attorney, were assigned to lead a "taint team." The purpose of the taint investigation was to ensure that no attorney-client privileged documents were seized or viewed by the team conducting the criminal investigation. Reap provided instructions concerning the use of taint procedures to the FBI agents who would be conducting the search.

On May 24, 2010, FBI agents proceeded to Sigillito's office to execute the Search and Seizure Warrant. FBI agents were in the parking lot when Sigillito arrived. After

watching him enter the office, the agents knocked on the door to Sigillito's office suite and he answered. The agents identified themselves, and Special Agent Cosentino and FBI Contractor Appelbaum interviewed Sigillito. Special Agent Consentino testified that Sigillito confirmed that he had no current criminal or civil clients, that "very little money" from the BLP went to England and that he used new investor funds to pay earlier investors. During the interview, Stajduhar arrived at the office. Sigillito stepped out of the interview and spoke to Stajduhar privately for a very brief period. The interview then resumed for another minute or so before Sigillito terminated it. The entire interview lasted approximately forty-five minutes to an hour. When Sigillito ended the interview, Special Agent Cosentino informed Sigillito that he had a warrant to search his office. Sigillito did not ask to see a copy of the warrant. Special Agent Cosentino told Sigillito that the agents did not want to take documents that might contain attorney-client privileged information. Sigillito indicated that Stajduhar would be able to help the agents locate privileged documents. Sigillito then left the office and did not return at any point during the search.

Before searching the office suite, the agents took photographs documenting the condition of the office. These photographs were admitted into evidence during the Hearing as government Exhibits 7A through 7R. The photographs document that the office was extremely disorganized. Specifically, there were boxes and papers piled up around the office and there were papers and boxes strewn about on chairs, tables, a couch and the floor. Special Agent Costentino testified that he was shocked that the office was such a mess and that he was concerned about the amount of effort it would require to go through the items and determine what was relevant and what was not relevant to the investigation.

After taking photographs, the agents conducted a search of the office. Before the search, each participating agent read the affidavit in support of the warrant and a copy of Attachment A listing the items to be seized. Special Agent Cosentino directed the search. Special Agent Cosentino had a copy of the signed search warrant with Attachment A

attached, a copy of Sigillito's PAD and a copy of the affidavit in support of the warrant, including Attachments A and B[2] at the search site.  Stajduhar assisted the agents in determining which items should and should not be searched and seized.  Stajduhar directed the agents to boxes that contained documents that might be privileged, that related to Sigillito's church activities or that were otherwise immaterial to the search warrant and criminal investigation.  The agents did not search or seize the boxes Stajduhar identified as privileged or immaterial.  Special Agent Beach also assisted agents in determining whether certain documents were privileged.  If he determined the documents were privileged, the documents were not released to the investigating agents.  Because Stajduhar informed the agents that Sigillito purchased the items listed on the PAD with investor funds, the FBI employed an analyst to help the agents determine which books and other items in the office were on the PAD and should be seized.

At the conclusion of the search of the office, the agents took another series of photographs depicting the condition of the office as it was left by the agents, and the materials that agents left behind.  The photographs were admitted into evidence at the Hearing as Exhibits 8A through 8I.  The last three photographs show a copy of the Search and Seizure Warrant sitting on an office chair.  Sigillito testified that Attachment A was not attached to the copy of the Search and Seizure Warrant that agents left at his office.  Special Agent Cosentino testified on cross-examination that he left a copy of the Search and Seizure Warrant, with Attachment A attached, and a handwritten inventory receipt setting out all items that agents seized.  Special Agent Cosentino also testified that if he failed to include a copy of Attachment A, it was inadvertent.

The agents seized numerous items during the search of Sigillito's office, including books and other valuable items listed on Attachment A that agents believed Sigillito purchased with investor funds, as well as documents related to the investigation and

---

[2] Attachment B is a list of investor names.

10

included in Attachment A.  Categories of documents seized included: promissory notes, financial documents, email communications, correspondence, spreadsheets, marketing materials and notes relating to the loan investment activity under investigation.  The agents also seized four computers and several computer disks.  Following the search and continuing over a period of many months, Special Agent Beach conducted a taint review of the seized materials.  Only when Special Agent Beach determined that items were not privileged did he release them to the general investigation team.  To speed up the process, the government sought Sigillito's assistance in determining which items were privileged. Sigillito and his attorneys reviewed some materials for part of the day on June 24, 2010, left, and did not return to complete the review.

### D.  *Search Warrants and Seizure Warrant Issued on June 30, 2010*

On June 30, 2010, Special Agent Cosentino applied for a seizure warrant and two search warrants.  Special Agent Cosentino used the same affidavit to support all three warrant applications.   On that same date, United States Magistrate Judge Matt J. Whitworth approved and signed the seizure warrant application, the seizure warrant, the search warrant applications and the search warrants.  Both the seizure warrant application and the seizure warrant itself authorize the seizure of all items described in Attachment A[3] and state that the items in Attachment A are "subject to forfeiture."  Gov. Ex. 2A at 1; Gov. Ex. 2B at 1.  The search warrant applications authorize agents to search for the items in Attachment A, as well as property that constitutes evidence of a crime, contraband, fruits of a crime or things otherwise criminally possessed and property used as a means of committing a criminal offense.  Special Agent Cosentino obtained two separate search warrants for two separate locations because he believed many of the items subject to forfeiture in the seizure warrant were located at Sigillito's primary residence at 100 South

---

[3] Attachment A to the June 30, 2010 warrants is not the same document as Attachment A to the May 21, 2010 Search and Seizure Warrant.

11

Gore Avenue, Webster Groves, Missouri ("Gore Avenue"), and at Sigillito's secondary residence at 250 Links Road, Marthasville, Missouri ("Links Road").

On the morning of July 1, 2010, the FBI simultaneously executed search warrants at Sigillito's Gore Avenue and Links Road residences. Special Agent Carrie Carlson executed the Links Road search warrant and the seizure warrant. Neither Sigillito nor his family were present at the Links Road residence at the time of the search. A neighbor gave the FBI a key to access the residence after receiving permission from Sigillito. Prior to executing the search warrant, Special Agent Carlson read the search warrant, Attachment A and the affidavit in support of the search warrant. During the search, the agents seized only items that were listed on Attachment A, even though many other items of value were located in the Links Road residence. In total, the agents seized eight items from the Links Road address. Specifically, the agents seized four antique maps, three Persian rugs and one brass tray. The agents left a copy of the search warrant, Attachment A and an inventory receipt of the items taken from the Links Road residence on the dining room table before leaving.

At the same time Special Agent Carlson executed the warrants at the Links Road residence, Special Agent Cosentino and FBI Contractor Appelbaum approached the Gore Avenue residence and knocked on the door while several agents waited at a distance.[4] Special Agent Cosentino planned to give Sigillito time to get his family out of the residence, but after approximately forty-five minutes passed and Sigillito failed to have his family leave, Special Agent Cosentino and FBI Contractor Appelbaum decided to bring the rest of the team to the house. After the search team arrived, someone arranged to have the younger children removed from the Gore Avenue residence and taken to a friend's home.

---

[4] Special Agent Cosentino testified that it was highly unusual to execute a search warrant in this manner, but they were trying to show courtesy to Sigillito's wife, Margaret Finan.

12

At some point, Sigillito also left the residence, leaving Finan and the older children at the home.  When Sigillito left the residence, he was wearing a wrist watch that was listed on Attachment A as subject to seizure.

Finan assisted the agents during the search by locating specific items, primarily expensive jewelry items, that were listed on Attachment A as subject to forfeiture.  Special Agent Cosentino testified that agents decided not to seize some of the items on Attachment A because Finan stated that she obtained them from another source, such as from her mother, or that she obtained them before Sigillito began operating the BLP.  Before leaving the residence, the agents left a copy of the search warrant and a six-page handwritten inventory of the items that they seized.

The seizure warrant also authorized the seizure of a specified amount of money in Sigillito's counsel's trust account,[5] a quantity of expensive liquor held at the Racquet Club and funds in several of Sigillito's bank accounts.  On July 1, 2010, in lieu of having funds seized from its trust account, HNJ provided the FBI with a check in the amount sought.[6] Additionally, HNJ provided the FBI with certain gold coins listed on Attachment A.  The FBI also seized Sigillito's liquor from the Racquet Club and funds from Sigillito's bank account.  On July 2, 2010, HNJ provided the FBI with the watch Sigillito was wearing when the search warrant was executed on July 1, 2010.

On December 7, 2010, the government filed a Complaint in a related civil forfeiture action seeking to forfeit some of the property that agents seized during the execution of the Search and Seizure Warrant and the seizure warrant.  *See United States of America v. 478*

---

[5] At the time the FBI executed the warrants, Helfrey, Neiers & Jones ("HNJ") represented Sigillito.

[6] Although HNJ initially made the check payable to the FBI, it later learned that the check should have been made payable to the United States Marshal's Service ("USMS").  Consequently, the following day, HNJ substituted a check made payable to the USMS for the original check.

*Lots of Miscellaneous Antique Books and Pamphlets*, 10-CV-2298-UNA (E.D. Mo. 2010) (docket no. 1).  On May 31, 2011, the court stayed the civil forfeiture action until the conclusion of the instant criminal case.  *See id.* (docket no. 24).

