UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. No. 4:11-CR168 |
| | ) | |
| MARTIN T. SIGILLITO, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## THE UNITED STATES' TRIAL BRIEF

COMES NOW the United States of America, by and through its attorneys, Beth Phillips, United States Attorney for the Western District of Missouri, and Steven E. Holtshouser, Jess E. Michaelsen, and Richard E. Finneran, Special Attorneys to the Attorney General, and submits the following as its Trial Brief.

## I.      Case Overview and Theory of Prosecution

### A.      Factual Background

The Indictment in this case charges Martin T. Sigillito with devising and executing a scheme or artifice to defraud or to obtain money, property, or property rights through false or fraudulent pretenses, representations, or promises. While the scheme alleged in this case is unique, it has numerous characteristics that this Court will recognize as being typical of more common fraudulent schemes.

The evidence at trial will prove that the BLP originated in approximately 1999.  Its early years were 1999-2003.  During this time, defendant Sigillito, James Scott Brown and Kevin Cooper formed a triumvirate in which Brown and Sigillito paired up U.S. lenders with borrowers located by

1

Cooper.  One of the earliest borrowers was a law firm known as MGM which sought working capital to finance the litigation of miners' widows' claims in the U.K.  As originally conceived, funds from U.S. lenders were funneled through Brown and Sigillito to MGM through Cooper, a U.K. solicitor named Christian Swinburne and a U.K. accountant named John Stodt.  The funds were lent for short periods, usually 1 year, at high rates of return and fees totaling 32% were shared between Sigillito, Brown and Cooper.  Similar fees were also charged if a loan was renewed for another term or if a loan was redeemed.  Early investors included Brown and his family, a few of Sigillito's close friends and others.  Loan agreements were prepared by Swinburne.  Interest and principal payments were made by MGM.

Many lenders' funds were not returned to them, but were instead "re-loaned" to other borrowers, including commercial interests, such as JMJG, Symmtrex (a hanger manufacturer) and an individual named Chris Young.  Additional "fees" were taken for these new "loans" as well.  Several of these lenders defaulted in whole or in part, but said defaults were concealed from most U.S. lenders.  The BLP took a new direction, however, with the location of a real estate developer and borrower named Derek Smith, then doing business as Princess Hotels Management.  Smith needed small amounts of capital to support his real estate speculation business.  Smith bought options on real estate and then attempted to increase the value of the land by getting it re-zoned to a higher and more valuable use.

Smith trusted Brown and Sigillito based upon their credentials and demeanor.  Initially, he received some of the funds repaid by other borrowers as new loans from lenders and signed loan agreements prepared by Swinburne.  The business model of the loans was to back the loans with the personal and business assets of Smith which was represented by Sigillito to always be at least twice

2

the amount of Smith's liabilities. An Asset and Liability Statement of Smith accompanied each loan agreement and the agreement represented that the values were "current" or market value. A companion to this marketing tool was the representation that U.K. collections law was unique and permitted a lender to quickly convert a default into marketable assets of the borrower "down to his last cufflink." These representations were knowingly false, because Sigillito was an "expert" in international business law.

Other borrowers quickly evaporated and Smith became the primary borrower under the BLP for the remainder of its existence. Swinburne, Cooper and Stodt continued to play roles, but were essentially irrelevant by the middle years of the BLP. Smith continued to sign loan agreements, but had little appreciation for the collective amount of his debt. In addition, Smith was no longer receiving the bulk of the funds he "borrowed" nor was he sending funds from profits[1] to the U.S. to pay lenders. Instead, new loan funds were actually consumed by the monthly interest payment and redemption obligations to lenders and frequent, large fees taken by Brown and Sigillito. Thus, the BLP for the most part was not providing capital for Smith's projects. Smith did not actually need the loan funds to maintain his business, because few reached the level where it was necessary to exercise an option and projects that Smith actually presented to Sigillito for funding were not funded.

An important part of the Ponzi overhead, and what permitted the BLP to survive as long as it did was that many lenders chose to accrue interest and roll their loans over year after year resulting in ever-increasing debt for Smith without the need for any payout. In addition to overstating or

---

[1]Throughout most of the BLP, Smith did not actually generate any profit from any of his ventures. One of his hotels, the Hinton Grange Hotel in Bath, England generated about 100,000 pounds of net profit per year for some years. Not only did Smith not use that profit to carry the cost of his U.S. loans and Sigillito's fees, it would have been wholly inadequate to cover said cost.

fabricating the claimed values on the Asset and Liability Statements, his growing liabilities were severely understated, particularly omitting the total amount that he owed to U.S. lenders.

The BLP took a significant turn in 2005 when a single borrower, Wood Dickinson, lent $2.5 million to Smith under the BLP. Dickinson found other opportunities and sought to redeem his loan when it matured. Smith defaulted, but Sigillito recruited a very large lender, Phillip Rosemann. Between 2005 and 2007, Rosemann lent approximately $2 million to the BLP and during that time none of the funds went to Smith. However, in later December, 2006, Rosemann was due to receive the proceeds of the sale of his family's tooling business which resulted in receipt of $15.5 million. Sigillito convinced Rosemann to give him control of all of that amount. In early January, 2007, Rosemann lent $7 million of the $15.5 million to Smith, $5 million was lent to a Turkish construction company named Metis for 2 years and the rest was managed by Sigillito in CD's. The Smith funds were used to pay Brown and Sigillito undisclosed fees of over $1.3 million, to pay Wood Dickinson funds to settle his claim against Smith and the rest were used to fund other BLP overhead. At the same time, a total of approximately $19,000 of Rosemann's money actually was transmitted to Smith. As to the CD's, the evidence will show that as each one came due, Sigillito called Rosemann for lunch and convinced him to lend it to Smith, resulting in more fees for Sigillito and more funds to keep the BLP from collapsing. In the process, Sigillito became a multi-millionaire.

In the meantime, Sigillito had taken over primary control of the BLP from Brown. Loan agreements were prepared by his secretary, Elizabeth Stajduhar, in Sigillito's Clayton, Missouri office and loan signature pages which Smith signed in bulk were attached to the back. Numerous complex machinations occur in connection with BLP funds during the period 2007-2009 and will

be covered by the evidence.  Several prominent events included expansion of marketing efforts to include other recruiters working for Sigillito and Brown, the use of an accountant named Michael Houston to actually send lenders their periodic interest payments if they were not accruing interest, the transfer of IRA's from Millennium Trust Company to Enterprise Trust Company because Millennium instituted a policy of requiring loan funds to be received by Millennium any time a loan was being rolled over or renewed, Sigllito's purchase of a second home for $347,000 with lender funds, Sigillito's investment of $500,000 in a Lake of the Ozarks project with lender funds and a meteoric increase in the size of loans recruited by Sigillito.  Sigillito was also using the Racquet Club, an exclusive, private squash and lunch club in St. Louis, Missouri, as a hunting ground for new funds.

The collapse of the BLP was inevitable, as with any Ponzi scheme, and the seeds of it demise began to sprout in early 2009.  The seemingly unrelated loan by Rosemann to Metis defaulted in January, 2009.  It appears that Sigillito was planning on convincing Rosemann to re-loan those funds to Smith as a way to keep the BLP from falling apart.  Then in the Spring of 2009, two lenders totaling $2.5 million wanted to redeem their funds with Smith.  In addition, given the overall world economic conditions, it was becoming increasingly difficult to find new lenders to pay off old lenders.  On top of that, Sigillito was not keeping up with other current interest and redemption needs of the BLP.  The BLP was living literally "paycheck to paycheck."  Added to this pressure was the need to continued to conceal several secrets, among others, from all lenders: 1) the falsity of the Asset/Liability statements; 2) the overall size of Smith's BLP debt; 3) the amounts that Sigillito had taken in fees; 4) the fact that loan funds, for the most part, did not go to Smith and that funds to pay them did not come from Smith; and 5) the fact that in the event of a default and legal action by a

5

lender Smith's available assets could not come close to making a dent in the total BLP debt.

