UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 4:11-CR168 LRR |
| ) | |
| MARTIN T. SIGILLITO, ) | |
| ) | |
| Defendant . ) | |

**GOVERNMENT'S OBJECTIONS TO DISCLOSURE PRESENTENCE
INVESTIGATION REPORT FOR DEFENDANT MARTIN T. SIGILLITO**

COMES NOW the United States of America, by and through its undersigned counsel, and files its objections to the Disclosure Presentence Investigation Report (PSR) (Doc. #298) for Defendant Sigillito as follows:

**I.  Loss Amount**

Calculating loss in a Ponzi scheme presents unique factual and legal challenges under the Sentencing Guidelines.  The Government respectfully submits that paragraph 50 of the Disclosure Presentence Investigation Report (PSR) understates the applicable loss calculation in this case, first, because it focuses incorrectly on actual instead of *intended* loss, and second, because it erroneously credits as "return of principal" payments that were in fact made for the purpose of furthering the fraudulent scheme, and which cannot be distinguished from "interest" payments in any event. The PSR also fails to appreciate the importance of the fact that many victims in the scheme rolled over their interest payments into new loans, each of which constitutes a new principal investment and should be treated as such under the Second Circuit's reasoning in *United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012).

The PSR correctly determined that the total gross amount of money obtained from victims by Sigillito as part of his fraudulent scheme and conspiracy was $56.1 million, which amount does not include any interest accrued or reinvested as of May 2010. The Government takes issue, however, with the PSR's treatment of $14 million of the $56.1 million as purported "principal" repayments to victims, resulting in a "net" figure of $42 million. For the reasons stated below, there is no factual basis for treating $14 million of the funds returned to victims as "principal" repayments as opposed to payments of interest. Moreover, all payments, whether viewed as payment of interest/gain or return of principal, were lulling payments made for the purpose of perpetuating and preventing discovery of the fraud scheme and should therefore not be credited against loss at all. Under a proper calculation of intended loss, the loss in this case is as high $75,424,569.75 and no less than $51,799,251.73, which would result in an increase in the total offense level of two points from the Probation Office's recommendation. Such an increase would not have an impact on the advisory USSG range, because the range minimum and maximum is life in either case.

The figures relied on by the U.S. Probation Office to calculate USSG loss are primarily rooted in Government Trial Exhibit 102 and its supporting worksheets. A copy of Exhibit 102, modified to delete the total amount due and owing as of May 24, 2010, was submitted as Document 298-1 in support of the Disclosure Copy of the PSR on June 27, 2012. The worksheets for each individual victim were admitted at trial as Exhibits 102A-FF. These documents represent the most complete picture of the flow of funds into and out of the BLP over the course of the years during which it operated. The analysis of each individual victim's

financial position in the BLP compares loan funds delivered to the BLP with funds received that victims received from the BLP.

These analyses do not attempt to label or characterize funds received by victims as "interest" or "principal"—nor could they reliably do so. Some victims received no payments for a period of time because they opted to let interest accrue and then renewed their one-year notes for increasingly larger principal amounts. For those victims, it is impossible to distinguish future payments as "principal" or "interest," precisely because the rolled-over investment already included illusory "interest" gain.[1] Other victims received regular payments that appeared to them to be "interest" payments (based on frequency and amount), but did so for periods long enough to exceed the total amount their initial investment. While these victims "gained" in the sense that they received more than they initially invested, to them it appeared that their principal was never repaid. Yet other victims received some lump sum payments to either catch them up on past-due interest or to respond to an actual full or partial redemption request. In some cases lenders settled or moderated their claims, resulting in yet further difficulty in distinguishing interest from principal repayments.

The evidence at trial also demonstrated that affinity and referrals were key methods by which Sigillito raised new funds to perpetuate the scheme and that closing the deal on new investments often depended on a referral from a victim who had been receiving payments as agreed. None of these payments were "interest" or "principal" repayments in the sense of

---

[1] Under the Second Circuit's reasoning in *Hsu*, these reinvestments constitute new principal amounts and should be included in the total loss calculation. *See infra* p. 7.

coming from gains paid by Smith out of profits from business operations. All payments came from other lenders.

