UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:11-CR168 LRR |
| | ) | |
| MARTIN T. SIGILLITO, | ) | |
| | ) | |
| Defendant . | ) | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

COMES NOW the United States of America, by and through its undersigned counsel, and files this Sentencing Memorandum in response to this Court's Order (Doc. 341), as follows:

**A. Introduction**:

Upon receipt of the Disclosure Copy of the Pre-Sentence Report, the Government and Sigillito filed objections to the report and thereafter the parties separately responded. Thereafter, the Final Pre-Sentence Report (PSR) was received which contained the U.S. Probation Officer's (USPO) recommendation as to each objection. Rather than require the Court to refer to multiple pleadings, the Government will set forth its position with respect to each objection as impacted by the USPO's recommended resolution. In this pleading the Government will first address the objections to the PSR, most of which remain in dispute. The Government will refer to the issue numbering system established by the USPO at page 1 of the Addendum to the PSR and cross-reference the objection number used by the PSR. Second, the Government will address the application of Section 3553(a) sentencing factors and suggest a sentence that is just and warranted by the facts and circumstances.

The parties have conferred about the issues which warrant resolution by the Court.  Based on Sigillito's representations to the Government, through counsel, resolution of the group of factual objections referred to as "Objection No. 1" is not necessary and is not being requested by the parties.  Resolution of these factual disputes does not impact the advisory guidelines calculation.  The Government's position with respect to those disputes, however, can be found at pages 1–18 of Doc. 332, "Government's Response to Defendant's Objections to Draft PSR."

The following are the issues that remain in dispute and require resolution by the Court:

1. Loss amount

2. Obstruction of Justice

3. Number of Victims

4. Substantial Part of the Offense Committed Outside the U.S.

5. Vulnerable Victims

6. Abuse of Position of Trust

7. Aggravating Role

8. Availability of Consecutive Terms of Imprisonment

There is no dispute as to the amount of restitution.  In connection with resolution of these Sentencing Guideline issues, the Government may the following witnesses and exhibits, exclusive of evidence admitted at trial and victim impact statements offered during allocution, at the sentencing hearing:

    **1.**  **Witnesses**:

        a. FBI Forfeiture Contract Investigator (and former Special Agent) James Appelbaum

2

    **2.** **Exhibits**:

        a. Government Sentencing Exhibit 1 – BLP Lender Summary Main, Ex. 102 at trial

        b. Government Sentencing Exhibit 2 – Summary calculations of lenders owed nothing as of May, 2010

        c. Government Sentencing Exhibit 3 – Summary loss calculation

        d. Transcript of Martin T. Sigillito's Trial Testimony

**B.** **Summary of Government's USSG Calculations and Advisory Guidelines Range**:

Under the U.S. Sentencing Guidelines, life is the minimum and the maximum range for any Total Offense Level of 43 or above.   The PSR recommended a USSG Total Offense Level of 45, but 43 is the highest level.  If the Government's position on loss calculation is accepted, the Total Offense Level would be 47, still resulting in a Total Offense Level of 43 and an advisory range of life.  However, the Government notes that life is not an available sentence under any of the offenses here, each of which carries a maximum term of years.  Thus, it is the Government's position that this Court may sentence Sigillito to any term of years achieved by a imposing a maximum sentence on each count and running each consecutive to each other.  Here, the total possible sentence is 325 years.

The only Government objection to the PSR concerns the loss amount.  If the Government's objection is sustained, the Total Offense Level would be 47 rather than 45, but the highest Guideline number is 43, still resulting in an advisory range of life to life.  Even though an increase of 2 levels for loss would not impact the advisory USSG range, the Court's resolution of Sigillito's objections is unknown as is the result of appellate review.  Therefore, the Government respectfully requests this Court to determine the loss issues presented here.

3

**C.  Government's Sentencing Recommendation**:

Here, the advisory Guidelines recommend a sentence of life imprisonment.  Statutorily, 325 years is the maximum sentence available to the Court assuming Sigillito were sentenced to the maximum on each count and each sentence were run consecutive to the others.  Because life is not statutorily available sentence under any count of conviction, the Guidelines instruct the court to impose consecutive sentences as necessary to ensure that the defendant receives what is effectively a life sentence. *See* U.S.S.G. § 5G1.2. A court is given wide latitude in determining how many years is sufficient to ensure an effective life sentence. *See United States v. Demeyer*, 665 F.3d 1374, 1375 (8th Cir. 2012) (affirming imposition of 120-year sentence: "[I]t is not for us to micro-manage how the district court exercised its discretion to impose concurrent or consecutive sentences for the multiple counts of conviction in order to ensure that [the defendant] would in fact serve a life sentence. . . . 'The absurdity of a 750 year sentence, or even a 10,000 year sentence, should not detract from the gravity of [the defendant's] crimes.'" (quoting *United States v. Betcher*, 534 F.3d 820, 828 (8th Cir. 2008)). Where the advisory guideline sentence is above the statutory maximum, imposition of the statutory maximum sentence is presumed reasonable. *United States v. Zauner*, 688 F.3d 426 (8th Cir. 2012) (citing *United States v. Lazarski*, 560 F.3d 731, 733 (8th Cir.2009)); *see also United States v. Heggebo*, 416 Fed. Appx. 575, 576 (8th Cir. 2011) (affirming this Court's imposition of 480-month sentence to achieve life imprisonment).  This Court also imposed a statutory maximum sentence of 720 months (60 years) in a case where, as here and as proposed by the Government, the actual USSG Total Offense Level was 47 and the Guidelines therefore recommended a life sentence. *See United States v. Starr*, 533 F.3d 985, 1003 (8th Cir. 2008).

In accordance with the recommendation of the Guidelines, the Government recommends a

sentence that achieves an effective term of life in prison.  The Government respectfully suggests that in this case an effective life sentence would be satisfied by a sentence of at least 50 years.  However, given the magnitude of the losses, the impact on the victims and the relatively historic nature of the scheme in this district and state, a sentence to the maximum allowed, 325 years, would provide a powerful deterrent to others contemplating similar conduct while at the same time still achieving an effective life sentence.  Regardless of the sentence is imposed, the Government requests this Court to make a record on whether the Court's sentence would be the same irrespective of the resolution of the parties' objections to the PSR.

### D.  U.S. Sentencing Guidelines Issues:

#### 1.  Objections 2 and 3: Loss Amount

##### a.  Summary of Government's Position:

The Government respectfully submits that paragraph 50 of the PSR understates the applicable loss calculation in this case for two reasons.  First, the PSR incorrectly calculates actual loss by erroneously crediting $14 million worth of payments as "return of principal," when in fact most sums repaid to lenders cannot be characterized as interest or principal.  For actual loss purposes, the only amount that can credibly be characterized as return of "principal" is $4,441,954.82.  The effect of the error is to give Sigillito credit for payments that were, in fact, interest or made for the sole purpose of furthering the fraudulent scheme.  An accurate estimate of actual loss is at least **$51,799,251.73**, which gives Sigillito credit only for payments to lenders who were not owed anything on May 24, 2010.  But, an accurate estimate of intended loss was **$75,424,569.75**.  Both figures require an addition of 24 levels for loss rather than 22.

Second, the PSR failed to appreciate the unique structure of this Ponzi scheme and its significance for determining intended loss. The BLP utilized a system of accruing interest

annually and offering lenders the option to redeem their principal and interest or to reinvest both into a new loan.  Various features of Sigillito's fraudulent marketing were designed to perpetuate the scheme without detection by lulling lenders into frequently choosing the "rollover" option. Each rollover created a new principal amount just as if it were an original receipt of cash influx. By May 2010, the amount of outstanding "principal" was $70,524,569.75, and this was the amount Sigillito intended lenders to lose when the BLP inevitably collapsed.  It is important to point out that this figure does <u>not</u> include interest accrued but unpaid, whether due in the form of cash or new principal rollover, between the start date of each unpaid loan and May, 2010.  The primary authority for this approach is *United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012), and the Government has not found any Eighth Circuit which comes closer to the significant facts here. The Government will elaborate on these points, as well as address the points which Sigillito will raise, *infra*.

### b. <u>Legal Principles</u>:

Pursuant to application Note 3(A) to Section 2B1.1 of the U.S. Sentencing Guidelines (USSG), "loss is the greater of actual loss or intended loss."  Actual loss "means the reasonably foreseeable pecuniary harm that resulted from the offense."  Intended loss "means the pecuniary harm that was intended to result from the offense."  Application Note 3(A)(i) and (ii).  Loss does not include accrued interest or any money "returned" to a victim before the offense was detected. Application Note 3(D) and (E).  Application Note 3(F)(iv) provides that the gain to any one victim in a Ponzi scheme should not be credited against the loss to any other victim. Several courts have held that in calculating loss, credit should normally be given for payments of *principal* but not *interest*.  *See, e.g.*, *United States v. Peugh*, 675 F.3d 736, 741 (7th Cir. 2012). Any funds spent to facilitate a fraud scheme, however, are not deductible from loss.  *Id.* (citation

6

omitted).

To establish loss, all that is needed is a "reasonable estimate of the loss based upon a preponderance of the evidence." *United States v. Brown*, 2012 WL 2569075 (D. Minn., July 3, 2012); *see also*, *United States v. Jefferson*, 652 F.3d 927, 931 (8th Cir. 2011) ("This circuit takes a broad view of what amounts can be included in calculating loss." (internal quotations omitted)); *United States v. Hartstein*, 500 F.3d 790, 795 (8th Cir. 2007) (noting that loss need not be calculated with precision and must simply be a reasonable estimate of loss). When considering whether to grant credit for any payments to victims, intended loss is the Court's focus. *Id*. at 8 (citations omitted). This requires an examination of a "'defendant's actual, subjective intent'" and computation of the "'maximum possible loss from the perspective of a reasonable person in the defendant's position at the time of the fraud.'" *Id*. (quoting *United States v. Staples*, 410 F.3d 484, 490 (8th Cir. 2005)). In *Brown*, investor returns were not credited, because they were for the "illegal purpose of perpetuating the scheme." 2012 WL 2569075 at 9 (citations omitted).

The Eighth Circuit addressed applying these principles to a Ponzi scheme in *Hartstein*. The Court noted the difficulty of calculating loss in an investment fraud, but rejected the value of applying a label, such as "Ponzi," to a fraud scheme in resolving such difficulties. Instead, the court also focused on the actual, subjective intent of the defendant. *Hartstein* also considered the treatment of principal payments rather than interest or gains. The loss issue in *Hartstein* was whether to give the defendant credit for repayments to victims. The court noted that other circuits did not give credit for repayments in investment fraud schemes where the repayments were intended to lure additional investments or to avoid exposure by certain victims. *Id*. at 799 (citations omitted). The Eighth Circuit in *Hartstein*, however, declined to endorse a uniform

rule, but chose to focus instead on "intent in each case." *Id*.  Because Hartstein "borrowed money that she knew she could not repay but for the false and misplaced hope that she could perpetuate her fraud indefinitely," her subjective intent in making repayments was to "perpetuate the scheme" and the sentencing court could therefore refuse to credit any repayments. *Id*. at 800; *see also United States v. Hatchett*, 622 F.3d 984, 988 (8th Cir. 2010) (upholding refusal to grant any credit against gross receipts where district court found that defendant acted "without any intention of making the legitimate investments promised to investors" and "chose to repay his initial investors with funds from later investors in order to keep the initial investors satisfied and to attract others").

Determining intended loss in the context of a Ponzi scheme also requires determination of how to treat repayments and the distinction between "principal" and "interest."  The Second Circuit recently concluded that "intended loss" in Ponzi a scheme may include any "interest" that victims *reinvest* in the scheme, even if the reinvested gains later turn out to be illusory.  In *United States v. Hsu*, 669 F.3d 112 (2d Cir. 2012), the Court held that "a federal sentencing court *can include* as part of its 'intended loss' determination those earnings that victims reinvested in a Ponzi scheme, even though those 'earnings' were invested as part of the scheme itself." *Id*. at 120–21 (emphasis added).  The court noted that loss should not include "promised interest or return that was never received," but where an investor is told that his/her investment "has grown" and that the new total "is now available to be withdrawn or reinvested in the scheme" the "situation is different." *Id*. at 121.  Further, "[t]he choice to reinvest—an act frequently necessary to maintain the scheme itself—*transforms promised interest into realized gain* that can be used in the computation of loss for the purposes of federal sentencing." *Id*. (emphasis added).  Only the promised interest which has not yet been subjected to the choice to reinvest should be

8

excluded from the loss calculation. *Id.* In reaching its conclusion, the *Hsu* court stated that it was following *Hartstein*. *Id.* at 121 n.4.

