# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-1027

_____

United States of America

*Plaintiff - Appellee*

v.

Martin T. Sigillito, also known as Marty, also known as Bishop Sigillito

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 13, 2014
Filed: July 18, 2014

_____

Before LOKEN, MURPHY, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Martin Sigillito was convicted of multiple counts of wire fraud, mail fraud, conspiracy to commit wire and mail fraud, and money laundering, because of his involvement in a Ponzi scheme known as the "British Lending Program" (BLP). Sigillito also forfeited certain properties as a result of these convictions.

On appeal, Sigillito challenges several district court[1] decisions that span from indictment through sentencing. Sigillito's pre-trial challenges include the district court's (1) denial of his motion to suppress evidence found pursuant to a search warrant that allegedly failed to state with sufficient particularity the items to be seized, failed to contain statutory notices related to forfeiture, and was the product of an unlawful private search; (2) purported lack of jurisdiction because the government proceeded with allegedly interested Assistant United States Attorneys (AUSAs); (3) denial of a motion for new trial despite the government's alleged failure to disclose *Brady*[2] materials; and (4) denial of Sigillito's motion for new trial based on the government's alleged investigative misconduct. Sigillito also asserts that errors occurred during trial, including the district court's (1) failure to submit the maximum amount of forfeitable property to the jury; (2) failure to grant a motion for new trial where the government allegedly commented improperly on Sigillito's credibility; (3) cross-examination restrictions of certain witnesses that thwarted the potential to show witness bias or Sigillito's lack of intent; and (4) giving of a willful blindness instruction. Finally, Sigillito asserts sentencing errors, including (1) the district court's miscalculation of the amount of loss, (2) the district court's erroneous application of the vulnerable-victim enhancement, and (3) the substantive reasonableness of the sentence. We affirm.

## I. *Background*

Sigillito is an attorney and Anglican bishop who has lived in greater St. Louis for many years. According to Sigillito, he met J. Scott Brown, a Kansas City attorney, while in England attending a legal conference in 1988. He and Brown remained professional acquaintances throughout the 1990s. In 1999, Brown called Sigillito

---

[1] The Honorable Linda R. Reade, Chief Judge, United States District Court for the Northern District of Iowa, sitting by designation in the United States District Court for the Eastern District of Missouri.

[2] *Brady v. Maryland*, 373 U.S. 83 (1963).

Appellate Case: 13-1027    Page: 2    Date Filed: 07/18/2014 Entry ID: 4176736

about a program that would be "something that [Sigillito] and [Sigillito's] clients might be interested in." Sigillito testified that he received information and assurances about the program from Brown as well as legal advice about the program from others. Sigillito agreed to get involved.

This program became known as the BLP. Under the BLP, Sigillito and Brown recruited lenders in the United States to make loans to Derek Smith, a real estate investor in the United Kingdom. These loans were one-year, unsecured loans that paid exorbitant interest—often between 15 and 48 percent. Smith was not the only borrower at the BLP's inception, but Sigillito and Brown concealed various defaults by other borrowers by transferring their debt to Smith, who became the only borrower by 2003. Beginning in 2004, Sigillito operated the BLP from his solo law firm in St. Louis. By 2010, Smith owed investors approximately $70 million from BLP loans; however, Smith rarely received any of the loan proceeds. Instead, Sigillito and Brown used most of the money supposedly loaned to Smith to repay prior lenders. They also retained much of the lenders' money as loan fees (up to 32 percent of the loan).

Sigillito actively marketed the BLP to friends and church acquaintances. Sigillito made several fraudulent misrepresentations about the BLP to potential lenders. For example, he stated that Smith would receive the loan proceeds to make real estate purchases in the United Kingdom; however, Smith received little. Sigillito also represented that the loans were safe and virtually risk-free. He did this by regularly assuring lenders that Smith's asset-to-debt ratio was at least 2:1, or even as high as 3.7:1. These ratios convinced lenders that they could satisfy any potential default from Smith's abundant assets. Sigillito greatly inflated Smith's alleged assets in this ratio by including speculative future values in unrealized real estate options. Meanwhile, the liabilities were deflated by, most notably, the failure to include Smith's BLP obligations. In reality, Smith was insolvent during much of the time that the BLP operated, and emails confirmed that Sigillito was aware of Smith's

Appellate Case: 13-1027    Page: 3    Date Filed: 07/18/2014 Entry ID: 4176736

insolvency. Sigillito, Brown, and Smith warranted these misleading asset-to-debt ratios in each of the loan agreements that the various lenders signed.

Additionally, when Smith tried to leave the program, Sigillito demonstrated how he could alter the loan numbers to make Smith appear solvent. Sigillito then persuaded Phil Rosemann, the BLP's largest lender, to loan a significant amount to the BLP; however, Rosemann sought acceleration of the loan after the BLP made late payments to him. Sigillito continued to market the BLP actively in an effort to satisfy Rosemann's demands, including misrepresenting the extent of Smith's liabilities and the safety of the BLP, among other things. Sigillito also claimed that he regularly reviewed Smith's financial statements as part of his due diligence to the lenders, further misrepresenting Smith's purported worth.

The BLP began to crumble when Rosemann filed suit against Smith for repayment of the loan. Smith responded by asserting that he never received any of Rosemann's money. Rosemann then turned to Sigillito for an explanation. During this time, Sigillito's secretary, Elizabeth Stajduhar, who admitted to embezzling over $300,000 from Sigillito from 2004 to 2010 and over $80,000 in investor money from the BLP, contacted the Federal Bureau of Investigation (FBI) about the BLP. The FBI then initiated a criminal investigation, which led to Sigillito's arrest and indictment. In all, the BLP claimed approximately 150 victims. Records indicate that the BLP received at least $52 million in investor funds. Approximately $28 million went toward repayment of prior loans. Sigillito profited more than any other member of the BLP, making about $6.2 million.

On April 28, 2011, the government filed a 22-count indictment against Sigillito. He was charged with nine counts of wire fraud, in violation of 18 U.S.C. § 1343; six counts of mail fraud, in violation of 18 U.S.C. § 1341; one count of conspiracy to commit wire and mail fraud, in violation of 18 U.S.C. § 371; and six counts of money laundering, in violation of 18 U.S.C. § 1957. The district court conducted a four-week

-4-

jury trial beginning on March 19, 2012. After accepting plea deals, Stajduhar, Smith, and Brown all testified for the government. Brown and Smith admitted that the BLP was a Ponzi scheme. Brown testified that it existed just to generate fees and that Sigillito knew that the BLP became a Ponzi scheme as early as 2003. Smith testified that the loan agreements into which he entered were untruthful and contained misrepresentations.

On April 13, 2012, the jury found Sigillito guilty of 20 counts.[3] The district court denied Sigillito's motions for judgment of acquittal and for new trial. The district court also granted the government's motion for preliminary order of forfeiture. On December 28, 2012, the district court sentenced Sigillito to "240 months on each of Counts 1–13; 60 months on Count 16; and 120 months on each of Counts 17–22, with the terms imposed on Counts 2–13 and 16–22 to run concurrently with each other but consecutively to the term imposed on Count 1." Thus, the district court sentenced Sigillito to 40 years' imprisonment, which the district court expressly intended to be a life sentence.

II. *Discussion*

A. *Pre-Trial Challenges*

Sigillito avers on appeal that the district court committed several pre-trial errors. He contends that the district court erred in denying his motion to suppress evidence obtained at his law office because the warrant did not state with particularity the items to be seized, failed to contain requisite statutory notices related to forfeiture, and resulted from an unlawful private search. Sigillito also contends that the district court lacked jurisdiction over his case where the government proceeded with allegedly interested AUSAs. Additionally, Sigillito challenges the government's denial of his motion for new trial based on the government's alleged failure to disclose *Brady*

---

[3]The government had previously dismissed two counts of mail fraud.

Appellate Case: 13-1027     Page: 5     Date Filed: 07/18/2014 Entry ID: 4176736

materials. Finally, Sigillito avers that the government committed investigative misconduct, rendering erroneous the district court's denial of his motion for a new trial.

### 1. *Motion to Suppress*

Based on the information that Stajduhar provided the FBI, the government obtained a search warrant targeting Sigillito's law office. Sigillito voluntarily left his office when agents arrived to perform the search. Officers seized a variety of records, valuables, and potential evidence in connection with the BLP.