## IV.  ANALYSIS

### A.  Motion to Suppress May 24, 2010 Search of Defendant's Law Office and Motion to Suppress May 24, 2010 Seizures

Sigillito has filed three separate motions to suppress.  Two of the motions, the "Motion to Suppress May 24, 2010 Search of Defendant's Law Office" and the "Motion to Suppress May 24, 2010 Seizure Warrant," pertain to the search and seizure of items at Sigillito's office on May 24, 2010.  The first motion appears to challenge a search warrant and search warrant application, while the second motion appears to challenge a seizure warrant and seizure warrant application.  Contrary to Sigillito's assertions, there are not two separate warrants and applications to challenge with regard to the search of his office.  On May 21, 2010, Judge Buckles signed a single Search and Seizure Warrant authorizing the search of Sigillito's office and the seizure of evidence of a crime, contraband, fruits of the crime and other items illegally possessed.  Consequently, the court shall consider all of the arguments raised in the "Motion to Suppress May 24, 2010 Search of Defendant's Law Office" and the "Motion to Suppress May 24, 2010 Seizure Warrant" (occasionally referred to collectively as, "Search and Seizure Motions") together.

Sigillito presents numerous arguments in support of the Search and Seizure Motions.  Specifically, Sigillito argues: (1) "the search was a product of an illegal search by a private party with the encouragement and acquiescence, if not at the direction of, the government"; (2) "the search warrant is invalid on its face"; (3) "the application for [the] search warrant and the accompanying affidavit fail to state probable cause to believe a violation of either the mail fraud or wire fraud statute had been committed"; (4) "the affiant of the affidavit in support of the search warrant knowingly and intentionally or in

reckless disregard of the truth, omitted material information and knowingly and intentionally or in reckless disregard of the truth, made material false statements in his affidavit"; and (5) the agents engaged in an unconstitutional general search. Motion to Suppress May 24, 2010 Search of Defendant's Law Office at 1-2; Motion to Suppress May 24, 2010 Seizure Warrant at 1-2.

### 1. *Illegal search*

Sigillito maintains that Stajduhar provided Special Agent Cosentino with documents that she obtained from Sigillito's office. Sigillito argues that Stajduhar did not have authority to remove documents from his office and provide them to the FBI. Consequently, Sigillito maintains that Special Agent "Cosentino relied upon information obtained through an illegal private search." Memorandum of Law in Support of Motion to Suppress May 24, 2010 Search of Defendant's Law Office ("Sigillito's First Mem.") (docket no. 97) at 2. Sigillito further argues that the text messages Corlija sent Stajduhar create a "clear inference" that the government told Corlija to have Stajduhar obtain all documents to support her allegations before meeting with the FBI on May 19, 2010. *Id.* at 5. Therefore, Sigillito contends that Stajduhar conducted a private search for the purpose of assisting law enforcement and with the acquiescence and knowledge of law enforcement in violation of the Fourth Amendment.

In order to demonstrate that Stajduhar's actions violated his Fourth Amendment rights, Sigillito "must show that: (1) he had a legitimate expectation of privacy, and (2) that expectation was invaded by government action." *United States v. Welliver*, 976 F.2d 1148, 1151 (8th Cir. 1992) (citing *Smith v. Maryland*, 442 U.S. 735 (1979)); *see also United States v. Lucas*, 499 F.3d 769, 796 (8th Cir. 2007) (Riley, J., concurring) ("The applicability of the Fourth Amendment turns on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action" (internal marks omitted) (quoting *Hudson v. Palmer*, 468

U.S. 517, 525 (1984))).

### a.    *Legitimate expectation of privacy*

Whether Sigillito had a legitimate expectation of privacy in the records Stajduhar provided the government is a two part inquiry: (1) whether Sigillito asserted a subjective expectation of privacy over the documents, which is a question of fact; and (2) whether Sigillito's subjective expectation is objectively reasonable, which is a question of law. *United States v. Williams*, 521 F.3d 902, 905-06 (8th Cir. 2008).

> Under [*Katz v. United States*, 389 U.S. 347 (1967)], the first question involves determining whether the person, by [his] conduct, has demonstrated an actual expectation of privacy, *id.* at 361 (Harlan, J., concurring), or sought to preserve something as private. *Id.* at 351-52. The second question involves deciding whether the individual's asserted privacy interest is legitimate, i.e., "one that society is willing to recognize as 'reasonable.'" *Id.* at 361 (Harlan, J., concurring).

*Welliver*, 976 F.2d at 1151 (internal citations altered). The Supreme Court of the United States has stated that:

> "It is well settled that when an individual reveals private information to another, he assumes the risk that his confidant will reveal that information to the authorities, and if that occurs the Fourth Amendment does not prohibit governmental use of that information. Once frustration of the original expectation of privacy occurs, the Fourth Amendment does not prohibit governmental use of the now nonprivate information: This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him [or her] to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in a third party will not be betrayed."

*Georgia v. Randolph*, 547 U.S. 103, 132 (2006) (internal marks omitted) (quoting *United States v. Jacobsen*, 466 U.S. 109, 117 (1984)). Furthermore, what employees "observe

16

in their daily functions is undoubtedly beyond the employer's reasonable expectation of privacy." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 315 (1978).

During the Hearing, Sigillito testified that he spoke to Stajduhar about the confidentiality of records both before and immediately after he hired her. Sigillito testified that he told Stajduhar that he worked in both attorney/client and non-attorney/client matters and that "everything was confidential and nothing was to be disclosed to a third party" without his permission. Sigillito testified that Stajduhar had unlimited access to the office, "but for a limited purpose." Sigillito stated that Stajduhar had access to all documents and materials in the office, but solely for the purpose of aiding in servicing "our clients." Sigillito claimed that the materials on Stajduhar's flash drive were used by her or created by her in connection with his business and that he had the same expectation of privacy in the materials on her flash drive as he did in the materials in his office. Sigillito further testified that Stajduhar did not have authority to give any records to a third party without his consent, and that she did not have authority to allow third parties to enter the office and view documents.

On cross-examination, Sigillito admitted that he took no steps to limit Stajduhar's access to files or anything else in the office. In fact, Sigillito stated that Stajduhar was responsible for a vast majority of the document filing in the office and that, whenever he needed a document, he would ask Stajduhar to retrieve it. Sigillito also testified that Stajduhar had keys to the office and was frequently responsible for opening and closing the office. Sigillito stated that, over the almost ten-year period that Stajduhar worked for him, he would occasionally remind Stajduhar not to share client or lender data with any other client or lender. Sigillito also admitted that Stajduhar was responsible for maintaining much of the office finances, as well as Sigillito's personal finances, and that she had access to the business check books, although she did not have signatory authority on all of the accounts. Sigillito testified that he knew Stajduhar engaged in work outside of the office

17

and he claimed to have an expectation of privacy in the work Stajduhar performed at home.  Sigillito later admitted that, although he has a law degree and is familiar with such agreements, he did not have Stajduhar sign a written confidentiality agreement.

Stajduhar testified that, in her position as Sigillito's secretary, she was responsible for running the office.  Specifically, she was responsible for fielding phone calls, responding to emails, creating and maintaining documentation regarding all of the BLP loans, maintaining Sigillito's office and personal finances, and she was, in many respects, treated like Sigillito's partner in the business.  Stajduhar stated that she understood that some matters in the office were confidential.  For example, she understood that attorney/client matters were privileged and should not be revealed to third parties and that she was not supposed to reveal to lenders the amount other lenders invested or another lender's interest rates.  Stajuduhar testified that Sigillito did not supervise what she did on a day-to-day basis and that she had authority to speak to clients and lenders.  However, Stajduhar admitted that Sigillito did not give her permission to reveal documents to the FBI.

Sigillito distinguished the two separate sets of documents that Stajduhar provided the government.  On May 19, 2010, Stajduhar provided the government with approximately five-hundred pages of documents.  Stajduhar had all of the documents in her possession, in either paper or electronic form, before her attorney's initial contact with law enforcement on May 18, 2010.  Stajduhar had taken a few of the documents from the office in paper form, but she printed a vast majority of the documents at her home from her personal email account and thumb drive on May 18, 2010.  Stajduhar's attorney provided the government with a second set of documents on May 21, 2010.  Stajudhar went to work at the office that day and obtained a copy of Sigillito's PAD and a copy of three emails that were sent to Sigillito regarding potential investors in Israel.  Stajduhar also drew a map, or diagram, of Sigillito's office indicating the location of certain types

18

of documents.  The FBI specifically asked Stajduhar to make the office diagram to assist with the search, but Stajduhar provided the PAD and the emails to her attorney without any request from the FBI or her attorney because she thought they would be helpful.

At the outset, the court finds that Sigillito did not demonstrate a subjective expectation of privacy over the documents Stajduhar provided the FBI.  In order to receive Fourth Amendment protection, Sigillito must have engaged in conduct to show that "he sought to preserve something as private." *Bond v. United States*, 529 U.S. 334, 338 (2000) (internal marks omitted) (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979)). Although Sigillito testified that he did have a subjective expectation of privacy over the documents, by allowing Stajduhar unfettered and unlimited access to all BLP documents, his conduct showed otherwise.

Even if Sigillito arguably had a subjective expectation of privacy in the documents Stajduhar handed over to the FBI, such an expectation was not reasonable under the circumstances.  Courts considering similar circumstances have held that there is no reasonable expectation of privacy in information an employer willingly hands over to an employee and the employee subsequently reveals to law enforcement.  For example, in *Wang v. United States*, 947 F.2d 1400, 1401 (9th Cir. 1991), the Ninth Circuit Court of Appeals considered a case where a husband and wife hired an accountant.  The accountant voluntarily provided information to the Internal Revenue Service ("IRS"), which was investigating the couple.  *Id.*  The husband and wife later sued the accountant, alleging constitutional tort claims for, among other things, violating their Fourth Amendment rights.  *Id.* at 1401-03.  The district court concluded the accountant was acting as an employee of the United States and substituted the United States as the defendant.  *Id.* at 1401.  The district court then dismissed the Fourth Amendment claim.  *Id.* at 1402.  The Ninth Circuit affirmed the district court, noting that the husband and wife's Fourth Amendment claim was "defeated . . . by the fact that the [couple] voluntarily provided [the

accountant] with the information and documents he turned over to the IRS." *Id.* at 1403.