From 2009 through mid-2010, Sigillito was struggling to make BLP ends meet with the few new lenders he could find. His intent to defraud will be demonstrated by evidence, among others, of numerous lies that he told to placate lenders. His actions were desperate. These took the form of e-mail statements and concocted messages and letters from Brown and Smith. By early 2010, Rosemann had obtained the services of a new lawyer, Sebastian Rucci, who began investigating the BLP and Smith. Smith was sued by Rosemann in March, 2010, and Rucci endeavored to obtain explanations from Sigillito as to what had been done with Rosemann's money. By May, 2010, Stajduhar had concluded that the business being run by Sigillito was a fraud and went to the FBI. On May 24, 2010, the FBI interviewed Sigillito and searched his office and seized many items of evidence.

**B.     Factual Theories of Prosecution**

In one sense, the British Lending Program was a confidence/affinity fraud. An affinity fraud is a scheme in which the fraudster "target[s] members of a particular group united by common traits or interests that produce inherent trust." Black's Law Dictionary (9th ed. 2009). The United States' evidence will show that Sigillito preyed upon numerous groups with which he shared a common affiliation, including members of his social club "The Racquet Club," parishioners at his church, neighbors, and family friends. Sigillito utilized his position as an attorney and a bishop in the American Anglican Church Anglican to give his representations about the British Loan Program an air of legitimacy. Sigillito often utilized "recruiters" and "introducers" who had friendships with the individuals he targeted as potential lenders in the program, knowing that the recommendation of their friends would entice them to contribute their money to the scheme.

In another sense, the British Lending Program was a loan initiation fraud. Just as a borrower commits mortgage fraud when he misrepresents his financial position to a lending institution, Sigillito consistently misrepresented the financial position of the borrower when soliciting potential lenders. One of the hallmark representations of the British Lending Program was that asset-to-liability ratio of the borrower Derek Smith always equaled or exceeded 2-to-1. Most lenders were told that while their loan funds would be employed by Smith for a particular project, their investment was secured by all of the properties in Mr. Smith's portfolio. In light of the touted 2-to-1 asset-to-liability ratio, this meant that the "worst case scenario" of a default would inevitably result in the prompt recovery of all lenders' principal and interest, which was represented to be achievable within 90 days after default. The evidence will show that Sigillito knowingly falsified the "Asset and Liability Statements" attached to most "Loan Agreements" by providing inflated values for the properties that in most cases did not reflect their current market value and sometimes inventing nonexistent assets in order to artificially maintain the appearance of a 2-to-1 ratio. Even without such misrepresentations, however, the "Asset and Liability Statements" were materially false in that they either failed to disclose the amount of loans outstanding in the British Lending Program itself or, in later years, disclosed an amount of outstanding loans that dramatically understated the total owed.

In yet another sense, the British Lending Program was a pyramid scheme. Pyramid schemes are schemes in which new recruiters are paid fees based upon their referral of new investors in the scheme and those investors' subsequent referrals. One of the closely guarded secrets of the British Lending Program was the existence and/or extent of "fees" taken out of the loan principal at the point of initiation. Frequently and especially in the early years of the scheme, 32 percent of the loan principal was exacted as "fees," with funds being split equally between Sigillito, James Scott Brown,

7

Kevin Cooper, and the recruiter who referred the lender. The rate of the "fees" varied over time, but generally stayed at or above the 15 percent range. Although Smith ordinarily signed "Fee Deduction Authority" documents authorizing the withdrawal of fees from the loan principal, Lenders were rarely informed of the existence of any fees (or misleadingly told that all "fees" were "paid by the borrower") and almost never informed of the amount of the fees. Instead, they were told that their investments were "safe," "secure," "low-risk," or even "no-risk," representations that Sigillito knew to be false in light of Smith's ever-growing debts, a fact that he carefully kept from lenders.

The reason that the British Lending Program was able to sustain itself for so many years, however, is that its financial structure operated like a Ponzi scheme.[2] Rather that sending funds to England for use in real estate projects as promised to investors, Sigillito pooled lender's funds in his attorney trust account here in the United States. Rarely would funds from this account ever be sent to Derek Smith. Rather, the funds were used to pay fees to Sigillito and others for initiating the loans. In cases where lenders requested payments of interest on their loan or sought to withdraw their funds from the program, the funds used to pay them came not from any profitable business of Derek Smith's but instead from funds that had been contributed to the program by other lenders (or in the case of some interest payments, their own funds).

While the "Loan Agreements" generally provided for only a one-year term, many investors, induced by the perceived high rate of return, chose to "roll over" their investments by renewing their notes on a year-to-year basis. Many lenders placed their IRAs into the British Loan Program. Sigillito

---

[2] As the Court is aware from the parties' Motions in Limine, there is some disagreement between the parties as to what features must be present for a scheme to qualify as a "Ponzi scheme." Because this issue has been fully addressed in Sigillito's Motion and the United States' response, the question of whether the alleged scheme is a "Ponzi scheme" is not considered in further detail here.

referred to these as "long-term" loans even though by their own terms the "Loan Agreements" only authorized the funds to be lent for one year at a time. Because IRA lenders were not able to directly access the matured value of the notes, Sigillito was able to show what appeared on paper to be a growth in the value of their investment, even though the constant increase in Smith's liabilities to lenders was not met by any corresponding influx of revenue from legitimate operations. Meanwhile, he would extract further "fees" from the rolled-over loans each year, despite the fact that no new funds were being contributed to the program.

Though its attributes are complex, the British Lending Program is, in the end, a simple fraud. Lured by Sigillito's air of confidence and authority, a high rate of return, and the apparent success of their friends and neighbors, investors were induced to give Sigillito their money by lies about the financial condition of the borrower, the riskiness of the investment, and the source of the funds that would be used to pay returns on their investment. Sigillito lulled lenders into thinking their investments were safe by representing returns that did not exist and by paying interest and principal to lenders when they demanded it, so long as he had the funds to cover such demands. In the end, the British Lending Program folded under its own weight, unable to sustain the fees and rates of return for lenders when such minimal profit-making activity had occurred during the period of the fraud.

### C.    Factual Theories of Misrepresentation

The Indictment alleges 11 categories of false, fraudulent, or deceptive representations made to lenders in the program, including misrepresentations relating to the existence or amount of fees, Smith's ability to pay, risk, and the receipt of loan funds by Smith.  Most of these representations fall into the category of express misrepresentations of fact. But some also fall into the category of

9

representations which were false in their concealment of facts and thus amounted to mere "half-truths."  For example, Sigillito represented to prospective lenders that investing in the BLP offered no risk, little risk or was safe, without disclosing relevant facts concerning the uses to which their funds would be placed, the inability of Smith's projects to timely meet existing obligations, the speculative nature of Smith's projects or the economic pressure that the excessive fees placed on the ability of the BLP to timely meet all obligations to all lenders.  There will be other examples of representations which were deceptive and fraudulent in their failure to disclose relevant contrary facts of which Sigillito was aware.