Upon receiving the PSR, the Government asked CFI Appelbaum to conduct a supplemental examination of the data in Trial Exhibit 102 to determine how many lenders who had contributed funds to the $56.1 million total over the years were actually owed nothing at the conclusion of the scheme. Such an analysis offers the only plausible method to isolate actual principal, or "return" of funds, payments to any victim, on the conservative assumption that those repayments were not themselves meant to lull those lenders who "wanted out." Here, the Government can present evidence that there were 31 such victims and together they paid only $4,441,954.82 of the $56.1 million. This is the only amount that could even arguably be considered a "true" return of principal. The remaining 111 lenders who were still owed money at the end had paid in a total of $46,799,251.73 and were due $70,524,569.75 (not including any accrued interest that had not been reinvested). When the Metis loan funds are added, the total paid increases to $51,799,251.73 and the total due to $75,424,569.75. Thus, even this conservative method of analysis results in a loss which easily exceeds $50 million and an addition of two points for loss on top of the figure recommended in the PSR.

The question of what credit, if any, Sigillito should receive for payments made to lenders must be considered through the lens of the loss *intended* by Sigillito, taking the evidence of the scheme as a whole. Application Note 3(A) to Section 2B1.1 of the U.S. Sentencing Guidelines (USSG), states that "loss is the greater of actual loss or intended loss." Actual loss "means the reasonably foreseeable pecuniary harm that resulted from the offense." Intended loss "means the pecuniary harm that was intended to result from the offense." Application Note 3(A)(i) and (ii).

4

Loss does not include accrued interest or any money "returned" to a victim before the offense was detected. Application Note 3(D) and (E). Application Note 3(F)(iv) provides that the gain to any one victim in a Ponzi scheme should not be credited against the loss to any other victim. Several courts have held that in calculating loss, credit should normally be given for payments of principal but not interest. *See, e.g., United States v. Peugh*, 675 F.3d 736, 741 (7th Cir. 2012). Any funds spent to facilitate a fraud scheme, however, are not deductible from loss. *Id*. (citation omitted).

      To establish loss, all that is needed is a "reasonable estimate of the loss based upon a preponderance of the evidence." *United States v. Brown*, 2012 WL 2569075 (D. Minn., July 3, 2012). When considering whether to grant credit for any payments to victims, intended loss is the Court's focus. *Id*. at 8 (citations omitted). This requires an examination of a "'defendant's actual, subjective intent'" and computation of the "'maximum possible loss from the perspective of a reasonable person in the defendant's position at the time of the fraud.'" *Id.* (quoting *United States v. Staples*, 410 F.3d 484, 490 (8th Cir. 2005)). In *Brown*, investor returns were not credited because they were for the "'illegal purpose of perpetuating the scheme.'" *Id*. at 9, citation omitted.

      The Eighth Circuit addressed the very issue presented here in *United States v. Hartstein*, 500 F.3d 790 (8th Cir. 2007). The court noted the difficulty of calculating loss in an investment fraud, but rejected the value of applying a label, such as "Ponzi," to a fraud scheme in resolving such difficulties. Instead, the court also focused on the actual, subjective intent of the defendant. *Hartstein* is controlling here because of its focus on treatment of principal payments rather than interest or gains. The loss issue in *Hartstein* focused on whether to give the defendant credit for

5

repayments to victims. The court noted that other circuits did not give credit for repayments in investment fraud schemes where the repayments were intended to lure additional investments or to avoid exposure by certain victims. *Id.* at 799 (citations omitted). The Eighth Circuit in *Hartstein*, however, did not endorse a uniform rule, but chose to focus instead on "intent in each case." *Id.* Because Hartstein "borrowed money that she knew she could not repay but for the false and misplaced hope that she could perpetuate her fraud indefinitely," her subjective intent in making repayments was to "perpetuate the scheme" and the sentencing court could therefore refuse to credit any repayments. *Id.* at 800; *see also United States v. Hatchett*, 622 F.3d 984, 988 (8th Cir. 2010) (upholding refusal to grant any credit against gross receipts where district court found that defendant acted "without any intention of making the legitimate investments promised to investors" and "chose to repay his initial investors with funds from later investors in order to keep the initial investors satisfied and to attract others").