The *Hsu* court further explained the appropriateness of counting realized gain as part of intended loss, as follows:

> Victims' behavior necessarily changes in the face of the fraudulent reports of the success of their investments. That the purported proceeds from such "success" are maintained in accounts under the defendant's control, and not withdrawn by the investors, is essential to the very purpose of the Ponzi scheme. Nevertheless, when the victims are given the option of withdrawing the proceeds, and when the perpetrator induces them not to do so, but instead to reinvest the money and again put it at risk, the victims have suffered further loss. Reinvested historical gains—which, as the district court noted, were "part of a malicious effort to maintain [investors'] confidence and lure other victims"—have become part of the investors' expected gains and wealth, altering their decision-making, encouraging trust in the scheme, and thus inviting the infusions of capital that any Ponzi scheme needs to survive.

*Hsu*, 669 F.3d at 121. The failure to count realized gains as loss in such Ponzi schemes would "fail to take into account the natural and indeed desired reactions that investors will have to Ponzi schemes as they unfold." *Id.*

### c. **Application**:

The PSR determined loss to be approximately $42 million resulting in a 22-level increase in the Total Offense Level pursuant to USSG §2B1.1(b)(1)(L). The PSR arrived at this figure by starting with $56.1 million, the total of BLP and Metis receipts, and then subtracting or crediting $14 million, which the PSR claimed was "repayment of principal." The Government objects to this calculation and respectfully submits that the loss amount is $70,524, 569.75, resulting in a 24-level increase pursuant to USSG §2B1.1(b)(1)(M).

### i. **Actual Loss**:

The PSR correctly determined that the total gross amount of money obtained from victims by Sigillito as part of his fraudulent scheme and conspiracy was $56.1 million. This

figure can be found on the BLP Lender Summary – Main version in the PSR Appendix.  It consisted of $51,241,206.55 in strict BLP receipts and $4.9 million in Metis receipts.  However, this summary is not Exhibit 102 which was introduced at trial.  The worksheets for each individual victim were admitted at trial as Exhibits 102A-FF. These documents represented the most complete picture of the flow of funds into and out of the BLP over the course of the years during which it operated.  The analysis of each individual victim's financial position in the BLP compares loan funds delivered to the BLP with funds received that victims received from the BLP.  The PSR version of Trial Ex. 102 was supplied to the USPO for use in connection with determining *restitution*, not loss.  The "net gain and loss" column was not permitted by the Court to be admitted at trial and that is why it was omitted from Trial Ex. 102.  The Government did supply Ex. 102 to the USPO, but it is not attached as an Appendix to the final PSR.

However, for the purpose of calculating USSG loss, Trial Ex. 102 has limited utility.  Trial Ex. 102 calculated the total principal and interest due as of May 24, 2010, but the column titled "Principal and Interest Due" obscures the critical distinction for USSG loss analysis between original principal and rolled over "interest."  From a loss standpoint the column title should be simply "Principal Due."   This is because rolled over "interest", when added to original principal, produced a new *principal* amount reflected by each of the most recent loan agreements.  Most loan agreements outstanding as of May 24, 2012, included such rolled over "interest."  The actual loan agreements seen by the lenders made no distinction between original principal and "interest" reinvested ("rolled over") for years.

In connection with calculating actual loss, the Government takes issue with the PSR's treatment of $14 million of the $56.1 million as purported "principal" repayments to victims, resulting in a "net" figure of $42 million.  The problem is that there is no credible basis for

treating $14 million of the funds returned to victims as "principal" repayments as opposed to payments of interest.

It is entirely unclear to the Government on what basis the Probation Office was able to discern that $14 million of the $26 million was return of principal as opposed to interest, especially given the complexity of the scheme and the resulting impediments to any such accurate calculation.  In truth and fact, none of the payments were genuine payments of interest or return of principal.  No funds came back from England to lenders.  There were no revenues or profits generated by Smith's projects during the BLP to fund such payments.  The only source of repayment funds was new investor funds.

Nor do the amounts and patterns of repayments shed any clearer light on whether a payment was intended to be a pseudo-interest payment or a pseudo-principal payment.  Many investors who had opted to receive interest ceased receiving funds periodically.  Subsequently, they sometimes received lump payments intended to pacify them and prevent them from taking action against Smith. Thus, in looking at actual payments, one cannot discern from the amount or frequency of the payments themselves whether they were intended to give the appearance of interest or return of principal.  This is the flaw of reaching any conclusion about the nature of any of the payments to lenders.  Thus, even under an actual loss analysis, the evidence reasonably supports a finding that none of the repayments was a repayment of principal and that the full amount of receipts obtained from lenders represents a correct estimate of actual loss.

FBI CFI James Appelbaum will further explain the reality of the limited inferences which can legitimately be drawn from the pattern of payments made to lenders.  Further, he will explain the extent to which any repayments can credibly be viewed as return of principal.  He was asked to identify the lenders who were owed nothing as of May 24, 2010.  As to these lenders, it can be

concluded that regardless of the nature of the payments they received, they were repaid all that

they were due.  There were 31 such victims and together they accounted for only $4,441,954.82

of the $56.1 million in initial receipts.  This is the only amount that could even arguably be

considered a return of principal.  The remaining 111 BLP lenders who were still owed money at

the end had paid in a total of $46,799,251.73 and were due $70,524,569.75 (not including any

accrued interest that had not been reinvested).  When the Metis loan funds are added, the total

actual loss increases to $51,799,251.73.  Thus, even this conservative method of analysis results

in a loss which easily exceeds $50 million and an addition of two points for loss on top of the

figure recommended in the PSR.

This assessment accepts the proposition that Sigillito should receive credit for returns of

principal, even if such returns were intended to further and perpetuate the fraud scheme.  Thus,

actual loss was at least $51,799,251.73.  This results in an addition of 24 levels rather than the 22

recommended by the PSR.

Trial Ex. 102 did not distinguish funds received by victims as "interest" or "principal"—

nor could it reliably do so.  Most victims had their funds in IRA's and were not receiving any

payments.  Both IRA and non-IRA lenders elected to roll over, or reinvest, their principal and

interest due annually.  New loan agreements were issued reflecting an increased principal

amount.  Some victims who opted to receive interest payments received fractional and/or

irregular payments.  At times, victim payments were essentially being "triaged."  The most

valuable or "loudest" victims were paid first.  Other victims received regular payments that

appeared to them to be "interest" payments (based on frequency and amount), but did so for

periods long enough to exceed the total amount their initial investment.  While these victims

"gained" in the sense that they received more than they initially invested, to them it appeared that

their principal was never repaid.  Yet other victims received some lump sum payments to either catch them up on past-due interest or to respond to an actual full or partial redemption request. In some cases lenders settled or moderated their claims, resulting in yet further difficulty in distinguishing interest from principal repayments.

The evidence at trial also demonstrated that affinity and referrals were key methods by which Sigillito raised new funds to perpetuate the scheme and that closing the deal on new investments often depended on a referral from a victim who had been receiving payments as agreed.  None of these payments were "interest" or "principal" repayments in the sense of coming from gains paid by Smith out of profits from business operations.  All payments came from other lenders.

The PSR responds to the Government's actual loss position by suggesting that, given the difficulty in distinguishing principal from interest in the repayments, a "conservative analysis of loss in this case would be the amount of the principal balance lost by each of the 96 lenders" who were owed money as of May 24, 2012.  Aside from the fact that this analysis legitimizes Sigillito's loan rollover feature and ignores the realities of the scheme from the lenders' point of view, as discussed *infra*, this approach is gives Sigillito credit for *all* repayments, whether they were interest or principal.  The USPO apparently arrived at$34,627,714.31 by subtracting $25,834,035.49 (the total amount of all repayments) from $56,141,206.55 (the total amount of *initial* receipts).  This approach is not supported by any legal authority and is contrary to the USSG Section2B1.1, commentary note 3(D) and (E) and *Peugh*, because this approach clearly gives Sigillito credit for non-principal repayments.

Another problem with the PSR approach is that it has the effect of offsetting the loss to some lenders by the gain to others.  Wood Dickinson, for example lent $2.6 million in various

amounts starting in 2002, but was paid a total of $4.6 million by 2007 and was owed nothing as of May 24, 2010.  The excess $2 million that he received is included in the   This clearly violates USSG §2B1.1, Application Note 3(F)(iv).

Sigillito's version of actual loss essentially requests that loss be equal to restitution.  The effect of equating the two would give Sigillito credit for *every* dollar returned to any lender who suffered a final net loss.  For restitution purposes, victims have to accept credit for interest as well as principal payments.  But, as Application Note 3(D)(i) to USSG §2B1.1 makes clear, Sigillito is not entitled to credit for interest in an actual loss calculation.  In Ponzi cases, as here, interest payments made with other lenders' funds are merely lulling payments that perpetuate the scheme.

Sigillito claims six other credits in determining actual loss which do not deserve extensive discussion.  First, Sigillito claims credit for $5.4 million allegedly sent to Derek Smith over the course of the BLP.  He argues that these funds provided a "service" to lenders.  Sigillito might have a point if the lenders were equity investors in Smith's projects.  But, they were unsecured creditors and the only "service" they expected was timely repayment of principal and interest and this was not accomplished.  To the extent Sigillito did send funds to Smith, Sigillito was assuring lenders that Sigillito was conducting extensive due diligence as to the use of their funds.  These assurances were false.

Second, Sigillito claims credit for the $300,000 to $400,000 allegedly paid to Swinburne and Jackson to prepare documents.  This was a cost of running the BLP and did not provide any value to lenders.  The promises and representations in the agreements were the vessels of the fraud and it is insulting to lenders to suggest that they should have to bear the inflated costs of preparing the false documents that defrauded them and lulled them into a false sense of security.

14

Third, Sigillito claims credit for the judgment that Patricia Ahrens obtained by successfully suing Sigillito for malpractice. However, Ms. Ahrens has not been paid on the judgment as of the date of sentencing and therefore it cannot be considered a credit. Moreover, Sigillito continues to contest it. Of course, if Ms. Ahrens does receive payment that represents a loss from the BLP, as opposed to some other injury, Sigillito would receive credit for the payment on his restitution judgment to Ms. Ahrens. However, his malpractice insurer could then stand in her shoes to seek recovery from Sigillito. This Court need not decide how Ms. Ahrens's judgment will be treated for the purpose of determining actual loss.

Fourth, Sigillito claims credit for an unspecified amount for the value of Smith's assets. Sigillito argues that because Smith signed the loan agreements as "a deed," the loans were collateralized and Sigillito should be given credit against loss for the value of the collateral. This argument only applies to an actual loss calculation and not an intended loss calculation, but even if the premise of the argument were true, there was no collateral with any fair market value. The Hinton Grange Hotel was insolvent and subject to prior secured liens in excess of its value. The Little Farm Nursery was not owned by Smith and had no value. The personal residence was owned jointly with his spouse and had little or no net equity because it had been borrowed against several times to raise operating funds. And the option contracts had either expired or were worthless, because the value of the underlying land had not increased beyond the option contract price to generate any profit. The option contracts themselves were speculative and had no collateral value which is why Smith could not obtain traditional financing for his projects.

In any event, no lender has received the benefit of these assets and none have been liquidated. There may not actually be anything of substantial value when all is said and done, but as with Ms. Ahrens's judgment, any recovery that inures to the benefit of a lender will be a

15

credit against Sigillito's joint and several restitution obligations.