### a. *Particularity*

The search warrant described the property to be seized by reference to "Attachment A." Attachment A included 13 paragraphs describing the property to be seized. Sigillito argues that Attachment A authorized only a general search because it lacked the requisite particularity. He contends that the warrant and attachment failed "to describe the purported criminal activity to which the search related," for the only references to any criminal activity were the phrases "Ponzi Scheme" and "investment scheme." Sigillito also contends that Attachment A's description of business records is "impermissibly broad." Examples of this broad language include: "Records of all personal and business expenditures," "cash, checks, or other monetary instruments," and "business records, bank statements, bank deposit tickets, cancelled checks . . . and other records of receipts, dispositions, and disbursements of funds received by Martin T. Sigillito."

Sigillito also contends that the government intentionally removed Attachment A from the warrant during its execution. Sigillito supports this argument by noting that he did not receive Attachment A with the copy of the warrant that the government left at his law office. Sigillito posits that the FBI left only the warrant and an eight-page inventory of the items seized. The government's photograph of the materials that the FBI left at the scene does not show Attachment A. However, FBI Special Agent

-6-

Kevin Cosentino testified at the suppression hearing that, just prior to execution of the warrant, he distributed several copies of Attachment A for the members of the execution team to review. When asked whether he "believe[d] that Attachment A was included . . . in what [he] left behind," Special Agent Cosentino replied, "Yeah, it was my belief that the entire warrant was there, and it was also my intent that the entire warrant was there." He also testified that if Attachment A was not included, as the photograph may indicate, its absence would have been "completely inadvertent." When asked on cross-examination whether he agreed that Attachment A had been intentionally removed because it did not appear in the government's photograph, Special Agent Cosentino responded "that's not true." He later acknowledged that its intentional removal was "possible."

In its order denying Sigillito's motion to suppress, the district court found that Attachment A was present for the magistrate's consideration and at execution. The district court based its conclusion on Special Agent Cosentino's testimony that he possessed Attachment A during execution and that he left a copy of the warrant for Sigillito with Attachment A attached. Furthermore, if he did not leave Attachment A, the exclusionary rule would not apply to such an inadvertence. Additionally, the district court noted that although Attachment A described the business records sought broadly, the expansive nature of the fraud required broad language. According to the district court, the authorities had probable cause to believe that Sigillito's entire business was permeated by a continuous, ten-year fraud. Finally, the district court found that the officers acted in reasonable reliance on the warrant. Therefore, even if the warrant was invalid, the *Leon*[4] good-faith exception would allow introduction of the seized evidence. Consequently, the district court denied Sigillito's motion to suppress.

---

[4]*United States v. Leon*, 468 U.S. 897 (1984).

"On review of a motion to suppress, we review the district court's factual findings for clear error and review its legal conclusions *de novo*." *United States v. Brooks*, 715 F.3d 1069, 1075 (8th Cir. 2013) (citation omitted). We give "'due weight' to the inferences of the district court and law enforcement officials. A district court's credibility findings are well-nigh unreviewable, so long as the findings are not internally inconsistent or based on testimony that is incoherent, implausible, or contradicted by objective evidence." *United States v. Robbins*, 682 F.3d 1111, 1115 (8th Cir. 2012) (quotations and citation omitted).

The Warrant Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly* describing the place to be searched, and the persons or things to be seized." (emphasis added). Particularity prohibits the government from conducting "general, exploratory rummaging of a person's belongings." *United States v. Saunders*, 957 F.2d 1488, 1491 (8th Cir. 1992) (quotation and citation omitted). "To satisfy the particularity requirement of the fourth amendment, the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." *United States v. Summage*, 481 F.3d 1075, 1079 (8th Cir. 2007) (quotation and citation omitted). Furthermore, "[t]he degree of specificity required will depend on the circumstances of the case and on the type of items involved." *Id.* (quotation and citation omitted). This particularity standard is one of "practical accuracy rather than" of hypertechnicality. *United States v. Peters*, 92 F.3d 768, 769–70 (8th Cir. 1996) (quotation and citation omitted). The Fourth Amendment requires particularity in the warrant, not supporting documents like an application or affidavit. *Groh v. Ramirez*, 540 U.S. 551, 557 (2004).

We have recognized that fraud cases present unique particularity problems. We have stated that "a search warrant involving a scheme to defraud is sufficiently particular in its description of the items to be seized if it is as specific as the circumstances and nature of activity under investigation permit." *Saunders*, 957 F.2d

-8-

at 1491 (quotation and citation omitted). As a result, we have recognized a permeated-fraud exception that allows the government to seize almost every record of a business when evidence shows that fraud in the business was pervasive; in *United States v. Kail*, we explained:

> While the search warrant in this case was broad in the sense that it allowed inspectors to seize almost all of the business records of Coin & Stamp Gallery, we would conclude that under the particular facts of this case the scope of the warrant was justified. This is because it would not be possible through a more particular description to separate those business records that would be evidence of fraud from those that would not since there was probable cause to believe that fraud permeated the entire business operation. We would therefore affirm the district court's finding that the warrant was sufficiently particular.

804 F.2d 441, 445 (8th Cir. 1986). Furthermore, generic terms may satisfy the particularity requirement in certain cases. *See Peters*, 92 F.3d at 770; *see also United States v. Hall*, 142 F.3d 988, 996 (7th Cir. 1998) ("If detailed particularity is impossible, generic language is permissible if it particularizes the types of items to be seized.").

Here, the government satisfied the particularity requirement given the ubiquity of the BLP within Sigillito's law office. Additionally, no persuasive evidence suggests that the searching officers acted in bad faith and without reasonable reliance on the search warrant. First, as the district court explained, "there was probable cause to believe that Sigillito's entire business was permeated by a continuing fraud that lasted for approximately ten years." Stajduhar's revelations demonstrated that Sigillito rarely practiced law. Instead, since 2004, he devoted his time predominately to the operation of the BLP. As such, it was not error, much less clear error, for the district court to conclude that the fraud "permeated" the firm such that the warrant's reach encompassed most of the firm's records. Second, it would have been difficult, if not impossible, to craft more specific descriptions of the property to be seized considering

-9-

the expansive reach of the fraud. Third, although the warrant was somewhat vague as to the type of criminal activity involved, it was clear that the government was concerned about a fraudulent "investment scheme" or "Ponzi scheme." Such descriptions sufficed to alert both the magistrate and Sigillito as to the reason for the search and seizure. We hold that the warrant meets the particularity requirement.

Sigillito avers that the district court nonetheless erred by denying his motion to suppress evidence found pursuant to this search warrant because the searching agents failed to leave a copy of Attachment A at his law office. Sigillito contends that the executing officers intentionally determined not to leave a copy of Attachment A at the scene of the search to prevent Sigillito from learning the scope of the government's investigation. The district court relied on Special Agent Consentino's testimony that he possessed a copy of Attachment A during execution of the warrant and that he believed that he left a copy of Attachment A in Sigillito's law office. The district court also concluded that, even if Special Agent Consentino neglected to leave a copy at Sigillito's office, the exclusionary rule would not apply because any such failure would have been inadvertent.

A warrant may cross-reference other documents when it uses appropriate words of incorporation and if the supporting document accompanies the warrant. *United States v. Curry*, 911 F.2d 72, 77 (8th Cir. 1990) Incorporation relates to the concept of warrant particularity, for particularity prohibits general searches and also informs the subject of the search of the lawful authority of the officer, the need to search, and the limits of the power to search. *Groh*, 540 U.S. at 561.

We have previously determined that an attachment renders the warrant sufficiently particular if the attachment is present at the execution of the search, regardless of whether the searching officers provide the attachment to the defendant following the search. *United States v. Riesselman*, 646 F.3d 1072, 1077 (8th Cir. 2011). We have also recognized that, despite the attachment's absence at execution,

-10-

the exclusionary rule will not bar the seized evidence where the searching officers' omission of the attachment constituted nothing more than nonrecurring negligence. *United States v. Hamilton*, 591 F.3d 1017, 1027–29 (8th Cir. 2010).

Here, even if the executing officers failed to leave a copy of Attachment A at the scene of the search, any error would have been an isolated inadvertence rather than indicative of a pattern of recurring negligence. *See id.* Such inadvertence does not trigger application of the "last resort" remedy of exclusion. *See id.* at 1027–28 (citation omitted). Special Agent Consentino testified that any omission would have been accidental. Additionally, we reject Sigillito's contention that the executing officers intended to conceal the scope of the investigation by failing to leave Attachment A at the scene of the search. The record demonstrates that the executing officers left a comprehensive handwritten inventory of the items seized at the scene of the search. This inventory was sufficient to apprise Sigillito of the scope of the government's investigation into the BLP, even assuming that the government had such a duty to inform Sigillito at that stage in the proceedings. As a result, the district court did not clearly err in finding that any error in omitting Attachment A would have been merely an isolated incident of negligence.