Similarly, in *United States v. Longo*, 70 F. Supp. 2d 225, 255 (W.D.N.Y. 1999), the United States District Court for the District of New York held that a legal secretary's search of her employer's office and seizure of documents did not violate the Fourth Amendment because, although the evidence she took was used to support the issuance of a search warrant, probable cause existed even without the evidence. The District Court then alternatively held that the "[d]efendant had no reasonable expectation of privacy in the computer files as [the secretary] acted pursuant to the authorization granted to her by [the] [d]efendant in her status as legal secretary in accessing the computer and retrieving the specific directory and file names of the documents." *Id.* at 256. The district court found that it was within the secretary's "authority as [the] [d]efendant's legal secretary to access the computer and obtain the directory and file names, as she had 'the responsibility for creating, producing and preserving legal documents,' and had been given access to the computer system for the purpose of facilitating the legal work of [the] [d]efendant." *Id.* (internal citation and marks omitted).

The Seventh Circuit Court of Appeals has also considered two cases relevant to the court's inquiry. In the first, *United States v. Ziperstein*, 601 F.2d 281, 284 (7th Cir. 1979), the defendant owned numerous medical clinics that employed various personnel, including pharmacists. One of the pharmacists turned pharmaceutical records over to the FBI and the defendant argued such records should be suppressed in his criminal trial. *Id.* at 289. The Seventh Circuit affirmed the district court's admission of the pharmaceutical records, holding, among other things, that "the defendant did not have a legitimate expectation of privacy in the documents." *Id.* The Seventh Circuit explained,

> We are not concerned with determining whether these documents are properly characterized as "stolen." The Fourth Amendment clearly countenances numerous seizures where the items seized are taken without the express consent of the owner. Instead, the Fourth Amendment inquiry focuses on

> whether the owner had a reasonable expectation of privacy
> with respect to the seized items.  If no such expectation exists,
> the taking cannot run afoul of the Fourth Amendment.

*Id.*  The *Ziperstein* panel noted that "[t]here is . . . nothing to suggest any impropriety in a pharmacist obtaining control over the . . . records which serve as the basis of his daily activities."  *Id.*  The Seventh Circuit ultimately held that "pharmaceutical prescriptions come within the daily observation of a pharmacist," and are therefore "beyond any reasonable expectation of privacy" of the defendant.  *Id.*

Similarly, the defendant in *United States v. Miller*, 800 F.2d 129, 131 (7th Cir. 1986) owned a medical clinic.  All of the employees of the clinic had access to the clinic's business records, and "[n]one of the records were maintained in private or restricted areas."  *Id.*  The defendant employed an X-ray technician at the clinic who had certain responsibilities with regard to the clinic's business and medical records, had keys to the clinic and had unrestricted access to the entire clinic.  *Id.* at 131-32.  The employee learned that the defendant was under criminal investigation and was later contacted by and agreed to meet with investigators.  *Id.* at 132.  Subsequently, the defendant asked the employee to hide some of the records in the employee's home, but the employee refused.  *Id.*  The defendant told the employee he planned to remove the documents from the clinic, and the employee informed investigators.  *Id.*  Investigators arrived at the clinic with a subpoena.  The employee, who had been the sole employee at the clinic for several weeks, told investigators he was the custodian of the records.  *Id.*  The employee turned the records over and admitted he would have done so with or without a subpoena.  *Id.* at 132-33.

The *Miller* panel explained:

> To determine whether [the defendant's] Fourth Amendment
> right was violated we need only determine whether [the
> employee] was a "custodian of records" that the government
> sought to obtain through their second subpoena. . . . As a

> general rule, all the government must show is that the alleged
> "custodian of records" had apparent, opposed to actual,
> authority to dispose of the records. . . . If all the facts known
> to the police suggest that the person claiming to be a custodian
> of the records had sufficient authority, then the court should
> not suppress that evidence voluntarily given to the police.

*Id.* at 133.  The Seventh Circuit found that the employee's job duties were so wide and varied that he needed to have access to all of the documents that he provided to law enforcement, and that the employee had, in fact, used many of the documents in the course of his duties.  *Id.* at 134.  The Seventh Circuit held that this fact alone would generally be sufficient to find that the employee's seizure of the documents was reasonable.  *Id.*  However, because the employer had expressly limited "the purpose for which [the employee] had access" to the documents, namely to take them home and hide them from the police, this created a limitation on the employee's authority to turn the documents over to the police.  *Id.* at 134-35.  Furthermore, the employee informed the police of this express limitation, preventing the police from relying upon the employee's apparent authority.  *Id.*  Despite this finding, however, the Seventh Circuit created an exception to the express limitation rule.  *Id.* at 135.  The Seventh Circuit held that, when an employer asks an employee to hide documents for the purpose of obstructing justice, the "employee is a custodian of those records for the purposes of a valid subpoena or seizure."  *Id.*  Thus, the Seventh Circuit affirmed the district court's holding that the employee was a custodian of the documents and that they should not be suppressed.  *Id.*

The Eighth Circuit Court of Appeals discussed *Ziperstein* and *Miller* in *United States v. Welliver*, 976 F.2d 1148, 1151-52 (8th Cir. 1992).  *Welliver* involved a defendant who owned Omaha All Risk Insurance Services ("All Risk") and served as the managing general agent for two insurance companies.  *Id.* at 1150.  The defendant also owned a company that did all of the accounting and computer work for All Risk.  *Id.*  One of the computer programmers who worked for the defendant followed his instructions to "roll

over" some of the prior year's insurance information and claim losses that had been claimed the year before. *Id.* Subsequently, an investigator approached the programmer, showed her his badge, handed her a list of penalties for aiding and abetting and told her he wanted to ask her some questions, but she was not in trouble and did not need a lawyer. *Id.* The programmer told the investigator about the "roll overs" and described the supporting documentation. *Id.*

The investigator asked the programmer to get the documents and told her that "as long as the documents were not under 'lock and key' and were not 'something [she] shouldn't be looking at any way [sic],'" she had a right to obtain them. *Id.* The programer "contacted the local county sheriff, who told her that he thought it was within her rights to take the documents." *Id.* The programmer then went to All Risk and obtained the documents from a co-worker's desk drawer. *Id.* The programmer had access to the desk drawer and often used the drawer. *Id.* The programmer gave the documents to the investigator, who used them to prepare search warrants. *Id.* On appeal, the defendant argued that "the district court erred in denying his motion to suppress the business records" that the programmer seized. *Id.* at 1151. The Eighth Circuit affirmed the district court holding that the defendant "had no objectively reasonable expectation of privacy in the documents." *Id.* at 1153.

*Welliver* can be distinguished from the instant action because, as the Eighth Circuit recognized, the language of the reinsurance agreement explicitly stated that the federal government had the right to inspect all company records. *Id.* However, in its holding, the *Welliver* panel relied upon *California v. Ciraolo*, 476 U.S. 207, 211-214 (1986), in which the Supreme Court emphasized that objective reasonableness turns on "'whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment,'" and found no objectively reasonable expectation of privacy when police were lawfully operating an aircraft at an altitude of 1,000 feet and observed

23

marijuana in the curtilage of a home. *Id.* (quoting *Oliver v. United States*, 466 U.S. 170, 180-183 (1984)). The *Welliver* panel also recognized that the objective reasonableness determination is a "value judgment" based largely upon whether society is willing to recognize an expectation of privacy as reasonable. *See Welliver*, 976 F.2d at 1151-52.

The court has considered the relevant case law and all of the facts and circumstances of this case, *see O'Connor v. Ortega*, 480 U.S. 709, 718 (1987) ("Given the great variety of work environments . . . , the question whether an employee has a reasonable expectation of privacy must be addressed on a case-by-case basis."), and concludes that, if Sigillito did have a subjective expectation of privacy in the BLP documents, such an expectation was not reasonable. Although Sigillito testified that he limited Stajduhar's control over the documents, the record does not support Sigillito's testimony. Stajduhar testified that Sigillito expressly limited her authority to reveal information to third parties in only two situations: (1) she was not permitted to discuss attorney/client privileged matters; and (2) she was not permitted to disclose to a lender the amount of another lender's loan or interest rate.

Sigillito entrusted Stajduhar to serve as the custodian of all business documents and many of his personal documents. Additionally, Stajduhar possessed a vast majority of the documents in either paper or electronic form before either she or her attorney met with the FBI. In fact, Stajduhar printed almost all of the documents she initially provided to the government at her home directly from her personal email account and her personal thumb drive. The only documents Stajduhar took from the office itself after she began talking to the FBI were three emails and Sigillito's PAD. Stajduhar was a custodian of the emails, which were BLP documents, and she assisted Sigillito in updating the PAD when he purchased expensive items that he wanted to insure. Stajduhar testified that she did not remember if she drew the diagram of the office at home or at work. Regardless, Stajduhar testified that she could have drawn the diagram from memory at any location. For all of

these reasons, the court concludes that Sigillito did not have an objectively reasonable expectation of privacy in the documents Stajduhar provided to the FBI.

Furthermore, the court finds that all of the facts available to the FBI suggested that Stajduhar was the custodian of the documents and had sufficient authority to turn those documents over. Consequently, even if Sigillito did have an objectively reasonable subjective expectation of privacy in the documents, the FBI agents were justified in believing that Stajduhar was the legal custodian of the documents. *See Miller*, 800 F.2d at 133. Thus, the court concludes that the evidence should not be suppressed. Because the court concludes that Sigillito did not have a legitimate expectation of privacy in the documents and, even if he did, the evidence should not be suppressed, the court need not consider whether Stajduhar was acting as a government agent at the time she seized the documents and turned them over. However, the court will briefly address the second prong of the alleged Fourth Amendment violation, namely, whether Stajduhar's alleged invasion of Sigillito's privacy expectation constituted government action.