## II.   LEGAL ISSUES

### A.   ELEMENTS OF OFFENSES:

#### 1.   Wire Fraud

Counts 1 through 9 charge wire fraud, in violation of Title 18, United States Code, Section 1343.  The four elements of wire fraud are:

*One*, the defendant voluntarily and intentionally devised or made up a scheme to defraud other persons out of money, property or property rights by means of material false representations or promises, which scheme is described as follows: the defendant devised a scheme to defraud or to obtain money from persons who were induced to lend in the so-called British Lending Program;

*Two*, the defendant did so with the intent to defraud;

*Three*, interstate wire facilities were used in furtherance of some essential step in the scheme. See 18 U.S.C. § 1343; United States v. Frank, 354 F.3d 910 (8th Cir. 2004).

Each of the 9 wire fraud counts employs a wire transfer of funds as its predicate. Direct evidence of these wire transfers will be presented through both documentary evidence and

testimonial. The parties have stipulated that, if called to testify, a Custodian of Records for the Federal Reserve Bank would testify to the facts underlying the wire transfers charged in the Indictment, including that wire signals and communications were made across state lines in interstate commerce as required under the wire fraud statute. *See* Stipulations (Doc. #124) at 6.  In addition, there will be witness testimony regarding the wire transfers and the Federal Reserve records are certified.  The wire communications in question all involve the sending of funds from a lenders' bank or financial source to Sigillito's attorney trust bank account in connection with the BLP loans. Even in the case of such wire transfers between two banks in Missouri, the wire transfer occurred across state lines, because the Federal Reserve Bank system which executes wire transfers of funds, Fedwire, is located outside Missouri.  Almost all wire transfers in the U.S. occur using Fedwire. Banks which are not themselves members of the Fedwire system partner with correspondent banks who are members to carry out the transactions.

As the Supreme Court held in *Neder v. United States*, 527 U.S. 1 (1999), the materiality of a falsehood is an element of mail, wire, and bank fraud. *Id.* at 25. As such, the United States must present evidence showing that the falsehoods employed by Sigillito "would be important to a reasonable person in deciding whether to engage or not to engage in a particular transaction." *Preston v. United States*, 312 F.3d 959, 961 (8th Cir. 2002). The United States will make this showing, by inter alia, asking lender victims whether the presence or absence of certain representations would have affected their decision to invest. These hypothetical questions will be connected up with the testimony of other witnesses who will establish the truth of the premises underlying such questions.

11

### a.     Ultimate Success Does Not Negate Intent To Defraud

The United States expects that Sigillito will attempt to present evidence to prove that he honestly believed that the BLP might someday be successful and that he did not specifically intend that the lenders would ultimately lose money. Even if such a belief could be established, such evidence is insufficient to negate the element of fraudulent intent under the mail and wire fraud statutes. As the Eighth Circuit recognized in *United States v. Cheatham*, 899 F.2d 747 (8th Cir. 1990), "it is well-established that actions indicating a belief in the ultimate success of a business do not absolve defendants from liability for making misrepresentations in order to promote that business." *Id.* at 752; *see also* Parties' Joint Proposed & Agreed Jury Instructions (Doc. #139) at 70 ("[A]n honest belief on the part of the defendant that a particular business venture was sound and would ultimately succeed would not, in and of itself, constitute 'good faith' as used in these instructions if, in carrying out that venture, the defendant knowingly made false or fraudulent representations to others with the specific intent to deceive them." (following 8th Cir. Model Inst. 9.08 note 2(c))). As such, even if Sigillito incorrectly believed that the BLP was a viable business venture, that belief would not excuse his misrepresenting the truth to potential lenders in order to induce them to part with their money.

### b.     Half-Truths as False Representations

Several of the misrepresentations in this case were false in that they consisted of representations which were false in their failure to disclose relevant material information.  This is not the same as basing liability on silence or complete omissions to speak or act.  Rather, actual representations are false in that they amount to only half-truths.

In *United States v. Townley*, 665 F.2d 579, 585 (5th Cir. 1982), the Fifth Circuit said:

> [U]nder the mail fraud statue, it is just as unlawful to speak "half-truths" or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

*Id*. at 585.  Also, in *United States v. Autuori*, 212 F.3d 105, 119 (2nd Cir. 2000), the Second Circuit held:

> A duty to disclose can also arise in a situation where a defendant makes a partial or ambiguous statements that require further disclosure in order to avoid being misleading.

*Id*. at 119.  The argument that a literally true statement cannot be deceptive at the same time was emphatically rejected in *United States v. Phillip Morris*, 449 F. Supp. 2d 1, 892 (D.D.C. 2006), as follows:

> The mail fraud statute covers all fraudulent and deceptive statements, including statements that are literally true but deceptive in the context in which they are made.

*Id*. at 892.

Sigillito will contend that because there was a lack of fiduciary relationship between himself and some lenders, persons of ordinary prudence and comprehension could not be expected to be deceived by the false statements and omissions which form the basis of the fraud counts.  This proposition was explicitly rejected by the Seventh Circuit in *Emery v. American General Finance*, 71 F.3d 1343, 1347 (7th Cir. 1995), a civil RICO case in which mail fraud was charged as the predicate offense, as follows:

> But it is not true that if you are not a fiduciary anything goes, short of false statements.  A half truth, or what is usually the same thing a misleading omission, is actionable as fraud, including mail fraud if the mails are used to further it, if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled.

13

*Id*. at 1348; *see also United States v. Kimmel*, 777 F.2d 290, 293 n.1 (5th Cir. 1985), *cert. denied*, 476 U.S. 1104 (1986) (upholding jury instruction which said that half-truths calculated to mislead can constitute mail fraud); *United States v. Keplinger*, 776 F.2d 678, 697 (7th Cir. 1985), *cert. denied*, 476 U.S. 1183 (1986) (statements of half-truths or concealment of material facts can be fraudulent); *United States v. Allen*, 554 F.2d 398, 410 (10th Cir.), *cert. denied*, 434 U.S. 836 (1977) (same); *Lustiger v. United States*, 386 F.2d 132, 138 (9th Cir. 1967), *cert. denied*, 390 U.S. 951 (1968) (same).

## 2.   **Mail Fraud**

Counts 10 through 15 charge mail fraud, in violation of Title 18, United States Code, Section 1341, the elements of which are:

*One*, the defendant voluntarily and intentionally devised or made up a scheme to defraud another out of money, property or property rights or participated in such a scheme to defraud with knowledge of its fraudulent nature by means of material false representations or promises, which scheme is described as follows: the defendant devised a scheme to defraud or to obtain money from persons who were induced to lend in the so-called British Lending Program;

*Two*, the defendant did so with the intent to defraud; and

*Three*, the defendant used, or caused to be used, the mail, a private interstate carrier, or a commercial interstate carrier in furtherance of, or in an attempt to carry out, some essential step in the scheme.

Four of the counts are based on the mailing of statements after the loan was made by the company administering their IRA.  Two of the counts are based on the mailing of loan agreements. All of these mailings took place after the loan funds had been transferred by the lender to the BLP.