     Here, the evidence presented at trial clearly established that Sigillito's hope, if any, of repaying victims in full was false and misplaced. Any reasonable person in Sigillito's position would not have had any realistic expectation of repaying lenders' principal in full. The evidence at trial showed that Sigillito knew that the representations in the asset and liability statement were not true and that the amount owed by Smith far exceeded any minimal current asset value of any asset that Smith actually owned. The sheer amount of time that passed without the generation of any material gain by Smith was alone enough to prove that Sigillito's intent in making payments of any kind was perpetuation of, continuation of, and avoidance of discovery of the scheme and the true nature of Smith's financial condition. Each crisis was averted as it arose by obtaining new victim funds to quiet noisy victims and prevent actions against Smith or

any other borrower.  This was true, for example, in the case of W.D., who had filed an action against Smith and Sigillito found in P.R. a new lender whose funds could, without P.R.'s knowledge, be used to pay off W.D.  If permitted to occur, enforcement of statutory demands at any given time would have doomed the scheme by forcing Smith into involuntary bankruptcy and laying bare the false facade of the 2:1 asset to liability ratio claim.

In addition, regular payments to some victims helped to market the scheme to other, new investors or to cause prior lenders to lend more.  There was evidence that several lenders relied, in part, on the fact that other lenders that they knew and trusted had positive experiences with the BLP.  This and other evidence is more than sufficient for this Court to find that Sigillito's subjective intent in making repayments was to perpetuate the scheme.  The only loans which were ever repaid in full were repaid out of new lender funds and not out of any profits from Smith's operations.  As *Hartstein* also noted, loss need not be calculated with precision and must simply be a reasonable estimate of loss.  *See also United States v. Jefferson*, 652 F.3d 927, 931 (8th Cir. 2011) ("This circuit takes a broad view of what amounts can be included in calculating loss." (internal quotations omitted)).  Here, applying the "greater of actual loss or intended loss," USSG § 2B1.1, Application Note 3(A), Sigillito's subjective intent warrants that he should not be given credit for any repayments.

The fallacious distinction between "principal" and "interest" in a Ponzi scheme recently led the Second Circuit to conclude that "intended loss" in such a scheme may include any "interest" that victims *reinvest* in the scheme, even if the reinvested gains later turn out to be illusory. In *United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012), the court held that "a federal sentencing court can include as part of its 'intended loss' determination those earnings that

7

victims reinvested in a Ponzi scheme, even though those 'earnings' were invested as part of the scheme itself." *Id*. at 120-21.  The court noted that loss should not include "promised interest or return that was never received," but where an investor is told that his/her investment "*has grown*" and that the new total "is now available to be withdrawn or reinvested in the scheme" the "situation is different."  *Id*. at 121 (emphasis in original) .  Further, "[t]he choice to reinvest—an act frequently necessary to maintain the scheme itself—transforms promised interest into realized gain that can be used in the computation of loss for the purposes of federal sentencing."  *Id*.  Only the promised interest which has not yet been subjected to the choice to reinvest should be excluded from the loss calculation.[2]  *Id*.  In reaching its conclusion, the *Hsu* court noted that it was following *Hartstein*.  *Id*. at 121 n.4.

The *Hsu* court further explained the appropriateness of counting realized gain as part of intended loss, as follows:

> Victims' behavior necessarily changes in the face of the fraudulent reports of the success of their investments. That the purported proceeds from such "success" are maintained in accounts under the defendant's control, and not withdrawn by the investors, is essential to the very purpose of the Ponzi scheme. Nevertheless, when the victims are given the option of withdrawing the proceeds, and when the perpetrator induces them not to do so, but instead to reinvest the money and again put it at risk, the victims have suffered further loss. Reinvested historical gains—which, as the district court noted, were "part of a malicious effort to maintain [investors'] confidence and lure other victims"—have become part of the investors' expected gains and wealth, altering their decision-making, encouraging trust in the scheme, and thus inviting the infusions of capital that any Ponzi scheme needs to survive.