Fifth, Sigillito claims the loss to Wood Dickinson was not reasonably foreseeable. Mr. Dickinson, though, was one of those lenders owed nothing as of May 24, 2010. Mr. Dickinson was not even included in the Government's actual loss calculations. He would be included in an intended loss calculation, but he does not represent an amount that would change the offense level adjustment. In addition, there was evidence that Sigillito not only was fully aware of Mr. Dickinson's circumstances, but was instrumental in using Phil Rosemann's funds to pay Mr. Dickinson off to prevent Smith's involuntary bankruptcy. As Sigillito clearly knew, Smith's assets were not capable of covering his debts by a ratio of 2 to 1.

Finally, Sigillito disputes inclusion of the Metis loan in total loss. The PSR's response to this claim is thorough and accurate and will not be repeated herein. Sigillito convinced Phil Rosemann to loan funds to Metis based upon false representations, i.e., the safety of the loan and the commission being assessed, and later made the Metis default a false excuse for BLP non-payment. It was properly counted in the total loss caused by Sigillito.

### ii. Intended Loss:

The evidence presented at trial clearly established that Sigillito's hope, if any, of repaying victims in full was false and misplaced. Thus, over a decade he borrowed money primarily in the name of Derek Smith under circumstances where he knew the risk of repayment was greater and different than that which lenders were led by him to believe. As in *Hartstein*, Smith's ability to repay investors was based on nothing more than a hope or unrealistic belief that Smith's various projects would someday reap rewards. Lenders were led to believe that Smith was presently able to repay all his debts two times over. Lenders were also led to believe that their loan funds were actually being used by Smith to increase his wealth rather than their actual use,

namely supporting Sigillito's extravagant lifestyle and perpetuating the scheme.  Any reasonable person in Sigillito's position would not have had any realistic expectation of repaying lenders' principal in full.

The evidence at trial also showed that Sigillito knew that the representations in the asset and liability statements were not true and that the amount owed by Smith far exceeded any minimal current asset value of any asset that Smith actually owned.  Smith was actually insolvent as mentioned in Smith's very early e-mail to Christian Swinburne, but Sigillito was able to prevent Smith from pursuing the issue further.  The sheer amount of time that passed without the generation of any material gain by Smith was alone enough to prove that Sigillito's intent in making payments of any kind was solely to perpetuate and continue the scheme as well as avoid of discovery of the scheme or the true nature of Smith's financial condition by lenders.

Each crisis was averted as it arose by obtaining new victim funds to quiet noisy victims and by preventing legal actions against Smith or any other borrower.  This was true, for example, in the case of Wood Dickinson, who had filed an action against Smith and Sigillito found in Phil Rosemann a new lender whose funds could, without Rosemann's knowledge, be used to pay off Mr. Dickinson.  If permitted to occur, enforcement of statutory demands at any given time would have doomed the scheme by forcing Smith into involuntary bankruptcy and laying bare the false facade of the 2-to-1 asset-to-liability ratio.

In addition, payments to some victims, whether they perceived those payments as principal or interest,  helped to market the scheme to other, new investors or to cause prior lenders to lend more.  There was evidence that several lenders relied, in part, on the fact that other lenders that they knew and trusted had positive experiences with the BLP.  This and other evidence is more than sufficient for this Court to find that Sigillito's subjective intent in making

17

any repayments was to perpetuate the scheme.  The only loans which were ever repaid in full were repaid out of new lender funds and not out of any profits from Smith's operations. Therefore, under *Hartstein*, *Hatchett* and *Hsu*, for calculating intended loss, Sigillito is not entitled to *any* credit for *any* repayments to lenders regardless of whether they were principal or interest payments.  Thus, the intended loss is either the entire amount of actual receipts (approximately $56 million) or, more appropriately, the amount of principal due under loan agreements in effect as of May 24, 2010 (approximately $75 million).

Over $50 million is a truly conservative estimate of intended loss, particularly when the reality of the BLP is considered.  As discussed, *supra*, a system of annual loans was established by the operators of the BLP.  The short duration was part of the psychology of minimizing the risk perceived by lenders – at least the funds were not tied up for a long period.  However, Sigillito intended for the funds to be tied up for long periods based on targeting older, IRA lenders who were not likely to need the funds in one year and who would be satisfied by the higher than market rate interest.  That part of the BLP was accomplished with the rollover option – one year's worth of interest would be added to the previous principal amount and a new loan agreement would be generated.  From lenders' point of view, and the view intended by Sigillito, it appeared that their original loan had grown, that they had been paid their interest as promised and that there was now a new principal amount of loan.  To ignore this fact is to ignore the full extent of the financial harm or loss caused to lenders and the intent of Sigillito in this case.  It is also contrary to *Hartstein*, because just as in *Hartstein*, Sigillito "borrowed money that [he] knew [he] could not repay but for the false and misplaced hope that [he] could perpetuate [his] fraud indefinitely," his subjective intent in making repayments was to "perpetuate the scheme" and the sentencing court could therefore refuse to credit any repayments.  500 F.3d at 800 (citations

omitted).  *United States v. Hatchett*, 622 F.3d 984 (8th Cir. 2010), also supports the Government's focus on Sillito's intent to determine intended loss.  As in *Hatchett*, Sigillito did not have any intention of conveying the funds he borrowed in Smith's name to Smith or applying the funds to acquire and invest in flappable real estate projects. *Cf. id.* at 988.  Instead, before even receiving lenders' funds, he knew that they were going to be used to "keep the initial investors satisfied and to attract others."  *Id.*  This Court should make the same finding as in *Hatchett* and decline to grant Sigillito credit against any of the initial receipts.

The PSR's assessment of loss, which does not directly address the Government's intended loss analysis, ignores Sigillito's intent and the real harm suffered by victims.  *Hartstein* is controlling in this Circuit and supports the Government's position. The PSR's attempt to distinguish it from this case is form over substance.  It is true that in *Hartstein*, there was an actual return of investment followed by a reinvestment, but this was not a fact which the Court noted as significant to its determination of intended loss. The significant fact was that new lender funds had been used to create the temporary illusion of repayment, which repayment lulled investors into a false sense of security and contributed to their decision to reinvest.  Thus, the reinvestment became a new principal investment for the purpose of determining loss.

It is insignificant that Sigillito did not actually place the original principal plus earned interest back into the hands of lenders before asking them to re-loan the combination of the two. From the viewpoint of lenders, the result was the same as in *Hartstein* – they thought they had a safely reinvested a larger sum represented by the new principal amount on their new loan agreement.

*Hsu* is even more persuasive and explains why this approach to intended loss is appropriate.  Lenders lived their lives and made decisions as if the amount they roller over

represented new principal and part of their wealth which they could redeem at every annual due date. Applying *Hsu*, the intended loss here is not even limited to the $56.1 million in original cash investments that lenders made in the BLP, but in fact includes any earned interest *reinvested* in the scheme by rolling over their loan agreements. According to Exhibit 102 admitted at trial, and adding the $4.9 million due to on the Metis loan, this amount was $75,424,569.75. This was a figure, which itself was conservative as explained at trial, included original principal loaned plus earned "interest" which had been reinvested or rolled over annually by lenders. Said interest became new "principal" when it was rolled over. The figure did not include interest accrued during the last twelve months of the scheme, because lenders had not yet received the opportunity to roll said interest over into a new principal loan amount.

For example, victim Patricia Ahrens invested a total of $1.5 million in March and April of 2008. In the spring of 2009, the loan was renewed and the "interest" was reinvested or rolled over with the new total principal amount being $1,792,500. In the spring of 2010 it went unpaid and was reinvested and rolled over again for a new total principal amount of $2,142,031.50. This was the amount of principal outstanding as of May 24, 2010 and included in the calculation of Exhibit 102. The total amount due did not include any accrued, unearned, or "paid" interest, because it was not yet "due" and the lender had not yet been given the option to renew and roll over to a new, higher principal amount. The same methodology was used throughout Exhibit 102.

As stated, BLP victims who rolled over their investment, like Ms. Ahrens, lived their lives and made decisions and choices based on the assumption that their gains were real and their new principal amount was safe for future uses after each roll over. The BLP's practice of offering rollover opportunities, taken by all IRA investors and many others, furthered the scheme

by lulling investors into believing that their original investment plus the growth were safe and prospering. It helped Sigillito perpetuate the scheme by persuading lenders to reinvest their gains instead of taking their money elsewhere. Those decisions and choices have now had tragic consequences for many victims.  Sigillito should be held accountable for the full harm that he intended to cause and did cause the victims.  The intended loss calculation should therefore include such realized and rolled over gains.

2.   **Objection 4: Obstruction of Justice:**

The Total Offense Level should be enhanced by two points for obstruction of justice under U.S. Sentencing Guideline Section 3C1.1 because Sigillito's trial testimony included perjury.  The PSR found that this enhancement applied, subject to the Court's evaluation of the testimony.  Section 3C1.1 applies to a defendant's trial testimony if the Court is convinced that a defendant testified falsely under oath in regard to a material matter and did so willfully rather than out of confusion or mistake.  *United States v. Mabie*, 663 F.3d 322, 334 (8th Cir. 2011).  As with other Guideline enhancements, the district court need only be convinced of the basis for the enhancement by a preponderance of the evidence.  *United States v. Wisecarver*, 644 F.3d 764, 773 (8th Cir. 2011).  The finding must be based on the Court's own evaluation of the relevant evidence and not simply the jury's verdict rejecting a defendant's exculpatory testimony.  *United States v. Yarrington*, 634 F.3d 440, 452 (8th Cir. 2011); *see also United States v. Abdul-Aziz*, 486 F.3d 471, 479 (8th Cir. 2007).  This Court's finding that the enhancement applied was upheld by the Eighth Circuit in *United States v. Whiting*, 522 F.3d 845 (8th Cir. 2008).  In *Whiting*, at sentencing, this Court made specific reference to the specific components of the defendant's testimony which were found to be knowingly untruthful. *Id.* at 851.

Sigillito's trial testimony is now transcribed and available.  The Government will offer it

as an exhibit at the sentencing hearing as well as offer specific page references to portions of his testimony which were clearly perjured.  Sigillito's testimony was perjurious in many respects, but several highlights are sufficient to support a finding that Section 3C1.1 applies to warrant a two-level enhancement.  Primarily, Sigillito lied about several key components of his fraudulent representations to potential lenders which induced them to make loans, as described below.

### a.  **Purpose of Loans**:

Victims consistently testified that they were told by Sigillito and believed that their funds were to be delivered to the borrower and used by the borrower for several project-specific purposes.  *See, e.g.*, Trial Exhibit 2565 (Charles Davis marketing materials).  Several e-mails in 2009 and 2010 sent by Sigillito linked loan solicitations to a specific project, even though Sigillito knew that as soon as those funds were received they were going to be paid to other lenders.  Sigillito relied on paragraph 3 in some of the loan agreements to support his claim that the loan agreement permitted the funds to be used for any purpose including maintenance of the Ponzi aspects of the loan funds.  Even if Sigillito believed that paragraph 3 could be interpreted to authorize the actual use of the funds, Sigillito knew that it did not permit him to lie to lenders about how the funds were going to be used at a time when he was already using them in a manner contrary to his claims.

More importantly, Sigillito falsely testified that he did not tell lenders that their funds were going to be delivered to the borrower in England for the borrower's use in purchasing and developing real estate opportunities.  Instead, Sigillito testified that it was merely an "oversight" on his part that he failed to advise them that their funds were not going to England.  Numerous lenders testified to clear contrary recollections of specific representations by Sigillito as to what the loan funds were going to be used for and that had they known the truth they would not have

lent any funds to Smith.  The fact that Sigillito's testimony was knowingly false on this point was also shown by the efforts to conceal from lenders the source of funds used to make interest or other payments to lenders.  The e-mail and oral discussions about delays in payment being due to funds being received by Smith's bank to be followed by transfer of said funds to Sigillito's bank would be nonsensical had Sigillito not falsely made it clear to lenders that their money was being delivered by Sigillito to Smith and that Smith was the conduit for payments of any funds to lenders.  *See* Trial Exhibit 118 (BLP Financial Summary 2003-2010).