Sigillito argues on appeal that the failure to leave Attachment A violated Federal Rule of Criminal Procedure 41(f)(1)(C), which provides that "[t]he officer executing the warrant must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer took the property." When officers fail to leave an attachment to the warrant with the subject of the search, the officers violate Rule 41(f)(1)(C). *Riesselman*, 646 F.3d at 1078. However, exclusion of evidence is required only when the error prejudices the defendant, or the police act in reckless disregard to the proper procedure. *Id.* Leaving an inventory of the items seized at the scene renders it difficult for defendants to show

-11-

prejudice. *Id.* Sigillito has shown no prejudice and thus proven no reversible error for a violation of Rule 41(f)(1)(C).

### b. *Statutory Forfeiture Requirements*

Sigillito argues that the search warrant that authorized the search and seizure of documents and other valuables located in his law office was facially invalid because it failed to include requisite statutory showings. The district court found that Sigillito was "confused" about the nature of the search warrant. When the search occurred, the government mainly sought to investigate criminal activity and not to obtain forfeitable properties.

Sigillito contends that the warrant failed to comply with 21 U.S.C. § 853, which governs criminal forfeitures involving "[a]ny person convicted of a violation of [the control and enforcement subchapter] or [the import and export subchapter] of [the Drug Abuse Prevention and Control] chapter [of Title 21]. This particular statute provides:

> The Government may request the issuance of a warrant authorizing the seizure of property subject to forfeiture under this section in the same manner as provided for a search warrant. If the court determines that there is probable cause to believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that an order under subsection (e) of this section may not be sufficient to assure the availability of the property for forfeiture, the court shall issue a warrant authorizing the seizure of such property.

21 U.S.C. § 853(f). Subsection (e) of § 853 provides a process by which a court may issue a temporary restraining order to protect the property subject to forfeiture. The warrant did not contain these findings, so Sigillito argues that the search warrant was invalid.

-12-

The district court correctly held that the search warrant was not required to contain the § 853(f) findings. First, although the search-and-seizure team included a forfeiture expert, the government's investigatory purpose outweighed any interest in criminal forfeiture. Second, Federal Rule of Criminal Procedure 41(c) provides that "[a] warrant may be issued for . . . (1) evidence of a crime; (2) contraband, fruits of crime, or other items illegally possessed; (3) property designed for use, intended for use, or used in committing a crime; or (4) a person to be arrested or a person who is unlawfully restrained." Thus, Rule 41(c) contemplates search warrants without § 853 showings. Finally, the text of § 853 and its location in the Code demonstrate that these findings are required in search warrants in the context of certain drug crimes, not Ponzi schemes involving the crimes that Sigillito committed. As a result, the district court correctly determined that the warrant was not facially invalid.

### c. *Unlawful Private Search*

Sigillito contends that the government obtained probable cause to seize items as proceeds only as a result of an unlawful private search. More specifically, Sigillito contends that the FBI directed Stajduhar to return to Sigillito's law office in order to obtain materials that would form the basis of probable cause, most notably a Personal Articles Declaration (PAD) that contained evidence of the items that Sigillito bought with BLP proceeds.

The Fourth Amendment does not protect against searches by private citizens unless that citizen is acting as a "government agent." *United States v. Muhlenbruch*, 634 F.3d 987, 998 (8th Cir. 2011) (citation omitted). In deciding if "a private citizen is acting as a 'government agent,' we consider (1) whether the government had knowledge of and acquiesced in the search; (2) whether the citizen intended to assist law enforcement agents or to further his own purposes; and (3) whether the citizen acted at the government's request." *Id.* (citation omitted).

-13-

Stajduhar retrieved over 500 pages of documents before her contact with law enforcement. For these documents, Stajduhar did not act at the government's request; in fact, the government had no knowledge of her document retrieval. *See id.* Stajduhar later provided the PAD to the FBI, but it is unclear whether Stajduhar already had the PAD in her possession or obtained the PAD after returning to Sigillito's office at the FBI's request. The district court found that the FBI did not request her to obtain the PAD; however, Special Agent Cosentino testified that he *did* request the PAD, but it is unclear from his testimony whether Stajduhar had already obtained the PAD in her initial, unsolicited document grab.

We need not determine whether the district court clearly erred in concluding that the FBI never requested Stajduhar to search Sigillito's office to obtain the PAD. The record reflects that the affidavit used to support the search warrant did not rely on information contained in the PAD. In fact, the FBI did not possess a copy of the PAD until after it applied for the search warrant on Sigillito's office. Furthermore, the investigating agents recovered several copies of the PAD pursuant to their search of Sigillito's office. Any subsequent fruit that the PAD bore would not require suppression. *See Nix v. Williams*, 467 U.S. 431, 443–44 (1984) (noting the independent source and inevitable discovery exceptions to the Fourth Amendment's exclusionary rule). We reject Sigillito's call to suppress evidence seized pursuant to warrant because the underlying search warrant did not rely on the information that Stajduhar purportedly obtained during an unlawful private search.

## 2. *Jurisdiction and Interested AUSAs*

Sigillito makes two arguments relating to the authority of the AUSAs in this case to prosecute him. First, he argues that the United States Attorney's Office for the Eastern District of Missouri ("Eastern District USA") investigated and prosecuted him despite a conflict of interest. Specifically, Sigillito contends that the involvement of two attorneys who worked for the Eastern District USA during his investigation and prosecution prevented the district court from having jurisdiction to hear the case.

-14-

Sigillito emphasizes that the Eastern District USA had previously recused itself from participating in his prosecution. Second, and relatedly, he contends that the Attorney General's appointment of the United States Attorney's Office for the Western District of Missouri ("Western District USA") as the special attorney assigned to handle his prosecution was ineffective in eliminating the conflict pursuant to 28 U.S.C. § 547.

The government responds that we should review Sigillito's interested-AUSA arguments for plain error because Sigillito failed to object to the district court. Sigillito contends that we should conduct de novo review of these claims because an interested AUSA concerns the subject matter jurisdiction of the district court. We need not resolve the standard of review because Sigillito's arguments fail even under a de novo standard.[5]

### a. *Conflicts of Interest within the Eastern District USA*

Prosecutors are permitted to be zealous in their prosecution of a crime. *Young v. United States ex. rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987). However, prosecutors must be disinterested such that they may not represent the United States "in any matter in which they, their family, or their business associates have any interest." *Id.* at 803 (citation omitted). This is because "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 249–50 (1980) (citations omitted). As a result, the presence of an interested prosecutor is a

---

[5]We also decline to address whether Sigillito waived or forfeited these arguments by failing to object below. After oral argument in this case, Sigillito filed a motion in this court to correct the record. Sigillito sought to supplement the record with materials that would demonstrate that he raised the issue of subject matter jurisdiction to the district court as it related to the conflicts of interest in the Eastern District and the authority of the Western District to prosecute him. Because our decision does not turn on whether Sigillito raised his concerns to the district court, we deny his motion to correct the record.

-15-

fundamental error that "undermines confidence in the integrity of the criminal proceeding." *Young*, 481 U.S. at 810 (citations omitted). Because of the fundamental nature of this error, we do not conduct a harmless-error or prejudice analysis. *Id.* at 811–12.

Although such errors are so fundamental that prejudice need not befall the defendant, the defendant nonetheless must show that an actual conflict of interest is present. *See United States v. Rosnow*, 977 F.2d 399, 411 (1992). Furthermore, courts may require a stronger showing of conflict for a prosecutor than a judge. *Young*, 481 U.S. at 811.

Mary O'Sullivan, a testifying witness and victim of the BLP, is a cousin of Jim Crowe, an attorney employed in an allegedly supervisory capacity with the Eastern District USA. Because of the potential of perceived bias, the Western District USA conducted the prosecution instead of the Eastern District USA. Sigillito contends that the Western District USA did so because the entire Eastern District USA recused itself. Despite the recusal of the Eastern District USA, two of its attorneys participated in Sigillito's prosecution. Sigillito argues that the district court therefore lacked jurisdiction because of the presence of these two allegedly interested AUSAs.