### b.     *Government action*

"The fourth amendment affords no protection against a wrongful search and seizure of property by an individual absent any government participation." *Gundlach v. Janing*, 536 F.2d 754, 755 (8th Cir. 1976). "Whether a private party should be deemed an agent or instrument of the government for Fourth Amendment purposes necessarily turns on the degree of the government's participation in the private party's activities, a question that can only be resolved in light of all the circumstances." *United States v. Wiest*, 596 F.3d 906, 910 (8th Cir. 2010) (quoting *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 614 (1989)). To determine whether Stajduhar, a private citizen, acted as a government agent, the court must consider "(1) whether the government had knowledge of and acquiesced in the search; (2) whether [Stajduhar] intended to assist law enforcement agents or to further [her] own purposes; and (3) whether [she] acted at the government's request." *United*

*States v. Muhlenbruch*, 634 F.3d 987, 998-99 (8th Cir. 2011) (citing *United States v. Smith*, 383 F.3d 700, 705 (8th Cir. 2004)).

First, in considering whether the government acquiesced in the search, the court notes that Stajduhar had in her personal possession a vast majority of the documents in paper or electronic form before either she or her attorney made contact with the FBI. Consequently, the FBI was not aware of Stajduhar's initial collection of documents. However, the government may have been aware that Stajduhar intended to bring her documentation to the meeting with the FBI on May 19, 2010.  Although Stajduhar testified that the FBI did not ask her for any subsequent documentation other than the office diagram, Stajduhar took it upon herself to provide the FBI with certain documentation from the office, specifically three emails and Sigillito's PAD.  Based upon the record, it is unclear whether the FBI was aware of Stajduhar's intention to remove the documents, but for purposes of the Motions, the court will assume that the FBI knew that Stajduhar intended to remove these documents.

Second, in determining whether Stajduhar intended to assist law enforcement or further her own purposes, the court notes that Stajduhar testified that she decided to bring documents to the FBI because she was concerned about lenders, including her in-laws, who were losing money in the BLP.  Stajduhar testified that about six months before she eventually turned over documents, Sigillito stopped speaking to the lenders and she was the only one taking their phone calls.  Stajduhar stated that she was "dealing with people's heartaches."  Stajduhar testified that she witnessed and was asked to participate in conduct that concerned her, such as drafting a letter that was purportedly from Derek Smith, the person who was supposed to be receiving the BLP loan funds, and lying to lender's about Smith's assets and liabilities.  Stajduhar testified that she also came forward because she had taken money from Sigillito and she knew it was wrong.  The record demonstrates that on May 17, 2010, an attorney named Michael Becker—who had represented both Sigillito

and Rosemann in some capacity—came to the office. Upon learning of what appeared to be a Ponzi scheme, Becker told Stajduhar that he was withdrawing as counsel for Sigillito and Rosemann and he advised her to get an attorney. Stajduhar arranged a meeting with her attorney, Corlija, whom she had initially contacted about two weeks before. Corlija contacted the FBI and advised Stajduhar to turn the documents over.

Lastly, the court must consider whether Stajduhar acted at the government's request. Sigillito argues that Corlija's statements and text messages to Stajduhar demonstrate that she was acting on the government's behalf. Sigillito claims that Corlija did not direct Stajduhar to bring all of the documents to her meeting with the FBI until after Corlija met with the FBI. Sigillito maintains that this creates an inference that the FBI told Corlija to have Stajduhar bring documentation to the meeting. However, contrary to Sigillito's assertions, on May 17, 2010, prior to Corlija's meeting with either Stajduhar or the FBI, Corlija sent a text message to Stajduhar and instructed her to bring him all of the documentation that she had. *See* Gov. Ex. 5 at 4. With the exception of the office diagram, there is no evidence that the FBI directed Stajduhar to provide the government with any documentation.

The court has considered each of the above factors and the facts and circumstances of this particular case. *See United States v. Wiest*, 596 F.3d 906, 910 (8th Cir. 2010) (finding that an individual who turned over evidence was not acting on behalf of the government in light of the facts and circumstances of the case). The court notes that, when Stajduhar initially accumulated a vast majority of the documentation, the FBI had not even been made aware of Sigillito's potential law violations. Although the FBI may have known Stajduhar planned to bring documentation to them, she did so without any prompting by the government. Furthermore, Stajduhar's intent in bringing documents forward was to stop the scheme from continuing to hurt lenders and to protect herself from potential criminal punishment for taking money from Sigillito—not to provide assistance to the FBI.

27

Finally, the court finds that Stajduhar did not act at the government's request when she provided the FBI with documentation. Consequently, the court concludes that Stajduhar was not acting as a government agent at the time she obtained possession of documents and elected to turn them over to the FBI. *Cf. United States v. Inman*, 558 F.3d 742, 745-46 (8th Cir. 2009) (discussing factors and finding no intent to assist the government).

### 2. *Defective Search and Seizure Warrant*

Sigillito provides a multitude of arguments to support his assertion that the Search and Seizure Warrant is invalid on its face. First, Sigillito argues that the Search and Seizure Warrant is not sufficiently particular because Attachment A was not attached to the Search and Seizure Warrant left at the search site. Second, Sigillito maintains that, even if Attachment A was attached, the Search and Seizure Warrant is not sufficiently particular because it: (1) fails to account for the fact that Sigillito's office was a law office; (2) fails to sufficiently set forth the alleged crime or objects of the search; (3) allows for the seizure of all computer equipment without an allegation that computers were instrumentalities of the crime; (4) lacks particularity in its description of documents to be seized; and (5) lacked special findings that were required.

### a. *Attachment A*

Sigillito claims that the court should suppress all evidence obtained during the execution of the Search and Seizure Warrant because a copy of Attachment A was not attached to the Search and Seizure Warrant left at the search site after the search was over. Sigillito implies that the fact that Attachment A was not left at the search site supports a finding that Attachment A was not present during the search, thereby making the Search and Seizure Warrant insufficiently particular.

The Fourth Amendment requires that search warrants must particularly describe a place to be searched and items to be seized. *See* U.S. Const. amend. IV ("[N]o [w]arrants shall issue, but upon probable cause, supported by [o]ath or affirmation, and particularly

describing the place to be searched, and the persons or things to be seized."). "Although a search warrant must be particular, adequate reference to an affidavit or attachment listing items to be searched or seized can satisfy the requirement." *United States v. Riesselman*, 646 F.3d 1072, 1077 (8th Cir. 2011). The Eighth Circuit Court of Appeals has declined to directly address whether the incorporated affidavit or attachment must also be present at the search site to satisfy the Fourth Amendment. *See United States v. Hamilton*, 591 F.3d 1017, 1021, 1025-27 (8th Cir. 2010). However, if a warrant incorporates an attachment or affidavit that is present when the warrant is signed, and the attachment or affidavit is present at the search site during the warrant's execution, the warrant is not rendered insufficiently particular if the attachment or affidavit is not provided to the person whose property was searched at the conclusion of the search. *See Riesselman*, 646 F.3d at 1077.

In the present case, the first page of the Search and Seizure Warrant states, "SEE ATTACHMENT A" under the section designated to "identify the person or describe the property to be seized." Gov. Ex. 1B at 1. This plainly constitutes language incorporating Attachment A into the Search and Seizure Warrant. *See id.* ("[T]he search warrant in this case indicated Attachment 1 in the space designated for items to be searched. Such a reference sufficiently incorporated the attachment."); *Hamilton*, 591 F.3d at 1025-29. Furthermore, Special Agent Cosentino testified on cross-examination that he had a copy of Attachment A during the execution of the Search and Seizure Warrant and that he left a copy of the Search and Seizure Warrant, with Attachment A attached, and a handwritten inventory receipt setting out all items that agents seized. Special Agent Cosentino further testified that if he failed to include a copy of Attachment A, it was inadvertent.

In this case, the Search and Seizure Warrant incorporated an attachment that listed the items to be seized, the attachment was presented to the magistrate judge at the time the search warrant was issued and the attachment was present at the time of the search.

29

Accordingly, the court finds the Search and Seizure Warrant satisfies the Fourth Amendment's particularity requirements, even if agents failed to leave a copy of Attachment A in Sigillito's office at the conclusion of the search.  Furthermore, even if the Search and Seizure Warrant is not sufficiently particular, the court finds, under the facts of this case, the exclusionary rule is not an appropriate remedy.  *Cf. Hamilton*, 591 F.3d 1017, 1027-30 (discussing the exclusionary rule and declining to apply it to evidence obtained through a search warrant with more egregious deficiencies).

### b.    Law office

Sigillito maintains that "a special circumstance exists in this case which requires greater particularity in describing property to be seized."  Sigillito's First Mem. at 8. Sigillito argues that, because the location to be searched was a law office, the Search and Seizure Warrant in this case needed to be especially particular.  Sigillito cites no law to support this argument.  Sigillito generally cites to Justice Department Guidelines and admits that they "do not create any substantive or procedural rights or limit the prerogatives of prosecutors."  *Id.* at 9.  While Sigillito's Memorandum of Law cites to exhibits, Sigillito has failed to provide these exhibits to the court.  *Id.*  Due to Sigillito's failure to cite any law to support his position, his admission that the Justice Department Guidelines do not create any rights and his failure to provide the court with any exhibits to support his argument, the court declines to consider this argument.