14

In *Lane v. United States,* 474 U.S. 438, 451-2, 106 S. Ct. 725, 733, 88 L.Ed.2d 814 (1986), the

Supreme Court stated:

> Mailings occurring after the receipt of the goods obtained by fraud are within the statute if they "were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place."

citing *United States v. Maze*, 414 U.S. 395, 403 94 S. Ct. 645, 650, 38 L.Ed.2d 603 (1974).  The

mailings in question here had the effect of assuring lenders that their funds had been properly placed

and that their funds were safe.  IRA statements served to lull lenders into believing that a reputable

financial institution was associated with the loan and documented their loan.  As interest accrued,

such statements also served to assure them that their investment was growing as planned.  Many of

the lenders who received these statements were not sophisticated investors and believed that their

money was actually being controlled and monitored by the bank issuing the statement.  In fact, the

funds had been remitted to Sigillito and were being used by him to continue the Ponzi scheme and

pay himself fees.

Similarly, the mailing of loan agreements was the post-transfer document which served as

the borrowers' acknowledgment of his debt to the lender.  Without the mailing of the loan

agreement, a lender would be suspicious and the BLP scheme could not have lasted as long as it did.

These mailings served the same lulling purpose as the periodic payment of interest to lenders who

elected to receive interest

The Eighth Circuit Model Instruction 6.18.1341 (Mail Fraud) contains a portion that

addresses lulling mailings.  According to the Committee Comments, the instruction is to be modified

for wire fraud to substitute interstate wirings for mailings.  As modified, the instruction states "The

15

use of interstate wire facilities which are designed to lull victims into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are the use of interstate wire facilities in furtherance of the scheme." Thus, defendant's lulling emails and telephone conversations would be in furtherance of his scheme.

This Court already considered the issue of whether the mailings could qualify as "mailings in furtherance of some essential step" of the alleged scheme in ruling upon Sigillito's motion to dismiss the mail fraud counts. *See generally* Order (Doc. #121)*.* To establish these mailings the United States will provide testimony and documents evidencing their sending and/or receipt through the U.S. mail.

### 3. <u>Conspiracy</u>

Count 16 charges a conspiracy, in violation of Title 18, United States Code, Section 371, to commit wire and mail fraud. The elements of conspiracy are

*One*, between in or about 1999 and April 28, 2011, two or more persons reached an agreement or came to an understanding (1) to devise a scheme or artifice to defraud or obtain money or property by means or false or fraudulent pretenses, representations, or promises, and for the purpose of executing the scheme or artifice to defraud, transmit or cause to transmit by means of wire communication in interstate commerce, writings, signs, or signals and (2) to devise a scheme or artifice to defraud or to obtain money or property by means of false or fraudulent pretenses, representations, or promises, and for the purpose of executing the scheme or artifice to defraud, or attempting to do so, use or cause the use of the United States mails;

*Two*, the defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;

*Three*, at the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding; and

*Four*, while the agreement or understanding was in effect, a person or persons who had joined in the agreement knowingly did one or more of the acts alleged for the purpose of carrying out or carrying forward the agreement or understanding.

18 U.S.C. Section 371.

It is alleged that Sigillito conspired with Brown, Smith and others.  While the Indictment conjunctively alleges that the conspiracy had both aims, the jury need only find one in order to convict. *United States v. Pierce*, 479 F.3d 546, 552 (8th Cir. 2007).  However, a special verdict form is submitted to determine whether the jury unanimously finds that either or both substantive offenses were the object of the conspiracy.  Similarly, while the indictment alleges sixteen different overt acts in furtherance of the conspiracy, the jury need only find one such act to have been committed in furtherance of the conspiracy. *United States v. Mohamed*, 600 F.3d 1000, 1010 (8th Cir. 2010).

### 4.      Unlawful monetary transaction

The Indictment also alleges six counts of engaging in a unlawful monetary transaction in violation of Title 18, U.S.C., § 1957.  The elements of the offense are (1) that the defendant knowingly engaged in the monetary transaction charged; (2) that the transaction was in property of a value greater than $10,000 derived from a specified unlawful activity; (3) that the defendant then knew that transaction involved proceeds of a criminal offense; (4) the transaction took place within the relevant judicial district; and (5) the transaction in some way or degree affected interstate commerce.  The counts are all predicated on Sigillito's expenditure of proceeds that can be traced to the BLP.

17

The critical element is the second, namely, that the property involved was in fact derived from a specified unlawful activity, in this case, wire or mail fraud. To establish this element, the United States will present the summary testimony of Nick Kenney, Special Agent, IRS-CI, who will explain the forensic accounting methods used to trace the funds utilized in the charged transactions to the underlying fraudulent scheme. The theory of tracing employed by Mr. Kenney is essentially a "first-in, first out" approach, whereby funds withdrawn from an account are presumed to have their source in the most recent available deposit to that account. *See United States v. Banco Cafetero Panama*, 797 F.3d 1154 (2d Cir. 1986) (accepting "first in, first out" approach as valid tracing method). In addition, during the relevant time period Sigillito had no other substantial income source from he could have funded the acquisitions in question.

### 5.   Advice of Counsel Defense

The parties have submitted a proposed instruction that details the elements of the "defense" of "advice of counsel." The United States understands that Sigillito intends to offer evidence that he consulted regarding various aspects of the British Loan Program with an attorney named James Dankenbring. The United States submits that the evidence of Mr. Sigillito's consultation with Mr. Dankenbring will be insufficient to establish the prerequisites for the "advice of counsel defense" to apply.

As indicated in the proposed instruction, which is modeled after Eighth Circuit Model Instruction 9.08 note 2(d), "[a]dvice of counsel is not a defense to a crime." Rather, "[i]t is only a circumstance that may be considered in determining whether the defendant acted in good faith and lacked intent to defraud." *Id.* In order for the defense to be available, a defendant must have fully disclosed all material facts within his knowledge to the attorney, and he must have actually relied

on his counsel's advice in the good faith belief that his conduct was legal. *Covey v. United States*, 377 F.3d 903, 908 (8th Cir. 2004).

In this case, the defense has little or no application, because there will no be an issue of whether Sigillito's conduct was legal - the advice of an attorney could not insulate Sigillito from liability for misrepresenting important aspects of the BLP to potential lenders.  While Sigillito sought the services of several attorneys to further his scheme and , in effect, run interference for him with disgruntled lenders and others, here there will not be any evidence that Sigillito ever consulted an attorney to seek review of the BLP and render an opinion that the manner in which it was being conducted was or was not illegal.  The Government submits that such evidence is a necessary ingredient to assert advice of counsel as a defense to the charge.

To the extent Sigillito did discuss the BLP with counsel, it was not only not for the purpose of determining the propriety of his conduct but in his limited contact with counsel he did not make anything close to full disclosure of the relevant facts.  In his contacts with Mr. Dankenbring, Sigillito failed to disclose, among other things, the falsity of his representations relating to Smith's assets and liabilities and the extent and frequency of the fees taken by Sigillito or the actual use of the lender funds. The evidence will show that Sigillito's consultation with Mr. Dankenbring regarding the BLP pertained primarily to the 2001 to 2002 time-frame and was concerned chiefly with the question of whether or not the loans at issue constituted "securities" under federal and/or state law. If the loans were securities, then registration and certain disclosure obligations came into play.[3]  At no time did

---

[3]On this question, Mr. Dankenbring actually opined that the loans were securities and should be registered with appropriate jurisdictions.

Mr. Sigillito disclose to Mr. Dankenbring the numerous misrepresentations that he made to lenders to induce them to invest in the BLP.