*Hsu*, 669 F.3d at 121.  The failure to count realized gains as loss in such Ponzi schemes would "fail to take into account the natural and indeed desired reactions that investors will have to Ponzi schemes as they unfold." *Id*.

---

[2] In fact, promised interest is precisely what was conservatively excluded in calculating the $70 million figure in trial Exhibit 102.

Applying the reasoning in *Hsu*, the intended loss here is not limited merely to the $56.1 million in original investments that lenders made in the BLP, but in fact comprehends any accrued interest that those lenders *reinvested* in the scheme by rolling over their loan agreements. According to Exhibit 102 admitted at trial and adding the $4.9 million due to on the Metis loan, this amount, was $75,424,569.75.  This was a conservative figure that included original principal loaned plus earned "interest" which had been reinvested or rolled over annually by lenders.  Said interest became new "principal" when it was rolled over.  The figure did not include interest accrued during the last twelve months of the scheme, because lenders had not yet received the opportunity to roll said interest over into a new principal loan amount.

For example, victim P.A. invested a total of $1.5 million in March and April of 2008.  In the spring of 2009, the loan was renewed and the "interest" was reinvested or rolled over with the new total principal amount being $1,792,500.  In the spring of 2010 it went unpaid and was reinvested and rolled over again for a new total principal amount of $2,142,031.50.  This was the amount of principal outstanding as of May 24, 2010 and included in the calculation of Exhibit 102.  The total amount reflected as outstanding did not, however, include any accrued interest from March/April 2010 through May 24, 2010, because it was not yet "due" and the lender had not yet been given the option to renew and roll over to a new, higher principal amount.  The same methodology was used throughout Exhibit 102.[3]

BLP victims who rolled over their investment like P.A. lived their lives and made decisions and choices based on the assumption that their gains were real and their new principal

---

[3] Of course, lenders who chose to receive interest rather than reinvest it and roll over to a  new principal amount were viewed as still being due only their original principal.

9

amount was safe for future uses after each roll over. The BLP's practice of offering rollover opportunities, taken by all IRA investors and many others, furthered the scheme by lulling investors into believing that their original investment plus the growth were safe and prospering. It helped Sigillito perpetuate the scheme by persuading lenders to reinvest their gains instead of taking their money elsewhere. Those decisions and choices have now had tragic consequences for many victims.  Sigillito should be held accountable for the full harm that he intended to cause the victims , and the loss calculation should therefore include such realized and rolled over gains.

Even if this Court were to conclude that there was insufficient evidence to support a finding that Sigillito intended his repayments to perpetuate the scheme, the evidence is that much more inadequate to demonstrate what portion of the $26 million paid to lenders represented return of *principal* as opposed to interest.  Yet in both the response to the Government's objections to Brown's PSR and in Sigillito's Disclosure PSR, the Probation Office, applying an *actual* as opposed to *intended* loss approach, credited approximately $14 million against the gross figure of $56.1 million on the basis that $14 million of the $26 million could somehow be attributed to return of principal.

It is entirely unclear to the Government on what basis the Probation Office was able to discern that $14 million of the $26 million was return of principal as opposed to interest, especially given the complexity of the scheme and the resulting impediments to any such accurate calculation.  In truth and fact, *none* of the payments were genuine payments of interest or return of principal.  No funds came back from England to lenders.  There were no revenues or profits generated by Smith's projects during the BLP to fund such payments.  The only source of repayment funds was new investor funds.

Nor do the amounts and patterns of repayments shed any clearer light on whether a payment was intended to be a pseudo-interest payment or a pseudo-principal payment. Many investors who had opted to receive interest ceased receiving funds periodically. Subsequently, they sometimes received lump payments intended to pacify them and prevent them from taking action against Smith. Thus, in looking at actual payments, one cannot discern from the amount or frequency of the payments themselves whether they were intended to give the appearance of interest or return of principal. This is the flaw of reaching any conclusion about the nature of any of the payments to lenders. Thus, even under an actual loss analysis, the evidence reasonably supports a finding that none of the repayments was a repayment of principal and that the full amount of receipts obtained from lenders represents a correct estimate of actual loss.