### b.  Fees:

Sigillito falsely testified that he had neither misrepresented nor actively concealed the existence, size and frequency of "fees" taken by him and others involved in the BLP.  Again, most lenders were told that the loans did not involve any fee.  The nonexistence of fees was clearly represented in written marketing materials.  *See,* Trial Exhibit 2565.  Several were led by Sigillito to believe that his only gain was in the form of a better interest rate on his own loans to Smith.  Mary O'Sullivan recalled in vivid detail an encounter at the Racquet Club in which Sigillito actually sought an endorsement from Ms. O'Sullivan to another club member that he, Sigillito, was not "getting anything" for his efforts to invest Tom, Neil, and Mary O'Sullivan's funds with Smith.  Sigillito testified that he disclosed to anyone who asked that he received a fee and disclosed the full amount of the fee when asked.  This testimony was clearly false and contrary to the overwhelming weight of the evidence.

### c.  Consultation with Counsel:

Sigillito testified in his defense that he had disclosed every material fact about the BLP to his attorney James Dankenbring and that he relied on Dankenbring's apparent approval of Sigillito's BLP business. This testimony was demonstrably false. Even though several of

Sigillito's communications with Dankenbring were documented in writing, there was nothing to document the disclosure by Sigillito of the salient features of the BLP, namely the misrepresentations to new lenders about the fact that their funds would be used to pay prior lenders rather than to fund new acquisitions by Smith. Likewise, Sigillito could not have disclosed to Dankenbring that there had been prior defaults by Smith and other borrowers while at the same time approving of representations in written marketing materials and in oral statements to prospective lenders that there had never been a default in the BLP. Sigillito's testimony was also contradicted by the content of Dankenbring's last opinion letter, which expressly stated that it was premised on the assumption that Sigillito was following all of the advice previously given which included full disclosure of any and all fees. *See* Trial Exhibits MS-14 and 2556. Such disclosure, of course, was not occurring. A related, but separate, subject of false testimony was Sigillito's claim that he had received an oral opinion from Dankenbring that Sigillito did not need to disclose facts about fees to lenders.

### d. __Asset and Liability Statements__:

Sigillito's testimony concerning the Asset and Liability statements was false in several respects. First, Sigillito incredulously claimed that he was unaware that Smith's debt had even reached the $26 million level. According to Sigillito, this enormous fact had escaped his attention because he was busy on other things and delegated too much authority to Elizabeth Stajduhar. This was credibly contradicted by Ms. Stajduhar's testimony that the spreadsheets periodically prepared by her were given to and sought by Sigillito, especially those used to convince Smith to continue to sign loan documents despite his own concerns about his "ongoing solvency" and ability to repay the loans. *See* Trial Exhibits 3365, 3373, 1925, 3378, and 733 (loan balance summaries and summaries distinguishing between "long" and "short" term loans).

24

Sigillito's claim was also contradicted by his own involvement in representing the extent of Smith's debt to Eacotts in connection with the U.K. tax investigation of Smith.  Ms. Stajduhar testified credibly as to the fraudulent manner in which Sigillito came up with the figure of $26 million for Eacotts in Trial Exhibit 1370, which, not coincidentally, was nearly the same false figure he provided to P.V. in August 2009.

Second, Sigillito had to have known that the amount of Smith's debt was actually far greater than $26 million, given the size of the loans that he alone was recruiting from lenders in 2009 and 2010.  *See* Trial Exhibit 107 (summary of spreadsheets in Sigillito office). Sigillito's actual knowledge of the total debt was established by what he did not say to FBI SA Kevin Cosentino during the interview on May 24, 2010 when asked how an influx of $5 million was going to pay off $50 million.  Sigillito did not say that SA Cosentino was mistaken and the amount outstanding was far less than $50 million.

Third, Sigillito falsely testified that he had not "looked carefully at" the asset and liability statements.  He denied doing so to distance himself from knowledge that the 2-to-1 ratio was never being maintained.  Sigillito told the jury that he passed the asset and liability statements to lenders in "good faith."  Given Derek Smith's credible and documented testimony concerning Sigillito's role in editing the asset/liability statements and discussing with Smith the need to increase the value of the claimed assets, he clearly was aware that the statements were false in that Smith's assets did not have the value claimed and the liabilities were far greater than claimed.  *See* Trial Exhibits 307 and 1377 (describing revisions to asset/liability statements). Sigillito also knew how much was owed to him in fees.  *See* Trial Exhibits 2483, 3359 and 3373.

**e.   Rollie Baer Report**:

Sigillito also testified falsely concerning the contents of the so-called Rollie Baer "report," which was nothing more than a set of marketing materials summarizing Sigillito's oral representations. *See* Trial Exhibit 1368. Said materials were both edited and endorsed by Sigillito as true. Just one of the controversial parts of the report was the claim, repeated multiple times in the body of the materials, that the loans to Smith were safe, not only due the 2-to-1 asset to liability ratio, but also due to the claim that income from Little Farm Nursery and the Hinton Grange Hotel were together sufficient to cover Smith's "cost of carry." Sigillito did not deny that he knew that Little Farm Nursery was not an income-producing property, but he claimed that the inclusion of the misrepresentation in the report was an "error" that he failed to "catch." The claim concerning the income generated by both properties was so prominently featured in the materials and mentioned so many times therein that Sigillito could not have overlooked it.

**f.   Phil Rosemann's Counsel**:

At one point in his testimony, Sigillito was being question about the nature of his dealings with Phil Rosemann. In connection with the Metis loan, the fees taken by Sigillito and Brown off the Metis loan were not fully disclosed to Mr. Rosemann, and Sigillito had an apparent conflict of interest. The questioning concerned how Sigillito could act as Phil Rosemann's attorney on the Smith loans but at the same time be both a lender to Smith and a representative of Smith in his dealings with lenders. Rather than admit the obvious conflict, Sigillito falsely testified that he was not Mr. Rosemann's attorney in connection with the Smith or Metis loans and had made that clear to Mr. Rosemann. Mr. Rosemann, of course, clearly and credibly testified that Sigillito was his attorney in connection with anything having to do with the investment of his funds. E-mail communications between Sigillito, Mr. Rosemann and his

attorney Sebastian Rucci corroborated the nature of the relationship.  Sigillito's testimony was a clear fabrication.

### g.  Misrepresentations to Lenders:

Finally, Sigillito concluded his testimony by claiming that he did not intentionally mislead a lender or omit a material fact.  All of the credible evidence which preceded his testimony established that said testimony was knowingly false.  For example: Sigillito denied telling Paula Fielder that the BLP was a "top secret" loan program that should not be discussed with anyone else; Sigillito denied the false representations to Kim Walker in March 2009, at a time when Metis had already defaulted, that she should invest in a financially healthy Turkish company that was clearly Metis and was clearly intended to remove Phil Rosemann as a Metis lender by selling the debt to Kim Walker and then using the proceeds to assist Smith; Sigillito denied the false representations to Sharon Cobb about Smith's money flow and the reasons for delay in Smith's payments; and Sigillito's false testimony that he learned a lot about the truth of the BLP from Paul Vogel.  Although the Government can identify numerous other aspects of Sigillito's testimony that warrant the Section 3C1.1 enhancement, the ones mentioned above are more than sufficient to support the enhancement.  Therefore, two additional points should be assessed for obstruction of justice.

### 3.  Objection 5: 50 or More Victims:

The PSR provides for a four-level enhancement for greater than 50 victims pursuant to U.S.S.G. § 2B1.1(b)(2)(B).  Sigillito objected to this enhancement on multiple grounds.  His arguments misconstrue many basic USSG premises and ignore the evidence submitted at trial. Sigillito argued that he should not be held accountable for victims brought into the BLP prior to November, 1, 2001, that he should not be held accountable for the victims brought into the BLP

by others and that there were no victims prior to the FBI executing a search warrant at his office on May 24, 2010.  The government believes that the PSR properly applied this enhancement.

Sigillito's argument that victims brought into the BLP prior to November 1, 2001, should not be counted is based upon his erroneous belief that, because the enhancement was not enacted until November 1, 2001, victims prior to that date should be excluded from the guideline total number of victims.  This raises the question of the correct Guideline Manual to apply.  The Court should apply the Guideline Manual in effect on the date of sentencing pursuant to USSG § 1B1.11(a).

While Sigillito's argument did not explicitly make an *ex post facto* argument, that may be what he was attempting.  Section 1B1.11 and its Application Notes provide guidance for sentencing a defendant when his criminal conduct spanned a lengthy period of time as did Sigillito's offenses.  Application Note 2, specifically states that "the last date of the offense of conviction is the controlling date for *ex post facto* purposes."  Sigillito was convicted of conspiring to operate the BLP under Count 16, which charged that the offense continued through April 28, 2011.  Thus, the Guidelines Manual in effect on April 28, 2011 would control if there were any *ex post facto* issues.  Because there are no conflicts between the 2010 and the 2012 manual, applying the manual in effect at the time of sentencing is appropriate.[1]

Sigillito's argument attempts a piecemeal approach by selecting favorable provisions from a prior manual and misapplying those to his case.  Section 1B1.11(b)(2) states, "The Guidelines Manual in effect on a particular date shall be applied in its entirety.  The court shall not apply, for example, one guideline section from one edition of the Guidelines Manual and

---

[1] Although the Eighth Circuit has acknowledged that its sister circuits have found, in the wake of *United States v. Booker*, 543 U.S. 220 (2005), that the *Ex Post Facto* Clause does not apply to changes in the now-advisory Sentencing Guidelines, it continues to apply an *ex post facto* analysis to the Guidelines in light of its post-*Booker* decision in *United States v. Larrabee*, 436 F.3d 890 (8th Cir. 2006). *See United States v. Carter*, 490 F.3d 641, 643 (8th Cir. 2007).

another guideline section from a different edition of the Guidelines Manual . . . ."  In fact Sigillito's argument proposes an even more piecemeal application of the guidelines, which simply is not proper.  The PSR applied the proper Guideline Manual in its entirety and the sentencing enhancement for more than 50 victims is fully applicable.  Thus, the defendant is responsible for all victims, even those who were brought into the BLP prior to November 1, 2001.

Next, Sigillito claims that he was not responsible for the victims brought in by others, such as Brown and other recruiters.  He claimed that it would be "virtually impossible" for him to foresee the victim-lenders that they might bring into the BLP.  A defendant is responsible for "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant."  U.S.S.G. § 1B1.3(a)(1)(A).  A defendant is also responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity . . . ."  U.S.S.G. § 1B1.3(a)(1)(B).

Sigillito was convicted of his role in jointly operating the BLP with Brown, Smith and others.  The evidence presented at trial established that Sigillito utilized recruiters to bring in additional lenders.  Sigillito sought out the recruiters to bring in additional victims and often was called on to assist with sales pitches to help those recruiters bring in new victims.  Many times Sigillito pushed the recruiters to bring in a certain amount of money that he knew was needed in order to keep the BLP afloat.

The evidence also established that Sigillito was the organizer or leader of this activity and that his office was the hub of the knowledge of the number of victim-lenders in the BLP, the amount of outstanding BLP loans and the amount of ongoing funds needed to keep the BLP afloat.  He and his office were also responsible for preparing and obtaining loan documents for

BLP victim-lenders.  Sigillito's argument flies in the face of the weight of the evidence against him.  He clearly knew the number of victims brought in by all those involved in the BLP; at a minimum, it certainly was reasonably foreseeable to him.  Applying this standard to the evidence, Sigillito is responsible for victims brought into the BLP by others that he could have reasonably foreseen, which number is greater than 50.

Sigillito's last argument that there were no losses and no victims until the FBI executed a search warrant at his office on May 24, 2010, simply ignored the mountain of evidence presented at trial that established the fraudulent nature of the BLP.  The FBI did not cause the BLP victim-lenders to lose money.  The lenders were victims at the time they conveyed their funds to Sigillito under false pretenses.  From that point forward, the only question was how much they would never get back for restitution purposes.  Sigillito and his fraudulent conduct in perpetrating the BLP were the causes of victim losses and the futility of the BLP.  Like all Ponzi schemes, it was doomed from the start and destined to come to an end at some point.  And like all Ponzi schemes uncovered by law enforcement, the perpetrator is likely to claim falsely, as Sigillito does here, that the scheme would have continued indefinitely if only the FBI had not acted.