Sigillito has failed to demonstrate that Crowe exercised any authority in the case that would call the fairness of the trial into question. Crowe did not supervise the two Eastern District USA attorneys in this case or participate in Sigillito's prosecution. The two attorneys had no personal or financial interest at stake in the outcome of the prosecution. In other words, Sigillito has failed to demonstrate the presence of an actual conflict of interest. *See Rosnow*, 977 F.2d at 411. Additionally, we reject Sigillito's comparison to the recusal of all of the district court judges in the United States District Court for the Eastern District of Missouri ("Eastern District of Missouri") because a stronger showing of conflict is required for prosecutors than judges. Furthermore, the judges in the Eastern District of Missouri recused themselves

-16-

for an entirely different, more problematic conflict—Sigillito's wife was a law clerk for a judge in the Eastern District of Missouri. Consequently, Sigillito has failed to demonstrate the presence of an actual conflict of interest that would undermine our confidence in the integrity of his criminal proceedings below. *See Young*, 481 U.S. at 810.

### b. *Authority of the Western District USA to Prosecute*

Federal law provides that "each United States attorney, within his district, shall . . . prosecute for all offenses against the United States." 28 U.S.C. § 547. However, "[t]he Attorney General may appoint attorneys to assist United States attorneys when the public interest so requires." 28 U.S.C. § 543. These "special attorneys"

> may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings and proceedings before committing magistrate judges, which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought.

28 U.S.C. § 515.

Sigillito contends that the United States Attorney (USA) from the Western District USA had no authority to prosecute him because 28 U.S.C. § 547 requires that USAs prosecute crimes only within their district. While generally true, Sigillito ignores the statutes that allow the Attorney General to appoint special attorneys. Special attorneys may conduct any type of legal proceeding regardless of district of residence because of 28 U.S.C. § 515. As the Supreme Court has noted, specific statutes control over general statutes, regardless of the date of enactment. *Bulova Watch Co. v. United States*, 365 U.S. 753, 758 (1961). The more specific statute, which deals with special attorneys, allows for prosecution regardless of the special attorney's residency. Because the USA and AUSAs in the Western District USA were

-17-

special attorneys in this case, they had the authority to prosecute Sigillito in the Eastern District USA. Thus, Sigillito's argument on this point fails.

### 3. Brady *Violations*

Sigillito argues on appeal that the district court failed to grant his motion for a new trial; however, his motion for a new trial never included arguments relating to alleged *Brady* violations. Thus, we review these claims for plain error. *See United States v. Payton*, 636 F.3d 1027, 1039 (8th Cir. 2011) ("Because [Defendant] failed to raise his *Brady* claim before the district court, we review for plain error." (citation omitted)). "To prevail on a plain error standard, [Sigillito] must show that the court committed an error that was plain, that affected his substantial rights, and that seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 1039–40 (quotation and citation omitted).

In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. "To show a *Brady* violation, the defendant must establish that (1) the evidence was favorable to the defendant, (2) the evidence was material to guilt, and (3) the government suppressed evidence." *United States v. Ladoucer*, 573 F.3d 628, 636 (8th Cir. 2009) (quotation, alteration, and citation omitted). We have determined that "materiality is evaluated neither under a sufficiency of the evidence test nor by the mere possibility that it might have influenced the jury, but rather by how the government's case would have looked had the defense had access to the undisclosed information." *United States v. Haskell*, 468 F.3d 1064, 1075 (8th Cir. 2006) (citation omitted). In other words, "[o]mitted evidence is material where it creates a reasonable doubt that did not otherwise exist." *United States v. Wadlington*, 233 F.3d 1067, 1076 (8th Cir. 2000) (quotations and citations omitted). *Brady* applies even when the defendant does not specifically request the covered information. *United States v. Gonzales*, 90 F.3d 1363,

-18-

1368 (8th Cir. 1996). One of the limits of *Brady* is that it does not cover "information available from other sources or evidence already possessed by a defendant." *United States v. Jones*, 160 F.3d 473, 479 (8th Cir. 1998) (citation omitted). We consider undisclosed *Brady* material collectively to determine if nondisclosure undermines confidence in the verdict. *Gonzales*, 90 F.3d at 1368.

The Court has extended *Brady* protection to witness-credibility evidence when the reliability of the witness "may well be determinative of guilt or innocence." *Giglio v. United States*, 405 U.S. 150, 154 (1972) (quotation and citation omitted). One reason for this extension to witness-credibility evidence is because "exposure of a witness'[s] motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 316–17 (1974) (citation omitted). We have determined that witness motivations, like the payment of money as an incentive to change testimony, fall within the *Brady* disclosure requirement. *United States v. Librach*, 520 F.2d 550, 554 (8th Cir. 1975). Furthermore, the prosecutor must disclose the possibility of a reward that gives the witness a personal stake in the defendant's conviction. *United States v. Bagley*, 473 U.S. 667, 683 (1985).

### a. Brady *Disclosures Involving Stajduhar*

Sigillito claims that the government committed three separate *Brady* violations relating to Stajduhar's testimony. First, the government failed to provide information of her plea agreement by the time of her suppression hearing. Second, the government failed to disclose that her embezzlement continued beyond 2008 and into 2009 and 2010. Third, the government failed to disclose that Stajduhar embezzled $80,000 from investor funds rather than $12,000.

We reject Sigillito's first argument regarding the government's failure to disclose Stajduhar's plea deal. Stajduhar's presence at the suppression hearing should have indicated to Sigillito that a plea deal had been reached. Sigillito could have cross-

Appellate Case: 13-1027    Page: 19    Date Filed: 07/18/2014 Entry ID: 4176736

examined Stajduhar regarding potential plea deals. We do not believe that any potential error here "seriously affect[ed] the fairness, integrity or public reputation of" the suppression hearing. *See Payton*, 636 F.3d at 1039–40 (quotation and citation omitted). We also reject the argument that this "evidence was material to [Sigillito's] guilt." *See Ladoucer*, 573 F.3d at 636 (quotation and citation omitted).

As for Sigillito's second and third *Brady* accusations relating to Stajduhar, Stajduhar admitted at trial during cross-examination that her embezzlement continued into 2009 and 2010 and involved $80,000 in investor funds rather than $12,000. The government correctly notes that Sigillito admitted in his brief that the government provided Sigillito thousands of pages of documents in discovery, which contained the information that he now claims he never received. Importantly, he admitted to uncovering this information in the documents that the government provided, for he cross-examined Stajduhar at trial on the extent of her embezzlement. Thus, we reject Sigillito's *Brady* arguments relating to Stajduhar.

### b. Brady *Disclosures Involving Promises of Restitution to Victims*

Sigillito also contends that the government failed to inform him of its statements to witnesses—many of whom testified against Sigillito at trial—that they may receive proceeds from the sale of Sigillito's forfeited assets if Sigillito was convicted. Sigillito supports his allegation with affidavits from victims who testify to these discussions. Sigillito agrees that the government promised mere "pennies or nickels on the dollar" at most. The government counters by noting that Sigillito should have known that victims would receive restitution because restitution is mandatory under 18 U.S.C. § 3663A. Sigillito responds by noting that the government's promises involved forfeited assets, not restitution. Unlike restitution, proceeds from the sale of forfeited assets may be given to victims at the Attorney General's discretion. 18 U.S.C. § 1963(g)(1).

-20-

We reject Sigillito's *Brady* argument even if the government promised victims proceeds from the sale of forfeited assets. Sigillito conceded the following in his brief:

> Because these witnesses had lost money and in many instances presented a superficial sympathetic persona, cross-examination was necessarily somewhat tentative to avoid alienating the jury. Had the defense known the witnesses were told by prosecutors they might be compensated if Defendant were convicted and therefore had a motive to lie or embellish his/her testimony, cross-examination would have been considerably more vigorous.

Sigillito's statements are significant because they demonstrate that Sigillito wanted to cross-examine these victim witnesses in a manner that would avoid "alienating the jury." The concern for jury alienation is not diminished when a victim witness may receive mere "pennies or nickels on the dollar" from a large original investment that Sigillito squandered. It strains credulity that Sigillito's counsel would have pursued a "considerably more vigorous" cross-examination strategy of these witnesses, as their meager rewards would not render them any less sympathetic. Furthermore, the fact that the witnesses may receive proceeds from forfeiture rather than restitution does not mitigate Sigillito's concern about alienating the jury. In both situations, the victims were going to lose significant amounts of money as a result of the BLP scheme. Thus, we reject Sigillito's contention because any error would not have "seriously affect[ed] the fairness, integrity or public reputation of" the trial. *See Payton*, 636 F.3d at 1039–40 (quotation and citation omitted). Additionally, we conclude that this was not evidence material to Sigillito's guilt. *See Ladoucer*, 573 F.3d at 636.