### c.    Failure to identify alleged crime or objects of the search

Sigillito argues that the Search and Seizure Warrant is not sufficiently particular under the Fourth Amendment because it fails "to describe the purported criminal activity to which the search related or even what generically was the object of the search (i.e., evidence of a crime, contraband, fruits of a crime, or property used in committing the crime)."  Sigillito's First Mem. at 9 (footnote omitted).  At the outset, Sigillito's argument fails because the application for the search warrant explicitly states that the object of the

search is to uncover "evidence of a crime," "contraband, fruits of [a] crime, or other items illegally possessed." Gov. Ex. 1A at 1. Furthermore, the affidavit in support of the warrant application sets forth the reasons for the issuance of the warrant and Attachment A sets forth a description of the items to be seized, including references to the alleged Ponzi scheme. Both the affidavit and Attachment A were present at the time the Search and Seizure Warrant was issued by the judge and executed at the search site.

The remainder of Sigillito's argument also fails because the law of the Eighth Circuit does not require a warrant to include the name of a specific crime or statute. The Eighth Circuit case that Sigillito relies upon, *Rickert v. Sweeny*, 813 F.2d 907, 909 (8th Cir. 1987), does not support the proposition that a search warrant must set forth the alleged crime or statute allegedly violated to satisfy the Fourth Amendment's particularity requirements. Instead, the case stands for the proposition that placing a criminal statute in a warrant is not sufficient to "limit the search in any substantive manner." *Id.* at 909.

Thus, contrary to Sigillito's assertions, *Rickert* makes clear that a warrant does not necessarily require the name of a crime or statute to be sufficiently particular. *Id.*; *see also United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007) ("It is not necessary for an affidavit to include the name of the specific crime alleged, [r]ather, 'only a *probability* of criminal conduct need be shown.'" (internal citations omitted) (quoting *United States v. Koonce*, 485 F.2d 374, 380 (8th Cir.1973))). Because the Search and Seizure Warrant, Attachment A and the affidavit in support of the warrant were all present at the time the warrant issued and during the search, and because they set forth the appropriate limitations and descriptions of the items to be seized, the court finds the Search and Seizure Warrant is sufficiently particular. The presence or absence of any criminal statute or specific offense name is not helpful to the court's particularity determinations.

### d. Computer equipment

Sigillito maintains that, because there is no allegation in the Search and Seizure

Warrant that his office computers were used as instrumentalities of a crime, "the seized computer equipment is 'evidence' only to the extent that some of the data it stores is evidence." Sigillito's First Mem. at 13. Sigillito then argues that the Search and Seizure Warrant is constitutionally deficient because it fails to set forth the relevant files or information stored in the computer.

Contrary to Sigillito's assertions, however, the Search and Seizure Warrant was supported by probable cause to believe that Sigillito's office computers were used both as a container to store evidence and as an instrumentality of the crime. In the affidavit in support of the Search and Seizure Warrant, Special Agent Cosentino averred that Stajduhar advised him about a laptop computer at Sigillito's desk, a desktop computer at her desk and a hard drive in the closet, all of which were "used for the business purpose of the above described Ponzi scheme." Gov. Ex. 1A at 4. The affidavit also included over seven pages of discussion justifying the government's request to seize the computer hardware "believed to contain some or all of the evidence described in the warrant." *Id.* at 4-11. Thus, because there was probable cause to believe the computer equipment at issue in this case was used both in the form of a container and as an instrumentality, the cases that Sigillito cites to support his position are either not controlling upon this court or are not applicable to the facts of this case.[2]

Furthermore, Attachment A to the Search and Seizure Warrant authorized the seizure of "[b]usiness records" and "[c]orrespondence, memoranda, client lists, agendas, and other documents and papers which may relate to investors and potential investors and other documents related to the investment scheme." Gov. Ex. 1B at 2-3. Such a description of records inherently authorized the seizure and subsequent search of computer equipment for those documents. *See United States v. Peters*, 92 F.3d 768, 770 (8th Cir.

---

[2] Although Sigillito does cite one Eighth Circuit case, it does not support Sigillito's position.

1996) (finding that "the general term 'records' [in a search warrant] adequately covered the search of records in audio cassette form"); *see also United States v. Hudspeth*, 459 F.3d 922, 927 (8th Cir. 2006), *vacated on other grounds and opinion reinstated in part by United States v. Hudspeth*, 518 F.3d 954 (8th Cir. 2008) (en banc) (finding a warrant that authorized search of "any and all" business documents necessarily contemplated the search of computers for those documents); Fed. R. Crim. P. 41(e)(2)(B) ("A warrant [to search for and seize a person or property] under Rule 41(e)(2)(A) may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information. Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant."). Consequently, the court finds that the Search and Seizure Warrant is sufficiently particular with regard to the search and seizure of computer equipment to satisfy the Fourth Amendment.

### e. *Particularity of documents*

Sigillito argues that the Search and Seizure Warrant fails to describe the documents to be seized with particularity. Sigillito claims that the warrant fails to specify individuals or groups to which the records should pertain and includes an overly expansive time frame. Sigillito also takes issue with specific language used in the Search and Seizure Warrant. The Eighth Circuit set forth the constitutional standard for the particularity of a search warrant involving a scheme to defraud in *United States v. Saunders*, 957 F.2d 1488, 1491 (8th Cir. 1992). In *Saunders*, the Eighth Circuit explained:

> [T]he language must be sufficiently definite to enable the searcher to reasonably ascertain and identify the things authorized to be seized. *Steele v. United States*, 267 U.S. 498, 503-04 (1925). "This Court has applied a standard of 'practical accuracy' in determining whether a description is sufficiently precise to satisfy the requirements of the Fourth Amendment, recognizing that the degree of specificity required necessarily depends upon the circumstances of each particular case." *United States v. Strand*, 761 F.2d 449, 453 (8th Cir.

33

1985), (citing *United States v. Johnson*, 541 F.2d 1311, 1314 (8th Cir.1976)).  While it is true that a search warrant must be particular enough to avoid a "general, exploratory rummaging" of a person's belongings, *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971), a search warrant involving a scheme to defraud is "sufficiently particular in its description of the items to be seized 'if it is as specific as the circumstances and nature of activity under investigation permit.'" *United States v. Kail*, 804 F.2d 441, 445 (8th Cir. 1986), (citing *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982), *cert. denied*, 464 U.S. 814 (1983)).

*Saunders*, 957 F.2d at 1491 (internal citation altered).

The court has reviewed the Search and Seizure Warrant, the affidavit supporting its issuance, Attachment A and Attachment B, each of which were present at the time of the warrant's issuance and execution.  In the affidavit, Special Agent Cosentino set forth the reasons justifying the search, Attachment A lists the items to be seized and Attachment B is a list of lenders in the BLP.  Although the court recognizes that the list of items to be seized in Attachment A is broad, the court concludes that the expansive nature of the fraud alleged in this case required broad warrant language.  *See, e.g.*, *United States v. Kail*, 804 F.2d 441, 445 (8th Cir. 1986) ("[I]t would not be possible through a more particular description to separate those business records that would be evidence of fraud from those that would not since there was probable cause to believe that fraud permeated the entire business operation.").  The court finds that there was probable cause to believe that Sigillito's entire business was permeated by a continuing fraud that lasted for approximately ten years.  Consequently, the court finds that the Search and Seizure Warrant's description of items to be seized and ten-year scope is sufficiently particular under the facts and circumstances of this case to satisfy the Fourth Amendment.

### f.    *Special findings*

Sigillito argues that, at the time the warrant issued, "no civil judicial forfeiture proceedings had commenced nor had an indictment or any other criminal process been

instituted." Sigillito's Memorandum of Law in Support of Motion to Suppress May 24, 2010 Seizure Warrant ("Sigillito's Second Mem.") (docket no. 99) at 1. Thus, Sigillito maintains that the government was required to demonstrate probable cause to believe that the property to be seized would be subject to forfeiture and that a temporary restraining order would not be sufficient to assure the availability of the property for forfeiture. Sigillito asserts that the Search and Seizure Warrant is unlawful because it fails to include these findings and, therefore, the items found during the execution of the Search and Seizure Warrant should be returned and evidence of the same be suppressed.

As discussed above, Sigillito is confused about the nature of the Search and Seizure Warrant. Sigillito apparently believes that two separate warrants were executed on May 24, 2010—a search warrant and a separate seizure warrant. Sigillito appears to argue that the purpose of the search warrant was to obtain evidence while the purpose of the seizure warrant was to seize property subject to forfeiture. However, only the Search and Seizure Warrant was issued on May 21, 2010, and executed on May 24, 2010. The object of the Search and Seizure Warrant was not to obtain property subject to forfeiture, but to locate "evidence of a crime," "contraband, fruits of [a] crime, or other items illegally possessed." Gov. Ex. 1A at 1. Attachment A to the Search and Seizure Warrant only listed items to be seized that fell into one of these categories. To the extent any property was seized during the execution of the Search and Seizure Warrant on May 24, 2010, it was not seized for forfeiture purposes. Because the Search and Seizure Warrant was not issued or executed for the purpose of obtaining items subject to forfeiture, as Sigillito argues, the Search and Seizure warrant and supporting documentation was not required to include special findings related to forfeiture.

### 3. *Probable cause*

Sigillito argues that Special Agent Cosentino's affidavit in support of the Search and Seizure Warrant failed to establish probable cause that a federal crime was committed and

failed to establish Stajduhar's reliability. Consequently, Sigillito maintains that all of the evidence obtained during the search of Sigillito's office should be suppressed. The court will address each of Sigillito's arguments, in turn.