In addition, Sigillito did not act in accordance with the advice he actually received from Mr. Dankenbring. In a November 26, 2001, memorandum to Sigillito, Mr. Dankenbring advised Mr. Sigillito of the numerous steps that Sigillito should take to avoid exposure "to potential claims of intentional and/or negligent misrepresentation." *See* **Ex. 1** at 1. Mr. Dankenbring's memorandum included the following recommendations, among others:

- "Treat each loan as a separate, distinct transaction requiring its own documentation and evaluation."
- "Avoid overlapping collateral security for multiple loans and overlapping use of proceeds to the extent possible."
- "Provide full disclosure (including amount and recipient) to each borrower of all fees that will be paid in conjunction with the loan process, regardless of who is liable for the payment of such fees."
- "Obtain a formal appraisal of the assets from a reputable and disinterested UK appraiser (supported by a written resume) to the individual lender, including an opinion that sufficient assets are available to secure the entire accelerated amount of the note, as well as any anticipated costs of enforcement . . . ."
- "Avoid any pooling of funds with respect to the various loan transactions."

**Ex. 1** at 2–4. Far from acting in "strict" conformity with this advice, Sigillito ignored it entirely and acted contrary to the advice. Sigillito could not reap millions in fees if he followed Mr. Dankenbring's advice. Thus, Sigillito's claim of advice of counsel will fail under both prongs of the test and there will be a serious question whether Sigillito presents sufficient evidence to support the giving of an advice of counsel defense instruction to the jury.

The United States is aware that this Court has previously excluded evidence of the hiring of an attorney on the ground that it "just doesn't follow . . . that by hiring a very respected attorney and

. . . law firm" a defendant "could not possibly have had criminal intent." *See United States v. Rubashkin*, 655 F.3d 849, 861 (8th Cir. 2011) (quoting district court record).  The United States agrees that in most cases the mere fact of the retention of an attorney should be excluded as irrelevant to the question of criminal intent.  The evidence may present a different situation and the evidence of Sigillito's consultation with Mr. Dankenbring may be relevant to Sigillito's claim of good faith. As such, the United States reserve its right to seek exclusion of such evidence at trial until the evidence and issues are more fully developed.  Regardless, the Government does not believe the evidence presented will be adequate to support instructing on an "advice of counsel" defense.

### 6.     Documentary Evidence Obtained Through Search Warrant

The United States recovered a great many of the exhibits it will use at trial in the search of Sigillito's office executed on May 24, 2010. FBI Special Agent Kevin Cosentino will testify generally to the manner in which these documents and other items were seized. The parties have, however, stipulated to the authenticity of the documents recovered in the search warrant. *See* Stipulation (Doc. #124) at 1. This does not, however, preclude the parties from raising other objections, such as relevance, prejudice, or hearsay, to the admission of those documents.

### 7.     Electronic Communications Obtained from Computers and E-mail Accounts

The United States recovered a wealth of material through searches of various computers and e-mail accounts. These included two computers recovered from the search of Sigillito's office, as well as searches of Mr. Sigillito's email account and his secretary Elizabeth Stajduhar's email account. The parties likewise stipulated to the authenticity of these record. *See* Stipulation

(Doc. #124) at 5.  In addition, other electronic communications were provided to the United States in paper form from various witnesses in the case. These documents were provided to Sigillito in discovery and their authenticity has been stipulated to. *See* Stipulation (Doc. #124) at 2–4 .

### 8.    Voluminous Records and Summaries

The United States will also introduce voluminous records of various kinds, including bank records and loan agreements discovered during the search of Mr. Sigillito's offices. In order to aid the jury in its understanding of these records, the United States shall offer summary exhibits pursuant to Federal Rule of Evidence 1006. That rule provides that such summaries are considered evidence and may be considered by the jury as such.  The summaries will be available for review by the defendant prior to trial.  Moreover, defendant has had access to all of the underlying documents and evidence for several months now.  The following supports the intended usage of the summaries in question.

It has long been the rule that summaries of the sort involved here may be exhibited to the jury during the trial in the discretion of the trial court in order that they "may guide and assist the jury in understanding and judging the factual controversy."  *United Stats v. Downen*, 496 F.2d 314, 321 (10th Cir. 1974); *see also United States v. Johnson*, 319 U.S. 503, 519 (1942); *United States v. Orlowski*, 808 F.2d 1283, 1289 (8th Cir. 1986); *United States v. Nelson*, 735 F.2d 1070, 1072 (8th Cir. 1984); *United States v. Kaatz*, 705 F.2d 1237 (10th Cir. 1983); *United States v. Behrens*, 689 F.2d 14 (10th Cir. 1982), *cert. denied*, 103 S.Ct. 573; *United States v. King*, 616 F.2d 1034, 1041 (8th Cir.), *cert. denied*, 446 U.S. 969 (1980); *United States v. Skalicky*, 615 F.2d

1117, 1120-21 (5th Cir.), *cert. denied*, 449 U.S. 832 (1980); *United States v. Foshee*, 606 F.2d

111, 113 (5th Cir. 1979), *cert. denied*, 444 U.S. 1082 (1980); *United States v. Scales*, 594 F.2d

558, 561-64 (6th Cir.), *cert. denied*, 441 U.S. 946 (1979); *United States v. Normile*, 587 F.2d

784, 787 (5th Cir. 1979); *United States v. Ellenbogen*, 365 F.2d 982, 988 (2d Cir. 1966), *cert.

denied*, 386 U.S. 923 (1967); *see generally* Fed. R. Evid. 1006.

   The Eighth Circuit, in *United States v. Smallwood*, 443 F.2d 535 (8th Cir.), *cert. denied*,

404 U.S. 853 (1971), allowed the admission of charts that summarized other exhibits.  The court

stated, as follows:

> The court room use of summaries of business records, particularly where
> the actual records are voluminous and complex, is not only proper but
> advisable.  (Citations omitted)  Evidential use of such summaries rests
> within the sound discretion of the trial judge, whose action in allowing
> their use may not be disturbed by the appellate court except for an abuse of
> discretion.

443 F.2d at 540; *see also King*, 616 F.2d at 1034.  Computer printouts which summarize

voluminous evidence are also permissible under Rule 1006.  *City of Phoenix v. Com/Systems,

Inc.*, 706 F.2d 1033 (9th Cir. 1983); *United States v. Johnson*, 594 F.2d 1253, 1254-57 (9th Cir.),

*cert. denied*, 444 U.S. 464 (1979); *United States v. Smyth*, 556 F.2d 1179 (5th Cir. 1977).

   In *Smallwood*, the summaries in issue were based on materials already in evidence.  The

same will be true here.  Any alleged inaccuracies in the summaries go, according to *Smallwood*,

to the weight to be accorded the summaries, not to their admissibility.  Moreover, the

Government will propose the limiting jury instruction as described in that case.  Such an

instruction cautions the jury that summaries do not constitute evidence, but only serve as aids in

the jury's consideration of the facts. *See, e.g.*, Devitt & Blackmar, Federal Jury Practice and

Instructions (Third Edition) Section 15.23. In *Smallwood*, the court cited with favor a prior

Eighth Circuit case which reasoned, as follows:

> Exhibits which may facilitate understanding of complex factual issues are
> to be encouraged for court room use.

*Boston Securities, Inc. v. United Bonding Insurance Co.*, 441 F.2d 1302, 1303 (8th Cir. 1971);

*see also United States v. Brickey*, 426 F.2d 680, 686-87 (8th Cir.), *cert. denied*, 400 U.S. 828

(1970); *Ping v. United States*, 407 F.2d 157, 159-160 (8th Cir. 1969) (summaries of checking

accounts records in criminal tax case).