## II.     Obstruction of Justice for Perjurious Trial Testimony

The Total Offense Level should be enhanced by two points for obstruction of justice pursuant to U.S. Sentencing Guideline Section 3C1.1 based on Sigillito's perjured trial testimony. Section 3C1.1 applies to a defendant's trial testimony if the Court is convinced that a defendant testified falsely under oath in regard to a material matter and did so willfully rather than out of confusion or mistake. *United States v. Mabie*, 663 F.3d 322, 334 (8th Cir. 2011). As with other Guideline enhancements, the District Court need only be convinced of the basis for the enhancement by a preponderance of the evidence. *United States v. Wisecarver*, 644 F.3d 764, 773 (8th Cir. 2011). The finding must be based on the Court's own evaluation of the relevant evidence and not simply the jury's verdict rejecting a defendant's exculpatory testimony. *United States v. Yarrington*, 634 F.3d 440, 452 (8th Cir. 2011); *see also United States v. Abdul-Aziz*, 486 F.3d 471,479 (8th Cir. 2007). This Court's finding that the

enhancement applied was upheld by the Eighth Circuit in *United States v. Whiting*, 522 F.3d 845 (8th Cir. 2008). In *Whiting*, at sentencing, this Court made specific reference to the specific components of the defendant's testimony which were found to be knowingly untruthful.

Here, the Government does not have the benefit of a transcript of defendant's testimony, which testimony was voluminous and covered several days of trial. Sigillito's testimony was perjurious in many respects, but several highlights are sufficient to support a finding that Section 3C1.1 applies to warrant a two-level enhancement. Primarily, Sigillito lied about several key components of his fraudulent representations to potential lenders which induced them to make loans. His false testimony can be broken down into two main categories: testimony concerning the purpose of the loans, and testimony concerning the risk of the loans

    A.    **Purpose:**

Victims testified that they were told by Sigillito and believed that their funds would be delivered to the borrower and used by the borrower for several project-specific purposes. *See, e.g.*, Trial Exhibit 2565 (C.D. marketing materials). Sigillito relied on paragraph 3 in some of the loan agreements to support his claim that the loan agreement permitted the funds to be used for any purpose including maintenance of the Ponzi aspects of the loan funds. Even if Sigillito believed that paragraph 3 could be interpreted to authorize the actual use of the funds, Sigillito knew that it did not permit him to lie to lenders about how the funds were going to be used at a time when he was already using them in a manner contrary to his claims. More importantly, Sigillito falsely testified that he did not tell lenders that their funds would be delivered to the borrower in England for the borrower's use in purchasing and developing real estate opportunities. Instead, Sigillito testified that it was merely an "oversight" on his part that he

failed to advise them that their funds were not going to England.  Numerous lenders testified to clear contrary recollections of specific representations by Sigillito as to what the loan funds were going to be used for and that had they known the truth they would not have lent any funds to Smith.  The fact that Sigillito's testimony was knowingly false on this point was also shown by the efforts to conceal from lenders the source of funds used to make interest or other payments to lenders.  The e-mail and oral discussions about delays in payment being due to funds being received by Smith's bank to be followed by transfer of said funds to Sigillito's bank would be nonsensical had Sigillito not falsely made it clear to lenders that their money was being delivered by Sigillito to Smith and that Smith was the conduit for payments of any funds to lenders.  *See* Trial Exhibit 118 (BLP Financial Summary 2003-2010).

### B. Risk:

#### 1. Fees:

Sigillito falsely testified that he had neither misrepresented nor actively concealed the existence, size and frequency of "fees" taken by him and others involved in the BLP.  Again, most lenders were told that the loans did not involve any fee.  The nonexistence of fees was clearly represented in written marketing materials.  *See* Trial Exhibit 2565.  Several were led by Sigillito to believe that his only gain was in the form of a better interest rate on his own loans to Smith.  M.O. recalled in vivid detail an encounter at the Racquet Club in which Sigillito actually sought an endorsement from M.O. to another club member that he, Sigillito, was not "getting anything" for his efforts to invest T.O.'s, N.O.'s, and M.O.'s funds with Smith.