Application Note 1 to U.S.S.G. § 2B1.1 defines a victim as "any person who sustained any part of the actual loss determined under subsection (b)(1) . . . ."  Paragraph 40 of the PSR incorporates Appendix A into the PSR which is the BLP Lender Summary.  There were 140 BLP lenders identified as victims.  The lenders were grouped by spouses and businesses.  If they were counted separately there would be an even larger number of identified victims.  The summary indicates the amount of loans and the amounts returned to lenders.  It does not delineate between returns of interest payments or principal payments.  Taking a conservative approach and

eliminating from consideration all lenders who received payments of either interest or principal in excess of their original loans, there were at least 96 lenders who were victims and sustained a part of the actual loss. The number is 111 if the Court considers lenders who were still owed money as of May 24, 2010. This is well in excess of 50 and thus the PSR properly applied the four-level enhancement to Sigillito's guideline calculation.

### 4. Objection 6: Substantial Part of Offense Committed Outside U.S.:

Paragraph 59 of the final PSR applied a two-level enhancement on two independent bases: 1) a substantial part of the fraudulent scheme was committed outside of the United States; and 2) the offense involved sophisticated means. Both of these apply pursuant to U.S.S.G. § 2B1.1(b)(10)(B) and (C). Sigillito objected to paragraph 59 and he argued that the enhancement is not applicable under either subsection. The government believes that the PSR has properly applied this enhancement.

Sigillito claimed that only a small portion of the fraudulent scheme occurred outside the United States and that a "substantial portion" occurred in the United States. Sigillito's argument on this point was largely based upon his mistaken recollection of the evidence. He wrongly claimed that all the lenders were from the United States. While the majority of the lenders were from the U.S., there were some U.K. residents as well. This also rendered his claim that all loans were made in the U.S. factually inaccurate. He claimed that the money was held in the U.S., interest payments were made from the U.S., and the misrepresentations were made in the U.S. These claims were not supported by the evidence at trial. Some money was transferred to Smith from the U.S. and some money for interest payments was transferred back to the U.S. from the U.K in the early years of the BLP. In addition, key lulling communications were caused by

Sigillito to be sent by Smith from the U.K. (and Spain in one instance) to lenders.  Also Smith signed the essential loan agreements outside the U.S.

Additionally, Sigillito made false misrepresentations about the BLP to victim-lenders when he was abroad in the U.K. and the Middle East.  He also wrongly asserted that all three co-defendants resided in the U.S.  All of the purported borrowers were from the U.K. and the primary borrower and co-defendant Smith, was a U.K. resident.  Without a British borrower there would not have been a BLP.  This fact alone supports the enhancement.  Sigillito also claimed that the accounting for the BLP took place in the U.S.  While this was true in later years, Sigillito and his co-conspirators also at times employed Solicitors, Accountants and others in the U.K. to assist in BLP operations.

Several significant parts of the BLP were carried out in the U.K.  All of the borrowers were located in the U.K., the loan agreements were signed by Smith in the U.K., and Smith's purported assets to back the loans were located in the U.K.  The biggest fraudulent misrepresentations of all were about Smith and the borrowers, how successful Smith was, how valuable his assets were and how he was using their loan money to buy more assets. Finally, many of Sigillito's clients were required to pay him to set up offshore corporations, which were outside of the U.S.  The offshore corporations were designed to lend credence to the BLP.  Sigillito encouraged some victim-lenders to travel to the U.K. with him to visit Smith and see his assets.  Sigillito spent a substantial portion of the victims' money outside of the U.S. on rare books and artifacts.  When the borrowers defaulted on the loans, victim-lenders were forced to attempt collections against Smith in the U.K.  A substantial portion of the BLP's fraudulent scheme therefore took place outside of the U.S to justify the two-level enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(B).

Sigillito next argued that the sophisticated means enhancement did not apply. It is actually hard to conceive of a more appropriate circumstance for applying it than this case. Application Note 8 to U.S.S.G § 2B1.1 provides: "For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means." All three co-defendants were located in separate jurisdictions, Sigillito in Missouri, Brown in Kansas and Smith in the U.K. Sigillito employed recruiters from Arizona, Arkansas, Florida, Michigan and Missouri. They solicited victims from even more jurisdictions. According to the application notes this would suggest a sophisticated means enhancement is appropriate.

Application Note 8 further provides that sophisticated means includes "conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." Sigillito required some of the BLP lender victims to set up offshore corporations in order to lend money into the BLP. The use of these offshore corporations was designed to add the appearance of sophistication to the fraudulent lending scheme. Sigillito and Brown also used different bank accounts under different shell corporations and entities designed to conceal the fact that money was not going to or coming back from the U.K. Thus, the circumstances of this case fit squarely within the parameters of the sophisticated means enhancement under U.S.S.G. § 2B1.1(b)(10)(C).

### 5. Objection 7: Vulnerable Victim:

The Final PSR, paragraph 60, included a two-level enhancement, because the defendant knew or should have known that a victim was a vulnerable victim pursuant to U.S.S.G. § 3A1.1(b)(1). Sigillito objected to the enhancement being imposed based solely upon a

particular victim's age. While Sigillito is correct that a court may not "apply a blanket assumption that an advanced age is sufficient to render a victim vulnerable," a court may still impose the enhancement if it provides a "fact-based explanation of why advanced age or some other characteristic made one or more victims 'unusually vulnerable' to the offense conduct, and why the defendant knew or should have known of this vulnerability." *United States v. Vega-Iturrino*, 565 F.3d 430, 434 (8th Cir. 2009).

Here, the evidence showed that Sigillito deliberately selected many victims who were at or approaching retirement age in order to induce them to invest their retirement savings (IRAs) in the BLP. Sigillito knew that these lenders would incur penalties from withdrawing funds early from their IRAs, making them less likely to demand their money be returned to them at any given time. Even though the loan agreements were almost universally for one-year terms, Sigillito referred to many of these victims as "long-term lenders," as reflected in documents produced by Sigillito for his meetings with Smith. Smith's testimony established that Sigillito explained to him that the fact that these lenders funds were tied up in their IRAs meant that Smith could wait longer before having to pay back their notes. Smith testified that this consideration was instrumental in Sigillito's success in persuading Smith not to exit the BLP and instead to take on further and further debt.

Application Note 2, to U.S.S.G. § 3A1.1 defines a vulnerable victim as "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."

With respect to elderly victims, most were religious followers of Sigillito, and some were

acquainted with his parents.  Sigillito convinced them that he was an international financial expert and they trusted him due to their age, lack of investment sophistication and their personal history with Sigillito.  Several were also unduly influenced by his position as a Bishop and Sigillito was well aware of how they viewed him and essentially preyed upon their vulnerability. The circumstances described by Charles Davis were a perfect example of Sigillito taking advantage of the vulnerable position they were in due to their faith in a church leader.

These elderly victims were also in need of investment vehicles that were safe and provided the high rates of return associated with the BLP.  Given their personal circumstances and their undue confidence in his judgment, Sigillito was able to easily convince them that BLP loans were appropriate investments for their retirement funds.  These victims included Charles Davis, Noel Bosse, Linda Givens, Richard Aguilar, Henry Barthel, and to some extent, Stanley Kuhlo.

The enhancement should also apply to Mary O'Sullivan, Tom O'Sullivan and Neil O'Sullivan.  "Uncle Tom," until he passed, was not only elderly but mentally infirm.  As to Mary, Tom, and Neil O'Sullivan, the facts set out in PSR paragraphs 41 and 42 support the enhancement as to each of them.  Tom O'Sullivan was vulnerable due to age and infirmity. Although Mary O'Sullivan was the person with authority to apply his funds, he was an independent victim who is now deceased.  Neil O'Sullivan was vulnerable due to his wife's passing and his own terminal illness as well as his status as a legal client of Sigillito.  Sigillito acted unethically in advising Neil O'Sullivan to invest in the BLP in connection with preparing a trust document for him.  Sigillito was fully aware, according to the testimony of Mary O'Sullivan, of Neil O'Sullivan's circumstances.

35

Mary O'Sullivan was vulnerable in a number of other ways, including her background and limited education, her status as an employee of the Racquet Club where Sigillito was a Board member and the personal stress that she was under caring for uncle, her brother and her brother's children. Sigillito took advantage of Mary O'Sullivan in a most vile way. His pursuit of Neil O'Sullivan's life insurance proceeds and 401k distribution following his death literally took food out of Neil O'Sullivan's children's mouths. The harm caused by Sigillito's greed is partially responsible for the fact that Neil O'Sullivan's home, where Mary O'Sullivan lives and cares for his children, is at risk of foreclosure. Sigillito clearly earned the vulnerable victim enhancement.

**6.   Objection 8: Abuse of Position of Public or Private Trust:**

Paragraph 61 of the Final PSR applied a two-level enhancement for abuse of a position of public or private trust is not applicable pursuant to U.S.S.G. § 3B1.3. Sigillito objected to this enhancement and he argued there was no evidence presented that would qualify as an abuse of either a public or private position of trust. He claimed that his role as an attorney for some of the victim-lenders does not qualify him for the enhancement. While Sigillito had next to no actual legal practice, he led some lenders to believe the opposite. In fact, he was employed by several lenders as their attorney, and they in turn believed that he was acting on their behalf in several capacities. Thus, the government believes that the PSR properly applied this enhancement. *See United States v. Kieffer*, 621 F.3d 825, 836 (8th Cir. 2010) ("A licensed attorney generally holds a position of public trust . . . ."); *United States v. Goldman*, 447 F.3d 1094, 1096 (8th Cir. 2006) ("Use of knowledge gained as an attorney to commit a crime subjects a defendant to an enhancement for abuse of a position of public trust under USSG § 3B1.3."); *see also United States v. White*, 1 F.3d 13, 19 (D.C. Cir. 1993) ("The relationship between a client and an

36

attorney (and the attorney's firm) is such that all attorneys at a firm must be presumed to be in a 'position of trust' with respect to the firm's clients."). *But see United States v. Fiorito*, 640 F.3d 338, 351 (8th Cir. 2011) (noting that application of "abuse of position of trust" enhancement "'is fact intensive because it turns on the precise relationship between the defendant and her victims and therefore cannot be decided on the basis of generalities such as 'lawyers and doctors occupy positions of trust but bank tellers and insurance agents do not'" (quoting *United States v. Baker*, 200 F.3d 558, 564 (8th Cir. 2000)).

Victim Phil Rosemann testified at trial that he retained Sigillito in the early 2000's to act as his attorney in international matters.  Mr. Rosemann specifically placed a great deal of trust in Sigillito to handle his money and his international business dealings and investments.  Sigillito opened offshore corporations for Mr. Rosemann and often consulted Sigillito in his capacity as his legal counselor.  He placed a great deal of private trust in Sigillito as his attorney, such that when he received a payout of his interest in another business he had the entire amount, over $15 million, transferred directly to Sigillito's account to be managed by the defendant.  Mr. Rosemann continued to trust Sigillito as his attorney by allowing Sigillito to conduct due diligence related to an investment in a company in Turkey, Metis.  This is merely one example of a victim-lender for whom Sigillito acted in a position of trust based upon his role as a lawyer. Sigillito, meanwhile, concealed his divided loyalty to Derek Smith and his financial interest in every loan that he arranged for his clients. *See* Mo. Sup. Ct. Rule 4-1.7(a) ([A] lawyer shall not represent a client if the representation involves . . . a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibility to another client . . . ."); Mo. Sup. Ct. Rule 4-1.8(a) ("A lawyer shall not . . . knowingly acquire . . . [a] pecuniary interest adverse to a client unless . . . the client gives informed consent.").

Sigillito also acted as a family lawyer to Noel Bosse and the Givens family.  Several of the victims were required to open useless offshore accounts and were billed as legal clients. Linda Givens, especially after her husband passed, placed significant trust in Sigillito to act not only as her attorney, but as her personal financial advisor.  It was Sigillito's advice that she not redeem BLP loans to pay off the second mortgage her husband put on their home when Sigillito needed emergency funds for the BLP.

The evidence of Sigillito's role as an attorney for many of the victim-lenders is further evidenced by their actions toward the end of the BLP.  Many believed and requested Sigillito to file a lawsuit against Smith to recover on their loans, a clear indication that they considered him their lawyer.  He abused this position by delaying their legal action and concealing the fraudulent nature of the BLP while he attempted to recruit new lenders to pay them off before they discovered the secrets of the BLP.