### c. *Post-Appeal* Brady *Claims*

After the filing of briefs in this case, Sigillito filed a motion to stay this appeal and remand the case to the district court for a ruling on Sigillito's discovery of alleged new *Brady* violations. We denied the motion "without prejudice to the issue raised by

-21-

th[e] [m]otion being reconsidered by the panel to which the appeal is submitted for disposition on the merits." Sigillito claims that O'Sullivan's brother, Tom O'Sullivan ("Tom"), telephoned Sigillito's attorney to inform him that O'Sullivan offered fabricated testimony at trial with the government's knowledge. O'Sullivan testified at trial about speaking with Tom regarding investment in the BLP, but Tom contends that these conversations never happened. Furthermore, Tom contends that he told Special Agent Cosentino during the investigation that he never spoke with O'Sullivan about the BLP. Tom also claimed that Crowe told O'Sullivan that Sigillito was "legit." Sigillito avers that this evidence is significant because it impeaches O'Sullivan's credibility and reveals that Crowe discussed the matter with O'Sullivan, revealing a strategy to cover up Crowe's endorsement of Sigillito and the BLP.

We reject the merits of Sigillito's argument. First, the government correctly points out that O'Sullivan's discussions about the BLP with Tom have no bearing upon whether Sigillito made fraudulent statements to her about the BLP. While Sigillito could have impeached her, he has already admitted to a trial strategy of not impeaching the victims aggressively so as to avoid alienating the jury. Second, the government's case against Sigillito would remain strong despite impeachment of O'Sullivan, for several other victims testified as to Sigillito's misrepresentations. Third, the newly discovered evidence is inherently contradictory. Tom claims that he never discussed the BLP with O'Sullivan, yet he also claims that O'Sullivan informed him that Crowe thought Sigillito and the BLP were "legit." Thus, we reject these late-blooming *Brady* allegations on the merits.

#### 4. *Investigative Misconduct*

Sigillito contends that the district court abused its discretion in refusing to grant him a new trial based on various allegations of prosecutorial misconduct, which resulted in a violation of his right to due process. "We review a district court's denial of a motion for new trial for a clear and manifest abuse of discretion." *United States v. Anthony*, 537 F.3d 863, 867 (8th Cir. 2008) (quotation and citation omitted).

-22-

a. *The Letter to Potential Victims*

Five months after Sigillito's indictment, the government sent a letter to all identifiable, potential victims of the BLP. Sigillito contends that this letter disclosed non-public information, expressed the personal opinions of the AUSAs, vouched for the veracity of Smith and Brown, and improperly impugned defense counsel. For example, Sigillito takes issue with the letter's disclosure of Brown's and Smith's guilty pleas, which require them to "provide complete and truthful cooperation." The letter also warned its recipients that Sigillito's attorney may contact them, but that anything they said could be used in court. Thus, the letter reminded its recipients that they are not required to speak with Sigillito's attorney. The letter also explicitly stated that Sigillito had a right to a trial and is presumed innocent until proven guilty.

The Supreme Court has noted:

> The United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935). As a result, "[i]mproper vouching may occur when the government expresses a personal opinion about credibility, implies a guarantee of truthfulness, or implies it knows something the jury does not." *Bass v. United States*, 655 F.3d 758, 761 (8th Cir. 2011) (quotation and citation omitted). However, "[i]t is well established that prosecutors may admit plea agreements, even those which include truthfulness provisions, without violating the

-23-

dictates against vouching." *United States v. Jones*, 468 F.3d 704, 707 (10th Cir. 2006) (citations omitted). Additionally, a prosecutor strikes a foul blow when the prosecutor suggests conspiracy with the defense counsel or launches personal attacks on the defense counsel's integrity. *United States v. Holmes*, 413 F.3d 770, 775 (8th Cir. 2005).

Sigillito's argument that this letter violated his due-process rights such that he deserves a new trial fails for four reasons. First, as to vouching, the government merely informed the letter's recipients that Brown and Smith pleaded guilty and entered agreements that require them to present truthful testimony. The letter never identifies specific testimony and labels it as "truth." Furthermore, the government disclosed the fact and effect of the plea bargain, which does not offend the government's obligation not to vouch improperly for witnesses. *See Jones*, 468 F.3d at 707. Second, Sigillito fails to demonstrate how the letter disparages defense counsel. It merely informs its recipients that they are not required to speak with Sigillito's attorney. Nowhere does it indicate that Sigillito's counsel is untruthful or immoral, or otherwise cast any aspersion on his integrity or competence. Third, in each case that Sigillito cites in his brief, the court warned against impugning the defense or commenting on the veracity of witnesses in front of the jury. *See, e.g.*, *Jones*, 468 F.3d at 707. The jury never considered this letter. The veracity of witnesses to other witnesses is of minimal importance, for the *jury* is tasked with considering the veracity of witnesses in court. *See United States v. Meads*, 479 F.3d 598, 602 (8th Cir. 2007) ("Credibility is always an issue for the jury to determine." (citation omitted)). Finally, federal law requires the government to provide victims of a crime with this information and explain, among other things, "the status of the investigation of the crime" and "the acceptance of a plea of guilty or nolo contendere or the rendering of a verdict after trial." 42 U.S.C. § 10607(c)(3)(A),(F). Sigillito fails to provide any authority or argument that compliance with this statutory requirement violates his due-process rights.

-24-

Sigillito's argument relating to the disclosure of non-public information and expression of the AUSAs' personal opinions also fails. Sigillito never explains how the AUSAs expressed a personal opinion. After our independent review of the letter, we find no improper opinions. Additionally, § 10607(c)(3)(F) requires the government to disclose the non-public information of Brown's and Smith's guilty pleas. As the government properly notes, this information was provided to several private victims, not publicly disclosed. Thus, we reject Sigillito's arguments pertaining to this letter.

### b. *Other Alleged Misconduct*

Sigillito also asserts on appeal that the government improperly (1) intimidated Sigillito's wife in order to convince her to provide evidence against him, (2) threatened prosecution against a member of the Anglican Church because of his attempts to raise money for Sigillito's defense, (3) threatened to expedite return of the indictment if Sigillito or his wife spoke to potential witnesses, and (4) implicitly threatened defense counsel with prosecution. The district court denied these contentions because Sigillito failed to provide anything other than bare assertions of these alleged improper behaviors or cited any convincing authority to support his claims.

We agree with the district court. Sigillito still fails to present any law in support of his contentions, and we "regularly decline[ ] to consider cursory or summary arguments unsupported by facts or legal authorities." *Butler v. Crittenden Cnty., Ark.*, 708 F.3d 1044, 1051 (8th Cir. 2013) (quotation and citation omitted). As a result, Sigillito fails to provide the court with any basis by which to accept these arguments, and he also fails to provide good reason why this court should grant him leave to supplement the record. We thus reject these contentions.

### B. *Alleged Errors Committed During Trial*

Sigillito argues that the district court erred in its (1) failure to submit the determination of the maximum amount of forfeitable property to the jury; (2) failure to grant a motion for new trial where the government allegedly commented improperly

Appellate Case: 13-1027   Page: 25   Date Filed: 07/18/2014 Entry ID: 4176736

on Sigillito's credibility; (3) restrictions on cross-examination of certain witnesses that thwarted the potential to show witness bias or Sigillito's lack of intent; and (4) giving of a willful blindness instruction.

1. *Submission of the Maximum Amount of Forfeitable Property to a Jury*

Approximately two months after trial, the Supreme Court decided *Southern Union Co. v. United States*, holding that *Apprendi*[6] extends to criminal fines such that a jury must determine any fact, other than a prior conviction, that increases the criminal defendant's maximum potential fine. 132 S. Ct. 2344, 2348–49 (2012). Sigillito argues that the district court erred in failing to submit to a jury the total amount that Sigillito was to forfeit, in light of *Southern Union*. Sigillito contends that, because the Court has also determined that criminal forfeitures qualify as a "fine," *United States v. Bajakajian*, 524 U.S. 321, 328 (1998), a jury should have determined the total amount forfeited based upon the underlying facts, like "the amount of [Sigillito's] gain or the victim's loss." *S. Union*, 132 S. Ct. at 2351. Sigillito did not elect to have a jury determine the forfeitability of specific properties pursuant to Federal Rule of Criminal Procedure 32.2(b)(5)(A). Thus, we review this challenge on appeal for plain error. *See United States v. Hively*, 437 F.3d 752, 763 (8th Cir. 2006); *see also United States v. Lara-Ruiz*, 721 F.3d 554, 557 (8th Cir. 2013) (reviewing for plain error a defendant's argument based on *United States v. Alleyne*, 133 S. Ct. 2151 (2013), where the Court decided *Alleyne* while defendant's case was pending appeal).