### a.     Applicable law

"An affidavit establishes probable cause if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the place to be searched." *United States v. Cowling*, 648 F.3d 690, 695 (8th Cir. 2011) (citing *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "A magistrate reviewing an application for a search warrant employs a totality-of-the-circumstances analysis and makes a practical decision based on such factors as the veracity of the affidavit and the basis of knowledge of any person supplying hearsay information." *United States v. Nieman*, 520 F.3d 834, 839 (8th Cir. 2008). Reviewing courts must "allow substantial deference to a magistrate's determination of probable cause." *Id.*

### b.     Stajduhar's reliability

"'When information supplied by an informant forms the basis for probable cause in a warrant, the core question in assessing probable cause . . . is whether the information is reliable.'" *Cowling*, 648 F.3d at 695 (quoting *Nieman*, 520 F.3d at 839). In assessing reliability, the Eighth Circuit has considered "several factors, such as (1) whether officers conducted a face-to-face interview with the informant, (2) the level of detail included in the information provided to law enforcement by the informant, and (3) whether law enforcement independently corroborated any of the information provided by the informant." *Id.* The Eighth Circuit has also considered such factors as whether: (1) the informant is named in the affidavit or is a confidential informant; (2) there was no question that a crime was being committed, but only a question of where and by whom; and (3) the informant's statements were against his or her penal interest. *See United States v. McAtee*, 481 F.3d 1099, 1103 (8th Cir. 2007); *see also United States v. Revich*, 793 F.2d 957, 959

36

(8th Cir. 1986) (discussing similar factors).

Considering each of these factors, the court notes that officers conducted a face-to-face interview with Stajduhar. During the interview, Stajduhar provided a detailed account of the operations of the BLP. The FBI corroborated Stajduhar's story by viewing two of the many documents that Stajduhar provided them. Specifically, the FBI reviewed the main investor list and a spreadsheet of loan activity Stajduhar previously created for Rosemann. The FBI also conducted independent research and learned that Rosemann had filed a lawsuit against Derek Smith due to alleged improprieties with the BLP. The FBI also learned that MTC filed a Suspicious Activity Report in July of 2008, in which it alleged that Sigillito was engaged in a Ponzi scheme involving 59 IRA accounts. The FBI corroborated Stajduhar's statements that very little investment money remained by obtaining information regarding the bank accounts where Sigillito often kept BLP funds. Likewise, although the FBI did not have a chance to review all of the documents Stajduhar provided, or the text messages she allowed them to download from her cellular phone prior to applying for the warrant, Stajduhar's presentation of a large quantity of documentation corroborated her interview statements.

Furthermore, Stajduhar is not a confidential informant. She is named in the affidavit. Although the court cannot say there was no question that a crime had been committed, the court finds that Stajduhar willingly volunteered information that was against her penal interest, which is indicia of her reliability. Having considered each of the above factors and the facts and circumstances of this particular case, the court finds that Stajduhar's statements were reliable and that the Search and Seizure Warrant was supported by probable cause to believe that evidence of a crime would be found during a search of Sigillito's office.

### c.     *Allegations of criminal activity*

Sigillito also argues that the affidavit "does not set forth any specific scheme or

artifice to defraud, any specific false or fraudulent pretenses, representations, or promises and does not describe any mailings or wire transfers made in furtherance of and for the purpose of executing the alleged scheme or artifice." Sigillito's First Mem. at 22. The court disagrees.

In the affidavit in support of the Search and Seizure Warrant, Special Agent Costentino averred, based upon the information that Stajduhar provided, that Sigillito was engaged in a ten-year investment scheme, whereby lenders were informed that their investment money would be used for land investments in England and were promised rates of return in excess of 20%. And, although Sigillito collected approximately $44 million from investors, only a very small percentage of that money was sent to England for land investments. The affidavit noted that "much of the investor's principal investment [was] not used for purchase of land options but to pay other investors who had earlier loaned money to [Sigillito] for investment purposes." Gov. Ex. 1A at 2. "In other words, [Stajduhar] believe[d] there [were] no real investments and money from later investors [was] used to pay earlier investors the promised rate of return. . . . This is commonly referred to as a Ponzi scheme." *Id.* The affidavit continued by stating that Sigillito kept a substantial amount of money, which he referred to as a "fee" from each investment and noted that the investors were not necessarily aware of the amount of the so-called fees.

In the affidavit, Special Agent Cosentino averred that Stajduhar was aware of the bank accounts that Sigillito used to deposit investment money, which he then used to pay prior lenders and support a lavish lifestyle, including travel to foreign countries, staying at high-end hotels and using a limousine service full-time. The affidavit noted that very little money remained in these bank accounts. The affidavit went on to state that Stajduhar had begun to receive complaints, including cellular phone messages, from investors who had not received their overdue interest payments and that many of these callers demanded to speak with Sigillito and requested that their money be returned. The affidavit explained

that, at the time the warrant application was completed, Sigillito was in Israel attempting to secure a new $5 million investment in order to pay off those investors who were demanding payment and threatening legal action. Special Agent Cosentino averred that Stajduhar informed him that there was a separate client file maintained for each investor and that they were kept in Sigillito's office along with client promissory notes and that Stajduhar provided a list of all of the investors, which was attached to the Search and Seizure Warrant Application as Attachment B.

The affidavit explained that Stajduhar was "aware of all of this activity because she [was] intimately involved in the creation of correspondence and dealing with clients and payment of client money per the investment agreement." *Id.* at 4. Stajduhar was "also aware of monies taken out of bank accounts by [Sigillito] and the purchase of valuable collectible items described above through his credit card and/or checks." *Id.* Stajduhar also told Special Agent Cosentino about two computers and a hard drive that she and Sigillito used "for the business purpose of the above described Ponzi scheme." *Id.* at 4. The final paragraph of the affidavit states, "Based on all the above information this affiant believes there is probable cause to believe Tile 18, United States Code, Sections 1341 and 1343 have been violated as promissory notes and other documents are mailed to or from [Sigillito] as well as interstate transfers of money made in furtherance of this Ponzi scheme." *Id.* at 13. Based upon these facts, the court finds that Sigillito's argument lacks merit.

### 4. *Material false statement or omission*

Sigillito claims that the affidavit contained material false statements and omitted material facts. Sigillito argues that, if the material false statements were removed from the affidavit and the material omissions were added, the affidavit would not be sufficient to support a finding of probable cause. Thus, Sigillito seeks to void the search warrant under *Franks v. Delaware*, 438 U.S. 154 (1978).

"To void a search warrant under *Franks*, a defendant must show by a preponderance of evidence that (1) the affiant included in the warrant affidavit 'a false statement knowingly and intentionally, or with reckless disregard for the truth,' and (2) 'the affidavit's remaining content is insufficient to establish probable cause.'" *United States v. Finley*, 612 F.3d 998, 1002 (8th Cir. 2010) (quoting *Franks*, 438 U.S. at 155-56). "'A search warrant may [also] be invalidated because of omitted facts if (1) the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading and (2) the affidavit, if supplemented by the omitted information would not have been sufficient to support a finding of probable cause.'" *United States v. Alexander*, 574 F.3d 484, 488 (8th Cir. 2009) (quoting *United States v. Hart*, 544 F.3d 911, 914 (8th Cir. 2008)).

"If a defendant shows a *Franks* violation, then . . . 'the fruits of the search [must be] excluded to the same extent as if probable cause was lacking on the face of the affidavit.'" *Finley*, 612 F.3d at 1002 (quoting *Franks*, 438 U.S. at 156). Although an affidavit in support of a warrant must be truthful, this does not create a requirement "that 'every fact recited in the warrant affidavit is necessarily correct.'" *United States v. Buchanan*, 574 F.3d 554, 563 (8th Cir. 2009) (quoting *Franks*, 438 U.S. at 156). "'[P]robable cause may be founded . . . upon information within the affiant's own knowledge that sometimes must be garnered hastily.'" *Id.* (quoting *Franks*, 438 U.S. at 156). "Therefore, the affidavit must be truthful in the sense that the information put forth is believed or appropriately accepted by the affiant as true." *Id.* (internal quotation marks omitted) (quoting *Franks*, 438 U.S. at 156). "The test is 'whether, viewing all the evidence, the affiant must have entertained serious doubts about the truth [of his statements] or had obvious reasons to doubt the accuracy of the information.'" *Id.* (quoting *United States v. Schmitz*, 181 F.3d 981, 987 (8th Cir. 1999)).

Before a defendant is entitled to an evidentiary hearing under *Franks*, the defendant

must make a "substantial preliminary showing that a false statement was knowingly and intentionally, or with the reckless disregard for the truth, included by an affiant in a search warrant affidavit" and that "the allegedly false statement [was] necessary to a finding of probable cause." *United States v. Butler*, 594 F.3d 955, 960 (8th Cir. 2010). Similarly, to be entitled to an evidentiary hearing due to an alleged omission, the defendant must demonstrate the material was deliberately or recklessly omitted, and inclusion of the omitted material would have defeated probable cause. *See id.*; *see also United States v. Crissler*, 539 F.3d 831, 833-34 (8th Cir. 2008) ("'In order to be entitled to a hearing under *Franks* the defendant must make a substantial preliminary showing of a false or reckless statement or omission and must also show that the alleged false statement or omission was necessary to the probable cause determination.'" (quoting *United States v. Milton*, 153 F.3d 891, 896 (8th Cir. 1998))).