Thus, it is clearly within the discretion of the trial court to allow the use of charts at trial

where they would be of assistance to the jury, subject to the appropriate limiting instructions, and

such discretion will be subject to review only upon a clear showing of abuse and resulting

prejudice to the opposing party. *Smallwood*, 443 F.2d at 540; *Brickey*, 426 F.2d at 686-87; *King*,

616 F.2d at 1034.

The use of charts in the opening statement and closing argument is governed by the same

principles that apply to the use of charts at trial. *See United States v. Churchill*, 483 F.2d 168

(1st Cir. 1973); *United States v. Rubino*, 431 F.2d 284 (6th Cir. 1970). As described above, the

charts will help the jury picture the structure of the transactions at issue and the relationships of

the defendants, witnesses and entities involved, thereby effectuating the recognized goal of an

opening statement -- "to give the broad outlines of the case to enable the jury to comprehend it,"

*Virgin Islands v. Turner*, 409 F.2d 102, 103 (3d Cir. 1969), and "to make it easier for the jurors

to understand what is to follow, and to relate parts of the evidence and testimony to the whole." *United States v. Dinitz*, 424 U.S. 600 (1976) (Burger, C.J., concurring).

Prior to permitting the United States to use the charts, the Court should caution the jury that the charts are only aids to assist the jury in understanding the case. Before this Court accepts in evidence the above-described charts, it must determine that they are based upon and fairly represent competent evidence before the jury. Then, the Court should caution the jury that the charts are only aids to assist the jury in understanding the case and that their evidentiary value depends entirely on the accuracy and credibility of the proof offered at trial upon which the charts are based. *See Downen*, 496 F.2d at 321; *United States v. Conlin*, 551 F.2d 534, 538 (2d Cir. 1977).

**9.      Testimony of Cooperating Defendants and Other Witnesses**

Three witnesses testifying in this trial have entered into guilty plea agreements with the United States, and the Court has accepted their pleas. These witnesses are Elizabeth Stajduhar, Derek Smith, and James Scott Brown. The Government will present evidence of these agreements during direct examination.

It is proper for the Government to adduce this testimony from its witnesses rather than have to wait for cross-examination to draw out details of the witness agreements. "The Government is not required to wait until the defendant posits a particular defense ... but may prove up their case in anticipation of such a defense. *United States v. Jardan*, 552 F.2d 226, 219 (8th Cir. 1977)." *United States v. Gilmore*, 730 F.2d 550 (8th Cir. 1984). Believing that a substantial portion of defendants' strategy will be to attack the credibility of the Government's

witnesses who have entered into plea/immunity agreements, the prosecution properly may bring out relevant details concerning these matters during direct examination of these witnesses. *United States v. Koppers Co.*, 454 U.S. 1083 (1981) (evidence that Government's principal witnesses had earlier perjure themselves during early phases of investigation was properly elicited by government on direct examination in anticipation of defense counsel's attempt to attack witnesses' credibility). The government's disclosure during direct examination of its witnesses' cooperation and plea/immunity agreements is proper to diffuse any attempt by defendants to show bias on cross-examination. *United States v. Roth*, 736 F.2d 1222, 1226-27 (8th Cir. 1984).

### 10.    Testimony of Expert Witnesses

The United States intends to offer the testimony of at least one expert witnesses: Giles Wheeler. Two other witnesses will testify primarily as summary witnesses, having summarized and performed calculations on voluminous financial and business records associated with the BLP. These two witnesses will be Contract Forfeiture Investigator James R. Appelbaum, and Special Agent, IRS-CI, Nicholas D. Kenney. It is the Government's contention that Appelbaum and Kenney do not qualify as expert witnesses, unless arithmetic is an expertise, but out of an abundance of caution the Government noticed them as experts to Sigillito.

Mr. Wheeler will be offered as expert on certain issues of English law pertaining to the enforcement and collection of judgments, as well as the recording of deeds in England and the regulation of British lending practices. The purpose of this testimony will be to demonstrate the

falsity of certain representations Sigillito made regarding the application of English law to the loans at issue.

### 11.    Proposed Defense Expert John Loughlin

The United States filed a motion in limine for full disclosure of the opinions and bases for the opinions of proposed defense expert John Loughlin. The Government believes it is entitled to discovery of such opinions.  More importantly, regardless of the disclosure, the Government does not believe that Mr. Loughlin's testimony will be a proper subject of expert testimony and that his opinions (to the extent they are opinions and not simply a regurgitation of what Sigillito told him) will not be based on any area of expertise in which he is qulified.  Mr. Loughlin is a professor at Lindenwood University in St. Louis. While it is unclear the precise area of expertise that Mr. Loughlin claims, the United States understands that he intends to offer an opinion regarding the real estate activities of Mr. Smith, the economic feasibility of the British Lending Program, and whether or not it can be described as a "Ponzi scheme." The United States believes that these are matters upon which Mr. Loughlin is either too ill-informed or inexpert to testify. Therefore, it is likely that, upon receiving full disclosure of the basis for his opinions, the United States will move to exclude Mr. Loughlin as an expert or seek a *Daubert* hearing.

In addition, even if Mr. Loughlin does testify, there are additional practical considerations of which the Court should be aware relating to his dual role as a fact witness to the matters at issue in the trial. Prior to the Indictment in this case, the United States became aware that Mr. Loughlin had communications with Mr. Sigillito regarding the British Lending Program.  Mr. Laughlin appeared before the grand jury and testified regarding these communications.

Essentially, Mr. Loughlin, a fellow Racquet Club member with Sigillito, testified that the extent of his knowledge of the BLP was that Sigillito marketed the program to him and that Mr. Loughlin declined to invest.  Despite questioning which should have elicited the information, Mr. Loughlin failed to disclose that, during the BLP's existence, he was far more involved in the BLP than he implicated before the Grand Jury.  It turns out that he had discussed the BLP extensively with Sigillito and that he prepared marketing materials for the BLP which Sigillito approved and attempted to market the BLP to wealthy friends for a fee. Sigillito even referred to it as Mr. Loughlin's "new career."

The Government has attempted to question Mr. Loughlin further since the additional evidence of Mr. Loughlin's involvement has been discovered.  Because of his failure of candor before the grand jury, the United States has informed Mr. Loughlin that he may be a target of the Government's continuing investigation and perhaps an investigation for perjury.  He has retained independent counsel and through said counsel it appears that Mr. Loughlin wishes to exercise his Fifth Amendment right in connection with such questions.  Before Mr. Loughlin is called as a witness by Sigillito, his status should be clarified and Sigillito should be made aware of the risks of calling Mr. Loughlin and the potential prejudice to his defense by having one of his witnesses claim the Fifth Amendment in front of the jury.  The subject of Mr. Loughlin's involvement in the BLP would certainly be relevant to cross-examining him if he is offered as an expert on the BLP.  The United States has discussed these issues at length with counsel for Sigillito, but it is not clear whether said counsel or Sigillito fully appreciate the risk of these circumstances to the

defense.  It is an area in which the Court may wish to conduct further inquiry, either in camera and/or ex parte.

Under Federal Rule of Evidence 702, a qualified witness may testify as an expert, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed.R.Ev. 702.  The expert's testimony is still admissible even if it "embraces an ultimate issue to be decided by the trier of fact."  Fed. R. Evid. 704.  Admission of expert testimony or lay opinion testimony is a matter within the broad discretion of the trial judge that will not be disturbed absent a clear abuse of discretion.  *United States v. Daniels*, 723 F.2d 31, 33 (8th Cir. 1983); *see also United States v. Fleishman*, 684 F.2d 1329, 1335 (9th Cir. 1982), *cert. denied*, 103 S. Ct. 464 (1983); *United States v. Freeman*, 514 F.2d 1184, 1191 (10th Cir. 1975).