### 2. Consultation with Counsel:

Sigillito testified in his defense that he had disclosed every material fact about the BLP to his attorney James Dankenbring and that he relied on Dankenbring's apparent approval of Sigillito's BLP business. This testimony was demonstrably false. Sigillito could not have disclosed to Dankenbring that there had been prior defaults by Smith and other borrowers yet represent in marketing materials and statements to prospective lenders that there had never been a default in the BLP. Even though several of Sigillito's communications with Dankenbring were documented in writing, there was nothing to document the disclosure by Sigillito of the salient features of the BLP, namely the misrepresentations to new lenders about the fact that their funds would be used to pay prior lenders rather than to fund new acquisitions by Smith. Sigillito's testimony was also contradicted by the content of Dankenbring's last opinion letter, which expressly stated that it was premised on the assumption that Sigillito was following all of the advice previously given which included full disclosure of any and all fees. *See* Trial Exhibits MS-14 and 2556. Such disclosure, of course, was not occurring. A related, but separate, subject of false testimony was Sigillito's claim that he had received an oral opinion from Dankenbring that Sigillito did not need to disclose facts about fees to lenders.

### 3. Asset and Liability Statements:

Sigillito's testimony concerning the Asset and Liability statements was false in several respects. First, Sigillito incredulously claimed that he was unaware that Smith's debt had even reached the $26 million level, because it "escaped my attention because I was busy on other things and delegated too much authority to [E.S.]." This was credibly contradicted by E.S.'s testimony that the spreadsheets periodically prepared by her were given to and sought by

Sigillito, especially those used to convince Smith to continue to sign loan documents despite his own concerns about his "ongoing solvency" and ability to repay the loans. *See* Trial Exhibits 3365, 3373, 1925, 3378, and 733 (loan balance summaries and summaries distinguishing between "long" and "short" term loans). Sigillito's claim was also contradicted by his own involvement in representing the extent of Smith's debt to Eacotts in connection with the U.K. tax investigation of Smith. E.S. testified credibly as to the fraudulent manner in which Sigillito came up with the figure of $26 million for Eacotts in Trial Exhibit 1370, which not coincidentally was the same false figure he provided to P.V. in August 2009.

Second, Sigillito had to have known that the amount of Smith's debt was actually far greater than $26 million, given the size of the loans that he alone was recruiting from lenders in 2009 and 2010. *See* Trial Exhibit 107 (summary of spreadsheets in Sigillito office). Sigillito's actual knowledge of the total debt was established by what he did not say to FBI SA Kevin Cosentino during the interview on May 24, 2010 when asked how an influx of $5 million was going to pay off $50 million. Sigillito did not say that SA Cosentino was mistaken and the amount outstanding was far less than $50 million.

Third, Sigillito falsely testified that he had not "looked carefully at" the asset and liability statements. He denied doing so to distance himself from knowledge that the 2:1 ratio was never being maintained. Sigillito told the jury that he passed the asset and liability statements to lenders in "good faith." Given Derek Smith's credible and documented testimony concerning Sigillito's role in editing the asset/liability statements and discussing with Smith the need to increase the value of the claimed assets, he clearly was aware that the statements were false in that Smith's assets did not have the value claimed and the liabilities were far greater than

15

claimed. *See* Trial Exhibits 307 and 1377 (describing revisions to asset/liability statements). Sigillito also knew how much was owed to him in fees. *See* Trial Exhibits 2483, 3359 and 3373.