As to victims Charles Davis and the Aguilars and the Givens, Sigillito's specific religious tie to them constituted an additional example of abuse of a position of trust.  Mr. Davis testified concerning the circumstances of meeting Sigillito, Sigillito's behavior in church after delivering a sermon and conducting a service.  He had complete trust in the BLP by virtue of Sigillito's religious position.  He regularly served as the Aguilars' priest.

All of these facts presented at trial more than support the two-level enhancement for abuse of a position of trust pursuant to U.S.S.G. § 3B1.3.

**7.   Objection 9: Aggravated Role in the Offense:**

Paragraph 62 of the Final PSR applied a four-level enhancement for Sigillito acting as an organizer or leader of the BLP pursuant to U.S.S.G. § 3B1.1(a).  Sigillito objected to this enhancement claiming double-counting with the enhancement under U.S.S.G. § 3B1.3.  He also

claimed there were only three participants and that it was not otherwise extensive.  Lastly, he requested a two-level enhancement similar to co-defendant Brown.  The PSR properly assessed a four-level enhancement.

As discussed *supra*, the two-level enhancement pursuant to U.S.S.G. § 3B1.3 was properly applied for abuse of a position of trust.  It was not applied as a use of special skill enhancement pursuant to 3B1.3 as Sigillito suggests.  Thus, there is no double-counting as he claims.

Sigillito also argued that there were not more than five participants and the BLP was not otherwise extensive.  For purposes of determining that issue, Application Note 1, U.S.S.G. § 3B1.1, defines a participant as "a person who is criminally responsible for the commission of the offense, but need not have been convicted."  Additionally, the enhancement is applicable when either five or more participants are involved, or it was otherwise extensive.  Application Note 3, provides that when considering whether it was otherwise extensive a court may consider "all persons involved during the course of the entire offense . . . . Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."  There are only three defendants who have been convicted: Smith, Brown and Sigillito.  Ms. Stajduhar did not plead guilty to an offense that made her culpable for the BLP.  However, the evidence presented at trial clearly established that the BLP was extensive and that there were other participants.

The BLP operated for over ten years in the United States and in the United Kingdom.  Sigillito employed the services of many others.  For most of the significant life of the BLP, Sigillito was the life force behind its growth and operation as well as the individual who profited the most from it.  In the U.S., Sigillito, directly and through Brown, employed the services of

many recruiters to sell the BLP, an accountant to make interest payments, three different institutional custodians to handle the IRAs, and attorneys to defend their actions.  In the U.K., Sigillito employed solicitors, accountants, and Kevin Cooper, who located borrowers and received fees during the early years of the BLP.  Sufficient evidence was presented at trial to justify a finding that the BLP involved five or more participants and that it was an extensive organization.

Sigillito argued that he should be treated similar to Brown on this enhancement issue.  But the evidence presented at trial was that Sigillito, not Brown, was the organizer and leader of the BLP for the majority of the years it operated.  Sigillito was in charge for the later years of the BLP and the years that it brought in the majority of the funds.  Sigillito was in control of the loan agreements, he and his office directed who received interest and fee payments, he directed others on how much money to bring into the program, he controlled and directed Smith to stay in the BLP as a borrower and sign blank documents, he controlled which Smith asset and liability statements to use, and he directed Brown and Smith to write lulling communications.  Smith would and did do anything Sigillito told him to do.  Sigillito was the hub.  In fact, some victims testified that they had not even heard of Brown until the lulling communications at the end of the BLP.  In some cases, Sigillito was receiving loan funds from lenders that Brown was not aware of and Sigillito did not share the fees from said loans with anyone.  Treating Sigillito similar to Brown is not warranted by the evidence.  A four-level enhancement for Sigillito's role as the organizer or leader was warranted pursuant to U.S.S.G. § 3B1.1(a).

**8.   Objection 10: *Southern Union* and Consecutive Sentences:**

Sigillito argued that the Supreme Court's recent decision in *Southern Union Co. v. United States*, __ U.S. __, 132 S. Ct. 2344 (2012), required that a jury find the facts that would permit

40

Sigillito's sentences on the twenty counts of conviction to run consecutively. This argument rests on two demonstrably false propositions: 1) that *Southern Union* implicitly overruled the Supreme Court's holding in *Oregon v. Ice*, 555 U.S. 160 (2009); and 2) that this Court's power to impose consecutive sentences derives not from statute, but from the Sentencing Guidelines. Because this Court possesses unfettered statutory power to impose consecutive sentences, and because the imposition of consecutive sentences based upon judge-found facts is constitutional in any event, this Court should impose consecutive sentences as necessary to achieve the total sentence of life imprisonment recommended by the Guidelines.

### a.   Sigillito's Claim That the Jury Must Find the Facts That Would Authorize Consecutive Sentences Is Foreclosed by the Supreme Court's Decision in *Oregon v. Ice*

In *Ice*, the Supreme Court considered Sigillito's precise argument, namely, that the Court's previous decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004), required that a jury to find any facts that resulted in the imposition of consecutive sentences. There, the Court recognized that the several states had various practices with respect to sentencing:

> Most States continue the common-law tradition: They entrust to judges' unfettered discretion the decision whether sentences for discrete offenses shall be served consecutively or concurrently. In some States, sentences for multiple offenses are presumed to run consecutively, but sentencing judges may order concurrent sentences upon finding cause therefor. Other States, including Oregon, constrain judges' discretion by requiring them to find certain facts before imposing consecutive, rather than concurrent, sentences.

*Id*. at 163–64.  The Court noted that there was no dispute that the first two practices were constitutional; the only question was whether Oregon's approach—which resulted in an increase in the maximum total sentence based upon judge-found facts —was likewise permissible. *Id*. at 164.  In light of the historical practice of permitting judges to sentence defendants to consecutive

sentences "by default," *id*. at 169, the Court found that the Sixth Amendment permitted judges, not juries, to find the facts that permitted the imposition of consecutive sentences, *id*. at 172.

Despite this clear holding, Sigillito suggests that the Court's decision in *Southern Union* "dictates that, under the facts of this case, the jury must have determined the facts which would permit the imposition of consecutive sentences under the Sentencing Guidelines." Def.'s Objs. (Doc. #319) at 27. Sigillito even suggested that *Southern Union* "rais[es] the question of whether *Ice* is still applicable precedent on the concurrent/consecutive sentencing issue." Def.'s Objs. (Doc. #319) at 26 n.6. These claims are not only foreclosed by *Ice*; they are contradicted by *Southern Union* itself.

The *Southern Union* Court expressly discussed *Ice* and upheld the continuing validity of its holding that "when a defendant is convicted of multiple offenses," *Apprendi* does not "forbid[] judges to determine facts that authorize the imposition of consecutive sentences." *S. Union*, 132 S. Ct. at 2352. The *Southern Union* Court expressly distinguished *Ice* on the basis that the power to decide fines was historically given to juries—unlike the determination of consecutive sentences, which *Ice* recognized was traditionally a function reserved for judges. *S. Union*, 132 S. Ct. at 2352–53. Thus, rather than overrule *Ice*, the *Southern Union* Court assumed the validity of its holding and explicitly identified the circumstances that set the present case apart from it. Moreover, there were no consecutive sentences imposed in *Southern Union*, so the Court had no occasion to revisit its (very recent) holding in *Ice*. Sigillito's arguments to the contrary are therefore expressly precluded by *Ice* and should not be considered by this Court.

### b.  This Court's Power to Impose Consecutive Sentences Derives Not from the Sentencing Guidelines, But from Statute

Even if *Ice* had been somehow been implicitly overruled by *Southern Union*, its reasoning would not require that the jury to find any facts for this Court to impose consecutive

sentences under the federal sentencing scheme. As *Southern Union* recognized, there is no *Apprendi* problem where a sentencing scheme does not prescribe a statutory maximum, i.e., where it does not impose additional penalties on the basis of judge-found facts. *S. Union*, 132 S. Ct. at 2353. *Ice* likewise found it to be beyond dispute that the historical practice of vesting judges with "unfettered discretion" to decide whether to impose consecutive sentences comported with the Sixth Amendment. *Ice*, 555 U.S. at 163. Since the federal sentencing scheme adheres to that common-law tradition by permitting judges to apply consecutive sentences without any required fact-finding, this Court may constitutionally impose consecutive sentences without impacting Sigillito's Sixth Amendment right to trial by jury.

Because Section 5G1.2 of the Sentencing Guidelines provides that a court should impose consecutive sentences whenever necessary to achieve the "total punishment" recommended by the Guidelines, Sigillito has inferred that a jury should be required to find all the facts that support the determination of the total punishment, including the total loss. Def.'s Mem. in Opp. (Doc. #319) at 27. Sigillito's argument would mean an enormous expansion of the jury's role, effectively requiring that every factor considered by the Sentencing Guidelines be determined by the jury. But as the Supreme Court held in *United States v. Booker*, 543 U.S. 220 (2005), the Guidelines' recommendation of a "total punishment" is just that—a recommendation, which this Court has the power to disregard. *See id*. at 266 (noting that, due to excision of §§ 3553(b)(1) and 3742(e), Guidelines became merely "advisory").

As such, after *Booker*, the Court's power to impose consecutive sentences comes not from the Guidelines, but 18 U.S.C. § 3584, which gives total discretion to judges to determine whether to run sentences concurrently or consecutively, without any required fact-finding. Section 3584 merely requires judges to consider the factors set forth in 18 U.S.C. § 3553(a) in

43

determining whether to impose concurrent or consecutive sentences. Judges remain free to impose consecutive or concurrent sentences in the exercise of their discretion. Thus, the federal sentencing regime adheres to the common-law practice, recognized as constitutional in *Ice*, that "entrust[s] to judges' unfettered discretion the decision whether sentences for discrete offenses shall be served consecutively or concurrently." *Ice*, 555 U.S. at 714. There is no constitutional obstacle to the exercise of that discretion here. The United States therefore respectfully requests that the Court impose consecutive sentences as necessary to achieve the total recommended sentence of life imprisonment.

### E. Sentencing Memorandum and Section 3553(a) Factors:

#### 1. General Legal Principles

In holding that the Sentencing Guidelines are now advisory, the Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), said that district courts, while not bound by the Guidelines, must consult them and take them into account at sentencing. *Id.* at 264. In *Booker*, the Supreme Court also stated that the standard of review on appeal of a district court's sentencing decision is whether the sentence was "unreasonable." *Id.* at 261–62. The Supreme Court elaborated further on the manner in which the Guidelines are to be utilized in sentencing criminal defendants in *Rita v. United States*, 551 U.S. 338 (2007). In *Rita*, the Supreme Court noted that the Guidelines were the product of the Sentencing Commission's examination of tens of thousands of sentences in an effort to carry out the objectives set forth in 18 U.S.C. § 3553(a). *Id.* at 349.

The *Rita* Court summarized the relationship between the Guidelines and the § 3553(a) factors as follows:

> The result is a set of Guidelines that seek to embody the §3553(a) considerations, both in principle and in practice. Given the difficulties in doing so, the abstract

and potentially conflicting nature of §3553(a)'s general sentencing objectives, and the differences of philosophical view among those who work within the criminal justice community as to how best to apply general sentencing objectives, it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve §3553(a)'s objectives.

*Id*. at 350. Thus, the Supreme Court in *Rita* recognized that although a district court has the authority to vary from the Guidelines, the Guidelines nevertheless serve to gauge the type of sentences which might comply with the goals of § 3553(a).

The Eighth Circuit has provided guidance to follow *Booker*. In *United States v. Haack*, 403 F.3d 997 (8th Cir.), *cert. denied*, 126 S.Ct. 276 (2005), the Eighth Circuit said that a district court must first determine the applicable sentencing range and then should decide if a traditional departure is appropriate under either Part K and/or § 4A1.3 of the Sentencing Guidelines. *Id.* at 1002–03. This results in a "guidelines sentence." *Id.* at 1003.

After the "guidelines sentence" is determined, the court shall then consider all other factors set forth in 18 U.S.C. § 3553(a) to determine whether to impose the sentence under the guidelines or outside the guidelines. *Id.* While a defendant's age and family considerations are certainly worthy of consideration by a court in determining a defendant's sentence, 18 U.S.C. §3553(a) sets forth additional factors which must be taken into account in fashioning a sentence.