The government relies on *Libretti v. United States*, 516 U.S. 29 (1995), a pre-*Apprendi* Supreme Court case. The defendant in *Libretti* "challenge[d] the adequacy of his waiver of a jury determination as to the forfeitability of his property under Federal Rule of Criminal Procedure 31(e)." *Id.* at 48. He argued that he could not waive such a right without certain protections because the right to a jury determination of forfeiture was constitutional in nature. *Id.* The Court held otherwise, noting:

_____

[6]*Apprendi v. New Jersey*, 530 U.S. 466 (2000).

-26-

> [O]ur analysis of the nature of criminal forfeiture as an aspect of sentencing compels the conclusion that the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection. Our cases have made abundantly clear that a defendant does not enjoy a constitutional right to a jury determination as to the appropriate sentence to be imposed. See, *e.g.*, *McMillan v. Pennsylvania*, 477 U.S. 79, 93, 106 S.Ct. 2411, 2420, 91 L.Ed.2d 67 (1986) ("[T]here is no Sixth Amendment right to jury sentencing, even where the sentence turns on specific findings of fact"); *Cabana v. Bullock*, 474 U.S. 376, 385, 106 S.Ct. 689, 696, 88 L.Ed.2d 704 (1986) ("The decision whether a particular punishment . . . is appropriate in any given case is not one that we have ever required to be made by a jury"); *Spaziano v. Florida*, 468 U.S. 447, 459, 104 S.Ct. 3154, 3161, 82 L.Ed.2d 340 (1984) (no right to a jury determination as to the imposition of the death penalty).

*Id.* at 49. Consequently, "the right to a jury determination of forfeitability is merely statutory in origin." *Id.* The government contends that *Libretti* forecloses Sigillito from arguing that the Sixth Amendment required the district court to submit the issue of forfeiture to the jury.

Sigillito responds by arguing that *Apprendi* and its progeny—particularly *Southern Union* and *Alleyne*—implicitly overrule *Libretti*. Sigillito notes that the Court has defined "statutory maximum" under *Apprendi* as "'the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.'" *Southern Union*, 132 S. Ct. at 2350 (quoting *Blakely v. Washington*, 542 U.S. 296, 303 (2004)). Sigillito therefore argues that "the 'statutory maximum' as defined in *Southern Union* is not limited to a maximum imposed by a statute, but rather defines maximum in terms of facts reflected in the jury verdict or admitted by defendant." Because the maximum amount of forfeitable property relies on factual findings like the amount that Sigillito gained, a jury should have determined the property to be forfeited. Sigillito further buttresses his argument by noting that the Court in *Alleyne* called into question *McMillan's* validity post-*Apprendi*. *See Alleyne*, 133 S. Ct. at 2157–58. Of course, the Court cited *McMillan* in *Libretti* in support of

-27-

its proposition that the Sixth Amendment does not require submission of criminal forfeiture to a jury. *See Libretti*, 516 U.S. at 49.

We nonetheless reject Sigillito's argument that the district court committed plain error in failing to have the jury determine the maximum amount of forfeitable property. First, we are compelled to apply *Libretti* and its determination that the Sixth Amendment does not require a jury verdict on criminal forfeitures. *See id.* We have acknowledged that "[t]he Supreme Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*." *Northport Health Servs. of Ark., LLC v. Rutherford*, 605 F.3d 483, 490 (8th Cir. 2010) (quotation and citation omitted). Furthermore,

> the Supreme Court has frequently instructed, "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."

*Id.* at 491 (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)). Thus, *Libretti* controls.

Second, criminal forfeiture statutes prescribe no minimum or maximum punishments, which are the primary focus of *Apprendi* and its progeny. *See Alleyne*, 133 S. Ct. at 2155 (minimum sentences); *Apprendi*, 530 U.S. at 469 (maximum sentences). One court has explained:

> "We have previously held that *Apprendi* has no effect on criminal forfeiture proceedings because forfeiture provisions have no statutory maximum. *Apprendi 's* statutory maximum was supplied by the statute of conviction . . . . The criminal forfeiture provisions do not include a statutory maximum; they are open-ended in that all property representing proceeds of illegal activity is subject to forfeiture."

-28-

*United States v. Fruchter*, 411 F.3d 377, 383 (2d Cir. 2005) (quoting *United States v. Messino*, 382 F.3d 704, 713 (7th Cir. 2004)). As a result, "[a] judge cannot exceed his constitutional authority by imposing a punishment beyond the statutory maximum if there is no statutory maximum. Criminal forfeiture is, simply put, a different animal from determinate sentencing." *Id.* The *Southern Union* Court reiterated this principle by stating that there can be no "*Apprendi* violation where no maximum is prescribed." *Southern Union*, 132 S. Ct. at 2353. Thus, although criminal forfeitures are like fines in that they constitute punishment, they are unlike the fine in *Southern Union* that involved a statutory maximum amount. *See id.* at 2349 (allowing a fine of up to $50,000 for each day of violation).

Finally, other circuits that have considered this issue have all concluded that neither *Southern Union* nor *Alleyne* applies to criminal forfeitures, so *Libretti* continues to control. *See United States v. Wilkes*, 744 F.3d 1101, 1109 (9th Cir. 2014) (*Southern Union* and *Alleyne*); *United States v. Simpson*, 741 F.3d 539, 560 (5th Cir. 2014) (*Southern Union*); *United States v. Johnson*, 540 F. App'x 573, 575 (9th Cir. 2013) (*Alleyne*); *United States v. Torres*, 531 F. App'x 964, 973 n.3 (11th Cir. 2013) (noting in dicta that *Libretti* controls); *United States v. Phillips*, 704 F.3d 754, 769 (9th Cir. 2012) (*Southern Union*); *United States v. Day*, 700 F.3d 713, 733 (4th Cir. 2012) (*Southern Union*). We join these circuits in holding that *Libretti* still controls, such that "the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection." *See Libretti*, 516 U.S. at 49.

### 2. *Improper Comments on Sigillito's Credibility*

Sigillito contends that the AUSA commented improperly on Sigillito's veracity during cross-examination and disparaged Sigillito during closing arguments. Sigillito did not object on these grounds to the district court, so we review for plain error. *See United States v. Poitra*, 648 F.3d 884, 887 (8th Cir. 2011).

Appellate Case: 13-1027   Page: 29   Date Filed: 07/18/2014 Entry ID: 4176736

We must determine whether the comments were actually improper and, if so, whether they prejudiced Sigillito so as to deprive him of a fair trial. *Wadlington*, 233 F.3d at 1077. In analyzing prejudice, "we consider: 1) the cumulative effect of the misconduct; 2) the strength of the properly admitted evidence; and 3) the curative actions taken by the district court." *Id.* (citation omitted). The Supreme Court has characterized the test as whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quotation and citation omitted). Generally, the prosecutor may not provide a personal opinion of the defendant's veracity. *United States v. White*, 241 F.3d 1015, 1023 (8th Cir. 2001). The prosecutor may nonetheless use "'colorful pejoratives' and argue a personal interpretation of the evidence" during closing. *Id.* (quoting *United States v. Shoff*, 151 F.3d 889, 893 (8th Cir. 1998)).

We reject Sigillito's argument that the AUSA commented improperly during closing argument about Sigillito's character. Sigillito fails to specify the statements that were improper. He attributes this deficiency to the district court's refusal to order a transcript so that he could effectively raise this issue. The government contends that Sigillito objected only once during closing, and the district court sustained the objection. In any event, Sigillito failed to present this argument with the requisite specificity to enable us to find in his favor.

As for the AUSA's allegedly improper cross-examination of Sigillito, Sigillito contends that the AUSA "clearly inferred that, in his opinion, [Sigillito] was a liar." The record of the exchange between the AUSA and Sigillito reveals nothing improper:

> Q.    And do you recall [your wife] testifying that she had a loan that she believed was in the amount of $175,000 and that she believed that the money that she had loaned had been sent to Derek Smith in England and was with him and had been used for that purpose? Do you recall that?

-30-

A.    I recall she said that, sir.

Q.    Okay, so my question to you is, were you deceiving your wife as well as the lenders as to where the money was going?

A.    No, sir, I was not.

Q.    So how did she get that understanding if not from you?

A.    I do not know.

Q.    Is there anyone else that she dealt with in the BLP besides you in order to make that loan?

A.    No, there is not.

Q.    She wasn't making that up, was she?

A.    I don't believe my wife makes up anything.

As the transcript demonstrates, the AUSA did nothing improper by calling Sigillito's credibility into question in this manner. We therefore find no error plain or otherwise.