The court has reviewed all of the purported misstatements of fact and omissions that Sigillito maintains Special Agent Cosentino either included or left out of the affidavit. The court has thoroughly reviewed Sigillito's Memorandum of Law in Support of Motion to Suppress May 24, 2010 Search of Defendant's Law Office and his Memorandum of Law in Support of Motion to Suppress May 24, 2010 Seizure Warrant and has also considered all of the evidence and testimony that was presented during the Hearing. During the Hearing, the court preliminarily ruled that Sigillito failed to establish that he was entitled to a *Franks* hearing because he failed to make a substantial preliminary showing that Special Agent Cosentino knowingly, intentionally or recklessly included or omitted any information that was necessary to the probable cause determination. The court now reaffirms that ruling and finds it unnecessary to issue a specific ruling on each of the alleged misstatements and omissions.[3]

---

[3] The court finds that it would be a waste of the court's time and judicial resources
(continued…)

### 5. *General search*

Sigillito's last claim with respect to the Search and Seizure Warrant is that the FBI's search of his office was executed in such a manner as to render the search an unconstitutional general search. Sigillito argues that many items were seized from his office that were not within the scope of the warrant. Sigillito claims that "[s]uch a flagrant violation of the parameters of a very broad warrant requires that all evidence seized must be suppressed and returned." Sigillito's First Mem. at 36.

The government maintains that it seized over 150,000 pages of material in this case. Sigillito estimated that the government seized approximately 70,000 to 80,000 documents. Sigillito maintains that he reviewed four discs containing just over 70,000 documents seized from his office and that he determined that 7,781 of the documents "had nothing to do with the BLP." *Id.* at 35. Sigillito did not present these documents to the court, but claimed that 3,096 of these documents were attorney/client privileged documents, 263 related only to the practice of law, 1,086 were strictly personal in nature, 735 were church-related and 2,601 documents were "miscellaneous." *Id.* at 35-36. Sigillito did not produce a single document to attempt to corroborate his claim.

"The general rule, of course, is that police may only seize items described in the search warrant, absent an exception to the warrant requirement." *United States v. Robbins*, 21 F.3d 297, 300 (8th Cir. 1994). Items seized outside the scope of a warrant should be suppressed. *See id.* at 301. "Unlawful seizure of items outside a warrant does not alone render the whole search invalid and require suppression and return of all

---

[3](…continued)
to expound on this further, but notes that the government does discuss in detail Sigillito's claimed misstatements and omissions in its Response. Therein, the government explains why many of Sigillito's claimed misstatements and omissions do not constitute misstatements or omissions at all, and to the extent they do, they were not intentional or reckless, nor were they material to the probable cause determination. The court agrees with the government's analysis.

documents seized, including those lawfully taken pursuant to the warrant." *Marvin v. United States*, 732 F.2d 669, 674 (8th Cir. 1984). However, "[a] flagrant disregard for the limitations of a search warrant might make an otherwise valid search an impermissible general search and thus require the suppression or return of all evidence seized during the search." *Id.* at 674-75.

In the present case, the court finds that there was not a flagrant disregard for the terms of the Search and Seizure Warrant. The record shows that the agents attempted to stay within the boundaries of the warrant and, in this case, just as the Eighth Circuit concluded in *Marvin*, "the extensive seizure of documents was prompted largely by practical considerations and time constraints." *Id.* at 675. For example, when agents arrived at Sigillito's office to execute the Search and Seizure Warrant, the office was in such disarray that it was difficult for agents to determine which documents were relevant to the BLP. Sigillito delegated protection of privileged documents to Stajduhar. Further, all of the seized documents underwent taint procedures before they were released to the investigating team.

Additionally, as the government points out, Sigillito involved many people in the BLP, including family members and church members, and he also conducted legal work for people within the BLP. Such facts made it difficult to distinguish which documents were related to the BLP and should be seized, and which documents were strictly attorney/client documents, personal family correspondence or church documentation. Consequently, the record does not support suppression of all evidence obtained during the search.

### 6. Government's Arguments

The government argues that, even if the Search and Seizure Warrant was invalid in its issuance or execution, the evidence obtained should not be suppressed pursuant to the

*Leon*[4] good faith exception, the inevitable discovery doctrine and the independent source doctrine.

The Supreme Court created the good faith exception to the exclusionary rule in *United States v. Leon*, 468 U.S. 897 (1984).  "The Supreme Court held the exclusionary rule should not be applied so as to bar the admission of 'evidence obtained by officers acting in reasonable reliance on a search warrant issued by a detached and neutral magistrate,' even if that search warrant is later held to be invalid."  *United States v. Clay*, 646 F.3d 1124, 1127 (8th Cir. 2011) (quoting *Leon*, 468 U.S. at 900).  "'The good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the [issuing judge's] authorization.'"  *United States v. Perry*, 531 F.3d 662, 665 (8th Cir. 2008) (quoting *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007)).  "'When assessing the objective [reasonableness] of police officers executing a warrant, we must look to the totality of the circumstances, including any information known to the officers but not presented to the issuing judge.'"  *Id.* (quoting *Proell*, 485 F.3d at 431).

The Eighth Circuit has set forth some specific factors to consider when determining whether an officer's actions were objectively reasonable.  For example, the court should consider whether the officer seeking the warrant consulted with an attorney, whether the officer interviewed an informant in person and whether the informant's statements were independently corroborated.  *See Clay*, 646 F.3d at 1127.  In this case, Special Agent Cosentino consulted with First Assistant United States Attorney Reap and Assistant United States Attorney Meyers, both of whom reviewed the warrant application, affidavit and search warrant before Special Agent Cosentino presented them to Judge Buckles.  Furthermore, as discussed above, Special Agent Cosentino personally interviewed Stajduhar and relied upon many of her statements and some of the documents she gave him

---

[4]  *United States v. Leon*, 468 U.S. 897 (1984).

in drafting the Search and Seizure Warrant and application. *See United States v. Warford*, 439 F.3d 836, 842 (8th Cir. 2006) ("'[T]here is an inherent indicia of reliability in the richness and detail of a first hand observation.'" (quoting *United States v. Robertson*, 39 F.3d 891, 893 (8th Cir. 1994))). Special Agent Cosentino also independently corroborated Stajduhar's statements when he conducted independent research and learned that Sigillito had engaged in questionable conduct in the past and that MTC had filed a Suspicious Activity Report alleging that Sigillito was engaged in a Ponzi scheme. Special Agent Cosentino also reviewed two of the relevant documents that Stajduhar provided, verified that little money remained in Sigillito's bank accounts and discovered that a BLP investor had filed a federal lawsuit alleging improprieties within the BLP.

Viewing the totality of the circumstances, the court finds that Special Agent Cosentino and the other agents acted in reasonable reliance upon the Search and Seizure Warrant at the time it was issued and executed. *Cf. United States v. Kattaria*, 553 F.3d 1171, 1178 (8th Cir. 2009) ("It is not objectively unreasonable to execute a warrant 'where there was evidence to corroborate [an informant's] tip and where an independent magistrate had found that the affidavit stated probable cause.'" (quoting *United States v. Koons*, 300 F.3d 985, 991 (8th Cir. 2002))). Consequently, even if the Search and Seizure Warrant was invalid in some manner, any evidence obtained during its execution would be admissible pursuant to the *Leon* good faith exception. Because the court finds that this exception applies, the court need not consider the remaining exceptions advocated by the government.

### 7. *Conclusion*

For all of the foregoing reasons, the court shall deny the Search and Seizure Motions.

### B. *Motion to Suppress July 1 and 2 Searches and Seizures*

Sigillito also "moves to suppress the July 1 and 2 searches of Defendant's residences

and other locations." Motion to Suppress July 1 and 2 Searches and Seizures at 1. As discussed above, on June 30, 2010, Special Agent Cosentino obtained two search warrants and one seizure warrant. The FBI executed both search warrants on July 1, 2010 and seized a majority of the items listed on the seizure warrant. The FBI also seized some items listed on the seizure warrant on July 2, 2010. The court is not aware of any searches conducted on July 2, 2010. Consequently, the court construes Sigillito's requested relief in the Motion to Suppress July 1 and 2 Searches and Seizures as seeking suppression of all documents and other items seized during the execution of the two search warrants and the seizure warrant that Judge Whitworth signed on June 30, 2010. To support the Motion to Suppress July 1 and 2 Searches and Seizures, Sigillito argues: (1) the search warrants are facially deficient; (2) the seizure warrant is facially deficient; and (3) the affidavit in support of the search warrants and seizure warrant lacks probable cause. *Id.* at 1-3.

### 1.    Search warrants

Sigillito argues that the two search warrants that Judge Whitworth signed on June 30, 2010, are defective because: (1) the warrants fail to allege specific criminal activity; (2) agents had complete discretion in determining the items to be seized; (3) there is no time limitation stated in the warrants; and (4) the PAD, which was used to identify the items to be seized, was obtained during the prior illegal search of Sigillito's office.

### a.    Specific criminal activity

As the court discussed above, *see supra* Subsection IV.A.1.b.iii, the search and seizure warrant was not required to set forth a specific statute or crime to satisfy the Fourth Amendment. As noted in Federal Rule of Criminal Procedure 41(c),

> "A warrant may be issued for any of the following: (1) evidence of a crime; (2) contraband, fruits of a crime, or other items illegally possessed; (3) property designed for use, intended for use, or used in committing a crime; or (4) a person to be arrested or a person who is unlawfully restrained."

46

The search warrant applications signed on June 30, 2010, each stated that the property to be seized was listed in Attachment A and that the basis for the seizure was to obtain "property that constitutes evidence of the commission of a criminal offense," "contraband, the fruits of a crime, or things otherwise criminally possessed," or "property designed or intended for use or which is or has been used as a means of committing a criminal offense." Gov. Ex. 3A at 1; Gov. Ex. 4A at 1. The applications also noted that the request for the search warrants "concern[ed] a violation of Title 18, United States Code, Sections 1341 and 1343." Gov. Ex. 3A at 1; Gov. Ex. 4A at 1.