### 12.   **Electronic Presentation of Evidence**

The Government intends to use the Sanction trial presentation system to present the vast majority of exhibits electronically.  This presentation should expedite the presentation of the voluminous exhibits in this case.  Given the stipulations in this case, the entire content of the Government's exhibits, with the exception of the summaries, are admissible.  Thus, there should be no issue of actually displaying each exhibit to the witness and jury simultaneously without the need to first authenticate and admit each exhibit separately.  However, the Government may not offer every one of these exhibits into evidence.  The proposed procedure will be to notify defense counsel which exhibits will be shown to the witness and jury and give him an opportunity to raise any relevance or other objections.  If there are none, the Government intends to simply present

the exhibits, keep track of which exhibits are actually utilized and then reconcile these at the end of each trial day and offer them into evidence formally at that time.  Additional exhibits may become necessary depending on the witness answers or the cross-examination.  Only exhibits admitted as such would be available to the jury in hard copy form for use during deliberations.  A complete hard copy of the exhibits will be available in the event of a system failure, in which case the document camera system will be used to publish the exhibit to the witness and jury.

### 13.   Attorney Witnesses

As the United States indicated in its Motions in Limine, several attorneys are likely to be called to offer testimony at trial. These attorneys have or had attorney-client relationships with numerous other individuals, some of whom are witnesses in this case. As requested in its Motion in Limine, the United States requests that this Court confine the cross-examination of these witnesses to avoid the unnecessary invocation of the attorney-client privilege by any such witness on the stand, an event which might cause confusion for the jury and necessitate that the Court give curative instructions to avoid any adverse inference.

### 14.   Impeachment With Prior Conviction

One of the Government's witnesses, a lender, has a prior felony conviction involving the illegal storage of hazardous materials in a fireworks business.  Under Fed. R. Evid. 609(a) and (b), the government will oppose efforts by defense counsel to introduce details associated with such prior conviction.  Cross-examination of such witnesses should be limited to the specific crime and not the details of the crime.  *See Cummings v. Malone*, 995 F.2d 817, 826 (8th Cir. 1993) ("The ability to introduce the specific crime is not a license to flaunt its details, however;

cross-examiners are limited to eliciting the name, date and disposition of the felony committed."); *see also Campbell v. Greer*, 831 F.2d 700, 707 (7th Cir. 1987) (explaining that cross-examination is limited to eliciting "the crime charged, the date and the disposition").

### 15.   Co-Conspirator Statements

A number of statements between alleged co-conspirators will be introduced in this case. This Court has already indicated it will follow the *Bell* procedure in admitting such statements and therefore the Government will not address this issue further.

### 16.   Summary Exhibits In Opening and Summary Witnesses

The government intends to employ various charts and other summary exhibits during the course of this trial. These exhibits will summarize various business and transaction records that will be introduced into evidence. The courts have long upheld the practice of using summaries in complex criminal trials. *See United States v. Johnson*, 319 U.S. 503, 519 (1943). The government will also introduce the testimony of a summary witnesses, who will analyze the information previously admitted into evidence in order to assist the jury. The use of summary exhibits and witnesses in the present case is particularly useful because the jury will be asked to absorb and understand a large number of exhibits, spanning several transactions, and covering a variety of financial and other information.

Federal Rule of Evidence 1006 provides that "the contents of voluminous writings . . . which cannot be conveniently examined in Court may be presented in the form of a chart, summary, or calculation." "Where charts which fairly summarize the evidence are used as an aid in understanding the testimony already introduced and the witness who prepared the charts is

subject to cross-examination with all documents used to prepare the summary, the use of charts is proper." *United States v. Orlowski*, 808 F.2d 1283, 1289 (8th Cir. 1986), *cert. denied*, 482 U.S. 927 (1987).  Similarly, "a summary witness' testimony may be received as long as that testimony is based on evidence in the case and the witness is available for cross-examination." *United States v. Caswell*, 825 F.2d 1228, 1235 (8th Cir. 1987) *see also* Eighth Circuit Model Jury Instruction 4.12 (regarding the admission and use of summary charts and schedules).

Further, the government may use other demonstrative charts in opening statement and closing argument that visually demonstrate the schemes at issue.  "Visual aids that summarize other evidence are generally permissible pedagogic devices, especially when used to organize complex testimony or transactions for the jury." *United States v. Crockett*, 49 F.3d 1357, 1360-61 (8th Cir. 1995).  See also Eighth Circuit Model Jury Instruction 4.11 (regarding demonstrative summaries not introduced into evidence).

### 17. **Case Agents In The Courtroom**

The case agents should be excepted from the rule of exclusion from the courtroom. Given the complexity of this case, three said agents will be needed at counsel's table at various times to assist with the trial.  In addition, two of the agents will testify as summary witnesses and part of the basis for their testimony will be the evidence received during the trial.  Accordingly, as is the usual practice, they should be excepted from the rule of exclusion.

### 18.      Concealment and False Exculpatory Statements

There will be evidence of false exculpatory statements made by Sigillito to law enforcement officers and also evidence of concealment and attempting to influence witnesses once he became aware of the investigation.

Under controlling precedent, the jury is entitled to consider evidence of a defendant's attempts to conceal evidence and influence witnesses.  *See United States v. Gomez*, 165 F.3d 650, (8th Cir. 1999) (explaining that a defendant's attempts to influence a witness "is admissible and can be probative of guilt") (citing *United States v. Hall*, 565 F.2d 1052, 1055 (8th Cir. 1977)). Furthermore, the government is permitted to argue that such evidence is indicative of the defendant's consciousness of his guilt.  The government intends to tender a proposed jury instruction on this point.  *See* Eighth Circuit Pattern Jury Instruction 4.09 (regarding consciousness of guilt); *see also United States v. Grajales-Montoya*, 117 F.3d 356, 361 (8th Cir. 1997) (holding that a consciousness of guilt instruction was appropriate where there was evidence that a defendant instructed someone "not to give federal agents any papers or information").

False exculpatory pretrial statements are admissible as substantive evidence to show the defendant's consciousness of guilt.  *See* Eighth Circuit Pattern Jury Instruction 4.15 (citing *United States v. Hudson*, 717 F.2d 1211, 1215 (8th Cir. 1983).

### 19.      Character Evidence

Sigillito may attempt to offer good character evidence as a defense to the crimes charged. In general, character evidence "is not admissible for the purpose of proving action in conformity

therewith" on other occasions.  Fed. R. Evid. 404(a); *see also United States v. Bruguier*, 161 F.3d 1145, 1148 (8th Cir. 1999).  In a criminal case, the defendant "may offer evidence of a pertinent trait of character . . . and, if he does, the prosecution may offer evidence in rebuttal."  <u>*Bruguier*</u>, 161 F.3d at 1148; *see also* Fed. R. Evid. 404(a)(1).

The defendant's ability to offer character evidence, however, is limited to proof "by testimony as to reputation or by testimony in the form of an opinion."  Fed. R. Evid. 405(a); *see also Bruguier*, 161 F.3d at 1149.  Only when "character or a trait of character of a person is an essential element of a charge, claim, or defense," may the defendant provide proof in the form of "specific instances" of the defendant's conduct.  Fed. R. Evid. 405(b).

None of the essential elements of the charges against the defendant involves character or a trait of character.  Moreover, should the defendant defend the charges on the basis of a "lack of intent or lack of motive," the use of specific instances regarding character "is not only disfavored, it is not permitted under Rule 405(b)."  *United States v. Marrero*, 904 F.2d 251, 260 (5th Cir.), <u>cert.</u> <u>denied</u>, 498 U.S. 1000 (1990).

Hence, the Court should preclude the defendant from eliciting testimony regarding specific instances of the defendant's conduct from his witnesses.  Rather, the Court should limit the defendant to offering evidence of opinion or reputation regarding the defendant's honesty and truthfulness.  In the event that the defendant or his counsel intend to elicit such evidence, the government requests that the Court order counsel to advise the Court in advance, and outside the presence of the jury, as to why such evidence would be admissible.

Further, if the defendant presents evidence of his character in the form of opinion or reputation evidence, the government should be allowed to cross-examine the witness regarding the defendant's illegal conduct.

### 20.   **Extrinsic Evidence to Impeach Is Improper**

Defendant may attempt to use extrinsic evidence to impeach the credibility of Government witnesses.  Federal Rule of Evidence 608(b) makes clear that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility . . . may not be proved by extrinsic evidence."  That rule permits inquiry into such specific instances on cross-examination, but the defendant may not prove these collateral matters by use of extrinsic evidence.  *See United States v. Lynch*, 800 F.2d 765, 770 (8th Cir. 1986), *cert. denied*, 107 S. Ct. 1310; United States v. Powers, 622 F.2d 317, 324 n.10 (8th Cir. 1980), *cert. denied*, 449. U.S. 837; United States v. Sullivan, 618 F.2d 1290, 1298 (8th Cir. 1980); *Carlsen v. Javurek*, 526 F.2d 202, 210 (8th Cir. 1975).  *See also United States v. Agnes*, 753 F.2d 293, 304 (3d Cir. 1985).  The reason for this rule is that extrinsic proof of a witness' specific conduct could "expand the trial to an inquiry into collateral matters which could distract and confuse the jury." *United States v. May*, 727 F.2d 764, 765 (8th Cir. 1984).  *See also United States v. Randle*, 815 F.2d 505, 507-8 (8th Cir. 1987); *United States v. Petty*, 798 F.2d 1157, 1161-62 (8th Cir. 1986).

### C.   **FORFEITURE PHASE OF THE TRIAL**

The Indictment in this case contains a forfeiture allegation. At the present time, Sigillito has indicated that he intends *not* to waive the jury on the issue of the forfeiture of the property alleged in the Indictment, although discussions with the United States on this issue are ongoing.

The jury's role in the forfeiture phase of a trial is confined to determining whether or not the property sought to be forfeited is traceable to the crime charged. In this case, the United States contends that it would be futile for the jury to consider the forfeitability of the property, because even if the jury found that the property was not traceable to the offense and therefore not directly forfeitable property, the United States could then still move this Court for an order forfeiting the property as "substitute property" of the defendant. *United States v. Saccoccia*, 564 F.3d 502, 506–07 (1st Cir. 2009) (noting that when government moves to amend order of forfeiture to include substitute assets, it is immaterial whether the property could have been forfeited directly); *United States v. Voigt*, 89 F.3d 1050, 1088 (3d Cir. 1996) (reversing forfeiture order on appeal, but noting that government is free to seek forfeiture of same property as substitute asset on remand); *United States v. Henry*, 64 F.3d 664, 1995 WL 478635, *4 (6th Cir. 1995) (Table) ("[T]he jury verdict indicating that the [property] should not be forfeited does not prevent the forfeiture of the property as a substitute asset. . . . [T]he very nature of a substitute asset requires that it is not property which is directly forfeitable.").[4] In such circumstances, the only way that the restrained property would not be subject to forfeiture would be if it were both (a) not derived from the offense and (b) not owned by the defendant, but instead by a third party. The United States submits that neither of these criteria can be satisfied.

---

[4]      The Eighth Circuit recently reached what might at first blush appear to be an inconsistent result in *United States v. Gregoire*, 638 F.3d 962 (8th Cir. 2011). In that case, the court held that, when the government dismisses certain items from a forfeiture allegation to avoid submitting them to the jury, the value of those assets cannot be included as part of a money judgment because they were not made unavailable by virtue of an act of the defendant. *Id.* at 972 (citing 21 U.S.C. § 853(p)). The problem in *Gregoire*, however, is that the government was essentially trying to substitute directly forfeitable property *for itself*. In this case, if the government is unable to prove that a particular asset can be adequately traced to the defendant's conduct, that finding will very nearly establish that at least one of the section 853(p) factors is met, permitting the forfeiture as a substitute asset to proceed.

Moreover, a defendant lacks standing to contest the forfeiture of property in which he does not claim an ownership interest. *See United States v. Wittig*, 2006 WL 13158, *3 (D. Kan. 2006) (noting that defendant's argument that forfeited property does not belong to him "is premature and not his to make;" "a defendant does not have standing to object to forfeiture on the grounds that a third party owns the property"); *United States v. Schlesinger*, 396 F. Supp. 2d 267, 273 (E.D.N.Y. 2005) (holding that defendants cannot object that property did not belong to them because extent of the defendants' interest in property and any other party's interest is deferred to ancillary proceeding); *see also United States v. Saccoccia*, 62 F. Supp. 2d 539, 541 (D.R.I. 1999) (noting that defendant lacks standing to object to forfeiture of property as substitute asset on ground that it does not belong to him).

If, however, Sigillito continues to dispute that the property to be forfeited is traceable to proceeds of the offense, he has a right to a jury under Federal Rule of Criminal Procedure 32.2(b)(5). In such a case, it will be necessary to introduce additional evidence to the jury to establish the forfeitability of the alleged items. To establish the forfeitability of the property, the United States need not put forth proof beyond a reasonable doubt; rather, it must merely prove that is more likely than not that the asset was acquired with proceeds of the underlying offense—i.e., the preponderance of the evidence must support that conclusion. *United States v. Keene*, 341 F.3d 78, 85–86 (1st Cir. 2003). At this time, the United States believes that the testimony of CFI Appelbaum will be adequate to meet this purpose. The government will use a combination of direct evidence of tracing and circumstantial evidence relating to date of

acquisition and lack of legitimate income to establish the forfeitability of the property for the

jury. The United States expects such a proceeding would take less than a day.

Dated: March 12, 2012                    Respectfully submitted,

                                         ERIC H. HOLDER, JR.
                                         United States Attorney General

                                         BETH PHILLIPS
                                         United States Attorney
                                         WESTERN DISTRICT OF MISSOURI

                                          s/ Jess E. Michaelsen
                                         JESS E. MICHAELSEN, #52253
                                         Special Attorney to the United States Attorney General
                                         Charles Evans Whittaker Courthouse
                                         400 East Ninth Street, Fifth Floor
                                         Kansas City, Missouri  64106
                                         Telephone:  (816) 426-3122

                                          s/ Steven E. Holtshouser
                                         STEVEN E. HOLTSHOUSER, #24277
                                         Special Attorney to the United States Attorney General
                                         111  South 10th Street, Room 20.333
                                         St. Louis, Missouri  63102
                                         Telephone:  (314) 539-2200

                                          s/ Richard E. Finneran
                                         RICHARD E. FINNERAN, #60768
                                         Special Attorney to the United States Attorney General
                                         111  South 10th Street, Room 20.333
                                         St. Louis, Missouri  63102
                                         Telephone:  (314) 539-2200

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on March 12, 2012, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all counsel of record.

                      *s/ Richard E. Finneran*