### 4. R.B. Report:

Sigillito also testified falsely concerning the contents of the so-called "R.B. report," which was nothing more than a set of marketing materials summarizing Sigillito's oral representations. *See* Trial Exhibit 1368. Said materials were both edited and endorsed by Sigillito as true. Just one of the controversial parts of the report was the claim, repeated multiple times in the body of the materials, that the loans to Smith were safe not only due the 2:1 asset to liability ratio but also due to the claim that income from Little Farm Nursery and the Hinton Grange Hotel were together sufficient to cover Smith's "cost of carry." Sigillito did not deny that he knew that Little Farm Nursery was not an income-producing property, but he claimed that the inclusion of the misrepresentation in the report was an "error" that he failed to "catch." The claim concerning the income generated by both properties was so prominently featured in the materials and mentioned so many times therein that Sigillito could not have overlooked it.

### 5. P.R.'s Counsel:

At one point in his testimony, Sigillito was being question about the nature of his dealings with P.R. In connection with the Metis loan, the fees taken by Sigillito and Brown off the Metis loan were not fully disclosed to P.R., and Sigillito had an apparent conflict of interest. The questioning concerned how Sigillito could act as P.R.'s attorney on the Smith loans but at the same time be both a lender to Smith and a representative of Smith in his dealings with lenders. Rather than admit the obvious conflict, Sigillito falsely testified that he was not P.R.'s attorney in connection with the Smith or Metis loans and had made that clear to P.R. P.R., of

16

course, clearly and credibly testified that Sigillito was his attorney in connection with anything having to do with the investment of his funds. E-mail communications between Sigillito, P.R. and Sebastian Rucci corroborate the nature of the relationship. Sigillito's testimony was a clear fabrication.

### 6.     Misrepresentations to Lenders:

Finally, Sigillito concluded his testimony by claiming that he did not intentionally mislead a lender or omit a material fact. All of the credible evidence which preceded his testimony established that said testimony was knowingly false. For example: Sigillito denied telling P.F. that the BLP was a "top secret" loan program that should not be discussed with anyone else; Sigillito denied the false representations to K.W. in March, 2009, at a time when Metis had already defaulted, that she should invest in a financially healthy Turkish company that was clearly Metis and was clearly intended to remove P.R. as a Metis lender by selling the debt to K.W. and then using the proceeds to assist Smith; Sigillito denied the false representations to S.C. about Smith's money flow and the reasons for delay in Smith's payments; and Sigillito's false testimony that he learned a lot about the truth of the BLP from P.V. Although the Government, with the benefit of a transcript, could likely identify numerous other aspects of Sigillito testimony that warrant the Section 3C1.1 enhancement, the ones mentioned above are more than sufficient to support the enhancement. Therefore, two additional points should be assessed for obstruction of justice.

Wherefore, the Government respectfully requests that its objections to the PSR be sustained and that Sigillito's total offense level be increased by a total of 4 levels for a total offense level of 47.

        Respectfully submitted,

        ERIC H. HOLDER, JR.
        United States Attorney General

        DAVE KETCHMARK
        Acting United States Attorney
        WESTERN DISTRICT OF MISSOURI


        *s/ Jess E. Michaelsen*
        JESS E. MICHAELSEN, #52253
        Special Attorney to the United States Attorney General

        *s/ Steven E. Holtshouser*
        STEVEN E. HOLTSHOUSER, #33531
        Special Attorney to the United States Attorney General

        *s/ Richard E. Finneran*
        RICHARD E. FINNERAN, #60768
        Special Attorney to the United States Attorney General

**CERTIFICATE OF SERVICE**

      I hereby certify that on July 25, 2012, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon the following:

**Douglas P. Roller**
dprcrimlaw@aol.com

        *s/ Jess E. Michaelsen*
        JESS E. MICHAELSEN, #52253
        Special Attorney to the United States Attorney General
        Charles Evans Whittaker Courthouse
        400 East Ninth Street, Fifth Floor
        Kansas City, Missouri  64106

        *s/ Steven E. Holtshouser*
        STEVEN E. HOLTSHOUSER, #33531
        Special Attorney to the United States Attorney General
        111  South 10th Street, Room 20.333
        St. Louis, Missouri  63102

        *s/ Richard E. Finneran*
        RICHARD E. FINNERAN, #60768
        Special Attorney to the United States Attorney General
        111  South 10th Street, Room 20.333
        St. Louis, Missouri  63102