Several of the factors to be considered under § 3553(a) are discussed below.

### 2.   Nature and Circumstances of the Offense:

One of the factors set forth in § 3553(a)(1) is "the nature and circumstances of the offense." In *United States v. Miller*, 484 F.3d 964, 967 (8th Cir. 2007), the Eighth Circuit reversed a sentence of probation in a drug case after the defendant had served 8 ½ months in pretrial detention where the Sentencing Guidelines called for a sentencing range of 37-46 months. According to the Eighth Circuit, the district court failed to accord significant weight to

the seriousness of the offense and the need to avoid unwarranted sentencing disparities. *See also*

*United States v. Gatewood*, 438 F.3d 894, 897 (8th Cir. 2007) (36 month prison sentence in a

felon in possession of firearm case where Guidelines range was 63-78 months failed to reflect

seriousness of offense conduct).

Here, there are many aspects of the case that the Government could discuss which

support a lengthy sentence.  This Court presided over the trial.  The post-trial motions rulings

demonstrate that this Court clearly has an complete command of the facts.  The Government will

not belabor these facts here nor repeat its closing arguments.  For purposes of punishment,

however, the following highlights of the circumstances of the offense help to justify this Court's

imposition of an effective life sentence.

### a.   Nature of the Misrepresentations:

Sigillito misrepresented the purposes for which the loans were being solicited, the use

that the money would be put to, and the risk associated with the loan.  He deprived lenders of the

information that they needed to make intelligent choices about the use of their money.  Most of

the loan funds were produced by lenders' hard work and labor, and Sigillito essentially wasted it

on expenses with no lasting value.  The risk was systematically misrepresented, most notably in

the false asset and liability statements.  Sigillito was able to convince lenders that there was little

or no risk of non-payment, because they were led to believe that the present value of Smith's

marketable assets exceeded his total liabilities by at least 2 to 1.  This, of course, could not have

been farther from the truth—and Sigillito knew it.  The misrepresentations continued to lead

investors to believe that documents were being produced legitimately in the U.K., that Smith was

the decision-maker on the BLP loans, and that their investment was secure.

### b.  **Complex Scheme by Design:**

The complexity of the scheme was no accident.  It was designed to overcome natural defenses to an otherwise bad investment.  One of the most devious aspects of the BLP scheme was the deliberate way in which it was marketed as achieving the greatest return and thereby caused the most harm.  This included the emphasis on Sigillito's legal and religious credentials, his use of affinity to find good "prospects" and trade on the reputations of others, the combination of a "too good to be true" interest rate with the low-risk appearance created by the asset and liability statements, the claimed lack of prior problems with loan and interest payment, the "short fuse opportunities," the threats to sue based on ambiguous commitments to loan funds, and the lulling effect of reports from Paul Vogel and Rollie Baer, all of which created the illusion of a successful and growing business model.  Representations concerning the pro-lender nature of U.K. were false, and Sigillito either knew they were false or intentionally closed his eyes to the obvious.  The mysterious nature of U.K. law and U.K. banking and real estate investment also served to overcome any lingering doubts that potential lenders harbored.  Such complexity was designed to conceal the truth that the business model was a fraud.

### c.  **Omissions of Material Information:**

There were many examples of circumstances that Sigillito should have disclosed to his victims under either a fiduciary duty theory or in order to make affirmative representations non-deceptive.  Lenders should have been told that Smith did not actually own the most "valuable" of the properties on the asset and liability statements and that the values were nothing more than speculation dependent on contingent future events.  Lenders should have been told that Smith needed to borrow funds just to meet his obligations to existing lenders and that the funds were circulating among lenders in the U.S. rather than being delivered to Smith for productive

investment.  Lenders should have been told that there had been prior defaults, that Smith was actually insolvent and could not obtain traditional financing if he tried.  Lenders should also have been told the truth about the reasons for delays and defaults, or the existence of both if they were unaware, so that they – not Sigillito – could make intelligent choices about what was in their best interest.  Instead, Sigillito always acted on what was in his best interest and that would prolong the scheme and avoid detection.

### d.  Financial Motivation:

Another aggravating fact is the extent to which Sigillito personally profited.  While Noel Bosse was having to sell her family farm in Colorado, while the Aguilars had to ration funds to allow them the ability to attend a weekend dance, while the Ahrens and the Walkers had to forgo other business opportunities, while Linda Givens maintained unnecessary debt on her residence and submitted her monthly budget to Sigillito for approval, Sigillito was living large.  This adds insult to the injury suffered by the victims.

### e.  Violation of Trust:

Finally, the most aggravating circumstance has been part of this case from the start – violation of trust.  Sigillito's conduct violated the trust that a client expects from his or her attorney.  Sigillito violated the trust that a parishioner and follower expects from his or her priest and bishop.  Sigillito violated the trust of his friends from many walks of life, including his parents' friends, his personal friends, his fellow club members, club personnel and even his wife.  As the victim impact statements reflect, the most common and serious consequence of Sigillito's crimes are that his victims feel that their trust was violated.  That is part of the reason that offenses like mail and wire fraud are prohibited and prosecuted federally.  These violations deserve severe punishment.

### 3. **Need for Deterrence and to Encourage Respect for the Law:**

In sentencing Sigillito, the Court must also consider the need for the sentence to afford adequate deterrence to criminal conduct to promote respect for the law. The Eighth Circuit has recognized that deterrence is one of the most important factors to be considered in imposing sentence. *See United States v. Sanchez-Garcia*, 642 U.S. 658, 663 (8th Cir. 2011) (approving of district court's giving "particular weight to the goal of deterrence, both general deterrence and specific deterrence"); *see also United States v. Caracappa*, 614 F.3d 30, 44 (2d Cir. 2010) (citing with approval district court's comment that general deterrence is a "critical element" of § 3553(a)). In *United States v. Likens*, 464 F.3d 823, 826 (8th Cir. 2006), the Eighth Circuit chastised a district court for failing to give appropriate weight to "the need . . . to afford adequate deterrence to criminal conduct" as required by 18 U.S.C. § 3553(a)(2)(B):

> The district court also incorrectly minimized the effect that a prison sentence has in achieving the goals of deterrence and promoting respect for the law. By minimizing the seriousness of the offense to justify a sentence of probation, the district court did not properly consider the need for the sentence imposed to serve as an adequate deterrent against other similar conduct. What we said in an earlier case applies with equal force here: "The goal of deterrence rings hollow if a prison sentence is not imposed in this case." *United States v. Ture*, 450 F.3d 352, 358 (8th Cir. 2006). Similarly, granting such a substantial variance does not promote substantial respect for the law. *See id.* at 357–58.

464 F.3d at 826; *see also United States v. Bueno*, 443 F.3d 1017, 1024 (8th Cir. 2006) (reversing district court's departure to 18 months from suggested range of 37 to 46 months as unreasonable for failure to adequately deter). While *Likens* and *Bueno* were both drug cases, the Eleventh Circuit has aptly noted that deterrence is even more crucial in the fraud context:

> Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment.

*United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotations and citations omitted).

An effective life sentence is necessary in this case to promote adequate general deterrence to criminal conduct. As Sigillito's own actions demonstrate, the financial motive for engaging in frauds such as the instant case is strong. Through his participation in the BLP, Sigillito went from being an unsuccessful attorney who had once declared bankruptcy to a multi-millionaire in the span of a few short years. Nor was the BLP a risky enterprise for Sigillito. Although he consistently misrepresented the risks of the program throughout its life, Sigillito took his fees at the initiation of every loan, ensuring that his profit was secure, at the expense of the lenders. These strong financial motives demand a correspondingly severe punishment to disincentivize such lucrative criminal conduct by others in the future.

Like all successful Ponzi schemes, the BLP was both designed to grow quickly and at the same time doomed eventually to fail. For more than ten years, the fraudulent conduct of Sigillito and his co-conspirators went undetected either by law enforcement or his victims. The reason the BLP was able to survive so long is that Sigillito and others preyed upon the trust and confidence of lenders to persuade them to leave their money in the program, promising higher and higher rates of return in order to lull them out of their mounting concerns. Sigillito knew that the collapse of the BLP was inevitable. Yet that alone was insufficient to dissuade him from misrepresenting to lenders year after year the risks attending the investments, even inducing new lenders to join the program whose funds were not previously at risk. Nor did Sigillito find his personal relationship with his victims, some of whom he had known since his childhood, to be any impediment to his fraudulent activities—to the contrary, they were a tool in his trade. Evidently, not even the prospect of future incarceration, which he must have known awaited him

after the BLP's demise, was enough to deter Sigillito from committing this tremendous crime. It is therefore all the more important that he be punished severely so as to persuade future would-be Sigillitos that a fraud scheme such as this, though it may make one rich, will not pay in the end.

### 4.   Protection of the Public:

Section 3553(a) also instructs the Court to consider "the need . . . to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). The Eighth Circuit has recognized that a history of continued or repeated fraudulent activity weighs against a defendant on this factor. *See United States v. Henderson*, 381 Fed. Appx. 620, 620 (8th Cir. 2010).

Although this may be Sigillito's first criminal conviction, his was no isolated crime. Sigillito engaged in a continuous pattern of fraudulent activity for more than ten years. During those ten years, Sigillito had numerous opportunities to bring a halt to the fraudulent conduct. There were also numerous occasions where the persistent inquiries of certain lenders threatened to uncover the fraud. In each of these circumstances, rather than come clean as to the true nature of the program, Sigillito redoubled his deceptive efforts, lulling the complaining lenders and defrauding new lenders in order to pay the old ones off. Such conduct demonstrates a willingness to engage in repeated criminal activity for the sole purpose of his individual gain, and at the sole expense of others.

The evidence at trial also demonstrated that Sigillito is a very effective con-man. Numerous lenders testified to their implicit trust of Sigillito and how it led them to invest their savings with him. Even sophisticated lenders who did not know Sigillito well, such as Brad Werner and J. Ben Miller, were so mesmerized by his apparent mastery of law and finance that they forwent formalized due diligence before making their investments. Other, less sophisticated lenders like Charles Davis were duped by his apparent air of confidence and authority in even a

single meeting. The Court was able to witness first-hand at trial Sigillito's significant rhetorical and oratorical gifts, including his ability to obfuscate and obscure the true nature of his fraudulent activity, even when confronted with documentary proof.

These considerations leave little doubt that, were Sigillito released from prison during his lifetime, he would be likely to reoffend. Even after the government's investigation was made public, Sigillito demonstrated an ability to obtain additional funds from the very people he had victimized in the course of the scheme (most notably, Linda Givens). In light of his repeated and continuous criminal conduct, lifetime incarceration is necessary to protect the public from future offenses by Sigillito.

### 5.   **The Need to Pay Restitution**:

The Court is instructed by Section 3553(a) to consider "the need to provide restitution to any victims of the offense." In this case, the defendant has no significant assets with which to repay victims. Those assets he does own are the subject of the government's forfeiture action, and the government intends to return the proceeds of that forfeiture to the victims in this case through restoration. Given Sigillito's age, it is unlikely that he would be able to obtain any significant income-earning employment after any significant period of incarceration. In addition, Sigillito's fraud conviction would make it nearly impossible for him to continue work in the legal profession, leaving him without a marketable set of credentials to use in securing future employment. Since the victims of Sigillito's crimes are unlikely to receive additional restitution by virtue of Sigillito's receiving a shorter sentence, this factor likewise weighs in favor of life imprisonment.

## 6.   Characteristics of the Defendant:

Several characteristics of the defendant justify an effective life sentence in this case. Chief among these are the facts that he was an attorney and a religious leader.  Although these factors were taken into account in reaching the Guidelines advisory sentence, they take this case out of the garden variety Ponzi scheme to more egregious level.  It was precisely because of the trust that others placed in an esteemed member of the legal community and a church leader that Sigillito was able to do so much harm to so many, and at such profit to himself.  Both characteristics essentially lowered the natural defenses of his victims and made them easier prey. In this sense, Sigillito presented himself as a "wolf in sheep's clothing."

Another characteristic that is aggravating of punishment is the motive beyond financial gain.  Sigillito subjected his victims to so much pain and loss for no greater good than his enjoyment of the finer material things in life.  These included the comforts of first class travel, a chauffeur-driven car, private school for his children, a vacation home, collectible antiques, lavish vacations for his family, the status associated with a private, members-only club, fine food, and overpriced liquor.  Most of these were temporary and fleeting pleasures, and few had any lasting value.  He lived as if there were no tomorrow – a sad truth in all Ponzi schemes, which can never last forever.  Words fail at describing a person who would use funds intended for the care and well-being of a dying man's soon-to-be-orphaned children to please his palate and provide him comfort. Yet in the case of Neil O'Sullivan, Sigillito did just that.

The Government anticipates that Sigillito will request the Court to consider a downward variance based on his age and lack of a serious criminal record.  In *United States v. Lee*, 453 F.3d 836, 839 (8th Cir. 2006), the Eighth Circuit held that a defendant who was 44 years old was not entitled to a downward variance because of his age.  According to the Eighth Circuit, age is

normally not relevant to sentencing unless the defendant is elderly and infirm.  In this case, Sigillito should not receive a downward variance because of his age.

The fact that Sigillito does not have any criminal history is not a ground for a downward variance.  In *United States v. Feemster*, 483 F.3d 583 (8th Cir. 2007), the Eighth Circuit said that the absence of grounds that justify further punishment is not a ground for a downward variance. *Id.* at 589. Sigillito's lack of a criminal history has already been taken into account under the Guidelines.  In *United States v. McMannus*, 436 F.3d 871 (8th Cir. 2006), the Eighth Circuit held that a defendant whose minimum sentence under the Guidelines was 262 months should not have received a sentence of 120 months merely because of a lack of criminal history.  *Id.* at 875. The court stated:

> In light of § 3553(a), we do not believe that Brinton's lack of criminal history, which is one of the factors that determined her advisory guidelines range, *see* U.S.S.G. ch. 4, or anything else in the record, justifies a variance of this magnitude.

*Id.*; *see also United States v. Ture*, 450 F.3d 352, 359 (8th Cir. 2007).

Sigillito may also rely on his family status to warrant a downward variance.  There is nothing in Sigillito's family situation that is uniquely different from other persons who are similarly situated.  In *United States v. Gentile*, 473 F.3d 888 (8th Cir. 2007), the Eighth Circuit held that a single mother who cared for a young child and also a nephew was not entitled to a sentence of probation when the minimum sentence under the Guidelines was 37 months.  *Id.* at 894. The court held that the defendant's personal circumstances were not so far removed from the typical offender so as to justify such a significant variance from the Guidelines range. The same is true here. Sigillito does not have any especially young children or other dependents in serious need of his care, nor has he demonstrated that their situation will be materially impacted by his incarceration.

**7.   Avoidance of Unwarranted Sentencing Disparity:**

Among the factors considered by 18 U.S.C. § 3553(a) is the "need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." *Id*. § 3553(a)(6). The Eighth Circuit in *United States v. Bryant*, 446 F.3d 1317 (8th Cir. 2006), recognized the importance of utilizing the Guidelines to avoid sentencing disparities, as follows:

> The sentencing guidelines are no longer mandatory, but they continue to be guideposts that must be respected, lest we see a return to the unwarranted sentencing disparities that resulted in the adoption of the guidelines themselves.

*Id*. at 1320.

In making such a determination, a court is not required to look to statistical data to determine whether a sentence approximates the norm among similarly situated individuals, but should instead focus simply on how similar conduct is treated under the Guidelines. In *United States v. Rubashkin*, for example, the Eighth Circuit recently reviewed a sentence imposed by this very Court against a defendant whose Guidelines loss was determined to be $27 million. 655 F.3d 849, 868 (8th Cir. 2011). The defendant cited statistical data showing "that fraud defendants with loss amounts in the $20-50 million range received 145 months sentence on average." *Id*. at 869. The Eighth Circuit rejected this evidence out of hand, noting that "district courts are certainly not required to impose an average sentence in every case" but are instead given "broad sentencing discretion." *Id*. (citing *Gall v. United States*, 552 U.S. 38 (2007); *United States v. Booker*, 543 U.S. 220 (2005)). Noting "[s]entences within the guideline range are presumed to be substantively reasonable," the Eighth Circuit affirmed this Court's imposition of a sentence of 27 years imprisonment. *Id.*

The Eighth Circuit further noted that Rubashkin's statistics were unhelpful because they failed to "show the degree of variation from that average," which variation may be justified in any case by a variety of other considerations. *Id*. at 869. Such statistics are deficient for another reason as well: they fail to take into account the complex multifactor analysis required under both the Guidelines and section 3553(a). For example, a first-time offender who accepts responsibility for a $25 million fraud might have a Guidelines recommendation as low as 63 to 78 months—but if the same offender organizes criminal activity here and abroad, abuses a position of trust, defrauds a large number of vulnerable victims, and perjures himself at trial, the Guidelines would recommend a life sentence.  That is because the Guidelines recognize the complexity of a court's sentencing determinations and therefore do not—like *Rubashkin's* statistics—focus on any one factor as being determinative.

Likewise, section 3553(a) focuses on many considerations beyond the nature of the offense itself, including the need for the sentence to promote respect for the law, to afford adequate deterrence, and to protect the public from further crimes of the defendant. *See* 18 U.S.C. § 3553(a)(2). The relevant comparison, therefore, is not merely with crimes causing similar losses, but rather with crimes of similar seriousness, as reflected by their treatment under the Guidelines. *See id*. § 3553(a)(6) (noting need to avoid "*unwarranted* sentencing disparities" (emphasis added)). Indeed, such a comparison is implicit in this Court's consideration of the Guidelines themselves. *See Gall v. United States*, 552 U.S. 38, 54 (2007) ("[S]ince the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities." (emphasis added)); *United States v. Reyes-Medina*, 683 F.3d 837, 841 (7th Cir. 2012) ("A sentence within a guideline range 'necessarily' complies with § 3553(a)(6)." (citing *Gall*)).

To the extent, however, that comparison with other cases has any relevance, an effective life sentence is by no means unprecedented in a financial fraud case such as this one, at least when such a sentence is recommended by the Guidelines. *Cf. United States v. Lewis*, 594 F.3d 1270, 1275 (10th Cir. 2010) (310-year sentence for $40M fraud; Guidelines recommended life); *United States v. Williams*, Case No. 8:09-cr-213 (D. Md. April 4, 2012) (150-year sentence for $78M fraud; Guidelines recommended life); *United States v. Harkless*, Case No. 5:07-cr-018 (C.D. Cal. Oct. 13, 2009) (100-year sentence for $39M fraud; Guidelines recommended life); *United States v. Simmons*, Case No. 3:10-cr-023 (W.D.N.C. June 11, 2012) (50-year sentence for $40M fraud; Guidelines recommended life; defendant was 47); *United States v. Hagen*, 468 Fed. Appx. 373, 375 (4th Cir. 2012) (45-year sentence for $27 million fraud; Guidelines recommended life; defendant was 46). Where the Guidelines recommend life imprisonment, it is "eminently reasonable for the district court to impose a sentence functionally equivalent to life imprisonment by imposing the maximum sentence for each crime of which [the defendant] was convicted and making the sentences consecutive." *Lewis*, 594 F.3d at 1275.

Sigillito will no doubt argue that he should not receive a sentence that is markedly greater than the sentence imposed on Derek Smith and James Scott Brown. There are several significant distinctions between Smith, Brown and Sigillito which serve to explain any disparity. "Sentencing disparities are not unwarranted when there are legitimate distinctions between codefendants." *United States v. Maxwell*, 664 F.3d 240, 245 (8th Cir. 2011) (citing *United States v. Jones,* 612 F.3d 1040, 1045 (8th Cir. 2010)). While Brown may have been instrumental in presenting the BLP program to Sigillito when it was in its infancy and while Smith may have been instrumental as the borrower willing to do anything Sigillito told him to, neither one comes close to Sigillito in terms of the harm that he caused and the profit that he reaped. Sigillito was

the life force behind the BLP when it was most productive.  Smith had to be controlled and managed by Sigillito to keep Smith from refusing to continue his participation.  Brown was not fully aware of the later extent of Sigillito's borrowing and was essentially used to lull lenders as directed by Sigillito. While Brown and Smith each received significant funds through the BLP, together they received only a fraction of the gains reaped by Sigillito.

More importantly, Brown's and Smith's responses to the demise of the BLP and the initiation of the law enforcement investigation sets them apart from Sigillito.  Both Smith and Brown immediately cooperated with law enforcement by answering questions and providing documents about the workings of the BLP.  The money trail told the story of who was primarily responsible for the BLP, but many questions remained. Both Smith and Brown were essential to completing the investigation.  From the vantage point of May 2010, Smith was a foreign national.  If he refused to cooperate, it might be years before the Government could extradite him.  The Government made a favorable agreement with Smith out of necessity and in an effort to obtain what little asset value there was for victims.  It remains to be seen what that value will be, but Sigillito's use of a foreign national as the borrower placed the Government at a severe disadvantage in obtaining needed evidence to prove the case against Sigillito.

Similarly, Brown was cooperative from the start and the Government spent several long days debriefing Brown about the meaning of various documents and records covering a decade of activity.  Like Smith, Brown was an essential witness and an agreement was made with him that also included recovery of assets which may offer some value for victims.  The terms of the agreement were dictated by circumstances, including Brown's age and health, and were necessary to offer Brown any incentive to cooperate.  Sigillito should not be heard to complain that his sentence would be too severe compared to Brown's sentence where Brown was a

necessary witness to prove Sigillito's guilt and Sigillito declined any opportunity to cooperate with respect to the government's investigation or its efforts to return assets to victims. He continues to make the contest to forfeit his assets one of his primary concerns.

In terms of culpability, the Government made agreements with the right participants. Sigillito was the participant who determined the course of the BLP, brought in the most revenue, and reaped the greatest benefit. Any disparity in the sentences given him and his coconspirators is warranted and just.

**F.  Conclusion**:

This case represents the largest Ponzi scheme ever prosecuted in this district. Sigillito's conduct spanned a long period of time, reached a large number of victims, violated the trust of numerous victims, used an international front, and reaped millions for his own personal satisfaction. Many victims have been left financially ruined and their futures have been placed in jeopardy. All victims are left feeling violated and unable to trust others in the future. Sigillito exercised his trial right and put his victims through a trial. He testified in his defense and attempted to escape responsibility by lying under oath. Through it all, Sigillito has remained unrepentant and unapologetic. He looks the storm in its eye and denies it is raining. An effective life sentence is warranted to deter others and punish Sigillito. The Government respectfully suggests that in this case an effective life sentence would be satisfied by a sentence of at least 50 years. However, given the magnitude of the losses, the impact on the victims and the relatively historic nature of the scheme in this district and state, a sentence to the maximum allowed, 325 years, would provide a powerful deterrent to others contemplating similar conduct while at the same time still achieving the same effective life sentence. As discussed *supra*, such a sentence would be well within this Court's discretion to impose.

Dated: October 10, 2012       Respectfully submitted,


ERIC H. HOLDER, JR.
United States Attorney General

DAVID KETCHMARK
Acting United States Attorney
WESTERN DISTRICT OF MISSOURI

  *s/ Jess E. Michaelsen*
JESS E. MICHAELSEN, #52253
Special Attorney to the United States Attorney General
Charles Evans Whittaker Courthouse
400 East Ninth Street, Fifth Floor
Kansas City, Missouri  64106
Telephone:  (816) 426-3122

  *s/ Steven E. Holtshouser*
STEVEN E. HOLTSHOUSER, #24277
Special Attorney to the United States Attorney General
111  South 10th Street, Room 20.333
St. Louis, Missouri  63102
Telephone:  (314) 539-2200

  *s/ Richard E. Finneran*
RICHARD E. FINNERAN, #60768
Special Attorney to the United States Attorney General
111  South 10th Street, Room 20.333
St. Louis, Missouri  63102
Telephone:  (314) 539-2200

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2012, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system upon all counsel of record.

  *s/ Richard E. Finneran*