### 3. *Cross-Examination Restrictions*

The government submitted a motion in limine before trial that sought to prevent Sigillito from questioning O'Sullivan about her kinship to Crowe and the Eastern District USA. The government also sought to exclude testimony from Brown and Smith regarding their efforts to create a new entity to control the BLP's assets, which, Sigillito contends, supports his theory of the case that Smith's properties had value such that Sigillito did not misrepresent facts relating to Smith's solvency. The district court granted the government's motion. The district court determined that evidence of O'Sullivan's relationship with Crowe was irrelevant under Federal Rules of Evidence 401 and 402 and substantially outweighed by the danger of unfair prejudice and confusion of issues under Rule 403. The district court also determined that evidence

-31-

of Brown's and Smith's alleged intention to create a new entity to control the BLP's assets after the search of Sigillito's office was irrelevant under Rules 401 and 402. Sigillito takes issue with both of these findings.

"We review a district court's evidentiary rulings for clear abuse of discretion, reversing only when an improper evidentiary ruling affected the defendant's substantial rights or had more than a slight influence on the verdict. We review Confrontation Clause objections to the admission of evidence de novo." *United States v. Watson*, 650 F.3d 1084, 1088 (8th Cir. 2011) (quotation and citations omitted).

Federal Rule of Evidence 401 provides that "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Furthermore, "[i]rrelevant evidence is not admissible." Fed. R Evid. 402. Finally, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice [and] confusing the issues." Fed. R. Evid. 403.

Confrontation Clause issues arise when a district court restricts the scope of cross-examination, for restrictions can "effectively emasculate the right of cross-examination itself." *Watson*, 650 F.3d at 1088 (quotation and citation omitted). "The Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose . . . infirmities through cross-examination." *Id.* (quoting *Delaware v. Fensterer*, 474 U.S. 15, 22 (1985) (per curiam)). Furthermore, exposure of the witness's motivation for testifying is an important aspect in the constitutionally protected right of cross-examination. *United States v. Jasso*, 701 F.3d 314, 316 (8th Cir. 2012). Generally, "[w]here there are facts that would support a reasonable inference of bias that relates to a witness's credibility, the defendant should be permitted to make an effective inquiry into that bias." *Id.* (citation omitted). The Confrontation Clause, however, "guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever

-32-

extent, the defense might wish." *Id.* (quotation and citation omitted). Finally, cross-examination is "peculiarly appropriate" in mail-fraud cases. *Reilly v. Pinkus*, 338 U.S. 269, 276 (1949).

Although the right of cross-examination is strong, "[a] district court may impose reasonable limits on cross-examination based on concerns about prejudice or confusion of the issues." *Jasso*, 701 F.3d at 317 (citation omitted). This is especially true where the link between evidence sought to be presented and the defendant's guilt is attenuated. *Id.* These limits exist even where the subject matter is bias, for district courts retain "wide latitude" in imposing reasonable limits on the contents of cross-examination. *United States v. Drapeau*, 414 F.3d 869, 875 (8th Cir. 2005) (quotation and citation omitted). Additionally, the ability to cross-examine the witness through other means is a factor in considering whether the district court violated confrontation rights. *Id.*

### a. *O'Sullivan*

Sigillito contends that the district court erred in disallowing him to cross-examine O'Sullivan about her familial relationship to Crowe because that relationship suggests bias. We hold that the district court did not abuse its discretion in preventing Sigillito from cross-examining O'Sullivan about this relationship. In *Drapeau*, a district court prevented a defendant from cross-examining a witness about her sister's employment with the United States Attorney's Office that prosecuted the case and her husband's membership in the FBI task force that arrested the defendant because this information was a waste of time, confusing, and irrelevant. *Drapeau*, 414 F.3d at 875. We determined that the district court did not abuse its discretion because the sister was not in a decision making position at the United States Attorney's Office. *Id.* at 876. As in *Drapeau*, Sigillito has failed to demonstrate that Crowe exercised any type of decision making authority over this case or the personnel involved. Therefore, the district court acted within its "wide latitude" to prohibit such questioning. *See id.* at 875.

-33-

b. *Smith and Brown*

The district court also did not abuse its discretion in limiting the testimony of Smith and Brown regarding their consideration of creating a new business entity to hold the BLP's assets following the search of Sigillito's office. The government never contended that the BLP did not own assets; in fact, the problem with the BLP is that it owned significant assets that BLP representatives, like Sigillito, duped investors into providing. Such testimony would not demonstrate Smith's solvency whatsoever, much less negate Sigillito's misrepresentations as to the extent of the BLP's assets.

Sigillito also contends that the district court should have allowed him to cross-examine Smith regarding Smith's statements that Smith and Brown were working together to resolve the situation with the BLP. This testimony allegedly demonstrates that Sigillito did not intend the BLP to be a fraudulent scheme. However, we have previously discounted such arguments, stating that the following "fairly states the applicable law" in this circuit:

> On the other hand an honest belief on the part of the defendant that a particular business venture was sound and would ultimately succeed, would not in and of itself, constitute good faith as used in these instructions; if in carrying out that venture the defendant knowingly made false or fraudulent representations to others with a specific intent to deceive them.

*United States v. Cheatham*, 899 F.2d 747, 751 (8th Cir. 1990) (quoting jury instruction with approval). This testimony would have shown, at most, only that Smith, and by extension Sigillito, believed that the BLP would ultimately succeed. However, it would not negate the misrepresentations that Sigilitto articulated in carrying out the scheme. Thus, the district court did not err in limiting cross-examination in this manner.

-34-

## 4. *Willful Blindness Instruction*

Sigillito contends that the district court erred by providing a willful blindness instruction to the jury. He also asserts that this error compounded the prejudicial impact that he received from the cross-examination limitations. The government counters by arguing that the evidence supported the instruction such that it was not error for the district court to provide it. "We review the district court's jury instructions for abuse of discretion and will affirm if the instructions, taken as a whole, fairly and adequately submitted the issues to the jury." *United States v. Whitehill*, 532 F.3d 746, 751 (8th Cir. 2008) (quotation, alteration, and citation omitted).

The Supreme Court has noted that willful blindness instructions are appropriate when "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2070 (2011) (footnote omitted). We have held that "[a] willful blindness instruction is not appropriate if the evidence implies defendants could only have had either actual knowledge or no knowledge of the facts in question." *Whitehill*, 532 F.3d at 751 (quotation and citation omitted). Instead, "[i]f reasonable inferences support a finding the failure to investigate is equivalent to burying one's head in the sand, the jury may consider willful blindness as a basis for knowledge." *Id.* (quotation and citation omitted). This instruction is especially appropriate "when the defendant denies any knowledge of a criminal scheme despite strong evidence to the contrary." *United States v. Lewis*, 557 F.3d 601, 613 (8th Cir. 2009) (quotation and citation omitted). In evaluating a district court's decision to provide a willful blindness instruction, "we view the evidence and any reasonable inference from that evidence in the light most favorable to the government." *Id.* (quotation, alteration, and citation omitted).

Here, the evidence suggested strongly that Sigillito knew of the fraudulent misrepresentations when he made them despite his claims to the contrary. *See id.* at 613. Sigillito's claim that he was unaware of the fraudulent nature of the scheme

-35-

demonstrates that, if true, he was burying his head in the sand. *See Whitehill*, 532 F.3d at 751. The government correctly points out that Sigillito possessed the information needed to discover readily that the BLP was a Ponzi scheme. The government's brief summarizes it best:

> Sigillito claimed that he did not actually know the value of Smith's "assets" and relied on others for the information. However, he also claimed he was conducting due diligence as represented to lenders. If the latter were true, he had to be deliberately ignorant not to conclude that Smith's assets had little or no current value. Similarly, Sigillito claimed that he did not know the full amount of Smith's BLP liability. Stajduhar testified that she prepared spreadsheets at his direction and provided them to Sigillito, but Sigillito claimed not to have reviewed them. If the jury believed both Sigillito and Stajduhar on this issue, it could still have found that Sigillito's ignorance was deliberate.

As a result, the district court did not abuse its discretion in providing the willful blindness instruction. The evidence showed that if Sigillito lacked knowledge, it was because he deliberately avoided acquiring it.

## C. *Sentencing Errors*

Sigillito asserts two primary challenges to his sentence. First, he contends that the district court miscalculated the amount of loss and erroneously applied the vulnerable-victim enhancement. Second, he avers that his sentence was substantively unreasonable.

"We review interpretation of the Sentencing Guidelines de novo and a district court's application of the Guidelines to the facts for clear error. We review all sentences, including sentences that vary from the Guidelines, for an abuse of discretion." *United States v. Rutherford*, 599 F.3d 817, 820 (8th Cir. 2010) (citations omitted). "A district court abuses its discretion when it (1) fails to consider a relevant factor that should have received significant weight; (2) gives significant weight to an

-36-

improper or irrelevant factor; or (3) considers only the appropriate factors but in weighing those factors commits a clear error of judgment." *United States v. Feemster*, 572 F.3d 455, 461 (8th Cir. 2009) (en banc) (quotations and citation omitted).

"We review a sentence in two parts: first, we review for significant procedural error, such as an improper calculation of the advisory sentencing guidelines range; and second, absent significant procedural error, we review for substantive reasonableness." *United States v. Barker*, 556 F.3d 682, 689 (8th Cir. 2009) (quotation and citation omitted).

## 1. *Procedural Errors*

The district court determined Sigillito's adjusted offense level to be 47. Sigillito contends on appeal that the district court committed two procedural errors when calculating his offense level. He first disputes the district court's amount-of-loss calculation as exceeding $50 million, which resulted in a 24-level increase in his offense level. *See* U.S.S.G. § 2B1.1(b)(1)(M). Sigillito asserts that he should receive an amount-of-loss credit because he returned some of the money to investors, resulting in a loss of approximately $25 million. Sigillito thus implies that he should have received only a 22-level increase in his offense level. *See* U.S.S.G. § 2B1.1(b)(1)(L). Sigillito next disputes the district court's application of the two-level vulnerable-victim enhancement. *See* U.S.S.G. § 3A1.1(b)(1). He contends that the evidence did not support application of this two-level enhancement because the victim in question "simply was not a vulnerable victim."

Procedural errors, like the miscalculation of a defendant's offense level, are subject to harmless-error review. *United States v. Henson*, 550 F.3d 739, 740–41 (8th Cir. 2008). "A procedural error at sentencing is harmless if it does not affect substantial rights." *United States v. Woods*, 717 F.3d 654, 659 (8th Cir. 2013) (quotation and citation omitted).

-37-

If we agreed with Sigillito that the district court committed these procedural errors, we would reduce Sigillito's adjusted offense level by four levels. This would result in a new adjusted offense level of 43. The Guidelines sentencing chart reveals that Sigillito's recommended Guidelines range would be life imprisonment at either an offense level of 47 or 43, for an offense level of 43 is the highest level that the Guidelines sentencing chart contemplates. *See United States v. Starr*, 533 F.3d 985, 1003 (8th Cir. 2008) ("Because of [Defendant's] high offense level, his advisory range is higher than the sentencing chart accounts for—he has a total offense level of 47, and the highest offense level on the chart is 43. At that offense level, the sentencing chart recommends a life sentence."). Because these additional four levels would not change Sigillito's Guidelines range, any alleged error here was harmless. Consequently, we reject Sigillito's challenges relating to the calculation of his offense level.

## 2. *Substantive Reasonableness*

Finally, Sigillito contends that his sentence is substantively unreasonable because Brown and Smith received significantly less punishment. Smith received only probation, and Brown received 36 months' imprisonment. Sigillito also avers that the district court sentenced him to 40 years' imprisonment despite the highest statutory maximum of 20 years' imprisonment. We presume that sentences within the Guidelines range are substantively reasonable. *United States v. Huston*, 744 F.3d 589, 593 (8th Cir. 2014). We reject both of Sigillito's arguments.

The district court sentenced Sigillito to 40 years' imprisonment, which the district court intended to be a life sentence as the Guidelines recommended. As for Sigillito's first argument, the district court properly considered several 18 U.S.C. § 3553(a) factors. Furthermore, unlike Sigillito, Brown and Smith cooperated with the government and pleaded guilty.

-38-

Second, Sigillito erroneously contends that the total punishment that a district court imposes should be less than the statutory maximum for the count with the highest statutory maximum. This is an erroneous interpretation of the law. Instead, a district court has broad authority to impose a consecutive sentence. *Rutherford*, 599 F.3d at 820. Notably, "the 'total punishment' imposed by the district court . . . *on each count* should generally be less than the statutory maximum for the count with the highest statutory maximum." *Id.* (emphasis added). Sigillito argues erroneously that his total punishment *for all counts* should not exceed the statutory maximum for the count with the highest maximum. Sigillito's argument ignores the authority of district courts to adjust consecutive and concurrent sentences to achieve an appropriate sentence under the law for the subject defendant. *See United States v. Demeyer*, 665 F.3d 1374, 1375 (8th Cir. 2012) (per curiam) ("[I]t is not for us to micro-manage how the district court exercised its discretion to impose concurrent or consecutive sentences for the multiple counts of conviction in order to ensure that [defendant] would in fact serve a life sentence."). Thus, we reject Sigillito's arguments relating to the substantive reasonableness of his sentence.

### III. *Conclusion*

Accordingly, we affirm the judgment of the district court.

_____

Appellate Case: 13-1027    Page: 39    Date Filed: 07/18/2014 Entry ID: 4176736

# United States Court of Appeals
## *For The Eighth Circuit*
Thomas F. Eagleton U.S. Courthouse
111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

VOICE (314) 244-2400
FAX (314) 244-2780
www.ca8.uscourts.gov

**Michael E. Gans**
*Clerk of Court*

July 18, 2014

West Publishing
Opinions Clerk
610 Opperman Drive
Building D D4-40
Eagan, MN 55123-0000

    RE: 13-1027 United States v. Martin Sigillito

Dear Sirs:

    A published opinion was filed today in the above case.

    Counsel who presented argument on behalf of the appellant was Douglas P. Roller, of Saint Louis, MO. The following attorney(s) appeared on the appellant brief; Douglas P. Roller, of Saint Louis, MO.

    Counsel who presented argument on behalf of the appellee was Richard E. Finneran, Spec. Attorney to the U.S. Attorney General, of Saint Louis, MO. and Jess E. Michaelsen, Spec. Attorney to the U.S. Attorney General, of Kansas City, MO. The following attorney(s) appeared on the appellee brief; Jess E. Michaelsen, Spec. Attorney to the U.S. Attorney General, of Kansas City, MO., Steven E. Holtshouser, Spec. Attorney to the U.S. Attorney General, of St. Louis, MO., and Richard E. Finneran, Spec. Attorney to the U.S. Attorney General, of Saint Louis, MO.

    The judge who heard the case in the district court was Honorable Linda R. Reade. The judgment of the district court was entered on December 28, 2012.

    If you have any questions concerning this case, please call this office.

        Michael E. Gans
        Clerk of Court

LMT

Enclosure(s)

cc:  Lois Law
     MO Lawyers Weekly

District Court/Agency Case Number(s):  4:11-cr-00168-LRR-1

# United States Court of Appeals
### *For The Eighth Circuit*
###### Thomas F. Eagleton U.S. Courthouse
###### 111 South 10th Street, Room 24.329
### St. Louis, Missouri 63102

Michael E. Gans
*Clerk of Court*

**VOICE (314) 244-2400**
**FAX (314) 244-2780**
**www.ca8.uscourts.gov**

July 18, 2014

Mr. Douglas P. Roller
ROLLER LAW FIRM
Suite 207
10702 Manchester Road
Saint Louis, MO  63122

   RE:  13-1027  United States v. Martin Sigillito

Dear Counsel:

   The court has issued an opinion in this case. Judgment has been entered in accordance with the opinion. The opinion will be released to the public at 10:00 a.m. today. Please hold the opinion in confidence until that time.

   Please review Federal Rules of Appellate Procedure and the Eighth Circuit Rules on post-submission procedure to ensure that any contemplated filing is timely and in compliance with the rules. Note particularly that petitions for rehearing and petitions for rehearing en banc <u>must</u> be received in the clerk's office within 14 days of the date of the entry of judgment. Counsel-filed petitions must be filed electronically in CM/ECF. Paper copies are not required. No grace period for mailing is allowed, and the date of the postmark is irrelevant for pro-se-filed petitions. Any petition for rehearing or petition for rehearing en banc which is not received within the 14 day period for filing permitted by FRAP 40 may be denied as untimely.

         Michael E. Gans
         Clerk of Court

LMT

Enclosure(s)

cc: Mr. Richard E. Finneran
   Mr. Jess E. Michaelsen
   Martin T. Sigillito
   Mr. James G. Woodward

   District Court/Agency Case Number(s):  4:11-cr-00168-LRR-1