In the affidavit in support of the search warrants, Special Agent Cosentino detailed Sigillito's alleged Ponzi scheme. Special Agent Cosentino averred that Stajduhar provided him with a list of personal property Sigillito owned and insured, and that Sigillito purchased the "bulk" of the items on the list with proceeds of the Ponzi scheme. Gov. Ex. 3A at 6; Gov. Ex. 4A at 6. Attachment A for the search warrants is labeled "LIST OF ITEMS TO BE SEIZED," followed by the statement: "Antique collectible books, maps, jewelry, coinage, wines and oriental rugs, and any other items purchased with investor/lender funds, which items are detailed below . . . ." Gov. Ex. 3B at 3; Gov. Ex. 4B at 3. The remainder of Attachment A is a list of items from Sigillito's PAD. During the Hearing, Special Agent Cosentino testified that Attachment A served to limit the seizure of items and that he understood what Attachment A referred to when it referenced the Ponzi scheme or investment scheme.

Based upon these facts, the court concludes that the search warrants are sufficiently particular and that the executing officers understood the basis of the search. The search warrants authorized agents to search Sigillito's two residences for, among other things, fruits of a violation of 18 U.S.C. §§ 1341 and 1343. Contrary to Sigillito's argument, this is a permissible purpose for a search warrant. *See* Fed. R. Crim. P. 41(c)(2). Consequently, the court finds that the search warrants do not run afoul of the Fourth

Amendment.

### b.    *Discretion*

Sigillito maintains that the search warrants allow for a general search because they authorize a search for "any other items purchased with investor/lender funds." Gov. Ex. 3B at 3; Gov. Ex. 4B at 3. The court disagrees. As noted above, Attachment A for the search warrants is labeled "LIST OF ITEMS TO BE SEIZED," followed by the statement: "Antique collectible books, maps, jewelry, coinage, wines and oriental rugs, and any other items purchased with investor/lender funds, which items are detailed below . . . ." Gov. Ex. 3B at 3; Gov. Ex. 4B at 3. The language that Sigillito refers to, "and any other items purchased with investor/lender funds," is expressly limited by the next portion of the sentence that states, "which items are detailed below." Gov. Ex. 3B at 3; Gov. Ex. 4B at 3. Thus, the court finds that the plain language of the warrant authorizes seizure of only those items listed on Attachment A, and the search warrants at issue did not authorize a general search.

### c.    *Time limitation*

Sigillito maintains that the search warrants are overbroad because they were not limited to items purchased within five years of the execution of the warrant. Sigillito argues that the government was not entitled to seize items purchased beyond the five-year statute of limitations for mail or wire fraud. However, Sigillito does not cite to any legal authority to support his position. The government, on the other hand, maintains that Sigillito's crimes are continuing offenses. *See* Resistance at 35 (citing *United States v. Blumeyer*, 114 F.3d 758, 766 (8th Cir. 1997)); *United States v. Garfinkel*, 29 F.3d 1253, 1259 (8th Cir. 1994); Resistance at 61 (citing *United States v. Garvin*, 565 F.2d 519, 523 (8th Cir. 1997); *United States v. Phillips*, 688 F.2d 52, 54-55 (8th Cir. 1982); *United States v. Ashdown*, 509 F.2d 793, 798 (5th Cir. 1975)).

The court finds that it is not necessary to determine the statute of limitations issue

at this time because evidence pertaining to events outside the statute of limitations period is admissible. In *Silvers v. United States*, No. 4:09CV1976 CDP, 2011 WL 4635617, at *12 (E.D. Mo. Oct. 5, 2011), the court explained that a statute of limitations exists to "bar[]stale claims or charges, not evidence." Thus, Sigillito is free to later argue that the government cannot charge him with certain acts that took place outside the statute of limitations period. However, the statute of limitations is not a rule of evidence and "has no bearing on the admissibility of evidence." *United States v. Ashdown*, 509 F.2d 793, 798 (5th Cir. 1975). Consequently, because the search warrants were supported by probable cause to believe that the items listed on Attachment A were obtained with investor funds, the court declines to find that the statute of limitations requires suppression of those items. *Cf. United States v. Garvin*, 565 F.2d 519, 523 (8th Cir. 1977) (noting evidence extending beyond the statute of limitations period "is admissible to show motive, intent, a continuing scheme, and lack of inadvertent action").

### d.    Prior illegal search

Sigillito argues that the items listed in Attachment A to the search warrants were based upon the PAD, which was obtained by the FBI during an illegal search of Sigillito's office. Consequently, Sigillito maintains that the evidence obtained during the search of Sigillito's two residences must also be suppressed. First, the court notes that the FBI did not initially obtain the PAD during a search of Sigillito's office, but instead Stajduhar took it upon herself to provide agents with a copy. Second, as the court found above, the search of Sigillito's office was not unlawful. As a result, the court finds that Sigillito's argument that evidence should be suppressed as the fruit of an illegal search is without merit.

### 2.    Seizure warrant

Sigillito argues that the seizure warrant Judge Whitworth signed on June 30, 2010 is defective because: (1) it was based upon the same description of items to be seized as

49

the search warrants; (2) it did not contain a requirement that the property seized was purchased within the last five years; and (3) it authorized the seizure of funds in bank accounts without any showing of a nexus between the funds and criminal activity.

First, as discussed above, the court has already rejected Sigillito's arguments pertaining to the validity of the description of the items to be seized in the search warrants. Because the seizure warrant is based upon the same affidavit and description of property as the search warrants, the court finds it unnecessary to repeat that discussion again here.

Second, the court declines to decide Sigillito's remaining challenges to the seizure warrant. As Sigillito recognizes, the search warrants were issued to obtain evidence, while the seizure warrant was issued to secure property for forfeiture. Although the only relief requested in the Motions is suppression of evidence, Sigillito repeatedly requests return of the property in his memoranda in support of the Motions. The court finds that Sigillito's challenge to the seizure warrant and request for return of property would be more appropriately considered in the pending civil forfeiture case. *See*, *e.g.*, *In re Martin Sigillito*, 10-MC-461-UNA, Order (docket no. 52) (noting that suppression issues should be decided in a criminal case and issues pertaining to seizure and return of property should be decided in a forfeiture case).

### 3.    *Affidavit*

Sigillito argues that the affidavit in support of the search warrants and the seizure warrant lacks probable cause and is invalid because: (1) the affidavit relies upon statements attributed to investors without any basis to assess their reliability; (2) the affidavit included material false statements and omissions; and (3) the affidavit relies upon leads obtained during the illegal search of Sigillito's office.

First, the affidavit at issue here contains much of the same information that was contained in the first affidavit that Special Agent Cosentino used to support the Search and Seizure Warrant that Judge Buckles signed on May 21, 2010. However, Special Agent

50

Cosentino added a significant amount of information in the second affidavit that he did not have at the time that he drafted the first affidavit. Although the second affidavit includes information that is attributed to unnamed investors, this fact alone does not render such information unreliable. Instead, the statements of the unnamed investors served to further corroborate and bolster Stajduhar's statements and bolster the reliability of the entire affidavit. Consequently, the court rejects Sigillito's contention that the affidavit's reference to unnamed sources defeated probable cause to execute the warrants.

Second, for the same reason the court rejected Sigillito's argument pertaining to intentional or reckless misstatements or omissions in Subsection IV.A.1.d, the court rejects Sigillito's contention that the second affidavit contains many of the same false and misleading statements as the first affidavit.

Finally, the court has already determined that the search of Sigillito's office was lawful. Consequently, the court declines to suppress evidence on the grounds that the affidavit at issue here was largely based upon information obtained during the search of Sigillito's office.

### 4. *Government's arguments*

The government argues that, even if the search warrants or the seizure warrant are invalid, suppression is not warranted because the agents reasonably and in good faith relied on the warrants. The court agrees. The second affidavit in support of the search warrants and the seizure warrant contains much of the same information as the first affidavit in support of the Search and Seizure Warrant. Special Agent Cosentino conducted a face-to-face interview with Stajduhar and corroborated her statements before he included them in either affidavit. Additionally, the second affidavit that Special Agent Cosentino used to support the search warrants and the seizure warrant included information that BLP lenders provided to corroborate Stajduhar's statements. The Eighth Circuit has held that factors such as in person interviews with informants and corroboration of informant testimony

weigh against suppression in a *Leon* analysis. *See Clay*, 646 F.3d at 1127.

Viewing the totality of the circumstances, the court finds that Special Agent Cosentino and the other agents acted in reasonable reliance upon the search warrants and the seizure warrant at the time they were issued and executed. *Cf. Kattaria*, 553 F.3d at 1178 ("It is not objectively unreasonable to execute a warrant 'where there was evidence to corroborate [an informant's] tip and where an independent magistrate had found that the affidavit stated probable cause.'" (quoting *Koons*, 300 F.3d at 991)). Consequently, even if either of the search warrants or the seizure warrant are invalid in some manner, any evidence obtained during their execution would be admissible pursuant to the *Leon* good faith exception. Because the court finds that this exception applies, the court need not consider the remaining exceptions advocated by the government.

### 5. *Conclusion*

For all of the foregoing reasons, the court shall deny the Motion to Suppress July 1 and July 2 Searches and Seizures.

## V. CONCLUSION

For the foregoing reasons, Defendant Martin T. Sigillito's "Motion to Suppress May 24, 2010 Search of Defendant's Law Office" (docket no. 96), "Motion to Suppress May 24, 2010 Seizure Warrant" (docket no. 98) and "Motion to Suppress July 1 and July 2 Searches and Seizures" (docket no. 100) are **DENIED**.

**IT IS SO ORDERED.**

**DATED** this 31st day of January, 2012.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA